1                   UNITED STATES DISTRICT COURT FOR
                        THE DISTRICT OF MARYLAND
2

3  --------------------------x
   UNITED STATES OF AMERICA   :
4            Plaintiff        :
                              :
5                             :
   vs                         :Criminal Action: AW-09-048
6                             :
                              :
7  LLOYD MACK ROYAL, III,     :
              Defendant.      :
8  --------------------------x

9
                              Monday, July 19, 2010
10                            Greenbelt, Maryland

11      The above-entitled action came on for a Sentencing
   Hearing Proceeding before the HONORABLE ALEXANDER
12 WILLIAMS, Jr., United States District Judge, in courtroom
   4A, commencing at 10:02 a.m.
13

14
           APPEARANCES:
15
           On behalf of the Plaintiff:
16
           JAMES F. FELTE, Jr., Esquire
17

18         On behalf of the Defendant:

19         HARRY J. TRAINOR, Jr., Esquire

20

21

22

23

24
   Tracy Rae Dunlap, RPR, CRR            (301) 344-3912
25 Official Court Reporter

1                          **I N D E X**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24                                          <u>Page</u>

25 Reporter's Certificate                    37

1          THE COURT:  All right.  Let's call this case.

2          MR. FELTE:  Your Honor, this is the case of United

3 States against Lloyd Mack Royal, III, docket AW-09-048.

4          Jim Felte from the Department of Justice Civil

5 Rights Division for the government, Your Honor.

6          MR. TRAINOR:  Harry Trainor representing Lloyd

7 Royal, who is present on my left this morning.

8          THE COURT:  All right.  What are the issues that I

9 need to resolve under the guidelines?  Do we want to hear

10 first from Mr. Trainor?

11         MR. TRAINOR:  Well, thank you.

12         THE COURT:  Have you all had discussions?  Is

13 there anything that is still pending or you worked out?

14         MR. TRAINOR:  We haven't worked out our guidelines

15 issues.  I think each of us has something to say on that.

16         MR. FELTE:  I guess just -- except one issue.  As

17 far as the government initially argued that the old

18 guidelines, the -- excuse me.  The current guidelines in

19 2009-2010 would apply.  After the government filed its

20 objection, the Fourth Circuit actually ruled on an issue

21 similarly on point to that in United States versus Lewis,

22 606 F 3d, 193, cited at the end of May 2010.  That is

23 contrary to the government's position on that.

24         THE COURT:  All right.  So the government concedes

25 that the present guidelines --

1          MR. FELTE:  Yes.

2          THE COURT:  So we're dealing with that.

3          MR. TRAINOR:  So the base offense level would be

4  24 on the first four counts, I suppose.

5          THE COURT:  All right.

6          MR. TRAINOR:  Your Honor, one thing I would like

7  to argue is against the adjustment for vulnerable victim

8  under 3(a)(1.1).  The defendant is also getting a two

9  level enhancement under the offense guideline

10  1.3(b)(2)(B) for unduly influencing a minor.  And then if

11  we apply 3(a)(1.1), that would give him two additional

12  levels for a particularly vulnerable victim, or unusually

13  vulnerable due to age.  But if we look at the application

14  note under 3(a)(1.1).  And that's application note two,

15  and in my book it's the second paragraph, it indicates --

16          THE COURT:  3(a)- what?

17          MR. TRAINOR:  (1.1).

18          THE COURT:  Uh-huh.

19          MR. TRAINOR:  In the application note two,

20  Paragraph two:  Do not apply subsection (b) if the factor

21  that makes the person a vulnerable victim is incorporated

22  in the offense guideline.  For example, if the offense

23  guideline provides an enhancement for the age of the

24  victim, this subsection would not be applied unless the

25  victim was unusually vulnerable for reasons unrelated to

1 age.

2        And it's our position that the offense guideline

3 does just that, it -- if we look at the two levels he

4 gets under 2(g)(1.3)(2)(B) for undue influence of a

5 minor, it doesn't -- it seems to me that it would be

6 improper to give him two additional levels for an

7 unusually vulnerable victim which is based on age as

8 well.

9        THE COURT:  Do you have any cases, or is it just

10 your interpretation of that subsection?

11        MR. TRAINOR:  I'm arguing from the application

12 notes.  I don't have a case that says that Your Honor.

13        THE COURT:  All right.

14        MR. TRAINOR:  It is also -- that applies, I think,

15 to -- well, I've made that argument.

16        In addition, throughout for each group, the

17 defendant -- I believe it's each group -- the defendant

18 has an upward adjustment for obstruction of justice,

19 3(c)(1.1) by two levels.  We are objecting to that.  It's

20 clear from the presentence report that that adjustment is

21 based on Ms. Bentolila who testified in this case.  I

22 looked back -- I didn't have a transcript of her

23 testimony, but I looked back at my notes on that subject.

24 And the essence was at some point the defendant and --

25 both defendants, Ms. Bentolila and Mr. Royal, were in the

1 lockup.   Really, when they first came into federal

2 custody, they were in the lockup in this courthouse.

3        She testified that as she was led away by a deputy

4 U. S. marshal, the defendant said "Do the right thing and

5 don't snitch."   That is -- our position is that should

6 not rise to the level of obstruction of justice for an

7 additional two level increase.   We are objecting to that,

8 and that's the extent of my argument on that.

9        Another adjustment that we object to is the

10 2(g)(1.3)(b)(iii) two level upward adjustment for use of

11 a computer or interactive computer service.   Mr. Royal

12 never had a computer.   There was some bit of testimony

13 that one of the victims would talk to another one of the

14 victims on MySpace, but there is no -- there is no

15 testimony that I recall that Mr. Royal ever actually used

16 a computer or interactive service to further the offense.

17        I believe one of the victims contacted another of

18 the young ladies and arranged for her to meet with

19 Mr. Royal, but I don't believe the testimony rises to the

20 level of orchestrating, and I don't think -- it's our

21 position that he should not get the enhancement for two

22 levels on 2(g)(1.3)(B)(iii).

23        We argue as well that he should not receive a four

24 level role enhancement.   This -- if we look at the

25 factors that the Court has to consider, I think there are

1  seven factors that the Court has to consider in deciding

2  whether a role enhancement is appropriate under

3  organizer, leader, manager or supervisor.

4         It's hard to really see an organization here that

5  was -- in which Mr. Royal led any real planning or

6  organizing of the offense on any large scale.  The

7  offense itself -- the scope of the offense covers

8  approximately a three-week period in 2007.  There was

9  very little in the way of proceeds of the offense, if

10 any.  There was not really any organization or decision-

11 making authority.  It's our position that on the scale of

12 this offense and Mr. Royal's participation in it, at most

13 he should get a two level role increase for -- role

14 enhancement for his role in this offense.

15         THE COURT:  Well, what was his role?

16         MR. TRAINOR:  Well, you know, obviously he was one

17 of the leaders of this offense.

18         THE COURT:  Well, the evidence I saw is that it

19 was his show.

20         MR. TRAINOR:  Certainly, he had the strongest

21 personality of people involved in it.  But it was a very

22 short-term, disorganized, not very well planned or

23 extensive organization.  And I would submit on that role

24 argument Your Honor.

25         THE COURT:  All right.

1        MR. TRAINOR:  Finally, we reach the question of

2 the firearm and whether, I guess, that goes beyond

3 guidelines.  I was going to talk about --

4        THE COURT:  Well, that's a statutory --

5        MR. TRAINOR:  -- whether it's brandishing.

6        THE COURT:  Brandishing or firing.

7        MR. TRAINOR:  The jury found brandishing.

8        THE COURT:  Let's see what the government has to

9 say.  I understand that question on the sheet basically

10 said brandishing.  The jury found that he brandished it,

11 and I didn't see a question on firing.  We'll see what

12 the government says to that.

13        MR. TRAINOR:  Thank you, Your Honor.

14        THE COURT:  All right.  Government, do you have

15 any response to these five issues and then any issues

16 that the government has?

17        MR. FELTE:  Certainly, Your Honor.  Thank you.

18        Judge, in responding to the defense's issues on

19 that, I'll start with the vulnerable victim.  The

20 enhancement --

21        THE COURT:  Pull that mike up a little bit.

22 You're kind of tall there Mr. Felte and -- all right.

23 Yes, sir.

24        MR. FELTE:  Thank you, Judge.  Is that a little

25 better?

1          The vulnerable victim enhancement, Your Honor, is

2   not based upon age, it's based upon other factors.  If we

3   start even with the victim, Melissa P.  He took advantage

4   of her situation knowing that she was homeless and

5   sleeping in storage sheds.  He then took her and placed

6   her with co-conspirators to enhance control over her.

7          And then you have not only applying to Melissa P.

8   but to the other two victims as well, you have him plying

9   them with drugs -- marijuana, cocaine, PCP -- and alcohol

10  to reduce their ability to say no to him, to make them

11  more pliable and easier to coerce.  And even the case of

12  U. S. v Altman, and Your Honor it's 901 F. 2d, 1161 out

13  of the Second Circuit, a 1990 case.  They upheld the

14  application of the vulnerable victim enhancement in a

15  case where the defendant was convicted of two counts of

16  sexual exploitation of a minor and interstate

17  transportation of a minor.  And they noted that while

18  both exploitation offenses include the age of the victim

19  in setting the respective base offense levels and thus

20  cannot be enhanced further for that reason, the

21  defendant's contention does not take into account of the

22  fact that he drugged his victims, making them physically

23  and mentally more vulnerable.

24          Judge, we're not basing this upon age.  We're

25  basing this upon other factors:  Knowing their family

1 situations, taking advantage of their homelessness, their

2 drug situation as well.  And even the case of United

3 States against Dock, 426 F. 3d, 269, Fifth Circuit, 2005

4 holds that where the defendant creates certain aspects of

5 environment, creates vulnerabilities, the vulnerable

6 victim enhancement will apply.  And he did that in case,

7 further isolating them; placing them with co-defendants

8 in this case.  And I think the vulnerable victim

9 enhancement is well established and is not based upon the

10 age of the victim.

11        In regards to the second objection.  As far as

12 obstruction of justice is concerned, Ms. Bentolila

13 testified, and it's my recollection even going beyond Mr.

14 Trainor's recollection, of "Just do the right thing and

15 don't snitch."  She expressed fear as far as threats of

16 bodily harm.  Judge, even if you take the defense at face

17 value, "Do the right thing and don't snitch," that is

18 clearly an attempt to prevent her and to have her

19 influence over her testimony.  Don't tell the truth.  And

20 I think that clearly counts as obstruction of justice.

21 You go beyond that and you have threats of bodily harm,

22 threats of injury, and that qualifies as obstruction of

23 justice.

24        Regarding the use of the computer.  It was the

25 defendant's instruction to the victim, Melissa P. to go

1 ahead and recruit other victims using MySpace.  She is

2 charged as aiding and abetting, so you have it on that

3 angle.  But is the defense again giving the instructions

4 to go ahead and use the computer, contact Elana L.

5 through MySpace.  And therefore that enhancement -- that

6 application applies, Your Honor.

7          Regarding the role of the organizer.  I will be

8 brief.  The defendant was the -- at the center of all

9 this conspiracy, he is the one who told everyone else

10 what to do.  There was not one single co-conspirator who

11 told another co-conspirator what to do.  He is the one

12 orchestrating and organizing everything from where he's

13 placing the victims, to recruiting the victims, to

14 obtaining clients, instructing other co-defendants to

15 obtain clients, as far as obtaining drugs --

16          THE COURT:  Do we have more than five here?

17          MR. FELTE:  Yes, Your Honor.

18          THE COURT:  Who are they?

19          MR. FELTE:  We have the defendant.  We have Honey,

20 Shandia Tibbs.

21          THE COURT:  Yes.

22          MR. FELTE:  Samantha Bentolila, Michael Anderson,

23 and then Paul Green, Your Honor.

24          THE COURT:  All right.  And the defendant.

25          MR. FELTE:  And the defendant.  Yes, Your Honor.

 1        THE COURT:  All right.

 2        MR. FELTE:  Lastly, Your Honor, as far as the

 3  firearm is concerned.  As the Court noted, the jury found

 4  brandishing in its verdict.  I would submit to the Court

 5  that ten years would be an appropriate sentence as well,

 6  because the evidence clearly establishes that he as an

 7  aider and abetter directed the victim in this case,

 8  Stephanie T., to fire -- to discharge that firearm.  And

 9  he did so, as he expressed and numerous witnesses

10  testified, so that if she went to the police afterwards

11  or at any time that she would somehow be wrapped up in

12  the crime because she fired the firearm.  And I think the

13  evidence is firm and places his conduct squarely within

14  the statute in that regard.

15        THE COURT:  All right.  Well, why didn't we put a

16  question to the jury with reference to that if that was

17  such a big deal?  Why didn't we do that?

18        MR. FELTE:  Judge, all I can say is that it was

19  not done in that case.

20        THE COURT:  Well, again, my views on that,

21  Mr. Felte, is that it's not the normal firing that we see

22  in these type of enhancements when someone is assaulting

23  someone and then they fire a weapon.  And for whatever

24  reason that was made, that young lady first fired the

25  weapon or attempted to file the weapon in the park which

1 didn't go off, and then later, after it was reloaded, to

2 fire it out the window for whatever.  But that, to me, is

3 not the kind of firing that we normally see and, I think,

4 in terms of the intent of the drafters of this document.

5        But you want to -- do you have anything else that

6 you want to say?

7        MR. FELTE:  Judge, I would call the Court's

8 attention to United States against Henderson.  That's 48

9 Fed App 455, Fourth Circuit 2002.  And in that case, you

10 had a group of conspirators committing a home invasion

11 armed robbery.  Three conspirators went to commit the

12 robbery.  One got inside the door before the door was

13 shut.  In a struggle that ensued between one of the

14 victims and the defendant, the shotgun that the defendant

15 had was discharged.  Nobody can say who actually

16 discharged the shotgun, and the shotgun actually wounded

17 the defendant himself.

18        In that case, the judge -- the Court held that a

19 sentencing enhancement for the discharge of a firearm

20 implied -- applied even though it may have been

21 discharged by someone else in that case.  And that's, I

22 think, analogous to the situation we have right here.

23 Even -- maybe in that case the intent -- maybe there

24 wasn't even an intent to fire the gun.  It went off

25 during the course of a struggle.

1          In this case you had even more of an intent.  You

2   have the defendant engaging in actions to cause someone

3   purposely to fire that firearm, and I would submit that

4   that falls within the confines.

5          THE COURT:  All right.  Well I appreciate that

6   case and so forth, but I think I side with the defense

7   here.  I think the brandishing is what the jury dealt

8   with and I will stick to that.  And, of course, the

9   brandishing that the jury found would require a seven

10  year consecutive sentence, and the firing would require a

11  ten year.  But we'll give the defendant the benefit of

12  the doubt here and go with the brandishing as to what the

13  jury found.  I'll stick to that.

14         I'm still a little not convinced that even that

15  case falls within what we had here and that the robbery

16  case -- again, when you bring shotguns, there's always an

17  effort and intent and you want to hurt and you want to

18  assault someone.  But here again, for whatever reasons,

19  Mr. Royal had the young lady do it.  Just to get a feel

20  for the gun or what have you is -- just to me doesn't

21  fall within the intent of the drafters with reference to

22  that discharge or the firing.  Just a different wrinkle.

23         So I'm going to go ahead with the defense's

24  position on here and find that the brandishing is the

25  issue here and not so much the firing.  I'll overrule the

1  government's position on that and sustain Mr. Trainor's

2  position there.

3       All right.  Mr. Trainor, do you have anything else

4  you want to mention on these other four issues that the

5  government has responded to?

6       MR. TRAINOR:  What I would ask the Court to do, as

7  I know the Court will, is apply the rule of leniency to

8  the guidelines on any close decisions.  I think that the

9  argument the government made on the 3(a)(1.1) factor is

10 really not applicable.  It was more of an argument for

11 undue influence than it was actually a particularly

12 vulnerable victim.  He's already being penalized for

13 undue influence under the offense guideline, and I would

14 think that application note two under 3(a)(1.1) would

15 guide us in the other direction to come down two levels.

16      THE COURT:  All right.  The Court has heard both

17 sides, and the Court is in agreement with the government

18 on these other issues in terms of the vulnerable victim

19 and enhancement for that.  Clearly, the evidence that I

20 heard suggests that it's not based on age so much.  And

21 even there is a distinction when you talk about undue

22 influence.  What we have here essentially is a vulnerable

23 victim or victims, and it was more than age.

24      You had a couple, probably all three of the minors

25 come, from dysfunctional families.  That's essentially

1 what happened here.  They were allowed to roam and hit

2 the streets, and one was living essentially in a dumpster

3 almost.  And he gave them drugs, as the government has

4 said.  And essentially he was able to take advantage of

5 them because of their vulnerability, and that's what the

6 facts were.  So, I think the enhancement for

7 vulnerability is correct.  So we would overrule the

8 defense's objection to that.

9        In terms of the obstruction of justice.  Again,

10 the evidence that I heard and which everyone here agrees

11 that Mr. Royal did say in lockup is, "Do the right thing

12 and don't snitch."  And looking at all of the evidence

13 associated in the case and the fact that the person who

14 testified, this Samantha woman, indicated that she was

15 afraid and nervous, and I heard that clearly.  That is a

16 bases to obstruct the processes of the court and to

17 influence testimony, and clearly obstruction of justice

18 is applicable.

19        Use of a computer.  The same reasons here.  The

20 defendant in fact asked that particularly that Elana,

21 woman be recruited and asked.  And there was a use of a

22 computer and the defendant directed and caused it, and I

23 think that enhancement is correct role of organizer.

24        Again, the government mentioned four persons.  And

25 that is true there were four with different types of

1 roles.  Some of them were driving.  Some were assisting.

2 But no question the defendant was at the center of this

3 enterprise, whatever it is.  And the evidence is what it

4 is.  And I think the suggestion by the probation officer

5 for a four level role enhancement is supported by the

6 evidence.

7        So with reference to those four issues, the

8 government's correct.  The Court will overrule the

9 objections as to those four, but the Court will certainly

10 accept the defenses challenge to the firing of the

11 weapon.  That's it.

12        All right.  And so anything else, Mr. Trainor?

13        MR. TRAINOR:  Nothing further on the guidelines,

14 Your Honor.

15        THE COURT:  All right.  Government, anything else?

16        MR. FELTE:  No, Your Honor.

17        THE COURT:  All right.

18        MR. FELTE:  I would just call the Court's

19 attention to one of the three victims who is present in

20 the courtroom today.

21        THE COURT:  All right.

22        MR. FELTE:  Two of the three have submitted victim

23 impact statements, and I would just move to attach the

24 victim impact statements.

25        THE COURT:  All right.  We will certainly do that.

1 I did read that.

2       Okay.  Well, we'll give the defense -- this is how

3 we'll work it.  We'll give Mr. Trainor an opportunity to

4 address the Court on behalf of Mr. Royal for where we

5 should be sentencing him, and we also then would give the

6 government an opportunity to present what they have on

7 behalf of the United States.  And we'll give Mr. Royal,

8 if he wishes, an opportunity to address this court if he

9 wants.  He doesn't have to, but he's entitled to an

10 opportunity to speak to the Court and give the Court

11 anything he wants me to consider.  So, we certainly will

12 listen to that if he has something he wants to say.

13       All right.  Mr. Trainor, we'll hear you sir.

14       MR. TRAINOR:  Yes, Your Honor.  As the Court

15 knows, Mr. Royal is a young man who has, up until this

16 point, a relatively minor criminal record.  However, the

17 timing of his PBJ on possession of marijuana in

18 Montgomery County was such as to move him into a category

19 two on the criminal history sentencing table.  I ask the

20 Court to consider the 264-month mandatory minimum in this

21 case --

22       THE COURT:  The what?

23       MR. TRAINOR:  -- as being sufficient but not

24 greater than necessary to serve the purposes of 18 U.S.C.

25 3553(a).  Congress has made this mandatory on the court.

1 At least we start from 264 months; that's 22 years.

2          THE COURT:  We started with what?

3          MR. TRAINOR:  I believe it's -- my math may be

4 incorrect, but 15 years mandatory minimum on the 1591

5 counts.

6          THE COURT:  Yes.

7          MR. TRAINOR:  And a 7-year consecutive on the

8 924(c) would be 22 years which is, I think, 264 months,

9 which would be below the guidelines level.  But in our

10 position -- it's our position that under all the

11 circumstances of this offense, considering the relatively

12 short duration of it --

13          THE COURT:  Are you asking for a sentence outside

14 the guidelines?

15          MR. TRAINOR:  I am, Your Honor, under -- I'm

16 asking for a 264-month sentence which is, in effect, the

17 mandatory minimum in this case as I see it.  And it's our

18 position that that would be sufficient but not greater

19 than necessary to punish this defendant for this offense

20 conduct under 18 U.S.C. 3553.  That's all I have.

21          THE COURT:  All right.  Government, your position

22 sir?

23          MR. FELTE:  Yes, Judge.  Judge, we would argue and

24 ask for a sentence within the sentencing guidelines.  The

25 defense spoke about the relatively short duration of this

1  sex trafficking conspiracy, but I would point out, and as

2  the Court heard in that short period of time, the

3  defendant recruited three very young -- excuse me.  Three

4  young vulnerable girls.  He beat two of three of them.

5  He held a knife to one's throat.  He put a gun to another

6  after abducting her from a party and after a car chase.

7  He threatened to kidnap one of the victim's younger

8  sister if she left him, and then threatened to burn her

9  belongings.

10       He plied the girls with PCP, marijuana, alcohol

11  and cocaine, causing one girl to actually suffer a

12  seizure.  And then after that, he instructed his

13  co-conspirators that they couldn't take her to the

14  hospital.

15       He sexually assaulted the girls, anally raping

16  one, and then coerced the girls to perform sexual acts

17  with strangers for his own profit.

18       So, in this short period of time, the defendant

19  certainly packed in quite a number of activities and

20  really showed no sign of stopping until the girls were

21  actually able to get away and law enforcement intervened.

22       The harm that these girls suffered is more than

23  just significant, it's extensive and long lasting.  Each

24  of these victims deals with these crimes and recovery in

25  their own way.  Two of the three have submitted victim

1 impact statements.  And what's clear from these victim

2 impact statements is the terror that the defendant

3 inflicted, the emotional and psychological harm that is,

4 again, significant and long lasting.  Three years have

5 passed since he victimized these girls and they're still

6 dealing with these issues.

7        I think based upon all of those facts, a sentence

8 within the guidelines is reasonable Your Honor.

9        THE COURT:  All right.  Mr. Royal, do you wish --

10 you don't have to stand, sir.  Just pull the mike closer

11 to you.  If you have a statement you would like to make,

12 the Court will hear you.

13        THE DEFENDANT:  Your Honor, with all due respect,

14 this is the best thing to ever happen to me.  I praise

15 the Lord God for bringing me through all this.  I thank

16 the Lord God for opening my eyes to a lot of things about

17 myself and the people around me.  In this situation, I've

18 learned who my real friends are.  In this situation, I

19 learned that not everybody you want to help and not all

20 the things you want to do is of God.

21        I'm sorry that so many people got hurt because of

22 this, but I know that God turns all things into good for

23 those who love Him.

24        I never meant to hurt anyone.  I never thought I

25 would be facing this right here and be dealing with so

1 much time.  I thought that if everyone told the truth,

2 the whole truth and nothing but the truth, there will be

3 no way that I'll be found guilty.  I was wrong in a lot

4 of things.

5       I'm far from what they paint me out to be.  I want

6 to tell my family that I always loved them, but because

7 of all this I'm learning to love them the way God wants

8 me to love them.

9       I want to tell the people who are involved in this

10 that I'm sorry for their hurt and their pain.  I could

11 have been a better person.  I could have encouraged

12 people to be better and do better, but I was blind to a

13 lot of things myself.

14       Again, Your Honor, I'm not what they say I am.  I

15 pray that -- I pray that justice is done.  I pray that

16 whatever some people want to find through saying what

17 they have said and doing what they have done that they

18 find it.  I pray for peace.  I pray for love.  I pray for

19 healing.

20       The old me would say something like, if I could

21 take it all back; if I could make different decisions.

22 But I know that if I didn't go through exactly what I've

23 been through, then I wouldn't be the person I am now to

24 know what I know.  And I know that there's a God and his

25 name is Lord Jesus, and he's willing and able to take all

1  of our problems and find solutions.  Give us peace and

2  hope.  His grace is sufficient in my weakness.  His power

3  is perfected.

4          I truly never meant any harm, if you can believe

5  that through all the testimony you heard.  But I just

6  want to remind the Court that you're listening to

7  testimony, and not everyone tells the truth.  Not

8  everybody speaks what's right.  And sometimes people say

9  things because they're hurt deep down inside.  And I

10 forgive any and all, and I just pray that whatever I have

11 done I can be forgiven as well.

12         There is so many people who are hurt right now.

13 But I want to encourage right now that -- if I can be

14 facing all this, and I have peace.  I'm not mad.  I'm not

15 willing to accuse anybody.  I just want people to be

16 healed.  I want people to find peace in their lives.  I

17 want people to have a better future, a future full of

18 hope.  I don't want anybody to be broken or bruised or

19 without.  I never wanted that for people.

20         In this case, I can say so much but I don't want

21 to talk too much about what people say because they used

22 my music against me.  I always wanted to use my music to

23 help, to heal, to make people realize something.  Some

24 time in my life your goodness gets perverted because you

25 try to -- you compromise yourself thinking you got to say

1 this and do that for the world to accept you.  They took

2 a couple of papers out of a box full of lyrics they

3 picked what they wanted to pick and when I saw my words,

4 it put me to shame.  Never again would I like to write

5 lyrics like that.

6          Never again am I willing to compromise myself or

7 settle for less to fit in.  I wouldn't know what I know

8 now if I hadn't been through what I been through, and I

9 praise God that it all happened, because that's faith.

10 And no matter what you do or what is said or what

11 happened, I believe that God, He has a hand in all this

12 and He knows what's best for me.  And if He wanted to

13 prevent all this from happening, it would never have

14 happened, but we been through it.  It's happened, not

15 just for me but for many in here.  So, I just want to

16 praise Him and thank Him.

17          And I'm thankful that I'm sitting in front of you.

18 And I'm thankful that this man is my lawyer.  And I'm

19 thankful for all of it.  And I hope it doesn't sound

20 twisted to some, but that's what it is.  Faith is just

21 believing that God will work all things for the good, for

22 those who love Him, and He knows my heart.  That's

23 something that you couldn't get a testimony of through

24 what people say.  My heart.  What I've been through.

25          With all due respect Your Honor, I just pray that

1  these words will be remembered.  With the merciful, he'll

2  show himself merciful.  With the blameless man, he'll

3  show himself blameless.  With the pure, he'll show

4  himself pure.  And with the devious, he'll show himself

5  shrewd.

6         At the end of the day we got to ask ourselves,

7  what are we?  What have we done?  What is our testimony?

8  And does it add up?  I didn't do -- I wasn't perfect but

9  Your Honor, I definitely was not what they painted me out

10 to be.  And I'm -- I pray that you deal with me with

11 mercy.

12        THE COURT:  All right.  Thank you.  The Court

13 appreciates those comments and I heard those comments,

14 and so the Court will make some comments also.

15        Sentencing is not the easiest thing for anybody

16 who is privileged to serve as a judge.  I've talked to a

17 number of my colleagues around the country, and the worst

18 thing about our job is that we have to sentence people in

19 different types of cases.  This is a different case.

20 I've had some pretty unusual cases in 16 years.  This is

21 a different case but a serious case.  And, of course,

22 people have choices they make choices, and there are

23 consequences that come from the decisions that they make.

24        And I'm not going to dispute what Mr. Royal has

25 said.  He said he didn't intend for anyone to get hurt,

1 and, of course, I probably believe him.  But the point of
2 the matter is that people did get hurt.  And the matter
3 was taken to trial.  And people have a right to go to
4 trial, and that's not a problem and we respect that.
5        But we have to look at the evidence that was
6 presented before 12 jurors, and we have to respect the
7 jury's verdict as to what they did.  And as Mr. Royal
8 knows, as well as the lawyers, witness after witness took
9 the stand and they basically fingered Mr. Royal.  They
10 did portray him as one who was dealing with some drugs
11 and had supplied drugs that he had gotten.  They also
12 portrayed him as having taken advantage of three minors
13 at the time, and that he knew they were underage and he
14 pimped them for commercial reasons and he got paid for
15 that.  And there was, of course, evidence that people
16 were psychologically and physically coerced  and
17 threatened.  And that's the evidence.
18        And there was nothing that refuted that.  No
19 evidence on the other side that refuted that.  And even
20 persons who were part of the enterprise, they came to
21 court and they testified against Mr. Royal and gave their
22 side of the story.  So, that's the evidence that we have.
23 We can't manufacture any other evidence.  We have to look
24 at that.
25        We also have to look at the fact that three young

1 ladies under age were basically taken advantage of.

2 There is no question about that.   And my thoughts on

3 that, again, is that we had three young ladies who were

4 vulnerable.   They were vulnerable because, again, of the

5 loose family structure that they have.   One of them even

6 took the stand and testified that she came from a

7 dysfunctional family and she had some problems.   So, I

8 mean, that's the evidence.   Basically, living outside and

9 was homeless.

10        And Mr. Royal, of course, contacted -- came in

11 contact with the three of them, and he used them for

12 whatever purposes that he had.   He said he didn't mean to

13 hurt anyone; that he's sorry, and I'll accept that.   I

14 have no problem.   But that's the evidence.

15        I also will mention, as I compare this case to

16 other cases that I've had over the years, Mr. Royal was

17 not the biggest drug dealer that I've seen.   I've seen

18 some pretty tough cases over the years dealing with drugs

19 and distributors of drugs.   Mr. Royal was, in a sense, a

20 small time drug dealer.   No question he had drugs; he

21 provided drugs.   That's what the testimony was.   And even

22 his girlfriend, Ms. Brown, testified she had to give him

23 -- loan him $2,500 to go to Queens, New York to buy

24 drugs.   That's not what I'm normally used to hearing in a

25 trial of a heavy, big dealer.   That's small time stuff.

1 So in the context of cases that come to federal court,

2 this is not the biggest drug dealing case that we have.

3        It also is not the biggest -- I call it

4 "professional pimp" case that we've seen.  Terrible as to

5 what he did, but we have seen organized, long-term

6 streetwalkers, professional women who work for a pimp and

7 are paid and taken care of, protected, etcetera.  So, he

8 certainly doesn't fall within that normal case, but a bad

9 case.  So I point those things out to give you my sense

10 on what this case is about.

11        I also will take into consideration the

12 government's concerns that they have with three young

13 ladies having suffered physical and psychological

14 injuries.  We have to accept that.  We have to take that

15 into consideration.  We also have to take into

16 consideration the jury's verdict.  The jury looked at

17 this evidence.  They took their time.  They had notes.

18 They came back to us and they reached a decision finding

19 Mr. Royal guilty of each and every one of those counts.

20 So, we have to look at that.

21        We also have to look at Mr. Royal's record.  I

22 thought that Mr. Royal was, as he is now, respectful.

23 He's been calm.  He respected the proceedings.  He stood

24 when the jury came in, and he even stood when the jury

25 left and was discharged, even after their verdict.  I saw

1  that.   And so he's been respective -- respectful, rather,

2  of the court and the proceeding, and so I will take all

3  of that into consideration, Mr. Royal.

4          You have a very tough case before you.   And as I

5  said, you elected to go to trial, and the government has

6  conceded that the present guidelines would be appropriate

7  and that Mr. Lambert was correct in his recommendation

8  that the guidelines that are applicable here help you.

9  And so instead of a life sentence that you were facing

10  and heavier time, you have a less period of time.

11          I will tell you this is not a case outside the

12  guidelines.   It simply is not the type of case for the

13  Court to go outside the guidelines.   The guidelines are

14  there and we have to be respective of that, and I don't

15  believe, after looking at all the factors, that it's a

16  case outside the guidelines.

17          I say that because, first of all, we have to look

18  at the nature of the offense.   And this was a very, very

19  serious offense involving minors.   Congress and the

20  legislatures have taken a hard line on this.   And there

21  were victims here.   I read the victim statements.   I

22  respect what they were saying.   They've had a hard time

23  adjusting to what has happened, and they were

24  legitimately frightened despite what your intent was --

25  your intent was; your purpose was, they were frightened.

1 And so the nature of this offense is a tough one.

2          It's a very serious offense.  We have to give a

3 sentence that protects society from any future conduct

4 that can be taken against victims such as the three that

5 were here.  So, we have to look at protection of those

6 persons and other members of society who are similarly

7 situated.

8          We also have to take into consideration the -- I

9 call it the deterrent aspect.  We have to, in our

10 sentencing, give a sentence that lets people know, not

11 just the defendant, but the general populace, understand

12 that there is a penalty that you have to suffer and a

13 risk that you take when you engage in these kinds of

14 activities.  So, deterrence is clearly a factor I have to

15 look at.

16          We also have to look, of course, at respect for

17 the law.  There has been evidence here, Mr. Royal, that

18 during the course of these events that you didn't have

19 respect for the law.  Disrespecting the law, and that's

20 by way of using drugs, by using minors, commercializing

21 them, all types of things that just breached the law, and

22 that's what happened here.  So we have to look at that.

23          And rehabilitation; correction.  That's not

24 something that I can say is definitely needed in this

25 case.  You have said in your comments that this was the

1 best thing to happen to you.  Well, that's a first step

2 toward healing and getting peace and so forth.  So,

3 that's fine.  I don't have any problem with that.  But

4 there is other kinds of things that take place in

5 incarceration and these institutions that you could take

6 advantage of.  And so to the extent that you are eligible

7 for those, and maybe Mr. Trainor has a suggestion of

8 something, we'll certainly take that in consideration.

9        So these are the factors, Mr. Royal, that I have

10 to look at.  And as your attorney says, we have to give a

11 sentence that certainly is appropriate, that takes all

12 these things in consideration, but is certainly

13 sufficient but not more than necessary.  So, I'm going to

14 give you a sentence, again, at the low end of the

15 guidelines that's -- and then you have to serve under the

16 statute seven years consecutive for the brandishing of

17 the weapon as the jury found.

18        So, here is the sentence.  They will be all

19 concurrent.  All of the counts I give you will be

20 concurrent, with the exception of Count Five which, under

21 the law, has to be consecutive to what you get, seven

22 years.  So, Count One will be five years.  That's the

23 maximum sentence, again, that will run with the other

24 sentences.  Counts Two, Three and Four, 360 months, which

25 is the low end of the guidelines.  Count Five, again,

1 that will be seven years for the brandishing count which,

2 under the law, is consecutive to the 360.  Count Six will

3 be 240 months, also concurrent; runs with the others.

4 And Counts Seven and Eight will be also concurrent, 360

5 months concurrent with Counts Two, Three and Four and the

6 others.  Again, the only sentence that's not concurrent

7 will be the Count Five which will be the seven years.

8        Following that sentence, you will be placed on

9 supervised release in reference to Count One.  Again, it

10 will be three years.  Counts Two, Three and Four -- what

11 is the government requesting on Two, Three and Four?  Do

12 you have any suggestion on that?  It's up to life.

13        MR. FELTE:  Judge, I would submit to the Court,

14 but I would ask for at least ten years on that.

15        THE COURT:  All right.  You could get life, but I

16 don't think that's necessary.  We'll give him ten years

17 of supervised release, concurrent with Count One.  Counts

18 Five and Six, it will be five years concurrent.  And

19 Counts Seven and Eight will be six years concurrent.  All

20 to run concurrent.

21        Mr. Royal, the recommended conditions I'm going to

22 adopt here.  First of all, you are required, because of

23 the minors, to register with any sex -- state sex

24 offender registration agency in any state where you

25 reside or are employed or carry on a vocation or are a

1 student, under the direction of probation.

2        You must also satisfactorily participate in a

3 treatment program approved by probation related to any

4 substance or alcohol abuse, which may and will include

5 evaluation, counseling and testing as necessary.

6        You must also satisfactorily participate in any

7 mental health program approved by probation which will

8 include evaluation, counseling and testing.

9        And you are convicted of eight counts by a jury,

10 and there is $100 per count for a total of $800 that has

11 to be paid by you.

12        Let's see.  Is there any restitution the

13 government's requesting?

14        MR. FELTE:  No, Your Honor.

15        THE COURT:  All right.  All right.  There is no

16 restitution here.  And obviously there is no money for

17 any fines.  This is not a fine case.  And essentially,

18 that's it.

19        I'm getting ready to recommend -- excuse me.  I'm

20 going to advise you of your rights to appeal in a second,

21 Mr. Royal, but that's the Court's sentence.  I think

22 that's fair and reasonable under the circumstances, and I

23 have taken into consideration everything that I've said

24 and I've also reviewed the letters that came from your

25 family members.  They were good letters.  I enjoyed

1 reading your mother's letter.  She gave me a perspective

2 that was helpful and explained what she thought.

3        So you went to trial, sir.  You were convicted.  I

4 thought you had competent counsel.  Mr. Trainor did the

5 best that he could under the difficult circumstances that

6 was posed by this case.  But to the extent that you wish

7 to appeal -- and you check with Mr. Trainor.  There are

8 issues that you can bring up and get a second view on.

9 You have ten days from today to note your appeal to the

10 United States Court of Appeals for the Fourth Judicial

11 Circuit.  You should consult with Mr. Trainor now.

12        Mr. Trainor, if you can file his appeal if he

13 wants an appeal.  If you can take care of that forthwith

14 so he can preserve what rights that he has here under the

15 law.

16        All right.  Mr. Trainor, do you have any other

17 recommendations or requests that you want to make?

18        MR. TRAINOR:  Yes, Your Honor.  I would request

19 that a judicial recommendation to the Bureau of Prisons

20 that Mr. Royal be designated to Cumberland or,

21 alternatively, Allenwood.

22        THE COURT:  Which one?

23        MR. TRAINOR:  Allenwood.

24        THE COURT:  Allenwood, Pennsylvania?

25        MR. TRAINOR:  Yes.  Alternatively.  I do have just

1   a comment on the commencement date of the sentence for

2   the record.

3          THE COURT:  Yes.

4          MR. TRAINOR:  I know he came into custody --

5   federal custody on February 3rd of '09.  However, the

6   presentence report confirms that he was held at the

7   Montgomery County Detention Center on the same conduct

8   for 34 days between May 24th '07 and June 27th '07.  I

9   feel that he should get credit for those days.

10         THE COURT:  All right.  So we have here February

11  3rd 2009?

12         MR. TRAINOR:  Was the first day in federal

13  custody.

14         THE COURT:  And he has an additional 34 days?

15         MR. TRAINOR:  I believe that is correct.  Yes,

16  Your Honor.

17         THE COURT:  All right.  We'll see what the

18  government's records reflect.

19         MR. TRAINOR:  He just said something to me.  I'll

20  tell you the presentence report has confirmed 34 days

21  between May 24th '07 and June 27th '07.  Mr. Royal tells

22  me that he was held beyond that date for approximately --

23         THE DEFENDANT:  It was about two weeks.

24         MR. TRAINOR:  About two additional weeks --

25         THE COURT:  All right.

1          MR. TRAINOR:   -- in Montgomery County because of?

2          THE DEFENDANT:   A detainer for the same thing.

3          MR. TRAINOR:   Because of a detainer which I'm not

4 aware of.

5          THE COURT:   All right.   Well, as we know, the

6 Bureau of Prisons will certainly compute this and give

7 him time and credit for every time that he's entitled to,

8 and we'll simply put that he's entitled to state time,

9 the Court believes.   But, again, the Bureau of Prisons

10 will make that final determination.

11         What does the government's records reflect here?

12         MR. FELTE:   Judge, I don't have anything that

13 differs from the presentence report in that regard.

14         THE COURT:   Madam Clerk, why don't we say he's

15 entitled -- the Court believes he is entitled to at least

16 34 additional days as a minimum and at least two weeks

17 more.   The Bureau of Prisons can compute that.

18         We also will recommend, Mr. Royal -- I can't make

19 the Bureau of Prisons put you where you want, but I will

20 recommend, as your attorney has said, that you be placed

21 at Cumberland in light of your family setting in this

22 area, and alternatively Allenwood, Pennsylvania.

23         Anything else, Mr. Trainor?

24         MR. TRAINOR:   Not at this time.

25         THE COURT:   Government, do you have anything else?

1          MR. FELTE:  No, Your Honor.  Thank you.

2          THE COURT:  All right.  This concludes this

3 hearing, and thank everybody for being here.

4               (Off the record at 11:01 a.m.)

5

6                      **CERTIFICATE**

7          Tracy Rae Dunlap, RPR, CRR, an Official Court
  Reporter for the United States District Court of
8 Maryland, do hereby certify that I reported, by machine
  shorthand, the proceedings had in the case of UNITED
9 STATES OF AMERICA versus LLOYD MACK ROYAL, III, Criminal
  Action Number AW-09-048 on July 19, 2010, 2008.

10

          In witness whereof, I have hereto subscribed my
11 name, this 22nd day of September 2010.


12
                        ___/S/__Tracy Rae Dunlap____
13                      TRACY RAE DUNLAP, RPR, CRR
                          OFFICIAL COURT REPORTER
14

15

16

17

18

19

20

21

22

23

24

25