UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION


UNITED STATES OF AMERICA       .   Criminal Case No. AW-09-0048
                               .
   v.                          .
                               .   Greenbelt, Maryland
LLOYD MACK ROYAL, III,         .
                               .
            Defendant.         .   Monday, March 8, 2010
. . . . . . . . . . . . . . .      10:35 a.m.




TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE ALEXANDER WILLIAMS, JR.
UNITED STATES DISTRICT JUDGE




APPEARANCES:

FOR THE GOVERNMENT:        SOLETTE A. MAGNELLI, ESQ.
                           Office of the United States Attorney
                           36 S. Charles Street
                           Baltimore, Maryland 21201

                           JAMES F. FELTE, JR., ESQ.
                           United States Department of Justice
                           950 Pennsylvania Avenue, N.W.
                           Washington, D.C. 20530


FOR THE DEFENDANT:         HARRY J. TRAINOR, JR., ESQ.
                           Trainor, Billman, Bennett, Milko
                             and McCabe, LLP
                           116 Cathedral Street, Suite E
                           Annapolis, Maryland 21401


OFFICIAL COURT REPORTER:  GLORIA I. WILLIAMS   301-344-3228

COMPUTER-AIDED TRANSCRIPTION OF STENOTYPE NOTES

<u>I N D E X</u>

| GOVERNMENT'S WITNESS | DIRECT | CROSS |
|---|---|---|
| Alicia Wojtkonski | 39 | 48 |

1                    P R O C E E D I N G S

2          THE COURT:  All right.  If you can call this case.

3          MS. MAGNELLI:  Yes, Your Honor.  This is United States

4    v. Lloyd Mack Royal, III, criminal number AW-09-048.  Your

5    Honor, Solette Magnelli for the government.  Joining me at

6    counsel table is Jim Felte from the Department of Justice, also

7    co-counsel for the government.  Your Honor, we are here for

8    multiple pretrial motions.

9          MR. TRAINOR:  Good morning, Your Honor.  Harry Traiinor

10   representing Lloyd Mack Royal, III, who is on my left seated at

11   counsel table.

12         THE COURT:  All right.  And I understand that there is

13   a second superseding indictment.  And has he been arraigned?

14         MR. TRAINOR:  I believe he has not been arraigned on

15   the second superseding indictment, Your Honor.

16         THE COURT:  All right.  Does he have a copy?

17         MR. TRAINOR:  We have copies before us.

18         THE COURT:  All right.

19         All, right, madam clerk, go ahead and arraign him.  He

20   can be seated.  He doesn't have to stand.

21         MR. TRAINOR:  All right.

22         THE COURT:  Just be seated, sir.  Yes.  No problem.

23         THE DEPUTY CLERK:  Sir, please raise your right hand.

24         (Defendant duly sworn by the deputy clerk.)

25         THE DEPUTY CLERK:  You may put your hand down.  Please

1  state your full name for the record.

2         THE DEFENDANT:  Lloyd Mack Royal, III.

3         THE DEPUTY CLERK:  What is your age?

4         THE DEFENDANT:  Twenty-nine.

5         THE DEPUTY CLERK:  In what year were you born?

6         THE DEFENDANT:  ███████, 1980.

7         THE DEPUTY CLERK:  1980?

8         THE DEFENDANT:  Yes, ma'am.

9         THE DEPUTY CLERK:  Thank you.  Have you been furnished

10  with a copy of the second superseding indictment by the U.S.

11  Attorney?

12        THE DEFENDANT:  Yes, I have.

13        THE DEPUTY CLERK:  Have you read the second superseding

14  indictment?

15        THE DEFENDANT:  Yes, I have.

16        THE DEPUTY CLERK:  Do you understand the charges placed

17  against you?

18        THE DEFENDANT:  Yes, I do.

19        THE DEPUTY CLERK:  Mr. Trainor, you have been court-

20  appointed to represent the defendant.  Are you satisfied the

21  defendant understands the charges placed against him?

22        MR. TRAINOR:  I am satisfied he understands the

23  charges.

24        THE COURT:  All right.  We'll go ahead and enter not

25  guilty pleas to the eight counts.  I believe there are eight

1  counts.

2  MS. MAGNELLI:  Yes, Your Honor.

3  THE COURT:  All right.

4  MR. TRAINOR:  Yes.

5  THE COURT:  Okay.  Well, today is a motions hearing and

6  then after that we'll prepare for the trial.  Let's see what

7  motions we have.

8  First of all, madam clerk, let's look at docket No.

9  31-1.  That is the government's motion in limine which needs to

10  be addressed, and there were three points, I believe.  One, the

11  government is requesting the court to prevent counsel from

12  speaking to matters of punishment and sentencing and, two, as to

13  the number of indictments returned by the grand jury.  And, of

14  course, with reference to those two items, I believe

15  Mr. Trainor's response is that he understands his obligations

16  and he understands what he can do and he cannot and he has no

17  intention of mentioning before the jury any punishment or

18  minimum mandatory or the fact that this is a second superseding

19  indictment or anything associated with that.

20  So, based on that representation -- is that correct,

21  Mr. Trainor?

22  MR. TRAINOR:  That is absolutely correct.

23  THE COURT:  Based on that representation, then we can

24  deny that as moot, as not necessary.  And then, of course, the

25  government has every right to object if there's any breach of

1  that.

2         And then the third item is that they move to protect

3  the full identities of the witnesses.  I'm not sure what

4  witnesses we're talking about, government.

5         MS. MAGNELLI:  Your Honor, when I filed that motion --

6  as you can see, it's somewhat dated -- we were looking to

7  protect all the names of the witnesses.  However, I understand

8  the right to cross-examination and now as we head into trial and

9  I realize exactly how many witnesses we have to call, the

10  government would be satisfied if we just kept out the last names

11  of the alleged victims.

12         THE COURT:  Three victims?

13         MS. MAGNELLI:  The three victims, Your Honor.

14         THE COURT:  All right.  Let's see what the --

15         MR. TRAINOR:  Your Honor, we would have to object to

16  that and the reason for that is in order to -- one, I feel like

17  it would -- these are adults.  The three victims are now adults,

18  that the message to the jury is that these are some special

19  witnesses who either need the protection of the court somehow,

20  and in a trial as serious as this I think all the witnesses

21  should be treated the same.  We have no intention to have a

22  press conference or to harass or barrage these people with

23  improper questions.  We just would like them treated the same as

24  other witnesses so we can effectively confront and cross-examine

25  the witnesses.

1          THE COURT:  All right.  Government, again, they're not

2    minors any more.  Is there some particular reason why we can't

3    mention during the course of the trial their last name?

4          MS. MAGNELLI:  Your Honor, it's not without some

5    precedence.  These particular victims -- it doesn't matter if

6    there's a press release or not.  This is a case where even

7    friends of the defendant have spoken to the press about it and

8    their names -- the Tyra Banks show has called one of the

9    victims.

10          THE COURT:  How do they know them?  They must know it.

11    They must already have it.

12          MS. MAGNELLI:  Because it was out in the press, and any

13    time anybody gets on Pacer, they know that this case is coming

14    up for trial.  It's just another way of protecting their

15    identities, protecting their safety.  Obviously we understand

16    that last names are something the defense would need to know,

17    but at this point they do know the last name.  They can do their

18    investigation.  It's not going to affect the cross-examination.

19    It would really just be about maintaining as much anonymity as

20    possible for the public record.  And in the past, in other

21    jurisdictions, I have held up photos for voir dire and that kind

22    of thing.

23          THE COURT:  Well, have they been threatened or

24    anything?  Is there any evidence they've been threatened or

25    anything or just as a general principle you're asking that it

1   be --

2          MS. MAGNELLI:  Your Honor, there is evidence that

3   witnesses in this case have been contacted.

4          THE COURT:  I mean the three, the three victims we're

5   talking about, the only ones you're asking that their last names

6   not be used.

7          MS. MAGNELLI:  Well, if I may, the two are somewhat

8   joined, because the government did initially ask for all names,

9   and that was because there were threats.  There were threats to

10  witnesses, and with that continuing, knowing that members of

11  defendant's family, friends of the defendant's family have

12  contacted witnesses as recently as two months ago indicating

13  they shouldn't testify because they know where they live,

14  obviously that is something that we do not want to happen to

15  anyone but especially the alleged victims.

16         It's a motion that the government feels is there to try

17  to protect these individuals from being harassed, from being

18  contacted, and we may get to -- because we do feel at this point

19  the defense does know who these people are and can do an

20  adequate investigation.  So that would be our argument on that.

21         THE COURT:  Well, again, if you want to use initial, we

22  certainly can allow that, since the defendants already know the

23  names, the last names anyway.  But just for purposes of the

24  press coverage, if you want to use first name and initial, I

25  don't see a problem with that, but --

1          MR. TRAINOR:  Your Honor, if I could just be heard

2     briefly.

3          THE COURT:  Sure.

4          MR. TRAINOR:  We would object to that.  The government

5     has just said that the names are out in the press and they've

6     been contacted by folks like Tyra Banks.  Now, I don't know

7     anything about that.  But it just seems that there's no purpose

8     at this point in treating these witnesses differently.  If their

9     names are out in the press, it's out in the press, and that's

10    not going to change by whatever you want to call them in this

11    courtroom.  But this is such a serious case for my client

12    that --

13         THE COURT:  Well, it's a serious case, but there's no

14    prejudice on your part just the way I'm not sure the government

15    has made a compelling argument to me as to why they need it.

16    But you aren't suffering any prejudice here.  You already know

17    the last names.

18         MR. TRAINOR:  Well, I just learned it this week.  It

19    was for the first time disclosed in the Jencks material which we

20    received this week.  So, that's our position.  I understand that

21    the court has ruled.

22         THE COURT:  Well, again, we'll go ahead and allow the

23    government to use a last initial if they have to but, like I

24    said, I may reconsider that.  I don't know.  But right now a

25    last initial because, again, of the nature of the allegations

1   and the sexual testimony we're going to hear, and some of it's

2   embarrassing and people have jobs and other things.

3       So, just to minimize the privacy that could develop

4   from that, I don't see a problem with utilization of an initial

5   so long as the defense knows their last names.  If they have to

6   investigate further and so forth, they know that.  But there's a

7   lot of other sensitive matters which I believe I allowed the

8   defense to see.  So, based on all of that, I'll go ahead and

9   right now allow the government to use first name and the

10  appropriate last letter.

11      All right.  So that's my ruling as to paper 31-1,

12  granted in part and denied in part, madam clerk.

13      Let's go to 48, which is a motion by the defense for a

14  bill of particulars on the second superseding indictment.  Do

15  you want to argue on that?

16      MR. TRAINOR:  Your Honor, this was filed before we

17  received Jencks.  We have now received it.  I would submit.

18      THE COURT:  All right.  Deny that as moot in light of

19  the fact that the government has provided pursuant to their

20  discovery arrangements Jencks material.

21      48-1, madam clerk, deny that as moot for the reasons

22  I've stated.

23      There's another motion, 49, a motion to suppress.  As I

24  read the government's response, they don't intend to use any

25  statements from either a 2007 proceeding or a 2009.  Is that

1  accurate or do we need to correct that?

2          MS. MAGNELLI:  Your Honor, I filed a supplemental

3  response.

4          THE COURT:  Okay.  A supplemental?  I don't have that

5  one.  I don't think I've read that.

6          MS. MAGNELLI:  I filed a supplemental response before

7  the deadline for my response and in that response I noted the

8  Shatzer case that had just come out a few days before and the

9  government changed its position given the Supreme Court's

10  decision.  We don't intend to use the 2007 statements, but we

11  are defending that the 2009 statements are admissible.  I can go

12  into the reasoning why --

13          THE COURT:  Well, just tell me what statements were

14  said that you intend to use.

15          MS. MAGNELLI:  Your Honor, after his arrest on, I

16  believe it was, February 3, 2009, the defendant was transported

17  by two federal agents to the Calverton R.A.  I have times noted

18  for that.  However, in the car he began to try to explain his

19  version of events.  The agents continued to indicate that he

20  should wait until they got to Calverton, that if he wanted to

21  talk, they could execute a written waiver, which I have, and

22  that he didn't have to talk to them, he could remain silent.  If

23  they testified, the agents would indicate that he continuously

24  would stay silent and then start talking again.  They would re-

25  admonish him, it would start again.  Once they got to the

1   Calverton R.A., after being allowed to use the restroom and them

2   booking him and those type of things, they did take a statement

3   from the defendant.  He executed the waiver form.  He both

4   acknowledged it verbally and he signed it.

5        Over the next few hours before he was brought to the

6   marshals here for booking, he made several statements, some of

7   which are self-serving hearsay that we would not be looking to

8   introduce, but he did make several other statements that the

9   government feels --

10       THE COURT:  Well, I don't have to know it right now.

11  We have to have a hearing on that and that's fine.

12       MR. TRAINOR:  I can maybe simplify this, Your Honor.

13       THE COURT:  Yes.

14       MR. TRAINOR:  We had filed a motion to suppress the

15  2007 statement as well as the 2009 statement.  Our position was

16  primarily based on Edwards, in that in the 2007 statement, which

17  was videotaped in Montgomery County, our client repeatedly

18  invoked his rights under the Fifth Amendment.  I believe the

19  government has conceded that, that they will not use the 2007

20  statement.

21       The basis for suppressing 2009 was that he had, in

22  fact, invoked his rights and at that point the state of the law

23  was that once you invoke, the government agents could not

24  reinitiate questioning.  However, subsequent to filing that, the

25  Supreme Court came down, I think February 24th or thereabouts,

1    with Maryland v. Shatzer.  My understanding of that opinion now

2    is that the law is now that if there is a break in custody of 14

3    days or more that the federal agents are free to reinitiate, re-

4    advise and seek --

5         THE COURT:  That's what it says.

6         MR. TRAINOR:  -- seek a waiver.  That's the state of

7    the law now and our argument was based on the law before it was

8    changed.  There was over a one-year break in custody, and we

9    would submit on the 2009 issue but ask that the ruling stand on

10   the 2007.

11        THE COURT:  All right.  I guess essentially the

12   government is not moving to use the statements from 2007 but

13   apparently there are some 2009 statements, and under the Supreme

14   Court's latest case, the government is requesting that they use

15   it.  I didn't hear the defense mention anything about

16   voluntariness and other issues and Miranda.  And so, again, if

17   those are issues, then we need to still have a hearing on the

18   statements.  And so, we can do that.  Before we leave today

19   we'll make a decision on that.  But he's entitled to a hearing.

20   I have to make sure that despite the Supreme Court's ruling that

21   the statement was a knowing and voluntary and understanding

22   statement made, after having been advised of his constitutional

23   rights which he has waived under Miranda.  And so, I have to

24   have a hearing to that effect just to protect the defendant.

25        MS. MAGNELLI:  Your Honor, and I would just note for

1   the record, just for purposes of preserving it, that we would

2   also note that there was the Edwards exception of reinitiation.

3   So, under both theories, we would put that on the record.

4           THE COURT:  Are you using the 2007?

5           MS. MAGNELLI:  We are not, Your Honor, but given the

6   uncertainty of future rulings, I just want to note for the

7   record that the government indicates that both would be

8   appropriate.

9           THE COURT:  All right.  Okay.  Well, again, I'm more

10  interested in what you wish to introduce by way of an admission,

11  a statement, confession, and to the extent that you want to use

12  that, I'll need to hear from an officer or something.

13          MS. MAGNELLI:  Yes, Your Honor.  We have the agent

14  outside.

15          THE COURT:  Okay.  All right.  So, we'll get back,

16  then, to the motion to suppress.  All right.  Let's keep moving.

17  We'll get to that.  He doesn't have to come right now.  I want

18  to take care of some of these other motions.

19          There's a motion to strike certain aliases as

20  irrelevant  and so forth.  Yes, Mr. Trainor.

21          MR. TRAINOR:  Yes, Your Honor.  That's docket No. 50,

22  defendant's motion to strike surplusage, and that's pursuant to

23  Rule 7(b) of the Federal Rules of Criminal Procedure.  The

24  indictment repeatedly uses the aka or alias of "Furious" in this

25  case as well as "B" and "Blyss."  I've now had the opportunity

1    to look through all of the Jencks material.  I think I've seen

2    virtually all of the discovery in the case at this point.  I

3    have found repeated references to people who know the defendant

4    as "B" or "Blyss."  I didn't find any witness who knows him

5    solely as "Furious."  "Furious" is apparently a rap name.  He's

6    involved in the rap music genre and it's not necessary to

7    identify the defendant in any way, but in a case like this, it

8    is so suggestive that it poses a heightened risk of prejudice

9    due to the nature of the charges, which include sex trafficking

10   and use of a firearm and repeated allegations of force being

11   used.

12           So, we object to the usage in the indictment and in the

13   evidence of the name "Furious" and ask the court to do a Federal

14   Rule of Evidence 403 balancing test and to decide that the

15   prejudice outweighs the probative value.

16           THE COURT:  All right.  Let's hear from the government

17   as to what evidence you have of this aka "Furious."  Is someone

18   going to refer to that or has he been identified as that or

19   what?  What do we have?

20           MS. MAGNELLI:  Your Honor, we have numerous witnesses

21   who still don't know the defendant's name.  They will only refer

22   to him by aliases.  We have numerous witnesses who know him by

23   "B" or "Furious," or "B," "Blyss" and "Furious," or "Blyss" and

24   "Furious."  So we have people who also know him by "B" and

25   "Blyss."

1       I think Mr. Trainor is correct.  There is no one person

2  who knows him just by "Furious."  However, there's the second

3  part of that nickname.  As I noted in my response, the

4  government seized numerous rap lyrics from the defendant's

5  girlfriend's residence and in those lyrics, in order to

6  establish the authorship of those lyrics, the nickname "Furious"

7  would need to come out in testimony.  The government would have

8  to show that he used the name "Furious" when he wrote these

9  lyrics.

10      These lyrics are important for two reasons.  One,

11 because they do discuss things such as drug dealing, the

12 pimping.  They name other people.  So, we have these lyrics and

13 the evidence will show over the course of several weeks that he

14 told numerous witnesses that one of the reasons he was

15 prostituting these girls or he had the gun or he had the drugs

16 is because he felt he couldn't rap about things he didn't know

17 about.  So he was doing the things on the street in order to be

18 able to write these lyrics.  And now we have these lyrics sort

19 of closing that circle.

20      So, in order to prove the authorship as well as the

21 names that people knew him by, the government would suggest or

22 argue that the nickname is appropriate.

23      I understand that the name itself when taken in an

24 isolated context might seem prejudicial.  However, counsel is

25 free to argue that it's just a rap name.  Obviously there are

1   other rappers out there with worse names.  I've indicated in my

2   response some of the more egregious types of nicknames that have

3   been allowed in trial.

4           But those would be the reasons.  They're not to show

5   any type of propensity.  We're not going to argue to the jury

6   nor are we going to bring out evidence that because his nickname

7   was "Furious" he must have beaten these girls.  That's just

8   never going to happen.  There are some valid reasons for

9   bringing in these nicknames.

10          THE COURT:  All right, Mr. Trainor, do you have any

11  response to the government's proffer?

12          MR. TRAINOR:  Your Honor, just at a minimum that it

13  should be struck from the indictment.  The government intends to

14  submit the indictment to the jury.  Every single count has

15  "Lloyd Mack Royal, aka Furious," and that is clearly

16  prejudicial, and there is no probative value of that.

17          THE COURT:  All right.  At the present time we're going

18  to deny the motion there, I think based on the government's

19  proffer as to some of the witnesses referring to him by way of

20  identification and the name as "Furious."  There's also question

21  of the authorship of certain material that we heard.  We've

22  looked at this point initially at the balancing under 403 and I

23  don't find at this point that the relevance is outweighed by the

24  prejudicial effect.

25          We will take another look at it after the evidence is

1   in.  And, of course, Mr. Trainor if you like, we can have a

2   cautionary instruction given to the jury that will make sure

3   that the jury does not take that nickname out of context but

4   that they will narrowly focus on what it's there for.

5           So, at the present time we're not going to strike it.

6   We're going to deny the motion with the right to re-request that

7   or to reconsider it upon the defendant's request at a later

8   date.

9           All right.  So, that takes care of 50, madam clerk.

10  Denied without prejudice to reasserting it.

11          All right.  There's also a motion filed by the defense

12  to exclude certain other evidence, I believe, under 404(b).

13          MR. TRAINOR:  There was such a motion filed, Your

14  Honor.  This was filed --

15          THE COURT:  And I guess that's also taken in context

16  with paper 56, the government's second motion in limine.  I

17  think we can probably do those together.

18          MR. TRAINOR:  Yes, I think that is accurate, that the

19  government has responded to that.

20          This was filed in response to the February 15, 2010,

21  letter from the government setting forth, I think, 12 areas of

22  either 404(b) evidence or what they describe as intrinsic

23  evidence.

24          THE COURT:  Now, madam clerk, for your information,

25  this is paper No. 60.

1      MR. TRAINOR:  Your Honor, since I filed this motion, we

2   have received some Jencks material that's clarified some of it,

3   but I do have objections.  There is a reference that the

4   defendant accidentally discharged a firearm in a time frame

5   prior to the period of the indictment that went off in his house

6   and a bullet came within two feet of his girlfriend, who was

7   pregnant.  What I've seen in the discovery so far is that one

8   witness talked about this and said that there was some playing

9   with the gun inside the house and that a bullet went off within

10  two feet of his Cierra Young, who is the mother of his baby.

11  And the time frame of this is that it occurred prior to the

12  birth of their child, and the birth of their child was June 12,

13  2006.  The critical period in the indictment is April and May

14  2007.  I would just submit that under 404(b) and 403, the

15  accidental discharge of a firearm in 2006 should not come in.

16      For the other items on the list, I would object on

17  the -- if any of these very general allegations that have

18  been -- these very general categories of evidence, I would

19  object if they occurred outside of the time frame of the

20  indictment.  It's hard for me to tell when they say something as

21  general as "the defendant regularly distributed marijuana and

22  used it with witnesses."  I don't know whether that was in 1994

23  or during the period covered by the indictment.

24      I made a very specific objection to the 2006 incident

25  and for the others I would just ask the government to flesh out

1   whether these categories of evidence occurred during the time

2   frame of the indictment or at some other time and then I would

3   better be able to address them.

4         THE COURT:  Well, again, I can't comment on it yet

5   because I don't know at this point.  A lot of information I see

6   under your motion, 12 categories, and some of it clearly is

7   intrinsic, some of it seemed to be extrinsic.  For example, item

8   No. 1, again, I heard something about an accidental discharge.

9   Is that the incident we're talking about?  And I also see in

10   item No. 1 discussions by the defendant regarding buying and

11   selling firearms, which apparently came outside of the April,

12   May time frame.  Is that --

13         MS. MAGNELLI:  Well, just to clarify, there are two

14   time frames in the indictment.  There's the drug conspiracy,

15   which is September 2006 to May 2007, and then there's the sex

16   trafficking, which is April and May of 2007.  So, it's a little

17   more expansive than just the sex part.

18         With regard to category one, that's one of the reasons

19   we filed the memo is to expand that.  At this point the defense

20   has now received an additional 5,000 pages of discovery and

21   Jencks.  All those details are in there.

22         With regard to, for example, category one, I'm looking

23   at page 5 of the government's second motion in limine.  The

24   buying and selling of firearms, some of that actually comes

25   after the May 2007 conspiracy dates.  Some of that -- and I can

1  tell the court what witnesses they come from, but it is all in

2  the Jencks there.  Also, with regard to the .380, the ammunition

3  that the defendant discussed obtaining, that is during the time

4  frame of the indictment.  The brandishing of other firearms, for

5  example, the discharge that nearly missed Ms. Young, there are

6  two witnesses who would testify about that and that -- Madison

7  was born on June 12th of 2006, which is just a few months before

8  the drug conspiracy, the September 2006 drug conspiracy starts.

9  So, with regard to the specifics of that information, it is in

10  the Jencks.  I can go on to the --

11       THE COURT:  Well, let me say this.  Of course, I don't

12  have Jencks, and I think I'm going to again put the burden on

13  both of you.  To the extent, government, that you're going to

14  come in with a witness which you clearly know is 404(b)

15  evidence, you can let the court know and we may have to have

16  discussions outside of the presence of the jury before the

17  witness is brought in.  And, of course, Mr. Trainor has to look

18  at all this discovery material and determine specifically what

19  he is objecting to and what he believes is intrinsic or arguably

20  is not intrinsic or not contextual and so forth.

21       I have no idea on No. 10, for example, "Defendant

22  attempted to illegally obtain and distribute prescription

23  medication."  I have no -- I don't have --

24       MS. MAGNELLI:  That's within the time frame.

25       THE COURT:  Yes, but I just don't have any information

1  about this case.  I mean, I'll hear it just the way the jury

2  will hear it.  And so, I don't know what that means in the

3  context of these charges.

4        No. 11, "Defendant was arrested but not convicted of

5  intent to distribute cocaine on May 2, 2006," I mean, I've got

6  to be convinced it's reliable.  I mean, I don't know any of

7  this.  I would simply say to the extent that the government is

8  going to call witnesses to establish this other crimes, bad

9  acts, whatever, then let me know, and to the extent that

10  Mr. Trainor is going to oppose it, challenge it, then we can

11  have a hearing outside the presence of the jury each morning or

12  whatever and we can do it that way.

13        MS. MAGNELLI:  Your Honor, I would just give the court

14  a heads up that nearly every witness -- not all but nearly every

15  civilian witness began their relationship with the defendant by

16  buying drugs from him.  So, it's going to be --

17        THE COURT:  And that sounds like it's intrinsic.  A lot

18  of that gives context to what has happened.  But, again, I'm

19  putting the burden on both of you.  If the government clearly

20  knows that there are witnesses of the incidents that fall

21  outside, then let me know so we can have hearings on them.

22        "Packaging consistent with PCP was seized in February

23  2009," again, is that contextual or is that connected with?

24        MS. MAGNELLI:  Yes, Your Honor.  It was found alongside

25  these rap lyrics.  My expert is going to testify that the

1   packaging is consistent with distribution.

2           THE COURT:  All right.  Okay.  I guess as to 60-1,

3   madam clerk, I'm going to reserve on this motion pending further

4   arguments by the attorneys as we go.

5           But, again, the closer we get to trial, again, if there

6   are some specific objections that we'd like to make, I'd like to

7   make some findings and some decisions outside the presence of

8   the jury so we won't argue and take away jury time every time an

9   item is being discussed or testimony is being discussed.  Let's

10  try to anticipate what it is.

11          And you have the material now, Mr. Trainor.  So, if you

12  can kind of give me a heads up so I can determine what we're

13  going to allow, what we're not going to allow, that would be

14  helpful.

15          MR. TRAINOR:  Your Honor, so long as we know the order

16  of witnesses on a day, I think we could do it every morning and

17  as long as we don't unduly mention any of this in opening.

18          THE COURT:  All right.  The government is shaking their

19  head.  That's possible.  So let's try to work on that.

20          All right.  So, madam clerk, 61, we'll reserve on that.

21          Let's move to the government's second motion in limine

22  and, again, there seem to be three points in connection with

23  that.  The government is requesting an order from the court with

24  reference to the general sequester of witnesses, exclude prior

25  sexual history of the alleged victims, and permit certain

1   relevant evidence which I believe we just talked about there.

2           MR. TRAINOR:  Yes.

3           THE COURT:  What's your objection here to the sequester

4   of witness?

5           MR. TRAINOR:  Your Honor, the government would like to

6   have a ruling that they could have two case agents at counsel

7   table.  I would just say we object to two and leave it at that.

8           THE COURT:  All right.  Well, I haven't heard any

9   reason not to permit that.  It's a complex case with a lot of

10  documents, and the government has made, I think, a plausible

11  argument in support of that.  So, we will permit that, madam

12  clerk.

13          And what about the prior sexual history?  Are we going

14  into the history?

15          MR. TRAINOR:  I would tell the court this, that in this

16  indictment there are charges that relate to force, but there are

17  also conspiratorial acts that specifically allege that the

18  defendant engaged in forcible sex acts.

19          That being said, I would tell the court this, that if

20  it ever arises that I feel that I have to get into propensity

21  evidence that I would approach the bench before doing it,

22  proffer to the court what I would intend to do and ask for a

23  ruling on that.  I will not mention it in opening.  I would not

24  blurt it out.

25          THE COURT:  That's fair.  That's a sensitive area and,

1  as you know, Mr. Trainor, the general approach is not to allow

2  that evidence in absent something extraordinary here.  And so, I

3  think that's a fair way to mention what you'll do, that you will

4  let me know in advance and we'll get a ruling.  I think that's

5  fair.

6          All right.  So, madam clerk, with reference to 56,

7  granted in part, denied in part.  Granted in part and -- excuse

8  me.  Granted in part and reserved in part, the government's

9  request on the sequester of witnesses, and we're going to

10 reserve on the excluding of prior sexual histories of alleged

11 victims and certain other relevant evidence.  We'll reserve on

12 that.

13         MS. MAGNELLI:  Your Honor, if I may, just to clarify

14 for the record.  With reference to the sequestration, there were

15 two additional categories of individuals.  I just want to bring

16 to the court's attention that we do -- I know there's going to

17 be some argument in a moment about Detective Stack.  However, I

18 want to let the court know Detective Stack will not be sitting

19 in the trial.  However, Detective Sakala will be.  He is not a

20 fact witness at all.  He is simply an expert witness.

21         And then with regard to the victims, we bring that to

22 the court's attention only because the government felt they have

23 a right to be here and if they are going to be excluded, it

24 should be by court order.

25         THE COURT:  All right.

1          MR. TRAINOR:  And we are objecting to the witnesses who

2     would be Melissa P., Stephanie T., and Ilana L. being in the

3     courtroom prior to their testimony.  The reason for that is that

4     this trial is very much about their credibility and if they're

5     given the opportunity to play off one another in the courtroom,

6     my client's right to confront and effectively cross-examine

7     witnesses will be destroyed.

8          THE COURT:  What is the government requesting here as

9     to those victims?

10          MS. MAGNELLI:  Your Honor, I simply noted in my

11     sequestration motion those individuals I thought would be

12     excluded from being sequestered and I believe the way I read it

13     is that the victims, they do have a right to sit in on these

14     types of hearings.  If they are going to be excluded, it needs

15     to be by the court, not by the government saying you can't come.

16          THE COURT:  Well, we can have a hearing on that, but I

17     agree with Mr. Trainor here that these are sensitive matters and

18     I don't think they should benefit from each other's testimony.

19     I've got some problems with that.

20          MS. MAGNELLI:  Your Honor, I understand that.  Again,

21     the government simply felt that it should be by court order.

22          THE COURT:  All right.  We can do that at the

23     appropriate time.  Thank you.

24          All right.  Motion in limine to include testimony from

25     the government as to proposed expert witnesses, madam clerk,

1    that's 57.  First of all, let me ask the government how many

2    experts do you have?

3           MS. MAGNELLI:  Your Honor, we have two.  We have one

4    drug expert, Detective Sakala, and Detective Stack.  Co-counsel

5    will be arguing the motion with regard to Detective Stack.  I

6    don't believe there's any objection with regard to the drug

7    expert.

8           MR. TRAINOR:  Well, as long as he's qualified and it's

9    relevant, but we didn't file a motion as to the drug expert.  We

10   filed a motion as to Detective Thomas stack, the prostitution

11   and pimping expert.

12          THE COURT:  All right.  Well, do you want to be heard

13   on that?

14          MR. TRAINOR:  I would like to be heard.

15          THE COURT:  Yes.

16          MR. TRAINOR:  Your Honor, we have asked the court to

17   exclude the government's proposed expert witness on a Detective

18   Thomas Stack.  The only notice we have is that he will offer

19   opinions concerning the methods employed by pimps to attract and

20   control women and girls for purposes of prostitution,

21   characteristics shared by women and girls who become involved

22   with prostitution, methods used to facilitate prostitution, and

23   the meaning of slang terms associated with sex trafficking,

24   pimping and prostitution.  That is the disclosure which really

25   tells us nothing.  A Rule 16 disclosure is inadequate and we

haven't been put on notice of any opinion.  We've been told that he's going to tell us about methods.  He hasn't told us what methods he is going to tell us about.  He says he's going to tell us about characteristics shared by of this general group of women and girls who participate in prostitution.  He hasn't told us what those characteristics are.  He's told us that he'll tell us about methods used to facilitate prostitution without telling us what those methods are.

They tell us further that he will sit in the courtroom -- well, I was just told that he was not sitting in the courtroom.  Is that correct?

MS. MAGNELLI:  That's correct.

MR. TRAINOR:  All right.  So, we have an inadequate disclosure at this point.  And then the government goes on to argue that the probative value of this testimony outweighs the prejudice, but there's nothing on which the court could perform a 403 balancing test because we don't know what the opinions are.

And, further, in the disclosure we're told that the basis of this witness's opinions, the opinions that we don't know, will be based on his experience as an investigator and on statements he's taken from other people who have been involved in prostitution or pimping.  To the extent that he's relying on what other people have told him during custodial interrogation after being arrested for prostitution or pimping, that clearly

1  is testimonial under Crawford v. Washington and should be

2  excluded on confrontation clause grounds.

3        So, basically the argument is the disclosure is

4  inadequate under Rule 16.  The disclosure has not given the

5  court a basis for performing the gatekeeping function for expert

6  testimony under Federal Rule of Evidence 702 and that if we

7  reach that point, we'd ask the court to do a 403 balancing test

8  when it has enough information to do so.

9        THE COURT:  Mr. Felte, do you have a response to that?

10        MR. FELTE:  Yes.  Thank you, Your Honor.  Judge, three

11  days after we were notified we were going to trial, February

12  11th when we were notified we were definitely going to trial,

13  the government provided notice on February 14th concerning the

14  categories that Mr. Trainor recited.  February 23rd, nine days

15  later, the government provided the CV for Detective --

16        THE COURT:  I'm going to have to ask you to speak up a

17  little.  Pull that mike up a little bit.  I'm not hearing.

18        MR. FELTE:  Sorry, Your Honor.

19        THE COURT:  Yes, sir.  Thank you.

20        MR. FELTE:  -- provided the CV.  Judge, this case and

21  this instance is really no different than narcotics experts or

22  narcotics paraphernalia experts that the court --

23        THE COURT:  Well, it's got to be different because we

24  don't have any appellate cases, do we, sustaining this kind of

25  thing, do we?  We see it in drug cases all the time.  Do we have

1  any cases that have clearly --

2          MR. FELTE:  We do, Your Honor.

3          THE COURT:  -- recognized this as --

4          MR. FELTE:  We do from the D.C. Circuit.

5          THE COURT:  D.C.?

6          MR. FELTE:  There is United States v. Anderson, 851

7  F.2d 384, D.C. 1988.  There an academic testified as far as

8  pimping patterns and pimp/prostitute's relationships, modus

9  operandi for pimps.  In U.S. v. Sutherland --

10         THE COURT:  What was the prosecution?  What was the

11  charge there?

12         MR. FELTE:  Interstate transportation of a minor for

13  purposes of prostitution, Your Honor.  And that's the case in

14  the other two cases that the government would cite as well.

15         THE COURT:  How was it helpful to the jury that they

16  can't see?  I mean, they understand these type cases.  How is

17  that going to be helpful to them?

18         MR. FELTE:  Well, specifically in United States v.

19  Taylor, Your Honor -- that's 239 F.3d 994, a Ninth Circuit case

20  from 2001 -- the court specifically noted that this area, the

21  pimp/prostitution relationship, terms that are used is a

22  specific area that is not of common knowledge.

23         THE COURT:  What terms are you talking about?

24         MR. FELTE:  They're all different types of terms,

25  things like "the bottom," "the trap," "turning out," "selling

the dream," "the game," even ones that may be more common but
may have some knowledge such as "trick" or "John," how those
factors, how those terms interact. I believe I mentioned "the
bottom," who "the bottom" is in this type of relationship. The
court specifically found that that was appropriate for --
appropriate subject matter for an expert witness.

That's also been done in U.S. v. Anderson, I believe,
that was cited as well. In U.S. v. Sutherland it was a police
sergeant's testimony. In this case we have Detective Thomas
Stack, who has 22 years of experience. He has made hundreds of
arrests. He's gone undercover I believe approximately 75 times.
He has interviewed. He has been trained. He has actually
taught at the university level on the subject at Georgetown,
American University and Montgomery College as well.

And there is no Crawford issue, Judge, because this is
just a typical expert testifying based upon his knowledge and
training. He is not a fact witness in this case. He has not
interviewed the victims. He has not interviewed witnesses in
this case. He is going to simply lay out these are what these
terms mean, this is how this relationship works, these are some
of the methods that are employed. He is not going to be basing
his opinion or his testimony by saying victim one told me this
or victim two told me this. It is in the traditional role of an
expert witness, much the same as a narcotics expert or a
narcotics paraphernalia expert.

1          THE COURT:  All right.  Well, Mr. Felte, I agree with

2     Mr. Trainor here that the methodology right now needs a lot of

3     work.  I need further proffer as to what the specific testimony

4     is going to be.  This is a -- I don't want to call it a novel

5     case out here in the Fourth Circuit, but there are no cases you

6     cited from the Fourth Circuit.  The detective has been

7     apparently accepted as an expert in the Maryland District Court,

8     not even a Circuit Court case.

9          MR. FELTE:  That's correct.

10          THE COURT:  And what are we talking about here?  This

11     is almost a misdemeanor court.  So, it is different.  It is new.

12     I'm not going to slam the door on him.  I would say that I need

13     more testimony and more specifics -- Mr. Trainor needs it

14     also -- from the officer as to the nature of his testimony, and

15     we would hold that hearing prior to the time that he would be

16     called so we can get an idea as to what he's going to do.

17          So, I won't rule it out.  I'll reserve on it, but I do

18     agree with Mr. Trainor that we don't have enough specifics.  You

19     mentioned some things that I was unaware of, terms and codes

20     that may be helpful to the jury, and if that's consistent with

21     the evidence, then maybe it is helpful, but I don't know yet.

22          And so, just before the witness is called to testify as

23     an expert, we would hold a hearing outside the presence of the

24     jury to get some information on the specifics of his testimony

25     and you can convince me later as to how helpful it is, and once

1  I understand the methodology and the helpfulness, then we can

2  decide whether to allow him to testify as an expert.

3      MR. FELTE:  Yes, Your Honor.  And, Judge, I just wanted

4  to clarify one thing.  In my response to the motion, it was

5  indicated that this detective would probably testify in the

6  second or third week of trial.  We now expect him as being the

7  lead witness as far as starting off the day of trial, and if

8  that --

9      THE COURT:  He would be a lead witness?

10      MR. FELTE:  Yes.

11      THE COURT:  All right.  So, we would have to have a

12  hearing maybe on the eve of trial or something.

13      MR. FELTE:  Yes, Your Honor.

14      THE COURT:  He's the first witness?

15      MR. FELTE:  Yes, Your Honor.

16      MS. MAGNELLI:  Yes.

17      MR. TRAINOR:  Well, maybe I should wait until then to

18  make my point, but --

19      THE COURT:  Well --

20      MR. TRAINOR:  -- I can't help myself.  How can he

21  define terms before a witness has testified to terms?  If a

22  witness says, "He told me to turn a trick," for example, I mean,

23  that obviously -- I think we know what the person is talking

24  about.  But the best way to do it is "What do you mean by that,"

25  rather than have a detective get on before the jury has heard

1   any evidence and says "A trick means this.  A bottom means

2   that."  I don't --

3        THE COURT:  Yes, I kind of agree.  I kind of agree,

4   Mr. Felte.  I don't make a habit of telling the government their

5   witness order and that sort of thing and how to present their

6   testimony, but I agree with Mr. Trainor here that we need to get

7   some sense of what this case is about and what the jurors are

8   going to hear from victims so we can pull it together and then

9   make some sense.  But just to plant in their head prior to

10   victims coming in certain terms and codes to me has a little, I

11   think, trappings of unfairness.  I agree with Mr. Trainor on

12   that.

13        So, I would ask you to let the court hear some evidence

14   first from witnesses that would then let the court know that

15   there's a need to bring in an expert to explain these things.

16   Let's not lead off with that witness.  I've got problems with

17   that.  So, I'll hold a hearing, but we're not going to do it on

18   the day of trial or the day before trial.  We'll do it once we

19   get into the case and I start hearing some things.  And that's

20   generally how I'm used to the evidence coming in, that you have

21   a theory that the government has about a conspiracy or something

22   and then the jury has heard something from witnesses as to what

23   has taken place, and then you bring the witness on as an expert

24   to help the jury decipher and understand the evidence.  But to

25   do it prior to, I've never seen it that way.  That doesn't mean

1    it can't happen that way. But I just feel that in a caution of

2    fairness to the defense, let's hear something about the case

3    first to see whether his testimony is even necessary and

4    helpful.

5           All right. So, reserve on that, madam clerk.

6           And the other expert, there's no objection to that,

7    assuming it meets the test --

8           MR. TRAINOR: That's right.

9           THE COURT: -- preliminarily.

10          All right. Let's see what else we have. We've got to

11   go back to the motion to suppress. Do we have any other

12   motions? Have we gotten everything?

13          MR. TRAINOR: There is the motion regarding the

14   defendant's health and vision that is pending. I don't know if

15   the court is prepared to deal with that.

16          THE COURT: All right. Well, the defendant has filed a

17   motion under 35, madam clerk, 36 and 52, which appears to be a

18   second motion for medical treatment. As all the parties know,

19   because I have received and reviewed the motions and have very

20   carefully sent notices to the parties in response as well as to

21   the Marshal Service. I did check with the Marshal Service today

22   and I asked them to provide me with a response to my latest

23   letter last month, in February, and I know that that is being

24   processed today or as we speak. They've had notice. So, I

25   expect to get something shortly. It may not be today, but it

1  may be in a day or two, but I expect to have something from the

2  Marshal Service.

3          Mr. Trainor has advised the court that the defendant,

4  Mr. Royal, is having difficulty seeing.  And I guess my question

5  is if he can't see, then get him some glasses.

6          MR. TRAINOR:  If I may just put something on the record

7  on that, Your Honor.

8          THE COURT:  Yes.

9          MR. TRAINOR:  Mr. Royal has advised me that when he

10  went into the Charles County Detention Center that he had

11  corrective contact lenses which were either lost or destroyed

12  there.  And he also tells me that he has complained about it to

13  the -- is it the health people there?

14          THE DEFENDANT:  Yes.

15          MR. TRAINOR:  -- to the health people at the Charles

16  County Detention Center.  When he reads now, he has to hold it

17  within just a few inches of his face.  He's able to read but

18  only at that level right now.  I asked him today what he can see

19  in the courtroom and he said that he could see madam court

20  reporter's colors but he couldn't see faces and things.

21          I'm concerned that he won't be able to do that with

22  witnesses or that if there are any large exhibits that he might

23  not be able to see them.  I just ask for an eye examination and,

24  if he needs glasses, he should have them before he goes on trial

25  for the rest of his life.

1          THE COURT:  That's a fair request.  And as I mentioned

2     to you this morning, Mr. Trainor, my brief conversation with the

3     Marshal Service was that they had contacted the Charles County

4     Detention Center and they dispute that there's been any request

5     or issues associated with vision.  Now, that's what they said.

6     I don't dispute that.  I don't agree with that.  I have no

7     comment on that.

8          So, when we leave this hearing today, I will contact

9     the Marshal Service myself downstairs and ask them to have him

10    examined, that his eyes be examined.  If he needs glasses, give

11    him glasses.  I mean, get him glasses.

12          MR. TRAINOR:  Thank you, Your Honor.

13          THE COURT:  Yes, that's a reasonable request.

14          MR. TRAINOR:  There was one other item that I brought

15    up in the motion.  My client had told me that he had been

16    scheduled to see a Dr. Smith on January 19, 2010, for another

17    evaluation on this condition in his chest that he's so concerned

18    about.  I have a document that he provided to me, which is a

19    note from a registered nurse, Dennis Graham, apparently from the

20    detention center that confirms that he was scheduled to see

21    Dr. Smith on January 19, 2010.  I have provided a copy to the

22    government.  I would just like to hand it up so the court can

23    see what I'm talking about, if I may.

24          THE COURT:  All right.

25          Madam clerk, ask the marshal or official to come

1   upstairs.  Ask Mr. Rivers to come up so we'll put this on the

2   record right now.

3          MR. TRAINOR:  I would say that my most immediate

4   concern is his vision at this point.

5          THE COURT:  All right.

6          All right.  Do we have a witness on the motion to

7   suppress?  How many witnesses do we have?

8          MS. MAGNELLI:  Just one.

9          THE COURT:  All right.  All right.  Bring the witness

10  in.

11         MS. MAGNELLI:  Yes, Your Honor.  The government calls

12  FBI Special Agent Alicia Wojtkonski.

13         THE COURT:  All right.

14         MS. MAGNELLI:  For the record, that's

15  W-o-j-t-k-o-n-s-k-i.

16         THE COURT:  All right.

17         MS. MAGNELLI:  Your Honor, I've asked Mr. Trainor and,

18  if the court doesn't object, if I could conduct this direct

19  while sitting down.

20         THE COURT:  Yes, certainly.

21         MR. TRAINOR:  I have absolutely no objection.

22         THE COURT:  All right.  Certainly.

23         MS. MAGNELLI:  And just to bring it up, there might be

24  times in the trial where that's necessary as well.  I'm happy to

25  ask for leave of the court every time.

1          THE COURT:  Not a problem.  Not a problem.

2          THE DEPUTY CLERK:  Please raise your right hand.

3     ALICIA WOJTKONSKI, GOVERNMENT'S WITNESS, SWORN

4          THE DEPUTY CLERK:  State your name loudly and clearly

5     into the microphone and spell your last name for the record.

6          THE WITNESS:  It's Alicia Wojtkonski.  It's

7     W-o-j-t-k-o-n-s-k-i.

8          THE DEPUTY CLERK:  Spell your first name.

9          THE WITNESS:  A-l-i-c-i-a.

10         THE DEPUTY CLERK:  Thank you.

11                        DIRECT EXAMINATION

12    BY MS. MAGNELLI:

13    Q    Agent, with what agency are you employed?

14    A    At the Federal Bureau of Investigation.

15    Q    How long have you been so employed?

16    A    Almost six years.

17    Q    And in that role, what is your duty or what are your duties

18    and responsibilities?

19    A    To investigate cases and prepare them for court.

20    Q    And you are, in fact, a special agent?

21    A    Yes.

22    Q    Did you become involved with a search and seizure and arrest

23    warrant on February 3, 2009?

24    A    Yes.

25    Q    And did you assist in the seizure of a Mr. Lloyd Mack Royal,

1  III?

2  A   Yes, I did.

3  Q   And do you see him in the courtroom today?

4  A   Yes, I do.

5  Q   Can you describe something he's wearing?

6  A   He's wearing a white T-shirt and black pants.

7       MS. MAGNELLI:  Let the record indicate she's identified

8  the defendant.

9       THE COURT:  All right.  So indicated.  And what was

10  that date again?

11       MS. MAGNELLI:  February 3, 2009.

12  BY MS. MAGNELLI:

13  Q   Is that correct, agent?

14       THE COURT:  All right.

15       THE WITNESS:  Yes.

16       THE COURT:  Thank you.

17  BY MS. MAGNELLI:

18  Q   On that date did you respond to 522 Carousel Court and

19  assist other agents in putting the defendant in custody?

20  A   Yes.

21  Q   Was that pursuant to a federal warrant?

22  A   Yes, it was.

23  Q   And after you assisted in doing that, did you stay for the

24  search?

25  A   No, I did not.

1   Q   What did you do?

2   A   Myself and Special Agent Tracey Burdette transported the

3   defendant.

4   Q   Where did you transport him?

5   A   First to our Calverton office for processing.

6   Q   And why did you go to the Calverton office?

7   A   It's closer to Greenbelt where we ultimately have to bring

8   him to the marshals and we have the proper equipment to process

9   him.

10  Q   Do you remember approximately what time you left 522

11  Carousel Court?

12  A   About 6:20 in the morning.

13  Q   And in the ride over to Calverton, who was present in the

14  vehicle?

15  A   Myself, Agent Burdette and the defendant.

16  Q   What, if anything, do you recall happening in the vehicle?

17  A   I recall the defendant attempting to speak with us several

18  times.

19  Q   Can you elaborate on that?

20      THE COURT:  I'm sorry.  I was speaking with my clerk.

21  Can you go back over that?

22  BY MS. MAGNELLI:

23  Q   Once in the vehicle during the transport to Calverton, do

24  you recall anything happening in the vehicle?

25  A   Yes.  The defendant expressed a desire to speak with us and

1  give his story.

2  Q   Can you elaborate on that a little?

3  A   I was sitting in the back with the defendant.  Agent

4  Burdette was driving and the defendant several times indicated a

5  wish to speak, saying that he needed to tell his side.

6  Q   And what did you do in response to these statements of the

7  defendant?

8  A   We said that if he wanted to speak that we would -- he did

9  not have to speak with us, he had the right to an attorney,

10  didn't have to make statements but if he did want to make

11  statements that upon our arrival at Calverton, we would go over

12  a Miranda waiver, explain his rights to him and have him sign

13  the form.

14  Q   And do you recall whether or not this occurred more than

15  once in the transport?

16  A   Yes, it did.

17  Q   Do you recall how many times?

18  A   Not exactly, but it was more than twice, probably more than

19  three times.

20  Q   Just to clarify, what exactly happened more than twice or

21  more than three times?

22  A   Say again.

23  Q   In other words, was this sort of a cycle?  He would say

24  something, you would admonish him?

25  A   Yes.

1    Q    Is that what you're referencing when you say two or three

2    times?

3    A    Yes.

4    Q    And why is it that you wanted to wait until you got to

5    Calverton?

6    A    First, because it's not particularly safe to transport a

7    defendant and take an oath while you're driving, and also

8    because we wanted to have the form, make sure that he understood

9    each of his rights, have him initial them and have him sign the

10   form.

11   Q    And is that pretty standard protocol at the FBI?

12   A    Yes.

13   Q    If you recall, to the best of your recollection,

14   approximately how long did it take you to get from 522 Carousel

15   Court to the Calverton R.A.?

16   A    I can't say exactly, but I remember it was snowing and it

17   was rush hour.

18   Q    Once at the Calverton R.A., what happened?

19   A    We took him to the processing room and another employee did

20   his biographical information and fingerprinted him and things

21   like that.

22   Q    Up until that point had the defendant ever asked for an

23   attorney?

24   A    No.

25   Q    Did he ask to make any phone calls?

1   A    No.

2   Q    Did he ask for anything?

3   A    At one point he asked to go to the bathroom.

4   Q    And what did you do in response?

5   A    We called a male agent that was in the building to come and

6   assist us with that.

7   Q    Now, after he was processed and he used the restroom, what

8   happened next?

9   A    We did sit down at some point in an interview room and go

10  over his Miranda waiver with him.

11  Q    Let me stop you there.  You keep saying "we."  Who is the

12  "we"?

13  A    Myself and Agent Burdette.

14          MS. MAGNELLI:  And, Your Honor, I have the waiver.  If

15  I may approach.

16          THE COURT:  All right.  That's fine.  Let Mr. Trainor

17  see it.  Have you seen the waiver?

18          MR. TRAINOR:  I have it in front of me.

19          THE COURT:  All right.  Okay.  Great.

20          MS. MAGNELLI:  I'll have that marked as Government's

21  Exhibit 1.

22  BY MS. MAGNELLI:

23  Q    Agent, can you tell me what that is?

24  A    Yes.  This is an FBI FD-395 Advice of Rights form.

25  Q    Do you recognize that particular form?

1   A   Yes, I do.

2   Q   How do you recognize it?

3   A   It has my signature on it, my name and some of my

4   handwriting.

5   Q   And when was that form used?

6   A   February 3, 2009.

7   Q   With whom was it used?

8   A   With Lloyd Mack Royal.

9   Q   And the other signatures on that page, did you see the

10  signatures being made?

11  A   Yes.

12  Q   Who made those signatures?

13  A   Lloyd Mack Royal, myself and Agent Burdette.

14  Q   Do you see the initials on that page?

15  A   Yes.

16  Q   Who did you see make those initials?

17  A   Lloyd Mack Royal.

18          MS. MAGNELLI:  Your Honor, if I may.

19          THE COURT:  All right.

20  BY MS. MAGNELLI:

21  Q   Agent, is this the exact form that you went over with the

22  defendant?

23  A   Yes, it is.

24  Q   And when you went over it with him, please tell the court

25  exactly how you went over this form with the defendant.

1  A   We explained to him what it was, explained that we were

2  going to read each of his rights.  If he understood it, he was

3  to indicate that and then to initial it.  So we went over each

4  one one at a time.  He acknowledged that he understood and

5  initialed it.

6  Q   Was he responding appropriately to any questions you put to

7  him?

8  A   Yes.

9  Q   With regard to the rest of the interview, do you remember

10 approximately what time -- I know there's a time stamp on that

11 Miranda form.  Is that approximately the time the interview

12 started?

13 A   I can't say for sure but probably.

14 Q   But that's about the time that it was executed?

15 A   Yes.

16 Q   And that's about an hour and 20 minutes after you left the

17 522 Carousel Court address?

18 A   Yes.

19 Q   And approximately what time did you leave to take the

20 defendant to the marshals for his initial appearance and

21 booking?

22 A   About 11:35 in the morning.

23 Q   All right.  So, between approximately 7:38 and 11:35, what

24 happened?

25 A   We were interviewing him at some points.  He was talking to

1    us.  I know that we had to pause occasionally for Agent Burdette

2    to take phone calls and things like that.

3    Q    Okay.  So it was not a continuous interview?

4    A    No.

5    Q    All right.  And do you recall whether or not at all during

6    those three hours the defendant asked to have his attorney

7    there?

8    A    He didn't.

9    Q    Did he ever ask to make a phone call?

10   A    No.

11   Q    Did he ever revoke his rights?

12   A    No.

13   Q    And without getting into his statements, but during the

14   three hours, did he continue to ask or answer questions

15   appropriately?

16   A    Yes.

17   Q    Did he seem confused at any time?

18   A    No.

19   Q    How many times have you issued or gone over an advice of

20   rights with a defendant?

21   A    Dozens probably.

22   Q    Did you make him any promises of any kind when you went over

23   the rights?

24   A    No.

25   Q    Did you indicate you would talk to the prosecutor or

1  anything else?

2  A   No.

3  Q   Once you were finished with the interview, did the defendant

4  stop talking?

5  A   For the most part.

6  Q   Did he continue to make statements on the way to the

7  courthouse here?

8  A   Yes.

9  Q   And all those statements are now reflected in a 302 that's

10  been provided to the defense.  You took notes and they're

11  reflected in the 302?

12  A   Yes.

13      MS. MAGNELLI:  Your Honor, I would have nothing further

14  of the agent.

15      THE COURT:  All right.  Let's see if Mr. Trainor has

16  any questions.

17      MS. MAGNELLI:  Thank you.

18      MR. TRAINOR:  I just have a few.

19                  CROSS-EXAMINATION

20  BY MR. TRAINOR:

21  Q   Agent, I'm Harry Trainor.  I represent Lloyd Royal.  Prior

22  to February 3, 2009, were you assigned to this case for

23  investigative purposes?

24  A   No.

25  Q   So your first involvement in this case was February 3rd of

1   2009?

2   A   Yes.

3   Q   At that time you had not seen the videotape, then, of

4   Mr. Royal's interrogation in Montgomery County in 2007?

5   A   No.

6   Q   Now, you say that you picked him up pursuant to a warrant

7   and drove him to Calverton for processing?

8   A   Yes.

9   Q   That processing consisted primarily of questioning him,

10  correct?

11  A   No.

12  Q   How long was he questioned?

13  A   I can't really say.

14  Q   You don't know?  Did you take notes?

15  A   Yes.

16  Q   Where are your notes?

17  A   In a 1A envelope.

18  Q   So you have retained your notes, correct?

19  A   Yes.

20  Q   But you didn't bring them with you today?

21  A   I do have them.

22  Q   You have them with you today?

23  A   Yes.

24  Q   I wonder if I could -- have you reviewed your notes prior to

25  this testimony?

1  A    Yes.

2           MR. TRAINOR:  I wonder if I could have --

3           THE COURT:  Do we have the notes so he can quickly look

4  at them?

5           MS. MAGNELLI:  I don't have the notes, Your Honor.  She

6  testified from memory.  So I didn't think they were an issue.  I

7  don't personally have the notes.  I don't know if the agent has

8  notes on her.

9  BY MR. TRAINOR:

10 Q   Can you turn over a copy of those notes to me today, please?

11          MS. MAGNELLI:  Your Honor, I would object.

12          THE COURT:  Yes, I will sustain the objection to that

13 question.

14          MR. TRAINOR:  All right.

15 BY MR. TRAINOR:

16 Q    So, notes exist, correct?

17 A    Yes.

18 Q    And you have retained them, correct?

19 A    Yes.

20 Q    And from those notes you prepared a typewritten FBI 302

21 dated February 5th of '09, correct?

22 A    Yes.

23 Q    Is there any statement that you claim that Lloyd Mack Royal

24 made on February 3, 2009, that is not set forth in the 302?

25 A    Not that I can recall.

1   Q   Everything that you recall that he said is in the 302 dated

2   February 5, 2009?

3   A   Everything pertaining to the case.

4   Q   And you have checked your notes and there's nothing in your

5   note indicating that he made statements that are not included in

6   the 302, correct?

7   A   Correct.

8   Q   That is correct?

9   A   Correct.

10          THE COURT:  Hold on one second.  Mister Marshal, are

11  you here in response?

12          THE DEPUTY MARSHAL:  Yes, sir.

13          THE COURT:  All right.  If you can come forward just

14  for a second.  I want to give you something.  Mr. Rivers was at

15  my office this morning in chambers and I mentioned that a letter

16  had gone out from me to him and to the Charles County Detention

17  Center.  I believe they have a copy of it and they're supposed

18  to be responding to my letter.

19          THE DEPUTY MARSHAL:  Yes, sir.

20          THE COURT:  Meanwhile, two things.  Defense counsel has

21  just given us this letter which I'm going to give you a copy of,

22  which is also contained in my letter.  It talks about a doctor's

23  visit with a Dr. Smith he was scheduled to have on January 19,

24  2010, which he said he never got.  And you can look at that

25  letter and that should be part of the response to me.

1          And then the second issue is that Mr. Royal who is here

2     in court claims that he cannot see, that everything is blurred

3     to him right now and he can't see much beyond the court

4     reporter.  And so, my statement to everyone in here is that he

5     should be examined immediately for glasses, and if he needs

6     glasses or corrective lenses, give it to him.

7          So, that's the message I wanted to let you know.  If

8     you can give it to Mr. Rivers and to the Marshal Service and to

9     Charles County.  If he can't see, he can't be effective.  So,

10    they need to have him examined immediately.

11          THE DEPUTY MARSHAL:  Yes, sir.

12          THE COURT:  And if glasses are needed, then let's give

13    it to him.

14          THE DEPUTY MARSHAL:  Yes, sir.

15          THE COURT:  So, that's all, those two things right

16    there.  And Mr. Rivers already was in my office this morning.

17    So he made sure that Charles County had my letter.  They're

18    going to respond to my letter shortly, but those two things are

19    in the letter.  So, I just wanted to give you that.

20          THE DEPUTY MARSHAL:  Yes, sir.

21          THE COURT:  All right.  Thank you.  Can you state your

22    full name for the record so the reporter will have it.

23          THE DEPUTY MARSHAL:  Charlie Northington.

24          THE COURT:  All right.  Thank you.

25          All right.

1        MR. TRAINOR:  Thank you, Your Honor.  Just a few more

2   questions.

3   BY MR. TRAINOR:

4   Q   Agent, you were present during the questioning of Mr. Royal

5   at Calverton at the FBI office, correct?

6   A   Yes.

7   Q   Was it you who were taking the notes or was it someone else?

8   A   I would say it was mostly me.

9   Q   Mostly you.  But someone else --

10  A   Agent Burdette.

11  Q   Were you taking them separately or on the same pad?

12  A   I believe she started to take the notes.  Her phone kept

13  ringing.  So she gave them to me to finish.

14  Q   Isn't it true that during that questioning you said to

15  Mr. Royal, "Tell me what happened so I can help you"?

16  A   No.

17  Q   Did you say anything to that effect?

18  A   No.

19        MR. TRAINOR:  Court's indulgence.

20        No further questions.

21        THE COURT:  All right.  Government, do you have

22  anything else?

23        MS. MAGNELLI:  No, Your Honor.

24        THE COURT:  All right.  You have may stand down.

25        I find that the statements made on this record are

1 knowingly and voluntarily and understandingly made and they're

2 in compliance with Miranda v. Arizona and I don't see a reason

3 to hold them out.  They will be admitted if the government wants

4 to use them.

5       Okay.  Anything else?

6       MR. TRAINOR:  Your Honor, I had a scheduling request

7 that I'd like to make to the court.  I have told the government

8 about this and they have told me they do not oppose it.  On

9 Friday, March 26th, I have been requested to be in Denver,

10 Colorado, for a conference on a Federal Bureau of Prisons

11 homicide case that I am handling in the Northern District of

12 West Virginia, and I really need to know whether or not the

13 court would let me go to that.  If the court says no, I will

14 cancel immediately.

15       THE COURT:  Well, I have no reason to say no.

16       MR. TRAINOR:  I'm looking at my schedule.  I could get

17 a flight out of BWI at about 6:15 on Thursday and certainly be

18 back --

19       THE COURT:  Where are you flying from?

20       MR. TRAINOR:  I would fly from BWI to Denver.

21       THE COURT:  Well, we can end at 4 o'clock.

22       MR. TRAINOR:  I just need to get to the airport in

23 time.

24       THE COURT:  We could end at 4 o'clock on that Thursday

25 if you just let me know.  Yes.  The government has no objection

1    to that, do you?

2           MS. MAGNELLI:  No, Your Honor, none whatsoever.

3           THE COURT:  Yes.  We'll work with you on that.

4           MR. TRAINOR:  Well, I'm going to pay for my ticket,

5    then.

6           THE COURT:  Okay.

7           MR. TRAINOR:  Thank you.

8           THE COURT:  All right.  Well, I think that's

9    essentially it.  I have the government's voir dire and I have

10   the government's proposed instructions.  If you have any voir

11   dire, you can get that to me.

12          MR. TRAINOR:  I filed it yesterday afternoon, just a

13   few questions.

14          THE COURT:  All right.  We'll go ahead and put that

15   together and we'll just prepare for trial.  That's fine.  Yes.

16          MS. MAGNELLI:  Thank you, Your Honor.

17          THE COURT:  All right.  Great.  So this concludes this.

18          (Proceedings adjourned at 11:50 a.m.)

19                     CERTIFICATE OF REPORTER

20          I hereby certify that the foregoing is a true and

21   accurate transcript of proceedings in the above-entitled matter,

22   to the best of my knowledge and ability.

23

24                         _____/s/_____

                            Gloria I. Williams
25                          Official Court Reporter