UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION


UNITED STATES OF AMERICA     .   Criminal Case No. AW-09-0048
                             .
    v.                       .
                             .   Greenbelt, Maryland
LLOYD MACK ROYAL, III,       .
                             .
             Defendant.      .   Tuesday, March 16, 2010
. . . . . . . . . . . . . . . .   10 o'clock a.m.



                    TRANSCRIPT OF TRIAL
          BEFORE THE HONORABLE ALEXANDER WILLIAMS, JR.
            UNITED STATES DISTRICT JUDGE, AND A JURY



APPEARANCES:

FOR THE GOVERNMENT:          SOLETTE A. MAGNELLI, ESQ.
                             Office of the United States Attorney
                             36 S Charles Street
                             Baltimore, Maryland 21201

                             JAMES F. FELTE, JR., ESQ.
                             United States Department of Justice
                             950 Pennsylvania Avenue, N.W.
                             Washington, D.C. 20530


FOR THE DEFENDANT:           HARRY J. TRAINOR, JR., ESQ.
                             Trainor, Billman, Bennett, Milko
                               And McCabe, LLP
                             116 Cathedral Street, Suite E
                             Annapolis, Maryland 21401


OFFICIAL COURT REPORTER:  GLORIA I. WILLIAMS   301-344-3228

          COMPUTER-AIDED TRANSCRIPTION OF STENOTYPE NOTES

<u>I N D E X</u>

<u>PRELIMINARY MATTERS</u> - 3

<u>PRELIMINARY INSTRUCTIONS TO JURY</u> - 14

<u>OPENING STATEMENTS</u>

  Government - 19

  Defense    - 39

<u>GOVERNMENT'S WITNESS</u>     <u>DIRECT</u>  <u>CROSS</u>

Anthony Caban              50      70

1                    P R O C E E D I N G S

2          MS. MAGNELLI:  Your Honor, this is United States v.

3    Lloyd Mack Royal, III, criminal number AW-09-048.  Solette

4    Magnelli for the government.  Seated with me at counsel table is

5    Jim Felte from the Department of Justice, Tracey Burdette from

6    the Federal Bureau of Investigation, and Alyson Dupouy from the

7    Montgomery County Police Department.  Your Honor, this case is

8    set for trial.

9          THE COURT:  All right.  Mr. Trainor.

10         MR. TRAINOR:  Good morning, Your Honor.

11         THE COURT:  Good morning.

12         MR. TRAINOR:  Harry Trainor representing Lloyd Royal

13   who is seated next to me at counsel table.

14         THE COURT:  All right.

15         MR. TRAINOR:  Just a couple of preliminary matters.

16         THE COURT:  Yes.

17         MR. TRAINOR:  The court was kind enough to grant an

18   order regarding my client's vision and I wanted to report to the

19   court that as of yesterday he received an eye examination and

20   got contact lenses.  This morning he reports to me that he can

21   see much better in the courtroom.  However, there's an

22   adjustment period on the contact lenses.  His problem now is at

23   Charles County Detention Center they don't let him have access

24   to his cleaning solution and his eye drops.  Am I right on that?

25         THE DEFENDANT:  Yes.

1    MR. TRAINOR:  And we would ask the court to do what it

2 can to see that he's able when he goes back in the evening to

3 get the solutions that he needs to keep his lenses clean and to

4 put it into his eyes.

5    THE COURT:  Yes, we'll certainly mention that.  Madam

6 clerk, if you can get a note together and we can ask the

7 marshals to look into that.  That's fine.

8    MR. TRAINOR:  Thank you, Your Honor.

9    THE COURT:  Any other preliminary matters?

10    MR. TRAINOR:  Nothing.

11    THE COURT:  All right.  On that, I'm glad to hear that

12 following the last hearing the Marshal Service as well as the

13 people at Charles County Detention Center addressed the issue of

14 the vision.  That's taken care of.

15    And, of course, as I mentioned to all of the parties

16 last time we were in court that there were three outstanding

17 motions for a medical exam.  One is, madam clerk, paper 35.  And

18 then paper 36, I believe, is the defendant's hand request for a

19 medical exam.  And then the final motion is 52, which is styled

20 as a second motion for medical treatment.  And the court

21 mentioned that it deferred on those motions pending receipt from

22 the Charles County Detention Center by way of the Marshal

23 Service getting the court an update on his medical situation.

24 The court did receive a letter from the health service

25 administrator at Charles County Detention Center, Erin Butler,

1  which the court has, and the court is satisfied that Charles

2  County has monitored his medical complaints and they've now

3  addressed his vision problem and he has seen various doctors in

4  connection with his breast complaints and chest examinations,

5  and I have a blow-by-blow report from Charles County as to what

6  has occurred.

7       There's been several complaints by Mr. Royal which,

8  again, according to this report, have been addressed.  And

9  specifically, Mr. Trainor, the report indicates that he never

10  really complained about any vision but at some point he did and

11  he said they were going to bring glasses from home or what have

12  you.  At any rate, that's been corrected.  He never really

13  documented any complaints or problems with his eyes.  As I said,

14  according to the records given to me, Mr. Royal only mentioned

15  one time a need for eyeglasses but preferred to have his glasses

16  brought from home.  But, again, a specialist was called in and

17  he's been seen.

18       There's also a report that a dental appointment was

19  made for the extraction of his right lower molar, which was

20  taken care of, and he's had other various and sundry complaints

21  which again are documented in terms of medical people addressing

22  his concerns.

23       So, the court is satisfied, Mr. Trainor, that there's

24  no need for me to grant these motions for any emergency

25  treatment or medical exam.  I'm satisfied, based on the report

1  that I have, that there are no cogent reasons for this court to

2  grant these motions.

3       So, madam clerk, papers 35, 36 and 52 will be denied

4  for the reasons I've just expressed.  And, again, the court is

5  in receipt of two reports, including one update as to what is

6  happening in Charles County, and beyond the complaint about the

7  vision, which we heard at the last hearing and has now been

8  addressed, the court has heard nothing else to suggest any need

9  for any medical exam.  So, that will be denied, madam clerk.

10      MR. TRAINOR:  Your Honor, may I address my client on

11 the record for a moment?

12      THE COURT:  Yes.

13      MR. TRAINOR:  Mr. Royal, is there any other medical

14 issue you want me to raise with the judge before we begin this

15 trial?

16      THE DEFENDANT:  No.

17      MR. TRAINOR:  Thank you.  I asked --

18      THE COURT:  That answer was no?

19      THE DEFENDANT:  Correct.

20      THE COURT:  He answered no.  All right.

21      Now, are there any other preliminary matters that we

22 need to address before we see whether the jury is ready?

23      MS. MAGNELLI:  Your Honor, I gave the court an exhibit

24 binder this morning and in it there was a letter trying to

25 follow the court's directive with regard to whether or not we

1  might have 404(b) every day and that kind of thing.

2          THE COURT:  If we had what?

3          MS. MAGNELLI:  404(b).  I just wanted to alert the

4  court that the people we believe are going to testify today, I

5  don't believe anything they're going to say is 404(b), but out

6  of an abundance of caution, I did note anything for the court

7  that I thought Mr. Trainor would object to just so that if we

8  need to address it, we can do so.

9          THE COURT:  All right.

10         MS. MAGNELLI:  The only other question I have, Your

11 Honor, is a procedural one.  I will be up at the witness stand

12 showing exhibits at some point and would be asking to publish

13 those exhibits to the jury.  And I've talked to Mr. Trainor

14 about this.  Would it be all right, to keep from having to go

15 back and forth, if my co-counsel could put an exact duplicate on

16 the ELMO once published?

17         THE COURT:  Is there any reason to oppose that?

18         MR. TRAINOR:  Your Honor, if it is an exact duplicate,

19 we will not oppose it.

20         MS. MAGNELLI:  It's a photocopy of the original, yes,

21 Your Honor.

22         THE COURT:  All right.

23         MS. MAGNELLI:  And I believe the court has mentioned

24 before that perhaps during my direct I can sit down.

25         THE COURT:  Yes.  There's no need for you to stand up.

1    Do you want me to mention that to the jury?

2         MS. MAGNELLI:  That's at the court's discretion.  I've

3    had the court address it or not.  I don't care either way.  I

4    think they'll see.

5         THE COURT:  All right.  Okay.  Great.

6         And, Mr. Trainor, you have a couple of additional

7    questions, I believe.  A lot of these questions I always give in

8    my set of instructions, the requests that you've made.  And you

9    also have objected to the government's proposed jury

10   instruction -- excuse me -- jury question No. 1 to the extent

11   that it includes, again, nicknames "Furious" and the other

12   nicknames, and we've already mentioned that before, that

13   apparently there are some witness who are going to identify him

14   by those names, and because that's a proffer made by the

15   government, the court will overrule or deny your objection to

16   asking that question whether any of the jurors know anyone by

17   the name of "Furious" and the other related nicknames.

18        All right.  Any other concerns about the voir dire?  I

19   had read where we're talking four weeks.  Are we talking four or

20   three?  I thought we were saying three.

21        MS. MAGNELLI:  Your Honor, the time estimate as it

22   stands is three to four weeks.  The government sincerely hopes

23   to cut that down so that we can in toto finish the trial in

24   three weeks.  I hope.  That is our goal.  So, as we go, we are

25   sort of cutting the --

1          THE COURT:  All right.  Do you have a witness list?

2    Are we going to read that?  The government can read that.  One

3    of your co-counsel can read that.

4          All right.  So we'll mention three weeks.

5          MS. MAGNELLI:  Your Honor, if you have the witness list

6    before you, I would just draw your attention to the -- out of an

7    abundance of caution, the government attached three photographs

8    of the individuals to whom we will not be referring by last name

9    should the court want to show those.  I wanted to make sure and

10   cover the bases.

11         THE COURT:  Is there any reason to show them?

12         MS. MAGNELLI:  Again, I've had other judges do so to

13   make sure that there is no problem with the witness list.

14         THE COURT:  Well, let's see what Mr. Trainor would

15   like.

16         MS. MAGNELLI:  These are the same photos we'll show

17   during trial.

18         THE COURT:  All right.  Can we put them on the screen

19   for them to see?

20         MS. MAGNELLI:  Yes.

21         THE COURT:  For the jurors.  I mean for the potential

22   jurors to see.

23         MS. MAGNELLI:  Yes, Your Honor, we can.

24         THE COURT:  All right.  Let's do that.

25         MS. MAGNELLI:  Okay.

1         THE COURT:  All right.  Since we're not going to use

2  their names.

3         Since I don't have any other questions, we'll play this

4  by ear.  Three alternates I suggested because of the three-week

5  trial as predicted.  So I'll need 15 jurors, three alternates.

6         All right, madam clerk, were you able to talk with the

7  jury clerk?

8         THE DEPUTY CLERK:  Yes, sir.

9         THE COURT:  And what is she doing?  Is she letting

10  people know that it's a potential three week?

11         THE DEPUTY CLERK:  They're doing their best for you.

12  They will do their best.  We're still going to have people that

13  will complain.

14         THE COURT:  What do you mean they're doing their best?

15         THE DEPUTY CLERK:  They're going to do their best to

16  make sure --

17         THE COURT:  Is she ready?

18         THE DEPUTY CLERK:  For the people to come up?

19         THE COURT:  Yes.

20         THE DEPUTY CLERK:  I'll check.

21         THE COURT:  It's going to be about 10 minutes before we

22  can get a jury together.  Apparently there are trials all over

23  the courthouse today, other judges also requiring jurors.  So

24  we'll wait about 10 minutes and see what happens.

25         Do you have an extra copy of the second superseding

1  indictment?

2       MS. MAGNELLI:  Yes, Your Honor.  Your Honor, I can make

3  an extra copy of the --

4       THE COURT:  At your convenience, just the unsigned

5  version.

6       MS. MAGNELLI:  Does the court want a copy of the

7  unsigned version?

8       THE COURT:  That's your copy.  Just keep it.  I just

9  need it at some point.

10       MS. MAGNELLI:  Your Honor, if I may bring up an issue

11  that we can deal with while the jury is not here.  I have two

12  witnesses who are here and there's some indication that they

13  only intend to show up today per their subpoena and I was hoping

14  to have the court advise them that they actually need to -- that

15  that controls the life of the trial, and while we are not going

16  to call them today that either they need to be on call or they

17  need to appear.  That might be something we can do.  I was going

18  to do it at the end of the day, but they are both here now and

19  we had a few minutes.  I thought that might be something --

20       THE COURT:  Well, are they under subpoena?

21       MS. MAGNELLI:  They are subpoenaed, yes, but there's

22  indication that they only intend to show up today at 9:45 and at

23  no other date or time.

24       THE COURT:  All right.  What are they, longer

25  witnesses?  Is there any reason why you can't call them today?

1          MS. MAGNELLI:  Yes, Your Honor.  We have witnesses who

2     are in town from travel and we just can't call them today, and

3     we actually told them that, but they insisted that they would

4     come on this day, at this time.

5          THE COURT:  All right.  Well, subpoenas are good for

6     the entire trial and if they don't show up, they do it at their

7     peril.  You certainly can tell them that.

8          MS. MAGNELLI:  Would the court like to advise them of

9     that on the record or should I just tell them?

10         THE COURT:  No.  You can bring them in at some point if

11    you don't get to them today.  You're not going to use them

12    today?  Is that definite?

13         MS. MAGNELLI:  I can't see how we would and I'm just

14    trying to not keep them around all day if I'm pretty sure we're

15    not going to use them.

16         THE COURT:  Are they local?

17         MS. MAGNELLI:  Yes.

18         THE COURT:  All right.  Well, then, you can bring them

19    in.  There's no point in wasting their time --

20         MS. MAGNELLI:  All right.

21         THE COURT:  -- if they're here.  When do you expect to

22    call them?

23         MS. MAGNELLI:  Your Honor, in this particular case we

24    have numerous people who are in from out of town and we're

25    trying to get all of them done first.  So, I would say toward

1  the end of the week.  I was more than happy to call them and let

2  them know.  They're both local.  But we stand where we stand on

3  that.  I think hearing it from the court will help.

4          Your Honor, apparently one of the witnesses I was

5  mentioning has left the courthouse.  We hope he'll be back.

6  This is the other witness.

7          THE COURT:  Where is the other witness?

8          MS. MAGNELLI:  We believe he went to move his car.

9          THE COURT:  All right.  This is who?  What is this

10 gentleman's name?

11         MS. MAGNELLI:  This gentleman's name is Glenn Fair.

12         THE COURT:  Mr. Fair, it's been brought to my attention

13 that you have been subpoenaed as a witness in this trial and I

14 want to say to you that this trial is going to be a fairly

15 lengthy trial and we've got to spend some time selecting a jury

16 and probably will not start until this afternoon, and the

17 government has indicated that it has out of town witnesses that

18 they will be calling first.  And so, the likelihood of you

19 getting on today is just not good.  You'll be probably asked to

20 come back on Friday, somewhere near the end of the week, and

21 rather than waste your time sitting here waiting for your turn,

22 we would just excuse you from today.  But I will remind you that

23 a subpoena is not just for today but it lasts through the trial,

24 and you will be contacted by the government to come and honor

25 your subpoena.  As I said, a subpoena means what it says, that

1   you will come or you don't come at your risk.

2          So, I'm simply suggesting to the government that they

3   not waste your time and have you just stay here and wait, but

4   I'm going to excuse you so you won't have to remain and he'll be

5   directed to come back the government says around the end of the

6   week.

7          Do you understand that, Mr. Fair?

8          MR. FAIR:  Yes, sir.

9          THE COURT:  All right.  Then we can excuse him --

10         MS. MAGNELLI:  Yes, Your Honor.

11         THE COURT:  -- until we need him.

12         MS. MAGNELLI:  Yes, Your Honor.  Thank you.

13         THE COURT:  Is there another person?

14         MS. MAGNELLI:  He's not back yet, Your Honor.

15         THE COURT:  All right.  Okay.  Well, Mr. Fair can be

16  excused.  I'll just put a note that I've advised him.

17         All right.  Thank you, Mr. Fair.  We'll see you when we

18  get to you.  All right.

19         MR. FAIR:  All right.  Thank you.

20         THE COURT:  Yes, sir.

21         (Voir Dire - Jury of 12 and three alternates duly

22  impaneled and sworn - Not transcribed herein.)

23         THE COURT:  All right, ladies and gentlemen, now that

24  you have been sworn, let me give you some preliminary

25  instructions to guide you in the participation in this trial.

1        It will be your duty to find from the evidence what the

2   facts are.  You and you alone are the judges of the facts.  You

3   will then have to apply to those facts the law as the court will

4   give it to you.  You must follow that law whether you agree with

5   it or not.  Nothing the court may say or do during the course of

6   this trial is intended to indicate or should be taken by you as

7   indicating what your verdict should be.

8        The evidence from which you will find the facts will

9   consist, one, of the testimony of witness, two, any documents

10  and other things received into the record as exhibits, and any

11  facts the party agree or stipulate to.

12       Now, certain things are not evidence and must not be

13  considered by you as evidence.  Let me list them.  Number one,

14  the opening statements you are about to hear, any final

15  arguments at the end of the case, or questions by lawyers,

16  that's not evidence.

17       Now, objections to questions are not evidence either.

18  Lawyers have an obligation to their clients to make an objection

19  when they believe evidence being offered is improper under the

20  rules of evidence.  You should not be influenced by the

21  objection or by the court's ruling on it.  If I sustain the

22  objection, ignore the question.  If I overrule the objection,

23  treat the answer like any other.  If I instruct you that some

24  item of evidence is received for a limited purpose only, you

25  must follow that instruction.

1    Any testimony that I tell you to exclude or tell you to

2    disregard, that's not evidence and must not be considered by

3    you.

4    Anything you may have seen or heard outside this

5    courtroom, that's not evidence and must be disregarded.  You are

6    to decide the case solely on the evidence presented here in this

7    courtroom.

8    There are two kinds of evidence, one, direct and the

9    other circumstantial.  Direct evidence is direct proof of a fact

10   such as the testimony of an eyewitness.  Circumstantial evidence

11   is proof of facts from which you may infer or conclude that

12   other facts exist.  I will give you further instructions on

13   these as well as other matters at the end of the case but have

14   in mind now that you may consider both kinds of evidence.

15   It will be up to you to decide which witnesses to

16   believe, which witnesses not to believe, and how much of any

17   witness's testimony to accept or reject.  Again, at the end of

18   the case I will give you guidelines for determining the

19   credibility of witnesses again at the end of the case.

20   The rules of evidence ordinarily do not permit

21   witnesses to testify as to opinions or conclusions.  An

22   exception to this rule exists as to those whom we call expert

23   witnesses.  Witnesses who, by education and experience, have

24   become expert in some art or some science or some profession or

25   calling, they may state their opinion as to relevant and

material matters in which they profess to be expert.  They also may state their reasons for the opinion.  You should consider each expert opinion received in evidence in this case and give it such weight as you think it deserves.

Now, just a few remarks about your conduct as jurors. First, I instruct you that during the trial you are not to discuss the case with anyone or permit anyone to discuss it with you.  Until you retire to the jury room at the end of the case to deliberate on your verdict, you simply are not to talk about this case.

Second, ladies and gentlemen, do not read or listen to anything touching on this case outside, again, of this courtroom.  If anyone should try to talk to you about it, bring it to my attention promptly.

Third, do not do any research or make any investigation about the case on your own.

Finally, one of the reasons I tell jurors not to discuss it until the end of the case -- and you'll be on breaks and you'll be having just small talk -- you are not to form any opinion until all the evidence is in.  So, keep an open mind until you start your deliberations at the end of the case.

Now, you may take notes if you want.  Pads and pencils will be provided.  You should remember, however, that note-taking can interfere with your ability to watch the witnesses and to hear everything the witnesses say.

1   Notes must be left behind at the end of the day and on

2   breaks.  If some people take notes, your notes will not control

3   when the jury is deliberating, but each juror's individual

4   recollection is to be considered.

5   Now, we're going to start this trial in a couple of

6   minutes.  First, each side may make an opening statement.  An

7   opening statement is not evidence and it's not any final

8   argument.  It's simply an outline, a preview of what the witness

9   expects the evidence to prove and it's simply offered to help

10  you to follow the evidence.  After the opening statements, the

11  evidence will be presented, and after that, then the attorneys

12  will make their closing arguments to summarize and interpret the

13  evidence for you.  I'll then give you the instructions on the

14  law to assist you in your deliberations.  You then will retire

15  to deliberate on your verdict.

16  Please remember where you are sitting and after each

17  break come back to the same seat.

18  So, those are the preliminary instructions, ladies and

19  gentlemen and, again, I'm going to require the attorneys to move

20  this trial.  We're not going to waste your time and if we have

21  any long objections, we'll let you go to the jury room, and I'll

22  try to take any long-winded objections before court starts or

23  after on any issues as to evidence and so forth.  So, that's

24  generally what happens.  And you have professional counsel on

25  both sides.  They've been in trials before.  They're very

1   learned.  So they know how to move things.  So, that's

2   essentially it.

3           Government, do you need a few minutes to set up?

4           MS. MAGNELLI:  Your Honor, I just need a podium.

5           THE COURT:  What's that?

6           MS. MAGNELLI:  If someone could move the podium.

7           THE COURT:  All right.  Can someone move the podium?

8   Do you need any help?

9           Ladies and gentlemen, while we're waiting, as you can

10  see, Ms. Magnelli is expecting and I've told her to the extent

11  she needs to sit down, she can sit down.  It's not a problem.

12  And she may be asking some questions from her seat.  Normally we

13  stand, but we'll work with her.

14          MS. MAGNELLI:  Your Honor, after openings we'll need a

15  few minutes.

16          THE COURT:  All right.  Okay.  Great.  No problem.

17          MS. MAGNELLI:  Your Honor, if I may proceed.

18          THE COURT:  Yes.  Thank you.  Go ahead.

19          MS. MAGNELLI:  Good afternoon, ladies and gentlemen.

20  My name is Solette Magnelli and I represent the United States in

21  this case along with my co-counsel, Jim Felte.  We are going to

22  be presenting a case to you over the next few weeks and it is my

23  time right now just to take a few minutes and try to give you a

24  little bit of a preview of the things that you're going to hear.

25          Now, I'm not going to take the time to lay it all out

1   for you, but my goal here is to give you just a preview, if you

2   will.

3           We're going to go back to April of 2007.  The time

4   frame here is actually going to be May and April, but we're

5   going to go back to April.  There was a particular night in

6   April of 2007 when Stephanie, who was just 17 years old at the

7   time, went to a house party with a friend.  She went to the

8   house party with Melissa, her girlfriend, and she went to the

9   house party with another friend, David, and she had no idea at

10  that moment when she went to that party that her night would end

11  up near Gunners Lake in Montgomery County when she was fearing

12  for her life.  Earlier that night Melissa and Stephanie were

13  hanging out, deciding what to do, and they decided to contact

14  David and David's friend Gavin and the four of them went to this

15  house party in Cinnamon Woods off Clopper and Mateny Road in

16  Montgomery County.  There they spent a little bit of time

17  hanging out with friends, doing what typical teenagers do.

18          Over the course of the next several hours at this house

19  party, Melissa and Stephanie started to get phone calls.  The

20  phone calls were from the defendant.  The phone calls from him

21  became increasingly angry and frustrated.  They became

22  increasing in number.  Essentially, the defendant was angry that

23  they were not with him.  He wanted to see them.  He wanted them

24  to be with him.

25          Now, Stephanie did not want to go.  Eventually Melissa

agreed to meet the defendant.  So, the plan basically was for David to drive Stephanie and Melissa to a closed parking lot of a grocery store and there Melissa would get out and she would wait for the defendant, and David and Stephanie would go back to the house party.  But things didn't go quite as planned.

They go to the local parking lot of this grocery store. Melissa gets out, and before David and Stephanie can pull away, the defendant arrives in his vehicle with his friend Mike.

Now, David, not knowing the defendant, takes Stephanie and they start to drive away, but he looks in his rearview and he realizes that the defendant is following him.  He doesn't know this guy, makes him nervous.  He starts to speed up.  Still following him.  He gets even more nervous.  He makes a wrong turn trying to get back to the house party and ends up in a cul-de-sac he's unfamiliar with.  After a little bit of jockeying of positions between the two cars, David finally makes it out of the cul-de-sac and gets to the house party.  David and Stephanie go inside believing that they had shook the defendant, that they had evaded him.

Now, when David left the party to take Stephanie home, he ran into the defendant in the front yard of this house.  The defendant had found him.  He had gone back to the parking lot. He had gotten Melissa and he had found the house party.  The defendant confronted David, threatened him, yelled at him and demanded that Stephanie get into his car.  Again, Stephanie was

1  refusing to go with the defendant, but he was close to David, he

2  was in his face, and he was intimidating, and he continued to

3  demand that Stephanie get into his car.

4         Now, eventually Stephanie, hoping for the best, being

5  17, got into the defendant's car.  When she got into the car,

6  her friend Melissa was in the back seat and the defendant's

7  friend Mike was in the front seat.  Now, the defendant got in

8  and drove away.  He didn't drive very far.  He drove to Gunners

9  Lake as I mentioned earlier.  He drove to Gunners Lake, which is

10  a little bit more out of the way, a little bit more hidden, and

11  he parks there, and at that point he left Melissa and Mike in

12  the car, but he took Stephanie with him.  He got out of the car.

13  He took Stephanie with him and he actually also took a firearm

14  with him.  Now, Stephanie didn't necessarily realize that in

15  that moment but she would realize it soon enough.  He got out.

16  He took Stephanie's hand.  He walked her to the lake, a little

17  bit out of the way, little bit more hidden, out of sight, into

18  the dark, and Stephanie was petrified.  She had no idea what to

19  say, what to think, what was going on.  All she knew is that

20  she'd grown more and more scared of this guy over the last few

21  weeks.  And this, being taken from a party, walking near a lake,

22  this was different.  This was new.  This scared her.

23         As they walked to the lake, essentially he said as long

24  as you hold my hand, everything will be okay, you'll be fine,

25  just hold my hand.  At some point thereafter he let go of her

1  hand and in that moment -- in that moment -- Stephanie believed

2  that she might very well die that night.  At 17, next to a lake

3  in Montgomery County, her life would come to an end, and she was

4  crying.  She didn't know what to think.

5          Now, over the next few minutes a flurry of activity

6  happened.  Stephanie is crying.  She was begging.  The defendant

7  got angry.  The defendant smacked her.  The defendant pulled out

8  a firearm, started waving it around, some time with the barrel

9  pointing at her.  He actually eventually gave it to her and he

10  said, "Shoot it at the lake."

11          Now, again, she's terrified.  She has no idea why he's

12  actually saying this, why does he say, "Shoot it at the lake."

13  She actually thought about taking the firearm and shooting him,

14  but she was really too scared to defy him.  At that point

15  anything could go wrong if she turned on him.  So, again, hoping

16  for the best, she did what the defendant told her to do.  She

17  pointed it.  She tried to shoot it.  She pulled the trigger.

18  Nothing happened.  She was surprised nothing happened.  The

19  defendant also seemed surprised that nothing happened.  What

20  happened was that Mike back in the car had unloaded the gun

21  before he had handed it to the defendant.

22          The defendant, now more angry and more frustrated, took

23  the gun, took Stephanie, went back at the car, yelled at Mike,

24  loaded the gun and then he drove away.  But as he was driving,

25  he turned and he handed the firearm to Stephanie, who was in the

1   back seat with Melissa, and he told her, "Shoot this out the

2   window."  That's essentially what he said.  She didn't know why

3   he was saying this.  She had no idea why he wanted her to do

4   this.  Now, we would find out later because he would tell

5   people.  But at that moment, in that time, she was crying.  She

6   was petrified.  He had already smacked her.  Now she knew he had

7   a firearm.  So, again, hoping for the best, she did exactly what

8   the defendant told her to do.  Of course she shot it out the

9   window.  Now, the bullet didn't hit anything.  Nobody was hurt.

10  But she did as she was told.

11      We will find out later that the defendant had gone

12  through this exercise with Stephanie because he had been angry

13  that Stephanie was out with another guy, with David.  He was

14  angry because he told people that Stephanie was still his.  He

15  was angry because Stephanie refused his demands to sell herself.

16  She belonged to him and she said no.

17      Now, ladies and gentlemen, over the next few weeks you

18  are going to hear a lot about a few teenage girls.  You're going

19  to hear from a lot of witnesses.  You're going to see a lot of

20  things.  And all these people are going to tell you about a

21  particular man.  He's known by a few nicknames.  He's known by

22  the nickname Blyss.  He's known by the nickname, B as in the

23  letter.  And he's known by the nickname Furious.  But make no

24  mistake, it's that man, Lloyd Mack Royal, III, the defendant.

25  He's the one they're all going to tell you about.

1       You are going to hear that Melissa, who was just 17 at

2   the time, and Stephanie, who was just 17 at the time, and Ilana,

3   who was just 16 at the time, one-by-one over the period of a few

4   weeks these teenagers found themselves in his world, a man

5   nearly a decade older, a man who knew how old they were, and you

6   will hear that one-by-one they were brought into and kept into

7   his world.  You will hear about the different ways that the

8   defendant tried to do that.  You will hear about the ways, the

9   methods he used to bring them in and keep them in and insnare

10   them, how he took them from their family, from their friends and

11   their support and brought them into his world with his family

12   and his friends and his support and his rules.  This was the

13   defendant's world.  Make no mistake.  And it was a world you

14   will hear that was filled with manipulation, threats,

15   prostitution and violence.

16       Ladies and gentlemen, when I talk about the methods

17   that the defendant used, you're going to hear a lot more about

18   that over the course of the trial, but let me just explain some

19   of the things you'll hear.  Let me give you a preview.  You're

20   going to hear about force, fraud and coercion.  You are going to

21   hear that the defendant at first would be nice to these girls.

22   He would pepper that kindness with threats and violence.  He

23   would take their puppy love and use it to manipulate and coerce

24   them.  He would shower them with compliments, and get them

25   shelter, and buy them clothes, and buy them food, and then he

1   would turn around and he would smack them, and he would threaten

2   them, and he would threaten their families and threaten to burn

3   their clothes, and he would mix the two until he created this

4   climate of fear, this relationship of revolving methods of

5   kindness and violence.  This climate of fear that he created

6   insnared these girls.

7           You will hear that the defendant used a lot of

8   individuals to try to help him do this.  You will hear that he

9   used the teenagers' desire for attention, for a place to sleep,

10  for drugs, for whatever it was they needed at the moment.  He

11  would use that desire against them.  And he would reinforce that

12  relationship with random acts of physical violence.

13          But what is this case about?  I mean, essentially, what

14  am I talking about here?  This is a case about domestic human

15  sex trafficking.  This is not international human trafficking.

16  You're not going to hear about individuals who are smuggled

17  across the border or individuals who ended up on a farm out on

18  the Eastern Shore, anything like that.  That's international

19  human trafficking.  It's a different type.  This is what's

20  happening right here, domestic sex trafficking.  These teenagers

21  are all from the Germantown, Gaithersburg area.  They were all

22  sold for sex in Montgomery County and the District of Columbia,

23  right here.  That's what we're talking about.

24          Now, needless to say, the people who are going to

25  testify for you, the evidence that the government is going to

bring to you are the people who know how the defendant's world

worked.  This is not a car accident case.  The government can't

go out and pull five independent witnesses from the stores and

the street corners and the sidewalks that saw this car accident

in the middle of an intersection.  It is not that kind of case.

This is not a case that happens in the public eye.  This is

hidden from the public eye.

What does that mean?  That means that the government

presents to you the evidence from people who knew the inner-

workings.  They are going to be the people who assisted in

selling these girls.  They are going to be the people who bought

drugs from that man.  They are going to be the people who paid

for the girls, who helped them get ready, who provided phones,

who provided clothes.  They are the ones who know because they

were there.  This is not the kind of crime you find out about

unless you have had some crossing of paths with it.

The government doesn't choose its witnesses from a

Rolodex.  The government can only present the evidence to you

that exists.  These individuals know the defendant and they will

tell you one-by-one their portion of these events.

But let's be clear.  You will also hear from the

teenagers.  They were teenagers at the time.  You will hear from

these young troubled girls with absolutely no life experience,

no real world understanding, because they also make up a part of

what happened.  They are the easy prey.  They are the

1  individuals who fill out that equation.

2  You are not going to hear from everyone, however.  You

3  are not going to hear from every single conspirator who came

4  into this conspiracy.  The government simply doesn't have that

5  kind of burden to bring you every single human being who knew

6  these crimes, or knew the defendant, or in some way saw or heard

7  something.  The government's burden is beyond a reasonable

8  doubt.  Not beyond any doubt.  Beyond a reasonable doubt.

9  But let's be clear.  No matter who you hear from from

10  that stand, no matter who testifies, this case is about what he

11  did, what he made happen to these teenagers.  Without the

12  defendant, none of this would have happened.  That's what the

13  evidence will show.

14  Now, I'm going to go over just a few of the individuals

15  who are going to testify for you, a sampling, if you will, and

16  I'm going to go over just a few of the events you'll hear about.

17  Again, there will be many more, but this is my time to just go a

18  couple of minutes.

19  The first person you're going to hear from -- well, the

20  first person I'm going to mention is a woman named Shantia.

21  Now, Shantia was just 18 years old back in March, April, May of

22  2007.  She will tell you numerous things.  A couple of things

23  she'll tell you is the defendant distributed marijuana to her.

24  The defendant asked her for several things with regard to these

25  girls and she will tell you that she complied.  When he asked,

she did it.  She thought she'd be paid.  She thought it would help continue the flow of drugs she was getting.  She did it, but she did it because he asked her to.  She will tell you that when the defendant asked if Melissa could live with her, she agreed.  She will tell you that when the defendant asked her if she could talk to Stephanie and Melissa about prostituting for the defendant, she agreed to do that as well.  She will tell you that when the defendant asked her to get a sex customer who would pay to have sex with Melissa and Stephanie, a two-for-one special, she agreed to do that as well, and she did and she will tell you that.  She will also tell you that had he not asked, she would not have done that on her own.  In fact, she would never have met these girls, Melissa, Stephanie or Ilana, had it not been for the defendant.

She will also provide evidence that the first time the defendant was forceful with Melissa and Stephanie that she was there.  She will also tell you that she saw the defendant assault Melissa.  Now, again, she's going to tell you a lot of other things, but those are some of the things she's going to tell you.

You're also going to hear from Sammy.  Sammy is another woman who helped that man get what he wanted.  Sammy is going to tell you that the defendant was her cocaine dealer.  She bought powder cocaine from him for several months.  She will tell you that he also asked her to do things and she did them because she

1   wanted to keep him happy, because she wanted the flow of drugs

2   to continue.  She will tell you that, again, when he asked if

3   Melissa could live with her, she agreed.  She will tell you that

4   when he asked her one night to get them ready, to dress them up

5   so they could go prostitute, she agreed, and she provided them

6   with provocative clothing and she did their hair and she did

7   their makeup, and she knew they were going to go to D.C. to be

8   prostituted by that man.  And when he asked if he could borrow

9   her Suburban SUV to carry everybody down to D.C., she agreed to

10  do that as well.  She also loaned him a phone that night.

11          She did all these things because the defendant asked

12  her to.  Make no mistake, she will tell you had he not asked,

13  she would not have done it.  She would not have even known these

14  girls but for the defendant.

15          She will tell you, quite plainly, that she didn't like

16  Melissa.  She will tell you she was not nice to Melissa when

17  Melissa lived with her.  She will tell you she smacked her, she

18  yelled at her.  She even would report back to the defendant when

19  Melissa did something she didn't like just to try to get the

20  defendant to punish Melissa, and he did.  He did punish her.

21          And she will take that stand and she will tell you she

22  has pled guilty to her role in this case.  But, again, she would

23  not have done it on her own.  Remember, but for the defendant,

24  none of this would have happened.

25          You will hear from Melissa.  Melissa will tell you that

1   at the time she met the defendant, she was utterly homeless.

2   Sometimes she would sleep outside, sometimes in a concrete

3   storage unit, with friends when she could, but she really had no

4   place of her own.  You will hear that she struggled from

5   day-to-day trying to feed herself, stealing food to feed

6   herself, and it is in these circumstances that she met the

7   defendant, and she told him everything that was going on with

8   her family and her life, that she was upset, and he listened.

9   The first time she met him, of course, she told him everything

10   that was going on and she told him her age.  So, right from the

11   beginning, the defendant knew exactly how old she was and

12   exactly the kind of hardships that she was going through.  And

13   he listened.

14       Ladies and gentlemen, she will tell you that the

15   defendant was somebody she found attractive.  She will tell you

16   that she kind of got a thing for him.  She wanted to please him.

17   Her feelings for him would grow.  She will tell you that she had

18   sex with him voluntarily.  She will also tell you that over just

19   the few weeks that they were together, just the few weeks

20   between April and May, that even though she was attracted to

21   him, she had some feelings for him, she would be jealous

22   sometimes of other girls.  The defendant became increasingly

23   threatening, increasingly violent.

24       So, while at first she found him intimidating, by the

25   end she felt imprisoned.  She thought she had nowhere to go and

no way to get out.  She will tell you about the drugs that he
gave her, some of which she did voluntarily, marijuana, cocaine,
PCP.  Some of those she did not do voluntarily.  Some of those
he forced her to do at times.  She will tell you that he was
sometimes very nice to her, but there was that method of
revolving acts of kindness and violence.  Sometimes he was mean
to her.  Sometimes they would be mixed all together in the same
scenario.

She will tell you that by the end of the few weeks she
was with him, he had smacked her, he had punched her, he had
threatened her, he had held a knife to her, he had threatened
her family, he had threatened the people around her.  She knew
he was threatening other people.  This fed into her fear of him.
She will tell you that he sold her.  He sold her on numerous
occasions to friends and to family.

She will tell you that her mother and her grandmother
eventually got her out of this.  They called the police.
Melissa will admit that when law enforcement first showed up,
she lied to them.  At that point she was still very much under
the influence of the defendant.  He had already contacted her
and said essentially don't tell anyone I was your pimp, don't
tell anyone I knew about it, and I certainly didn't know your
age.  And she took that information and what she knew of the
defendant and how she felt and she regurgitated it essentially
to police and she lied, because she did as she was told.

1    But that was three years ago and Melissa no longer does

2 what he tells her to do.  So she will take the stand and for the

3 first time under oath she will tell what happened to her.  She

4 will tell you as much as she can remember to the best of her

5 ability and she will do it from that stand.

6    You will also hear from Stephanie and Ilana who will

7 also take that stand.  Stephanie will tell you that she was just

8 17 at the time.  She will tell you that she met the defendant

9 through Melissa.  She will tell you the defendant gave her

10 cocaine.  She will tell you that he gave her so much cocaine one

11 night she had a seizure.  She will tell you that he sold her to

12 a stranger in the District of Columbia.  She will tell you that

13 sometimes he was nice to her and sometimes he was mean.  She

14 will tell you all about that firearm I told you about right up

15 front, and she will tell you that she also feared the defendant,

16 that the defendant knew how old she was but that she also feared

17 him.

18    You'll hear from Ilana who of the three victims spent

19 the least amount of time with the defendant, but she will also

20 tell you she was 16 at the time and, in fact, the evidence will

21 show that Melissa thought she was 14 and actually told the

22 defendant, "You know, I think Ilana is 14 years old," and yet

23 the defendant still sold her to a stranger at a Holiday Inn in

24 Gaithersburg in Montgomery County.

25    Ladies and gentlemen, you are going to hear from all

1   these witnesses.  Now, the orders might not chronological.  I

2   apologize for that in advance.  The chronology of events might

3   also not come out in order, but when you have a longer trial and

4   you have schedules to deal with and that kind of thing,

5   sometimes it gets out of order.  But make no mistake, at the end

6   of this trial you will have all of the evidence.

7        I want to talk about briefly five key events.  I will

8   tell you about them in the order they happened even though they

9   might not come out in that order during the trial.

10       The first event, the first major event happened at the

11  Motel 6.  This Motel 6 is located in Montgomery County.  This is

12  the first night that the defendant used force against Stephanie

13  and against Melissa.  You will hear that he had sex with them to

14  test their sexual abilities.  He was getting information to

15  determine how to sell them, what to sell them for, those types

16  of things.  You will also hear that he provided them with

17  marijuana that night.

18       You will hear that the next event happened in the

19  District of Columbia in an apartment off Georgia Avenue.  You'll

20  hear during that event that the defendant took Melissa and

21  Stephanie in Sammy's Suburban -- remember I mentioned that --

22  took them to a sex customer named Mark and sold them for about

23  $250.  You will hear that on that night the defendant, in fact,

24  provided those teenagers with cocaine.

25       You will hear about the third incident, the one I told

1  you about up front where Melissa and Stephanie go to the house

2  party in the Cinnamon Woods neighborhood in Montgomery County

3  and where Stephanie ends up at Gunners Lake just close by.

4         You will hear about a fourth incident, which is the

5  Holiday Inn in Montgomery County in Gaithersburg.  You will hear

6  that is where the defendant and another friend of his by the

7  name of Paul took Melissa and 16-year old Ilana and sold them to

8  Paul's drug customer, Adam.  You will hear that the defendant

9  provided the girls with PCP that night.

10        Then the fifth event, the very next night the defendant

11 again took Melissa through his friend Paul and now Shantia and

12 took them to another hotel, took them to the Courtyard Marriott,

13 which is the Wyndham now but, regardless, took them and sold

14 them to the same sex customer and also provided them with PCP.

15        What else are you going to hear in this case besides

16 witness testimony?  Well, you're going to hear a lot of

17 testimony that involves slang, sexual and vulgar language.

18 You're going to hear from people who have criminal records, who

19 have lied to the police.  You're going to hear that the

20 defendant told people that he was engaging in these crimes so he

21 could get experience with which to write rap lyrics, that he

22 couldn't rap about it unless he'd done it, talking about the

23 pimping and the drugs and the guns.  You're going to hear about

24 phone records.  You're going to hear that the defendant is

25 somebody who doesn't like to drive his own cars or get a phone

1    in his name and what that eventually does is hide his identity,

2    but you will hear evidence that the defendant was loaned

3    particular phones, particular phone numbers on particular

4    nights, that he used them, and you will see the contacts from

5    phone with sex customers, with the teenagers, with other

6    co-conspirators, and you will see what's called a cell site map

7    where essentially we track the movent of the phone from cell

8    tower to cell tower to cell tower from Maryland, for example,

9    the night to D.C., all the way into D.C. to the cell tower

10   closest to that apartment off Georgia Avenue where he sold them

11   for $250.

12          You will see hotel receipts.  You will see hotel

13   receipts from the first incident at Motel 6 when he first used

14   force against them that reflect his name and the date of April

15   15, 2007.  You will see hotel receipts from the Holiday Inn from

16   May 8, 2007, reflecting that sex customer's name, Adam.  You

17   will see a hotel receipt from the very next night, from the

18   Marriott, again, reflecting that sex customer's name, Adam.

19          You will see the clothes that Sammy loaned Melissa and

20   Stephanie, the provocative clothes that the defendant okayed for

21   them to wear to the District of Columbia.  You will see photos

22   of people and you will see photos of locations.

23          But, again, you will not hear from every person in this

24   conspiracy.  But make no mistake, at the end of this trial there

25   are a few things that the government believes you will know.

1   You will know that the defendant had no misconceptions about how

2   old these girls were.  You will know that he used force against

3   them, that he made threats to them and around them.  You will

4   know that he distributed drugs to these teenagers.  You will

5   know that the defendant essentially preyed on their age, on

6   their weaknesses, on their desires and, quite frankly, on their

7   immaturity.  And make no mistake, without the defendant's words,

8   without his actions, without his objectives, none of this would

9   have happened.

10          In a few weeks once all the evidence is in front of

11  you, my co-counsel will spend a few minutes going over the

12  charges more.  At that point once the evidence is all in, you'll

13  hear more about the law and the judge will give you lots of

14  instructions to make sure that you understand them.

15          Now, I'm just going to take my last few minutes and go

16  over those charges with you very quickly.

17          Count One is essentially conspiracy to commit sex

18  trafficking.  Basically it's when the defendant agreed with

19  other people like Sammy, Shantia, to sex traffic, to traffic, to

20  cause those teenagers to engage in commercial sex acts and that

21  at the time he either knew how old they were or he used force,

22  fraud and coercion against them and at the end of the day he

23  received some benefit.  That's Count One.

24          Counts Two, Three and Four essentially deal with the

25  actual trafficking incidents.  In other words, if Count One is

1   the agreement to do it, Counts Two, Three and Four are actually

2   doing it, actually selling them, and they deal with Melissa,

3   Stephanie and Ilana, one-by-one in these incidents I told you

4   about, whether it's a hotel or an apartment.

5           Count Five is all about that firearm, that the

6   defendant essentially either possessed it or he used it to

7   further the sex trafficking.  In other words, he used it in some

8   way or he possessed it in some way to help cause those girls to

9   engage in these sex acts, to further the sex trafficking

10  business.

11          Count Six is another conspiracy.  It's all about drugs.

12  Count Six is essentially that the defendant agreed with other

13  people to distribute drugs, marijuana, cocaine, and PCP.

14          Counts Seven and Eight are all about Melissa and

15  Stephanie and the drugs he specifically distributed to them at

16  specific times.  Now, remember, Ilana was with him the shortest.

17  So, Seven and Eight is Melissa and Stephanie, about the

18  distribution to them as minors, as teenagers, specifically, PCP

19  and cocaine.

20          Ladies and gentlemen, before we finish this case, the

21  government is going to present numerous witnesses, numerous

22  pieces of evidence, and I know this trial is going to go on a

23  little longer probably than we'd like, but that's the

24  government's burden, to present the evidence to you that will

25  support these charges.

1    Witness after witness after witness will take that

2    stand.  They will take the oath.  They will subject themselves

3    to cross-examination by my learned defense attorney.  They will

4    subject themselves to public scrutiny.  They will subject

5    themselves to your scrutiny and they will tell you what

6    happened.  They will admit their roles.  They will admit their

7    roles and what he did, the responsibility of Lloyd Mack Royal,

8    III, the defendant, because he's the one on trial.

9    So, at this point we just ask that you listen and that

10   you watch and at the end of this trial the government will stand

11   before you again and we will ask you to find him guilty of all

12   eight charges, to find him guilty of every single count against

13   him, every count, every single count.  Thank you.

14   THE COURT:  All right.  Mr. Trainor, for the defense.

15   MR. TRAINOR:  Thank you, Your Honor.  May it please the

16   court.

17   THE COURT:  Yes, sir.

18   MR. TRAINOR:  Judge Williams, members of the

19   prosecution team, Ms. Magnelli, Mr. Felte, ladies and gentlemen

20   of the jury.

21   My opening message to you is a simple one.  Nothing you

22   have heard so far is evidence.  There's no evidence before you

23   at this point.  The evidence will come in from witnesses on the

24   witness stand, and that's what matters.  So, what I am seeking

25   for Lloyd Royal is simply a fair trial.  Judge the case based on

1   the evidence, not on the rhetoric.

2           What you will learn about Lloyd Royal in this trial is

3   a little bit about his background first, that Lloyd was born in

4   Germany, lived there for a few years while his parents were

5   stationed there.  They were in the United States Army.  When he

6   was a youngster they moved back to Maryland, the Fort Meade

7   area, I believe, and he lived there off and on with his mother,

8   Harri Cox, who was mentioned on the opening witness list, at an

9   address on Thorson Court.  This is an address that will come up

10  on some of the exhibits.  It's the home where Mr. Royal's mother

11  lived.  It's the home where he lived from time to time.  It's a

12  home where his brother -- brothers, plural, his sister and

13  various other relatives, cousins, lived from time to time.

14          When not living with his mother, Lloyd lived with

15  friends, girlfriends, girlfriends' mothers, families, some of

16  them in Montgomery County you'll hear about, some of them, if

17  you -- and perhaps you'll hear from some of them on the witness

18  stand.  There was Crystal Brown who lived at one time at least

19  on Misty Meadow Terrace in Germantown.  Lloyd lived there for a

20  time.

21          He also lived with Cierra Young, who lived on Carousel

22  Court in, I believe, Gaithersburg, that area.  Cierra is the

23  mother of his child.  He has a child who I believe is about four

24  years old named Madison.  They lived for a time on Carousel

25  Court in Gaithersburg.

1     Lloyd left high school before he finished after he was

2   involved in a bad automobile accident that caused some damage to

3   his face and his eyes.  He never finished high school, although

4   after a while he took some courses at community college.

5     He's had various jobs, including as an automobile

6   salesman at Criswell Honda, held that job for a couple of

7   months.  His other jobs he didn't hold long.  He never held a

8   job long, because the driving force in Lloyd Royal's life was

9   his ambition, at least, to be in the music business.  He aspired

10   to be I guess what you would call as a rapper or a hip-hop

11   artist of some kind.  He admired the people who had had some

12   success in that area of the music business and tried to emulate

13   them.

14     Perhaps naively, certainly foolishly, he began to

15   conform himself to the image of a rapper or a hip-hop artist, at

16   least the image he had in his mind, took on various show

17   nicknames.  This B and Blyss were a couple of them, because

18   "Lloyd" apparently wouldn't work very well in the rap music

19   business.  I don't know.  Later on his nickname was given to him

20   by one of his music friends, Furious.  It has very little to do

21   with this case.  These are nicknames in the bad boy music

22   business, the rap music image, and they're related to this

23   fantasy life that he was living in, that he was part of the

24   music business and was on his way.

25     He even formed some kind of a company called Strictly

1    or Totally Royal Music or something like that.  This was a

2    company that had no assets.  It had no employees.  It had no

3    building to be in, had no offices, had no business.  It was just

4    a name, one of those things.

5         He did more, also foolishly, to conform to this bad boy

6    rap image.  He would pose for photographs, for example, in other

7    regalia associated with rap music, what they call gangster rap,

8    I guess.  I don't know a lot about it, but you'll probably see

9    photographs with kerchiefs over the face, flashing these hand

10   signs as they do that have some significance, perhaps something

11   that looks like a gun stuck in his belt in these photographs,

12   probably wearing sunglasses, which he would wear often day and

13   night.  It's an image.  But one of the real reasons was that his

14   eyes were pretty badly damaged in the automobile accident.

15        He did other things, like write lyrics.  Now, they're

16   gangster rap lyrics.  I don't know if any of you are familiar

17   with some of them, but the messages are, to many of us

18   offensive, certainly thuggish, distasteful, offensive sort of

19   lyrics.  If it was a crime to write these lyrics, our prisons

20   would be overflowing with rap stars.  But that's part of the

21   image that he was trying to project.  These lyrics are childish

22   almost in their poetic style and certainly not very

23   professional.

24        As a part of building this image, however, he would

25   invent other things about himself.  He bragged.  He tried to

pump up this bad boy image that he was trying to establish. He bragged about making money and having expensive things that money could buy. He bragged about having properties that he controlled. He bragged about having girls here and there, in Chicago and New York. But this image that he was projecting was almost completely phony. So, it was a false image. It was part of this fantasy he was living that he was on the verge of making it in the rap business. But it was far from the truth.

You'll see that Lloyd Royal really never had any success in his life, none, really. He wasn't anything close to a success in the music business, not even a small success, had no real part in it.

Whatever involvement he had in marijuana and the like was smalltime, really, and mostly self-destructive. He never really had a home of his own, not even an apartment or a place to stay in his own name. He either stayed with his mom, or he stayed with relatives, or he stayed with friends or girlfriends. He never had a car that he actually owned in his name. It was always if he's driving a car, it was somebody else's car.

The expensive things that he bragged about -- he would actually flash a watch and a pinky ring that he would tell folks this is platinum and these are diamonds and platinum and they're very expensive. And you'll probably see them. They, like a lot of other things that were part of his image, were phony. They weren't platinum. They weren't hugely expensive. They were

1  tacky and gaudy as you'll see.

2       But what Lloyd Royal was about was posing and about

3  posturing himself and about trying to create this image, and

4  it's a hugely negative image.  You'll see, like, although these

5  names, these nicknames, really don't have much relevance to this

6  case, every time Lloyd Royal's name is mentioned in writing on

7  something that the government controlled, it's going to have

8  "Furious" next to it.  It's going to have "Blyss" next to it.

9       So, I'd ask you, because I'm asking you to be fair in

10  this case, I'd ask you really to not give any undue weight to

11  this negative imagery.  Decide the case on the evidence.

12       The charges against Lloyd Royal are of the most serious

13  kind.  They're very, very serious charges.  And you're going to

14  sit through probably -- I don't know the number, but I would

15  estimate 20, 30, 40 witnesses in this case, something like that.

16       The biggest job that you have, I think, is really

17  judging the credibility of the witnesses.  You get to decide --

18  I mean, you really have to decide what you're going to believe

19  that comes from the witness stand, not what comes out of the

20  mouths of the lawyers, but what comes from the mouths of the

21  witnesses on the witness stand.  As the judge of credibility

22  that you are, you have the right and the obligation to decide

23  whether you believe all of what a witness says or you believe

24  some part of what a witness says or whether you just don't

25  believe any of what a witness says, and I ask you to be really

1  careful in that process.

2       The burden of calling these witnesses is right here

3  with the government.  They have the burden to call the witnesses

4  to the witness stand and present the evidence and, as you've

5  heard from the court and from the government in their opening,

6  their obligation is to prove every element of every offense you

7  consider to a very high level, and it's beyond a reasonable

8  doubt.  You're going to hear that over and over again, meaning

9  no reasonable doubt may remain.  If it does, the presumption of

10 innocence alone will pronounce Lloyd Royal not guilty of that

11 charge.

12      As the prosecution calls these witnesses, we'll have a

13 chance to ask questions of the witness.  We'll try to show you

14 which witnesses have credibility problems.  There are some

15 witnesses who may have been using drugs.  Probably many of them

16 may have been using drugs.  Some will try to minimize the amount

17 of drugs they were using.  Some might try to exaggerate the

18 amount of drugs they were using.  The point is that when they

19 were making certain observations that they will testify about,

20 going back in their memory three years, I suppose, they were on

21 drugs at the time.  You're going to hear about that and I ask

22 that you use that information in evaluating which part of what

23 they say is the truth.

24      You'll have witnesses the government has already told

25 you who told lies in the past.  You're going to be able to use

1  that when you scrutinize their testimony and judge their

2  credibility.

3  You're going to find witnesses who don't like Mr. Royal

4  a bit.  I think that will be pretty obvious.  So, look for the

5  witness who has some bias or hostility towards Mr. Royal because

6  that is a factor that you weigh when you judge credibility of

7  witnesses.

8  Look for the witness -- and I'm sure there will be

9  some -- that have a motive to just shade the truth a bit to make

10  themselves perhaps look better about choices they made and to

11  shift the blame to someone else for what was their

12  responsibility.

13  As you go through this process, which, I repeat, is the

14  most important process that you'll have to do, making a judgment

15  about the credibility of witnesses, I ask you to bear in mind

16  the basic principles you've been told about, that the defendant

17  is presumed innocent.  He's presumed innocent at this moment.

18  No evidence has been presented against him.  The presumption of

19  innocence stays with him.  It goes with him into the jury room

20  when you retire to deliberate.  It's a tool that you can use in

21  evaluating testimony in the case.  You can screen it through the

22  presumption of innocence.  If it could go either way on a point,

23  the presumption of innocence requires you to decide that point

24  in the defendant's favor.

25  And the other thing I ask you to remember is that there

1   can't -- that the proof has to be beyond a reasonable doubt.

2   When you're talking about somebody's entire future, what is a

3   reasonable doubt?  There isn't much that can be reasonable and

4   it has to be beyond that point.  It's a very heavy burden of

5   proof.

6           So, I'm not going to say much more than that here in

7   opening.  I ask you really to just give each witness the

8   appropriate scrutiny that is required in such a serious case.

9   Apply the presumption of innocence to every bit of testimony and

10   to every exhibit that you review, and please withhold your

11   judgment.  You shouldn't have any kind of judgment about this

12   case so far because no evidence is before you.  Please withhold

13   your judgment until the very end when you've had the benefit of

14   Judge Williams' final instructions on the law that you have to

15   apply to the facts as you find them in this case.  If you'll

16   approach your job in that way, I know that Lloyd Royal will have

17   a fair trial, and at this point I'm going to ask no more than

18   that.  Thank you.

19           THE COURT:  All right.  Thank you.

20           Madam clerk, why don't you let the jury stretch for a

21   few minutes in the jury room.

22           Ladies and gentlemen, we're not going long today.  I've

23   got a hearing at 4 o'clock with some parties.  So, I've to break

24   today around four anyway.  So, we won't even start a witness.

25   That's fine.  Let them take a break.

1           (Jury excused for a recess.)

2           THE COURT:  Government, do you have a witness you want

3    to start?

4           MS. MAGNELLI:  Yes, Your Honor.  Given that we're going

5    to finish at 4 o'clock, I think we're actually conferring on

6    switching witnesses.  So, if we could just have a moment.

7           THE COURT:  Sure.

8           MR. TRAINOR:  Can I run out?

9           THE COURT:  Sure.

10          (Recess from 3:15 to 3:25 p.m.)

11          THE COURT:  While the jury is on the way in, are there

12   any scheduling issues that you have that I need to know of?  You

13   can let me know.  I have hearings at 4 o'clock for the remainder

14   of the week.  So, I can only go till 4 o'clock this week, up to

15   four.  That's all I can do.  I've got to have hearings.  I've

16   got too many trials before me.  So, one today, one tomorrow and

17   one Friday at four.

18          Now, are we going straight through without any off

19   days?

20          MR. TRAINOR:  A week from -- this week I think we are.

21          MS. MAGNELLI:  The rest of the week.  So, the court has

22   a hearing every day?

23          THE COURT:  Every day at four.

24          MS. MAGNELLI:  The rest of the week, yes, we have

25   witnesses lined up.

1            THE COURT:  All right.

2            MR. TRAINOR:  It's next week that I had asked not to be

3    here on Friday.

4            THE COURT:  I'll work with you.  What day is that?

5    What day of the week, Friday?

6            MR. TRAINOR:  Friday, the 26th or 25th.

7            MS. MAGNELLI:  Yes.

8            THE COURT:  All right.  Okay.  So we won't have court

9    that the day.

10           MR. TRAINOR:  A week from Friday.

11           THE COURT:  All right.  A week from Friday.  All right.

12   Okay.  But, otherwise, we're going straight through.

13           MS. MAGNELLI:  And Mondays.

14           MR. TRAINOR:  We're not sitting Mondays.

15           THE COURT:  You all don't want to sit on Mondays?

16           MS. MAGNELLI:  Your Honor, I had not intended to sit on

17   Mondays, given the court's schedule.

18           THE COURT:  Well, I don't usually break when I have

19   short trials like this, three-week trials, but if you don't want

20   to sit Monday, that's fine.

21           MS. MAGNELLI:  I can do the afternoons, but I made all

22   my doctor's appointments for Monday mornings.

23           THE COURT:  All right.  Well, let's talk about that.

24   Let's talk about that before the week is out, but we'll work

25   with you.  But, as I said, longer trials I certainly take

1  Mondays off, but if defense attorneys don't ask me for time off,

2  then I go straight through.

3          MS. MAGNELLI:  I'm sorry.  I didn't understand that.

4          THE COURT:  No problem.  Well, we'll talk abut that.

5          MS. MAGNELLI:  And what time does court start, then?

6          THE COURT:  9:30 generally, unless I have a sentencing

7  or something.  But I'll get you a schedule.  We've got to do

8  some business while we try cases.

9          (Jury present.)

10          THE COURT:  All right.  Let's be seated.  Thank you.

11          Call your first witness, Ms. Magnelli.  Yes, Mr. Felte.

12          MR. FELTE:  It would be Anthony Caban, Your Honor.

13          THE COURT:  All right.

14          THE DEPUTY CLERK:  Please raise your right hand.

15          <u>ANTHONY CABAN, GOVERNMENT'S WITNESS, SWORN</u>

16          THE DEPUTY CLERK:  State your name loudly and clearly

17  into the microphone and spell your last name for the record.

18          THE WITNESS:  My name is Anthony Caban.

19          THE COURT:  Pull that mike a little closer to you,

20  Mr. Caban.

21          THE WITNESS:  My name is Anthony Caban, C-a-b-a-n.

22          THE DEPUTY CLERK:  Thank you.

23                  DIRECT EXAMINATION

24  BY MR. FELTE:

25  Q   Good afternoon, sir.  Sir, in what year were you born?

1    A    1984.

2    Q    Now, where were you born?

3    A    New York.

4    Q    Is that where you grew up?

5    A    Yes.

6    Q    Did there come a point in time when you moved to Maryland?

7    A    Yes.

8    Q    When did you move to Maryland, approximately?

9    A    August of 2006.

10   Q    And when you moved to Maryland, where did you move to?

11   A    Germantown.

12   Q    Now, did there come a point in time when you moved back to

13   New York?

14   A    Yes.

15   Q    Approximately when was that?

16   A    August of 2007.

17   Q    Now, Mr. Caban, did there come a point in time when you were

18   contacted by the FBI about what you observed and what you did

19   while you were down in Maryland?

20   A    Yes.

21   Q    When you first spoke to the FBI, were you truthful with

22   them?

23   A    No, I was not.

24   Q    Did you subsequently get an attorney to represent you as far

25   as your involvement in those events?

1  A   Yes, I did.

2  Q   Were you initially truthful with your attorney?

3  A   No, I was not.

4        MR. FELTE:  May I approach the witness, Your Honor?

5        THE COURT:  All right.

6  BY MR. FELTE:

7  Q   Mr. Caban, let me show you what's been marked as

8  Government's Documents 3.  It appears to be a proffer letter

9  dated March 13, 2009.  Do you recognize that?

10 A   Yes, I do.

11 Q   Let me turn to page 2.  Do you see your signature on that?

12 A   Yes, I do.

13 Q   Who else's signature is on that page?

14 A   My lawyer.

15 Q   And is there an FBI agent as well?

16 A   Yes, there is.

17 Q   And does Ms. Magnelli's signature appear on that as well?

18 A   Yes, it does.

19 Q   What is your understanding of this letter?

20 A   To give truthful and accurate information.

21 Q   And if you give truthful and accurate information, what is

22 your understanding as far as what the government will do?

23 A   Nothing.

24 Q   The government will not use that information against you?

25 A   Will not use that information against me.

1  Q   Have any other promises been made to you?

2  A   No.

3  Q   Have there been any promises made not to charge you?

4  A   No.

5  Q   Has anybody threatened you?

6  A   No.

7  Q   Now, sir, when you came down to Maryland, did you have a

8  job?

9  A   Yes, I did.

10 Q   Where did you work?

11 A   Eckerd's Pharmacy.

12 Q   What was your position there?

13 A   Pharmaceutical technician.

14 Q   As a pharmaceutical technician, what were your duties and

15 responsibilities?

16 A   To assist the pharmacist in answering phone calls, taking

17 prescriptions from patients and distributing medicine.

18 Q   Were you actually a pharmacist?

19 A   No, I was not.

20 Q   What types of drugs did you have access to as a

21 pharmaceutical technician?

22 A   Medications such as Zoloft, an antidepressant, pain

23 medicines such as ibuprofen and Extra Strength Tylenol, high

24 blood pressure medicine, stuff on those lines.

25 Q   What types of drugs did you not have access to?

1   A   Prescription drugs classified under C2 or C1, which were

2   medicines such as morphine, hydrocodone, Fentanyl.

3   Q   Are C2 and C1 drugs what are known as controlled substances?

4   A   Correct.

5   Q   Now, did there come a point in time after you moved to

6   Maryland that you got a second job?

7   A   Yes.

8   Q   What job was that?

9   A   Working as a car salesman at Criswell Honda.

10  Q   Where is Criswell Honda located?

11  A   Germantown, Maryland.

12  Q   Approximately when, if you remember, did you start that

13  second job at Criswell Honda?

14  A   Around Christmas of 2006.

15  Q   Now, at some point in time did you meet a man named Lloyd

16  Royal?

17  A   Yes, I did.

18  Q   Do you see that person in the courtroom here today?

19  A   Yes, I do.

20  Q   Could you please point to him and describe an article of

21  clothing he's wearing?

22  A   That gentleman right there.

23  Q   What is he wearing?

24  A   A white striped shirt.

25          MR. FELTE:  Your Honor, may the record reflect that the

1   witness has identified the defendant?

2            THE COURT:  All right.  So indicated.

3   BY MR. FELTE:

4   Q    Mr. Caban, is that how he looked when you knew him?

5   A    Yes.

6   Q    Now, how did you meet him?

7   A    We had both worked as car salesmen and just through

8   conversation, walking around the floor, and during orientation.

9   Q    Did you know him by any other names?

10  A    One other name.

11  Q    What was that?

12  A    Blyss.

13  Q    Now, while you were working with the defendant, did you have

14  a chance to engage him in conversation?

15  A    Yes.

16  Q    What kind of things did he talk about?

17  A    Started off as general conversations such as life, finances,

18  family.

19  Q    At some point did you ever have a conversation concerning

20  his phone?

21  A    Yes, I did.

22  Q    What was that conversation?

23  A    He had showed me his phone and showed me several pictures of

24  females on his phone and asked me if I would like to date any of

25  them and if I did like to date them that it would be -- it would

1   cost money to date them or be with them.

2   Q   What do you mean "or be with them"?

3   A   In a sexual manner.

4   Q   How did you respond to that?

5   A   I said no.

6   Q   Did you have any money at the time?

7   A   No, I did not.

8   Q   Now, was there ever a point in time when you socialized with

9   Mr. Royal outside of your employment at Criswell Honda?

10  A   Yes.

11  Q   Do you remember when that was?

12  A   Memorial Day of 2007.

13  Q   Did you actually have a memory of Memorial Day or are you

14  estimating?

15  A   It was around Memorial Day, I believe.

16  Q   And where did you socialize with him?

17  A   At a friend of his house.

18  Q   Do you remember who those friends were?

19  A   Her name was Samantha, and Pig.

20          THE COURT:  What was the other one?

21          THE WITNESS:  The other name that I knew was Pig,

22  P-i-g.

23          MR. FELTE:  May I approach the witness, Your Honor?

24          THE COURT:  All right.

25  BY MR. FELTE:

1    Q    Mr. Caban, let me show you what's been marked as

2    Government's Exhibit Clifftop Drive 1.  Do you recognize that

3    photograph?

4    A    Yes, I do.

5    Q    What is it?

6    A    Samantha's house.

7    Q    How do you know that?

8    A    I have been there before.

9    Q    Is this an exterior, this top one?

10   A    Yes.

11           MR. FELTE:  Your Honor, may I publish this to the jury?

12           THE COURT:  All right.

13   BY MR. FELTE:

14   Q    Let me show you what's been marked as Clifftop Drive 1a.  Do

15   you recognize that?

16   A    Yes, I do.

17   Q    And what is it?

18   A    The entrance level to Samantha's house.

19   Q    How do you know that?

20   A    I have been in there before.

21   Q    Let me show you what's been marked as Government's Exhibit

22   Photographs 3.  Do you recognize that?

23   A    Yes, I do.

24   Q    What is that?

25   A    A picture of Samantha.

1  Q   Is that a fair and accurate representation as far as you

2  knew her at that time?

3  A   Yes.

4  Q   Let me show you what's been marked as Government's Exhibit

5  Photographs 5.  Do you recognize that?

6  A   Yes, I do.

7  Q   And what is that?

8  A   The individual that I know as Pig.

9  Q   Is that a fair and accurate representation of how he looked

10  when you met him?

11  A   Yes.

12        MR. FELTE:  May I publish these to the jury, Your

13  Honor?

14        THE COURT:  All right.  Go ahead.

15  BY MR. FELTE:

16  Q   This is 1a.  Mr. Caban, that was the interior of what you

17  knew to be Sammy's residence?

18  A   Yes.

19  Q   Photograph No. 3, that was the woman you knew as Sammy or

20  Samantha?

21  A   Yes.

22  Q   And Photograph No. 5, this was the individual you knew as

23  Pig?

24  A   Yes.

25  Q   And what relationship was Pig to Samantha, as far as you

1  knew?

2  A    Spouses.

3  Q    Was that your understanding?

4  A    Yes.

5           THE COURT:  What was their relationship?

6           THE WITNESS:  Spouse.

7           THE COURT:  Okay.

8  BY MR. FELTE:

9  Q    Now, when you went to this barbecue, was there anybody else

10 at the barbecue?

11 A    Yes.  About 10 people.

12 Q    Was the defendant one of those?

13 A    Excuse me?

14 Q    Was the defendant, Mr. Royal, one of those people at the

15 barbecue?

16 A    Yes, he was.

17 Q    Other than Samantha, were there any other females at the

18 barbecue?

19 A    Yes.

20 Q    Did you try to speak with any of them?

21 A    Yes, I did.

22 Q    Who did you try to speak with?

23 A    A white strawberry blond female.

24 Q    And when you tried to speak with her, was she responsive to

25 your efforts at conversation?

1    A    No, she was not.

2            MR. FELTE:  May I approach the witness, Your Honor?

3            THE COURT:  All right.

4    BY MR. FELTE:

5    Q    Mr. Caban, let me show you what's been marked as

6    Government's Exhibit Photographs 10.  Do you recognize the

7    person in this photograph?

8    A    Yes.  That was the woman I tried to speak to.

9            MR. FELTE:  Your Honor, may I publish this to the jury?

10           THE COURT:  All right.

11   BY MR. FELTE:

12   Q    Now, at some point in time at the barbecue or cookout, did

13   you speak with the defendant concerning the person in photograph

14   No. 10?

15   A    Yes.

16   Q    And what, if anything, did the defendant say about her?

17   A    He asked me if I found her attractive, and I did.

18   Q    Was there any further conversation?

19   A    He asked me whether I would like to be with her or sleep

20   with her.

21   Q    When you say "be with her," what are you talking about?

22   A    In a sexual manner.

23   Q    Did he make any reference to her in regard to the girls that

24   he showed you on the phone?

25   A    Yes.

1   Q    What was that?

2   A    That to be with her it would cost money as well.

3   Q    Do you recall if any prices were discussed as far as being

4   with her?

5   A    No.

6   Q    You are not able to recall that?

7   A    No, I'm not able to recall that.

8   Q    Now, after you had this conversation with the defendant, did

9   you see this girl in photograph No. 10 again?

10  A    Yes, I did.

11  Q    Where was that?

12  A    In the restroom of Samantha's house.

13  Q    Was this the same day or a different day?

14  A    Same day.

15  Q    How did you come to see her in the restroom at Samantha's

16  house?

17  A    I had went upstairs to use the bathroom and she knocked on

18  the door while I was washing my hands and she had come in and

19  asked me if I had any protection on me and I said no.

20  Q    Protection.  What are you talking about protection?

21  A    Condoms.

22  Q    Okay.

23  A    She had -- I said no.  She had left the room or the

24  bathroom, come back shortly afterwards with a condom and I put

25  it on and she had began to give me oral sex.

1   Q   And then what happened?

2   A   After a short period of time and me not being able to

3   climax, she had stopped and had left the room.

4   Q   What did you do then?

5   A   Washed my hands and then exited the bathroom and went down

6   to the barbecue.

7   Q   When you went back down to the barbecue, did you see the

8   defendant?

9   A   Yes, I did.

10  Q   What, if anything, was said or happened between you and the

11  defendant?

12  A   When I had saw him, he had come over smiling and shook my

13  hands in kind of like a congratulatory tone and just

14  nonchalantly had said, "Now you owe me."

15  Q   After that day at the barbecue, did you ever go back to

16  Samantha's residence?

17  A   Yes, I did.

18  Q   Can you recall the next time that you went back to

19  Samantha's residence?

20  A   Within a matter of a week or two.

21  Q   And when you went back to Samantha's residence, do you

22  recall who, if anybody, you saw there at that time?

23  A   Samantha and Mr. Royal.

24  Q   And who?

25  A   And Lloyd Royal.

1   Q   The defendant?

2   A   The defendant.

3   Q   Did you have any conversations with the defendant and

4   Samantha at that time?

5   A   Yes, I did.  It started off as general conversation such as

6   how things were going, how financially strapped everybody was,

7   and then it proceeded into a brief conversation, just joking

8   around about how to make extra money and --

9   Q   Who, if anyone, said anything about making extra money?

10   A   The defendant had said about making extra money because of

11   my job at the pharmacy, being table to take pills and sell them

12   for profit.

13   Q   What did you say at that time?

14   A   At first I was very hesitant and said no.

15   Q   Now, did this topic ever come up again with you and the

16   defendant and Samantha?

17   A   Yes, it did.

18   Q   When did that happen?

19   A   On a second visit to Samantha's house.

20   Q   And how did that topic come up?

21   A   He had asked me again.

22   Q   Who had asked you again?

23   A   The defendant had asked me again about whether I would like

24   to make extra money, and I showed interest in the idea of making

25   extra money.  So he had wrote me out a list.  Him and

1   Samantha had -- the defendant and Samantha both wrote out a list
2   of a couple of medications for me to take from the pharmacy for
3   him to sell and give me a profit of it.
4   Q   So, is it at that time that you agreed to steal from the
5   pharmacy?
6   A   Yes.
7   Q   Did you end up stealing from the pharmacy?
8   A   Yes, I did.
9   Q   What did you steal?
10  A   Medications such as ibuprofen, Tylenol.
11  Q   Are these regular ibuprofen or Tylenol?
12  A   Extra Strength, behind the counter ibuprofen.
13  Q   What else?
14  A   Skelaxin, which is a muscle relaxer, and Zoloft, which is an
15  antidepressant.
16  Q   What did you do with these drugs that you stole?
17  A   I had given them to the defendant and Samantha.
18  Q   What did you give them in, if anything?
19  A   Prescription pill bottles with no label.
20  Q   You're talking about like the orange bottles?
21  A   Orange bottles with the white cap.
22  Q   Now, after you gave these stolen drugs to the defendant and
23  Samantha, what reaction, if any, did they have?
24  A   At first very excited.  After being there for a short period
25  of time, they had looked up the medications both on a

1    prescription book as well as on the Internet and found that the

2    medication that I had given them was not of high value on the

3    street.

4             MR. FELTE:  May I approach the witness, Your Honor?

5             THE COURT:  Yes.

6    BY MR. FELTE:

7    Q   Mr. Caban, let me show you what has been marked Clifftop

8    Drive 3.  Do you recognize that?

9    A   Yes, I do.

10   Q   What is it?

11   A   The prescription pill book that Samantha and Lloyd had used

12   to look up the medications that I had given them.

13            MR. FELTE:  Your Honor, may I publish the cover to the

14   jury?

15            THE COURT:  Yes.

16   BY MR. FELTE:

17   Q   Now, when these prescriptions that you had stolen were being

18   looked up in this pill book, and I believe you mentioned on the

19   Internet, by the defendant and Samantha, was anything said to

20   you?

21   A   Yes.  It was at this point where he had told me things on

22   the lines of, "This is the point where you don't tell anybody

23   what you did," giving me examples of people who went to jail

24   and -- people who went to jail for snitching and people whose

25   families get hurt because of snitches on the outside who tell or

1  give information and indirectly threatened me.

2  Q   Now, after the medications that you had stolen were looked

3  up in the pill book and on the Internet, was anything said about

4  getting different drugs?

5  A   Yes.  They had wrote me another list of higher potency, more

6  valuable pills.

7  Q   Who made this list?

8  A   Samantha and the defendant.

9  Q   Can you describe for the jury how this list was made?

10  A   On a piece of paper.

11  Q   Who was doing the writing?

12  A   I do not recall.

13  Q   Where was the defendant, if you recall?

14  A   Standing next to Samantha.

15  Q   And what were some of the drugs on this new list?

16  A   Fentanyl, morphine, codeine.

17  Q   At that point in time did you agree to try to get other

18  drugs?

19  A   No, I did not agree to get those specific drugs.

20  Q   Did you agree to get any drugs?

21  A   Yes, I did.  The defendant had asked me to try harder next

22  time to get better pills and these are the kind of pills that he

23  wants and that he would like to use and -- use to sell on the

24  streets and --

25  Q   Are the drugs that you mentioned, Fentanyl, morphine,

1  codeine, are they controlled substances?

2  A   Yes, they are.

3  Q   Did you have access to those substances at the pharmacy?

4  A   I did not.

5  Q   Did there come a point in time when you stole other drugs?

6  A   Yes.

7  Q   What drugs did you steal this time?

8  A   The same pills.  It was the second time that I had stolen

9  from the pharmacy.

10 Q   And what did you do with those pills?

11 A   I had given them to the defendant and Samantha.

12 Q   Where did you give them these pills?

13 A   At Samantha's residency.

14 Q   Was anything said when you gave them the second batch of

15 pills?

16 A   Yes.  There was more pressure to try to get better pills and

17 to once again keep my mouth shut.

18 Q   What do you mean by pressure?  Who applied any pressure?

19 A   The defendant had gotten into my face and spoke loudly and

20 got close to me and invaded my personal space.

21 Q   Well, what were you thinking at the time?

22 A   I was very frightened.

23 Q   Did the comment of "You owe me" ever come up again?

24 A   Yes.

25 Q   How did that come up?

1  A   Some time within the visits, one of the visits to Samantha's

2  house.  I don't recall the exact date.

3  Q   And what was said in regards to that?

4  A   Once again just nonchalantly said, "You owe me," except this

5  time in a demanding tone.

6  Q   Now, as far as the drugs and the pills that you stole and

7  you gave to Samantha and the defendant, did you ever get those

8  drugs back?

9  A   No, I did not.

10  Q   Did you ever get any money for them?

11  A   No, I did not.

12  Q   Did you try to get money for them?

13  A   I did through --

14  Q   What did you do to try to get money?

15  A   I had called the defendant's phone multiple times and text

16  messages.

17  Q   Well, what happened -- what, if anything, happened when you

18  text messaged the defendant?

19  A   He had called me back shortly afterwards telling me not to

20  try to contact him through text messaging about this issue ever

21  again.

22  Q   Well, were you able to actually get in touch with the

23  defendant after that and talk about any money?

24  A   No, I was not.

25  Q   Did you still try to get in touch with him by other means to

1  try to get some money?

2  A    Yes, I did.

3  Q    What were those means?

4  A    My second job I had known somebody who knew the defendant.

5  Q    And you mentioned a second job.  What other job was that?

6  A    Working at Shady Grove Hospital.

7  Q    And who did you know or who had you met that knew the

8  defendant?

9  A    A woman by the name of Ms. Brown.

10            MR. FELTE:  May I approach the witness, Your Honor?

11            THE COURT:  Yes.

12            MR. TRAINOR:  I wonder if I could be shown the exhibits

13  before they're shown to the witness.

14            MR. FELTE:  Sure.

15            MR. TRAINOR:  All right.

16  BY MR. FELTE:

17  Q    Mr. Caban, let me show you what's been marked as Photographs

18  No. 13.  Do you recognize that?

19  A    Yes, I do.

20  Q    And what is this?

21  A    A picture of Ms. Brown.

22  Q    Is that a fair and accurate representation of how you knew

23  her at the time?

24  A    Yes, it is.

25  Q    And this is back in the spring of 2007?

1    A    Approximately that time period.

2            MR. FELTE:  Your Honor, may I publish this photograph

3    to the jury?

4            THE COURT:  All right.  Yes.

5    BY MR. FELTE:

6    Q    And what effort did you make to reach the defendant through

7    Ms. Brown?

8    A    I had asked her if she had heard or talked to him and she

9    responded no.

10   Q    Where did you contact Ms. Brown?

11   A    At Shady Grove Adventist Hospital, in her department.

12   Q    Had you ever been to Ms. Brown's house before that?

13   A    Yes.

14   Q    And why had you gone to Ms. Brown's house before that?

15   A    In travels with the defendant, while hanging out with him.

16           MR. FELTE:  Thank you.  Please answer the questions

17   that counsel may have.

18           THE WITNESS:  Yes.

19           MR. TRAINOR:  I have five minutes?

20           THE COURT:  Yes.

21                      CROSS-EXAMINATION

22   BY MR. TRAINOR:

23   Q    Mr. Caban, my name is Harry Trainor.  You and I have never

24   spoken before, have we?

25   A    No.

1    Q    But you've met with and spoken to government agents on a

2    number of occasions, haven't you?

3    A    Yes.

4    Q    In fact, when you were first contacted by them, was it in

5    February of '09?

6    A    I believe that was the time period, yes.

7    Q    You knew at that time that you had a choice of talking to

8    them or not talking to them, didn't you?

9    A    Yes.

10   Q    And that was explained to you?

11   A    Yes.

12   Q    It was your choice to speak with the FBI agents at that

13   point, correct?

14   A    The FBI agent --

15   Q    Or the police.  Who did you speak with?

16   A    An FBI agent who had come to my house.

17   Q    And where were you living at that time?

18   A    New York.

19   Q    New York state?

20   A    Yes.

21   Q    All right.  And you had an interview with the FBI agents at

22   your house in February of '09, correct?

23   A    Correct.

24   Q    And you told the FBI agents about going to a barbecue, and

25   that was the Memorial Day of '07 barbecue, correct?

1  A   Correct.

2  Q   And you told them that you did not have sex there, correct?

3  A   Correct.

4  Q   And you told them that you didn't see anything at all that

5  would indicate this type of activity going on at the barbecue,

6  didn't you?

7  A   Yes, I did.

8  Q   After that you met with your lawyer, Mr. Montemarano,

9  correct?

10 A   Correct.

11 Q   And you told him a version consistent with that, correct?

12 A   Similar to -- similar to the testimony that I made today.

13 Q   But when Mr. Felte asked you, you said you lied to your

14 lawyer, correct?

15 A   I did.  I did not tell him the whole truth.

16 Q   So you lied then when you talked to Mr. Montemarano?

17 A   Yes, I did.

18 Q   And you lied to the FBI in February of '09, correct?

19 A   Yes, I did.

20 Q   Now, isn't it true that when you worked at Criswell Honda,

21 you were in terrible financial shape?

22 A   Yes.

23 Q   And that was the driving force in your life?  I mean, I

24 think you said at one time from what I've read that you were

25 malnourished even?

1  A   Correct.

2  Q   So you didn't have money to eat, you didn't have money to

3  pay your bills?  Am I right?

4  A   Yes.

5  Q   And you were looking for a way to make some money?  Am I

6  right?

7  A   Yes.

8  Q   And ultimately you decided to become a thief?

9  A   Not that clearcut.

10  Q   Well, isn't it true that you stole from your employer,

11  Eckerd Drugs?

12  A   Yes.

13  Q   You've never been prosecuted for that, have you?

14  A   No, I have not.

15  Q   And at some point you met with government agents and entered

16  into the agreement that Mr. Felte showed you and was described

17  as a proffer agreement, correct?

18  A   Correct.

19  Q   And for that you got the equivalent of immunity for what you

20  said, correct?

21  A   No.

22  Q   Well --

23  A   I was not promised immunity.

24  Q   -- the agreement that your words would not be used against

25  you?

1   A   Yes.

2   Q   So, however we characterize it, that's what you were getting

3   in terms of an agreement from the government, correct?

4   A   Correct.

5   Q   Now, Mr. Caban, when did you start working at a pharmacy?

6   A   My very first --

7   Q   In Maryland.

8   A   In Maryland?  I was transferred from New York to Maryland.

9   So, I started shortly after I had moved down there in August of

10  2006.

11  Q   August 2006.  So you were working for Eckerd Drugs in New

12  York?

13  A   Yes.

14  Q   You transferred to Montgomery County, Maryland, in August of

15  '06 as a pharmacy tech, correct?

16  A   Correct.

17  Q   And you continued to work there until when in Maryland?

18  A   I'm not able to give you the specific date.  I don't recall

19  when I had stopped.

20  Q   Well, did you stop before you went back home to --

21  A   Yes, I did.

22  Q   -- New York?  But you also worked at another medical

23  facility, Shady Grove?

24  A   Correct.

25  Q   Did you steal from them?

1  A    No, I did not.

2  Q    All right.  So the only thievery you've done is from Eckerd

3  Pharmacy, correct?

4  A    Yes.

5  Q    Now, I think you said that you didn't have access to any

6  controlled substances, did you?

7  A    No, I did not.

8  Q    The only thing that you had access to to steal were drugs

9  that were not controlled substances?

10  A    Correct.

11  Q    I think you said in answer to my question -- to Mr. Felte's

12  question about did the government promise that you wouldn't be

13  charged, you said no, they didn't make you that promise, did

14  they?

15  A    Correct.

16  Q    But you haven't --

17  A    There was no promises made.

18  Q    But you haven't been charged, have you?

19  A    No, I haven't.  The only promise that has been made was

20  through the proffer letter that the information I had given

21  would not be used against me.

22  Q    All right.  But you stole these items from Eckerd Drugs in

23  2007, didn't you?

24  A    Correct.

25  Q    Roughly three years ago?

1  A    Yes.

2  Q    Did you report to Eckerd that you had stolen from them?

3  A    No, I did not.

4  Q    Now, you told us about a barbecue at, I think you said,

5  Samantha and Pig's house?

6  A    Yes.

7  Q    Are you sure it was Pig and not Pic?

8  A    Pig, P-i-g.

9  Q    Oh, Pig is what you knew him as.  All right.  And you said

10 that you went up to use the bathroom on the second floor and a

11 young woman came in and asked you if you had protection,

12 correct?

13 A    Correct.

14 Q    And she came back with a condom and proceeded to engage in

15 oral sex with you?

16 A    Correct.

17 Q    You never paid her, did you?

18 A    No, I did not.

19 Q    She never asked for any money, did she?

20 A    No, she did not.

21 Q    And your testimony today is that when you came out of that

22 bathroom and went back to the barbecue that Mr. Royal said to

23 you, "You owe me"?

24 A    In a nonchalant way, yes.

25 Q    And what is a nonchalant way?

1  A   In a joking manner, "Now you owe me."

2  Q   "You owe me, buddy," or something like that?

3  A   Something along those lines.

4  Q   But you were asked about this very day when you were under

5  oath before the grand jury, correct?

6  A   Restate the question.

7  Q   You recall testifying under oath before the grand jury on

8  May 27, 2009, don't you?

9  A   Yes, I do.

10  Q   And you told about going up to the bathroom and having oral

11  sex with a young woman?

12  A   Yes.

13  Q   And you were asked about after you came out of that bathroom

14  did Mr. Royal discuss this with you again?

15  A   Not after the barbecue.

16  Q   At the barbecue?

17  A   At the barbecue once after I had returned from the bathroom

18  was the only time that this matter was discussed.  It wasn't

19  even directly discussed.

20  Q   You were asked, "Did he ask you about it afterwards," and

21  you answered "Yes," correct?

22  A   After I had left the bathroom.

23  Q   And you were then asked, "Do you remember what your response

24  was?"

25  A   Not word-for-word.  I do not recall what my response was.

1   Q   You didn't say anything at that point like, "You owe me,"

2   did you?

3   A   I do not say that, no.

4   Q   And you didn't testify to that before the grand jury, did

5   you?

6   A   I don't recall.

7   Q   Well, haven't you reviewed your grand jury testimony before

8   you testified today?

9   A   Yes, I did.

10  Q   And you know that in that transcript when you were asked

11  that question, you never testified before the grand jury that

12  Mr. Royal said on that day at the barbecue, "You owe me"?

13  A   I don't recall.  On my testimony -- I don't recall.

14          MR. TRAINOR:  Court's indulgence one moment.

15          THE COURT:  All right.

16  BY MR. TRAINOR:

17  Q   So you don't have a recollection of what you testified to

18  before the grand jury?

19  A   The majority of it I do.

20  Q   You don't remember saying before the grand jury that he

21  said, "Now you owe me," do you?

22  A   I believe I do remember.  I don't -- I can't remember every

23  single thing that was said in the hours that I spent in there.

24          MR. TRAINOR:  May I approach the witness, Your Honor?

25          THE COURT:  All right.  Sure.

1  BY MR. TRAINOR:

2  Q   Let me show you two pages from that testimony and ask you if

3  this refreshes your memory.  At page 12 of your testimony, line

4  25, you were asked, "Okay.  And while you were in the restroom,

5  what happened?"  And you answered, "She had entered," and then

6  you talk about what happened with the girl, correct?

7  A   Correct.

8  Q   And then the next page, line 12, you were asked, "He did ask

9  you about it afterwards?"  And you answered "Yes," correct?

10 A   Correct.

11 Q   And where is it that you say anything about "You owe me"?

12 A   It doesn't state it in there.

13         THE COURT:  What was the response?

14         THE WITNESS:  It does not say it in there.

15 BY MR. TRAINOR:

16 Q   It does not say it in there.  And the fact is that there

17 wasn't a discussion about you paying him anything, was there?

18 A   No.

19 Q   And the fact is you didn't pay anything for the girl or

20 anyone else, correct?

21 A   I did not.

22 Q   But you felt like you owed him, correct?

23 A   He had given me -- the defendant had given me the feeling

24 that I had owed him a favor for what had happened.

25 Q   And that's the justification you have in your mind for going

1  and stealing from your employer, correct?

2  A    One of the reasons.

3  Q    The fact is for all the thievery you did from Eckerd Drugs,

4  you never got a dime, did you?

5  A    No, I did not.

6  Q    Now, when you went to that barbecue -- let's go back to the

7  barbecue for a minute.

8           THE COURT:  Let me ask you this, because I don't want

9  to rush you, Mr. Trainor, how much additional time?  I have

10 another matter I've got to deal with.  We can come back

11 tomorrow.  It's no problem.

12          MR. TRAINOR:  If we could come back tomorrow.  If the

13 court would instruct the witness appropriately.

14          THE COURT:  Yes.  Yes.  You are not to discuss your

15 testimony with anyone and you'll be back tomorrow at -- what

16 time, madam clerk?

17          THE DEPUTY CLERK:  9:30.

18          THE COURT:  9:30.  Be back tomorrow at 9:30.

19          All right.  Let's go ahead and take a recess in this

20 case.  Ladies and gentlemen, I ask that you be back tomorrow at

21 9:30 for the continuation of this trial.  And, by the way,

22 ladies and gentlemen, I have motions hearings the next -- today

23 is Tuesday -- the next three days.  Is that right, madam clerk?

24          THE DEPUTY CLERK:  Yes.

25          THE COURT:  And so, we'll be leaving on or around four.

1   I try not to break up a witness's testimony if we're in the

2   process.  But we'll be leaving on or about 4 o'clock tomorrow

3   and the next two days.

4           All right.  Have a good evening.

5           (Jury excused.)

6           THE COURT:  All right.  We're done for today.  If you

7   all can at least clear your area because I've got a lot of

8   lawyers coming in this case.

9           MS. MAGNELLI:  Yes, Your Honor.

10          MR. TRAINOR:  Could the court instruct the witness who

11  he can talk to and who he can't?  He's on cross-examination.

12          THE COURT:  He's on cross-examination.  I mean, the

13  government, I'm sure, knows their obligations.  I'm not going to

14  tell the government that.  Yes, the government knows that.

15          (Proceedings adjourned at 4:15 p.m.)

16                      CERTIFICATE OF REPORTER

17          I hereby certify that the foregoing is a true and

18  accurate transcript of proceedings in the above-entitled matter,

19  to the best of my knowledge and ability.

20

21

22                    _____/s/_____

                        Gloria I. Williams

23                      Official Court Reporter

24

25