UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION


UNITED STATES OF AMERICA          .    Criminal Case No. AW-09-0048
                                  .
    v.                            .
                                  .    Greenbelt, Maryland
LLOYD MACK ROYAL, III,            .
                                  .
              Defendant.          .    Friday, March 19, 2010
. . . . . . . . . . . . . . . . .      9:40 a.m.




TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE ALEXANDER WILLIAMS, JR.
UNITED STATES DISTRICT JUDGE, AND A JURY

APPEARANCES:

FOR THE GOVERNMENT:          SOLETTE A. MAGNELLI, ESQ.
                             Office of the United States Attorney
                             36 S Charles Street
                             Baltimore, Maryland 21201

                             JAMES F. FELTE, JR., ESQ.
                             United States Department of Justice
                             950 Pennsylvania Avenue, N.W.
                             Washington, D.C. 20530

FOR THE DEFENDANT:           HARRY J. TRAINOR, ESQ.
                             Trainor, Billman, Bennett, Milko
                               and McCabe, LLP
                             116 Cathedral Street, Suite E
                             Annapolis, Maryland 21401



OFFICIAL COURT REPORTER:  GLORIA I. WILLIAMS   301-344-3228

COMPUTER-AIDED TRANSCRIPTION OF STENOTYPE NOTES

I N D E X

| GOVERNMENT'S WITNESSES | DIRECT | CROSS | REDIRECT |
|---|---|---|---|
| Crystal Brown | 5 | 11 | |
| Timothy J. Baker | 21 | 31 | |
| Paul Liquorie | 34 | 45 | 46 |
| Michelle Velasquez | 65 | 76 | 81 |
| Kureese Royal | 83 | 98 | |

1      P R O C E E D I N G S

2          THE COURT:  All right.  Do we have any preliminary

3    matters?

4          MS. MAGNELLI:  Your Honor, just at some point today if

5    we could address the 404.  We don't have to do it right now.

6          THE COURT:  All right.  Is this the only requested

7    404(b) evidence here, this incident in Montgomery County Circuit

8    Court before Judge Beard?

9          MS. MAGNELLI:  Your Honor, the circumstances of that

10   arrest are what's before the court as well as I would bring to

11   the court's attention, because Mr. Trainor made the objection to

12   anything beyond the time frame of the conspiracy, that we do

13   have a witness today who will testify about his interactions

14   with the defendant in 2008, which is about six months after the

15   end of the drug conspiracy named in the indictment, and that

16   individual will testify that he met the defendant by buying

17   drugs from him, that he actually lived with the defendant, spent

18   lots of time with the defendant, saw the defendant selling

19   drugs, certain quantities of marijuana, also PCP.

20          We'll talk about the fact that the defendant told him

21   that what was in the rap lyrics was true -- we've been talking

22   about these rap lyrics a little bit -- as well as that the

23   defendant and another individual -- this witness will testify he

24   was there when the defendant and another individual discussed

25   the fact that the defendant used to prostitute girls, he

1  couldn't do it any longer because essentially it was too

2  dangerous, he might get locked up.

3        THE COURT:  And what time is that witness coming in?

4        MS. MAGNELLI:  That witness is here.  We expect to put

5  them on before lunch.

6        THE COURT:  All right.  At the break we'll just talk

7  about it, I guess.

8        MS. MAGNELLI:  Okay.

9        MR. TRAINOR:  And just to be clear, we're going to be

10 objecting to that and to the rap lyrics coming in.

11       THE COURT:  To what coming in?

12       MR. TRAINOR:  Well, the government in their exhibit

13 book has a pile of rap lyrics that I think they're alleging that

14 the defendant wrote and we're going to be objecting to those

15 under 404.

16       THE COURT:  All right.  Well, we'll hear your

17 objection, yes.

18       All right.  Are we ready now?

19       MS. MAGNELLI:  Yes, Your Honor.

20       THE COURT:  All right.  Okay.  Let's bring the witness

21 in.

22       We're not sitting on Monday and Friday, right?

23       MR. FELTE:  That's correct.  And, Your Honor, I believe

24 there's a very good possibility that the government will rest

25 its case in chief on Tuesday.

1          THE COURT:  All right.

2          MR. FELTE:  Or Wednesday.

3          THE COURT:  But we're not sitting Monday and Friday?

4          MR. TRAINOR:  Of next week.

5          THE COURT:  Of next week.  All right.  So we'll see

6   what we have left.

7          All right.  Is our witness here from yesterday?

8          MS. MAGNELLI:  They went to get her.

9          (Jury present.)

10          THE COURT:  All right.  Let's be seated.  Good morning,

11   ladies and gentlemen.

12          All right.  We have a witness that's here?

13          MS. MAGNELLI:  Yes, Your Honor.

14          THE COURT:  She's on direct examination now and we'll

15   continue that.

16          I'll remind the jury that we're not sitting Monday and

17   Friday of next week, and the attorneys tell me that we are on

18   track.  We're on track.  So, I'll just leave it at that.

19          All right.

20          THE DEPUTY CLERK:  You're still under oath.

21          THE COURT:  All right.  Go ahead.  Yes, continue.

22          MR. FELTE:  Thank you, Your Honor.

23          CRYSTAL BROWN, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

24                    DIRECT EXAMINATION - RESUMED

25   BY MR. FELTE:

1  Q   Good morning, Ms. Brown.

2  A   Good morning.

3  Q   Please keep your voice up, okay?

4  A   Yes.

5  Q   Now, I believe when you were testifying yesterday, do you

6  recall indicating that you broke up -- you and the defendant

7  broke up or broke off your romantic relationship some time

8  around your son's birthday in 2007?

9  A   Yes.

10 Q   And do you recall what month your son's birthday is?

11 A   In April.

12 Q   And that was prior to a search warrant being executed at

13 your residence in May of 2007; is that correct?

14 A   Correct.

15 Q   Now, going back to when you had a boyfriend/girlfriend

16 relationship with the defendant, did you ever meet any women,

17 any other females when you knew the defendant through the

18 defendant?  Did you ever meet any other women through the

19 defendant?

20 A   Yes.

21 Q   Do you recall who they were?

22 A   I don't know their names, but it was a black young lady and

23 a Caucasian young lady.

24 Q   Can you describe the black young lady?

25 A   She was short, heavyset.

1  Q   Let me show you what's marked and admitted as Photograph No.

2  2.  Do you recognize that lady?

3  A   Yes.

4  Q   And who is that?

5  A   That's the young lady that I met through Mr. Royal.

6  Q   Please keep your voice up, okay?

7  A   Okay.

8          THE COURT:  You just didn't know her name?

9          THE WITNESS:  Yes.  I just don't know her name.

10          THE COURT:  But the picture seems familiar?

11          THE WITNESS:  Yes.

12          THE COURT:  All right.

13  BY MR. FELTE:

14  Q   Do you recall where you were when you saw this lady?

15  A   At her home.

16  Q   How did you get to her home?

17  A   With Mr. Royal.

18  Q   When you went to her home with Mr. Royal, what, if anything,

19  did you see?

20  A   Just some people in the house.

21  Q   Can you describe who some of these other people were, to the

22  best of your memory?

23  A   There was a guy, the black young lady, the Caucasian young

24  lady, me, Mr. Royal, and I think it was a guy.

25  Q   Okay.  Did Mr. Royal ever say anything to you about any of

1  the ladies that you had met?

2  A    Before we actually went to the house, he had told me that he

3  wanted to show me some people -- some girls to tell him whether

4  they can make him some money.

5  Q    What was your understanding of his phrase "make him some

6  money"?

7  A    Prostitution.

8  Q    When you went into the house, did you ever see any

9  interaction between the defendant and any of the girls?

10 A    Yes.

11 Q    What did you see?

12 A    Mr. Royal playing with the Caucasian lady's hair.

13 Q    Now, did you ever know the defendant to wear any jewelry?

14 A    Yes.

15 Q    What jewelry do you recall him wearing?

16 A    A ring and a bracelet.

17 Q    Let me show you what's been admitted as Royal 1a.  Do you

18 recognize that?

19 A    Yes.

20 Q    What is it?

21 A    A ring.

22 Q    Where have you seen this ring?

23 A    On Mr. Royal's pinky.

24 Q    Did you ever see Mr. Royal do anything with this ring?

25 A    He had the Caucasian young lady kiss the ring.

1  Q   Now, ma'am, I believe you indicated there was a time in

2  April when you and Mr. Royal broke up; is that correct?

3  A   Yes.

4  Q   Did you continue to have some phone calls with him after you

5  broke up?

6  A   Yes.

7  Q   Did there come a point in time several months later that you

8  saw him again?

9  A   Yes.

10 Q   Can you describe how you came to see him again?

11 A   It was very late, early morning.  I heard something hitting

12 my window and I got up to look out of my window and Mr. Royal

13 was out in the front of my house.

14 Q   What did you do when you saw Mr. Royal outside the front of

15 your house?

16 A   I went downstairs to open up the door.

17 Q   Then what happened?

18 A   Mr. Royal came in.

19 Q   What happened when he came in?

20 A   We talked briefly.  We had sex and we talked some more.

21 Q   After having sex, do you recall what you talked about?

22 A   Mr. Royal was apologizing, saying that he didn't mean to get

23 me involved in all this, and he did make a statement that either

24 he thought about killing me or he wanted to kill me because he

25 didn't want me to tell.

1    Q    Tell what?

2    A    He didn't say.

3    Q    After he made the comments thought about killing you because

4    he didn't want you to tell, what happened then?

5    A    Can you repeat your question again.

6    Q    After Mr. Royal made the statement he thought about killing

7    you because he didn't want you to tell, what happened after that

8    statement was made?

9    A    The conversation was kind of ending and he left.

10   Q    Now, up until yesterday had you ever seen Mr. Royal again

11   after that statement?

12   A    No.

13   Q    How, if at all, did the comments he thought about killing

14   you affect you?

15   A    It scared me.

16   Q    Were any changes in your lifestyle made?

17   A    Yes.  I would stay at my mother's house on the weekend.

18   During the weekdays I would stay at my house to go to work and

19   for my son to go to school.

20   Q    When you testified before the grand jury in February 2009,

21   did you think about those statements at all?

22            MR. TRAINOR:  Objection.  Leading.

23            THE COURT:  All right.  Yes.  Rephrase the question.

24   I'll sustain the objection to the form of the question.

25   BY MR. FELTE:

1  Q   Do you recall testifying for the first time before the grand

2  jury in February 2009?

3  A   Yes.

4  Q   What, if anything, were you thinking about when you

5  testified at that point?

6  A   The statement that Mr. Royal had said to me.

7  Q   And what was that statement again?

8  A   Either he thought about killing me or he wanted to kill me.

9          MR. FELTE:  Please answer any questions that counsel

10 may have.

11         THE COURT:  All right, Mr. Trainor, do you have any

12 questions?

13         MR. TRAINOR:  Yes, I have a few questions.  Thank you,

14 Your Honor.

15         THE COURT:  Yes.

16                      CROSS-EXAMINATION

17 BY MR. TRAINOR:

18 Q   Ms. Brown, I am Harry Trainor and you and I have not ever

19 spoken before, have we?

20 A   No.

21 Q   All right.  You testified before the grand jury in this

22 courthouse or in Baltimore?

23 A   In Baltimore.

24 Q   But it was the United States District Court, a federal grand

25 jury, correct?

1   A   Correct.

2   Q   And you initially lied under oath, correct?

3   A   Yes.

4   Q   And you're saying it's because you were afraid; is that

5   right?

6   A   Yes.

7   Q   All right.  Your relationship with Mr. Royal began in

8   September of '06, correct?

9   A   Yes.

10  Q   And you were introduced to him by someone and on that date

11  you bought a twenty dollar bag of marijuana, correct?

12  A   Yes.

13  Q   And that's a very small amount of marijuana, isn't it?

14  A   Yes.

15  Q   But you exchanged phone numbers with Mr. Royal on that day,

16  correct?

17  A   Yes.

18  Q   And it wasn't long -- it was only a very short time before

19  the two of you had developed a relationship and you were living

20  together?

21  A   Correct.

22  Q   And he had very little money, didn't he?

23  A   Well, at that time I didn't know how much money Mr. Royal

24  had.

25  Q   Well, he eventually got a job in 2006 as a car salesman,

1   right?

2   A   I'm not sure if it's 2006 but, yes, he did get a job.

3   Q   During your relationship --

4   A   Yes, during our relationship.

5   Q   -- he worked as a car salesman?  All right.  And you were

6   from New York, right?

7   A   Yes.

8   Q   And lived there for most of your life?

9   A   Correct.

10  Q   In fact, your relatives were there?

11  A   Correct.

12  Q   Your mother was there?

13  A   No.

14  Q   Family was there?

15  A   Yes.

16  Q   You had cousins up there?

17  A   Correct.

18  Q   And you had a drug connection up there through your family,

19  correct?

20  A   No, I didn't have a drug connection.

21  Q   You didn't?

22  A   No.

23  Q   All right.  There was a time during your relationship with

24  Mr. Royal that the two of you drove to New York, correct?

25  A   Yes.

1   Q   In your car?

2   A   Correct.

3   Q   And you were driving, correct?

4   A   Correct.

5   Q   And how many nights did you stay in New York?

6   A   We didn't stay.

7   Q   You just turned around and came back?

8   A   Correct.

9   Q   And you took $2,500 of your own money with you, correct?

10  A   Correct.

11  Q   In the form of cash; am I right?

12  A   Yes.

13  Q   And you went to visit one of your cousins in Brooklyn or

14  Queens; am I right?

15  A   Correct.

16  Q   And you gave the cousin the cash; am I right?

17  A   No.

18  Q   Where was the cash at that point?

19  A   I gave it to Mr. Royal.

20  Q   When did you give it to Mr. Royal?

21  A   Before he got out of the car.

22  Q   So you didn't give it to him in Maryland?  You gave it to

23  him after you met your cousin up there, right?

24  A   I gave it to him when we arrived in Queens.

25  Q   And that was before or after you met your cousin?

1  A   My cousin was there.

2  Q   When you gave the money?  What is your cousin's name?

3  A   Chris.

4  Q   Just Chris?  Does he have a last name?

5  A   I don't know his last name offhand.  He's a distant cousin.

6  Q   Is it you don't know his last name or you don't want to give

7  his last name?

8  A   I don't know it.

9  Q   Had you called Chris in advance before you drove to New

10 York?

11 A   Yes.

12 Q   And you told Chris that you wanted a drug connection,

13 correct?

14 A   Prior to that, me and Mr. Royal had a conversation.

15 Q   But it was you who placed the call to your cousin Chris?

16 A   Yes, with Mr. Royal's understanding that he wanted to

17 purchase drugs.

18 Q   But you were the -- what were you, the middleman?  You

19 arranged it, didn't you?

20 A   I just brought him there.

21 Q   And you brought the money there?

22 A   Correct.

23 Q   And you introduced him to your cousin Chris, correct?

24 A   Correct.

25 Q   And you drove with your cousin and Mr. Royal to a location

1   in Queens, New York?

2   A    Correct.

3   Q    And there was a drug transaction at that time?

4   A    Correct.

5   Q    And you drove back to Maryland with the drugs in your car?

6   A    Correct.

7   Q    And then the drugs were in your house?

8   A    Correct.

9   Q    And you've never been charged with anything to do with that

10  cocaine, correct?

11  A    Correct.

12  Q    You invested money in cocaine and expected to get a return,

13  didn't you?

14  A    No.  I lent Mr. Royal money and Mr. Royal was supposed to

15  give me my money back.

16  Q    You knew exactly what the money was used for?

17  A    Yes, I knew what it was going to be used for.  Yes.

18  Q    And you knew exactly how the money was supposed to get back

19  to you, correct?

20  A    The money that I loaned him, yes.

21  Q    And you were disappointed that you didn't get all of your

22  money back?  You got some of it, correct?

23  A    Correct.

24  Q    You met Shantia Tibbs; is that right, the woman whose

25  picture you identified?

1    A    Correct.

2    Q    And you went to her house for what purpose?

3    A    Mr. Royal wanted me to see some females for me to tell him

4    if they looked like they can make him money.

5    Q    What would you know about whether females could make money?

6    A    I don't know.

7    Q    Just no reason at all that you can think of?

8    A    No, I don't.

9    Q    And the last time you met with Mr. Royal was after May of

10   2007?

11   A    Correct.

12   Q    That was the night that the two of you made love, correct?

13   A    Correct.

14            MR. TRAINOR:  I have no further questions.

15            THE COURT:  All right.  Mr. Felte.

16            MR. TRAINOR:  One further question.

17            THE COURT:  Yes.

18   BY MR. TRAINOR:

19   Q    When you were in New York with Mr. Royal, did you meet with

20   other relatives other than your cousin?

21   A    I don't remember.

22   Q    Didn't you stop by to see your grandmother?

23   A    I'm really not sure.  I don't remember.

24   Q    You just don't remember?  Have you told us everything you

25   remember about that trip to New York?

1   A   Yes.

2           MR. TRAINOR:  No further questions.

3           MR. FELTE:  No redirect, Your Honor.

4           THE COURT:  All right.  You're excused.  Thank you for

5   your testimony.

6           Next witness, please.

7           MS. MAGNELLI:  Your Honor, if I may, the parties have

8   entered into a few more stipulations while we're getting the

9   next witness.

10          THE COURT:  All right.  Let's go ahead and hear those.

11  Ladies and gentlemen, stipulations again are agreements between

12  both sides as to certain facts and you are to take them as

13  facts.  Again, the reason for stipulations generally is to avoid

14  the appearance of witnesses who, again, the testimony is not

15  contradicted and it's pretty much in agreement.

16          All right.  What are the stipulations?

17          MS. MAGNELLI:  Thank you, Your Honor.  This one has

18  been marked as Stipulation No. 2.  It's been entered into by the

19  government.  My signature, Mr. Felte's signature, Mr. Trainor's

20  signature as well as the defendant's signature appears, and it

21  reads as follows:

22          The United States of America, by and through its

23  undersigned counsel, and the defendant, Lloyd Mack Royal, III,

24  through his counsel, Harry Trainor, hereby stipulate and agree

25  to the following:

1    That these records that I will discuss in a moment were

2    made at or near the date of the document, were created and

3    maintained in the ordinary and regular conduct of each business,

4    and that the following records and information are authentic and

5    admissible pursuant to Federal Rule of Evidence 803(6) without

6    the need for a records custodian to testify.

7    Specifically, Government Exhibit Motel 6 2 is a hotel

8    receipt in the name of Lloyd Royal dated April 15, 2007, from

9    the Motel 6 located at 497 Quince Orchard Road, Gaithersburg,

10   Maryland 20878.

11   And that Government's Exhibit Motel 6 3 is a redacted

12   guest list for April 15, 2007, from the same motel reflecting

13   the assigned motel room number and guest contact phone number,

14   date of birth, that kind of thing for the defendant, Lloyd

15   Royal.  I know that's very hard to see.

16   And the parties further agree that this stipulation

17   shall be received as an exhibit, admitted into evidence and read

18   to the jury.

19   Your Honor, I have another stipulation, if I may.

20   THE COURT:  All right.

21   MS. MAGNELLI:  This one is marked Stipulation No. 4,

22   again signed by myself and Mr. Felte on behalf of the government

23   as well as Harry Trainor and the defendant on behalf of the

24   defense.

25   The United States of America by and through its

1   undersigned counsel and the defendant, Lloyd Mack Royal, III,

2   through his counsel, Harry Trainor, hereby stipulate and agree

3   to the following:

4          The following record was made at or near the date of

5   the document, was created and maintained in the ordinary and

6   regular conduct of business, and that the following record and

7   information is authentic and admissible pursuant to 803(6) under

8   the Federal Rules without the testimony of a records custodian.

9          Specifically, Government's Exhibit Marriott 2 is a

10  hotel receipt in the name of Adam Grieder dated May 9, 2007,

11  from the Gaithersburg Courtyard Marriott, currently the Wyndham

12  Garden, located at 8035 Russel Avenue in Gaithersburg, Maryland

13  20879.

14         And that the parties further agree that this

15  stipulation shall be received as an exhibit, admitted into

16  evidence and read to the jury.

17         THE COURT:  All right.

18         MS. MAGNELLI:  Your Honor, if I may call Tim Baker.

19         THE DEPUTY CLERK:  Please raise your right hand.

20         TIMOTHY J. BAKER, GOVERNMENT'S WITNESS, SWORN

21         THE DEPUTY CLERK:  State your name loudly and clearly

22  into the microphone and spell your last name for the record.

23         THE WITNESS:  My name is Timothy J. Baker.  Last name

24  is spelled B-a-k-e-r.

25         THE DEPUTY CLERK:  Thank you.

1                        DIRECT EXAMINATION

2     BY MS. MAGNELLI:

3     Q    Mr. Baker, with whom are you employed?

4     A    I work for the FBI.

5     Q    And how long have you been so employed?

6     A    I've worked for the FBI for 22 years.

7     Q    What have you been doing in your most recent assignment with

8     the FBI?

9     A    For the last 12 years I've been assigned as an intelligence

10    analyst and for the last two I've worked for the Baltimore

11    Division.

12    Q    And in working for the Baltimore Division are you a

13    particular type of source analyst?

14    A    I'm typically described as an all source analyst.  Most

15    recently I've been working on a mapping initiative at the

16    bureau.

17    Q    When you say a mapping initiative, can you explain to the

18    jury what it is that you do?

19    A    As part of my intelligence analyst duties I'm responsible

20    for providing mapping support to FBI investigations.

21    Q    And when you say mapping support, what are you taking and

22    what are you creating?

23    A    I take data provided to me and display it in essentially a

24    summary chart.

25    Q    And did you, in fact, provide that type of support in this

1  case?

2  A   Yes, I did.

3  Q   All right.  And what did you do generally with regard to

4  this case?

5  A   I was provided with telephone records and I was asked to

6  create a series of charts or maps that would display that

7  information.

8  Q   Okay.  And how did the FBI get these records?

9  A   Pardon?

10 Q   How did the FBI get these records?

11 A   I understand they were obtained from the phone company and

12 provided to me.

13 Q   Were they pursuant to a subpoena?

14 A   Yes.

15 Q   What kind of data was reflected in these records?

16 A   Telephone records, date, time, telephone numbers involved,

17 subscriber information, durations of calls.

18 Q   Anything about location?

19 A   Part of the phone data was location information associated

20 with cell phone communications that were reflected in the phone

21 records.

22 Q   In other words, certain coordinates?

23 A   Coordinates of cell phone towers, their locations.  They

24 were associated with particular call events.

25 Q   And as a result of the documents that the FBI got, what

1  exactly did you produce?

2  A   I was asked to produce essentially a summary of that

3  information and have it reflected on a map that would indicate

4  locations of cell phone towers and particular locations of

5  interest pertinent to the investigation.

6  Q   Okay.  And you've had some training in cell networks and

7  that kind of thing?

8  A   Some basic FBI training on how those networks work.

9  Q   Very generally and basically, can you describe for us what a

10 cell tower does?

11 A   Generally speaking, a cell tower is a piece of equipment

12 used in the phone network, the cellular phone network, to help

13 transmit that communication through the cellular network.

14 Q   Okay.  And is there one cell tower per area usually or what

15 do you see generally?

16 A   I would say, generally speaking, there are -- they could be

17 rather dense, especially in populated areas, but there are

18 typically several in any given area.

19 Q   And based on your training, do you know why a particular

20 cell tower might be used during a call?

21 A   Typically a cell phone tower would be used because it's the

22 closest to the cellular device, the cell phone, being used in

23 the communication.

24 Q   And based on your knowledge and training, what happens when

25 an individual moves away from a particular cell tower?

1   A    A different cell tower, the next closest, would likely be

2   used.  That communication would then be relayed through that

3   cell tower.

4           MS. MAGNELLI:  Your Honor, if I could have the witness

5   join me off the stand and approach the easel.

6           THE COURT:  All right.

7   BY MS. MAGNELLI:

8   Q   Mr. Baker, I'm going to ask you to use this microphone for

9   the next portion of your testimony.

10          THE COURT:  Mr. Trainor, feel free to come on down and

11  watch.

12          MR. TRAINOR:  Thank you, Your Honor.

13  BY MS. MAGNELLI:

14  Q   Mr. Baker, I'm going to show you what has been marked as

15  Government Phone Exhibit 1.  Do you recognize this?

16  A   Yes, I do.

17  Q   How do you recognize this?

18  A   That was one of the exhibits that I was asked to prepare in

19  support of the trial.

20  Q   Okay.  I'm going to ask you to look at Government's Exhibit

21  Phone Exhibit 1a.  Do you recognize that?

22  A   Yes, I do.

23  Q   How do you recognize that?

24  A   It is a larger version of the table that's displayed on the

25  right side of the first exhibit.

1   Q   Did you, in fact, create a second page to the exhibit?

2   A   That's correct.

3   Q   And that is this enlarged table?

4   A   Yes.

5   Q   I'm going to place 1a on the easel and ask you a few

6   questions.  Can you describe for us, please, what is reflected

7   on this chart?

8   A   What you see on the right-hand side of the chart is a

9   summary of the telephone information that was gathered and on

10  the left side is a map that illustrates locations of cell phone

11  towers and two pertinent locations through the investigation.

12  Q   Okay.  Does this chart reflect everything in the records

13  that you observed?

14  A   No.

15  Q   Is this a summary chart?

16  A   It is a summary.

17  Q   And you were asked to look at a particular phone number --

18  actually, particular phone numbers on a particular date?

19  A   That's correct.

20  Q   Are you representing at all that this reflects all of the

21  phone activity on a particular date?

22  A   It is not all the phone activity.

23  Q   Can you just walk us through, please, what all these

24  different boxes and legends are?

25  A   Of course.  As I mentioned, the icons that you see in the

1 upper left and the bottom right indicate where cell phone towers

2 are located and specifically cell phone towers that were used to

3 transmit the wireless communication for the number listed at the

4 top.

5 Q   And what do the numbers in these green text boxes correlate

6 with?

7 A   Those numbers correspond to call events that are listed in

8 this first column of the chart.

9 Q   Can you give me an example?

10 A   Well, for instance, call event No. 1, which corresponds to

11 this box right here where we've listed a number 1.  Call event

12 No. 3 is reflected in that same box as being used again later

13 and so on.

14 Q   Okay.  Can you explain to the jury, please, why this text

15 box is linked to this cell tower?

16 A   That cell phone tower was used to transmit the

17 communications that are outlined in this top row.

18 Q   Okay.  I see you have some other information here on the

19 chart.  Again, is this all the information from the records?

20 A   It is not.  It's a summary.

21 Q   The records in this case, they were obtained from the phone

22 companies directly?

23 A   That's correct.

24 Q   Are they voluminous?

25 A   They are.

1   Q   Did you manipulate or change those records in any way?

2   A   The information was not changed.  It is just a summary

3   that's reflected here.

4   Q   And the information across the top of this, call number,

5   call number date, all of those, is there actually more

6   information in the record than what you've culled down here?

7   A   There is more.

8   Q   Why did you put these additional markers on the map?

9   A   Those green outlines are meant to indicate state boundaries.

10  The bottom left is state of Virginia, shows the division between

11  that and Maryland, as well as the border between the District of

12  Columbia and Maryland.

13  Q   This mapping tool, where did you get this mapping tool?

14  A   This is a tool that is widely used throughout the FBI.

15  Q   I'm going to show you what's been marked as Government's

16  Exhibit Phone Exhibits 1a.  Is this simply an enlarged version

17  of the same to and from calls?

18  A   That's correct.  It's identical.

19  Q   And you, in fact, created this as well?

20  A   That's correct.

21  Q   We actually have a smaller printout of both of these at

22  Phone Exhibits 1b and 1c; is that correct?

23  A   That's correct.

24  Q   All right.  Sir, I'm going to move on to what's been marked

25  as 2 and 2a.  Do you recognize what is in Phone Exhibits 2?

1   A    Yes, I do.

2   Q    What is this?

3   A    This is the second chart that I produced in support of the

4   investigation.

5   Q    And 2a?

6   A    The same.  I recognize that as well.

7   Q    All right.  Looking at Phone Exhibits 2, this is labeled

8   Call Activity for May 8, 2007.  Can you explain what you did

9   with this chart?

10  A    Yes.  Again, I was asked to illustrate locations of cell

11  phone towers that were used in the wireless communication for

12  several telephone numbers of interest in the case.

13  Q    All right.  And, again, there's a legend down here.  Is this

14  legend -- is it consistent with the legends -- the type of

15  legends used in all these charts?

16  A    Yes, that's correct.

17  Q    And why is it that some of these text boxes on the actual

18  map are different colors?

19  A    The different colors correspond to the three numbers of

20  interest at the bottom and also in corresponding colors.

21  Q    Can you give me an example of how one would correlate to the

22  other?

23  A    Sure.  The first number of interest in red corresponds to

24  all the red boxes and, again, the numbers reflected in those

25  boxes correspond to the table that we've provided.  So, call No.

1 that's reflected in this box would correspond to call event 1

that's listed at the top of that table and so on.

Q   All right.  And I see that actually going from Phone

Exhibits 2 to 2a you have maintained the color scheme.  In other

words, what number you assigned to red on 2 stays red on 2a; is

that correct?

A   That's correct.

Q   All right.  And, again, were the records that you based

these charts on voluminous?

A   They were voluminous, yes.

Q   And they were obtained directly from the phone companies?

A   That's right.

Q   Did you alter or manipulate those records in any way?

A   No.

Q   You simply summarized those records?

A   That's correct.  This is just a summary of that information.

Q   These charts are not meant to include every single phone

call made that evening?

A   That's correct.

Q   I'm going to show you what's been marked as Phone Exhibits

3.  Do you recognize this?

A   Yes.

Q   How do you recognize this?

A   Again, that's the third of a series of charts that I

prepared.

1  Q   And I'm going to show you what's been marked as 3a.  Do you

2  recognize that?

3  A   Yes, I do.

4  Q   Did you create that?

5  A   Yes.

6  Q   And, again, for the record, we have smaller versions of

7  these in print at 2b, 2c, 3b and 3c.

8       Sir, I'm going to ask you to look at Phone Exhibits 3

9  and I see that it's labeled Call Activity From May 9, 2007.  Can

10 you explain what you've done here?

11 A   Sure.  Again, this is a summary of cell phone activity that

12 used particular cell phone towers in this area as reflected in

13 the map.  The larger table on the second exhibit is just a

14 larger version of this table that's displayed on the right.

15 Q   Okay.  And, again, I see that there are text boxes and cell

16 towers.  Are you using the same method from the earlier charts

17 as you did on this chart?

18 A   Yes.  We stayed consistent with the legend.

19 Q   And, again, I see that some of the text boxes are green and

20 they point to a particular cell tower.  Is it true that that

21 color you maintained throughout the chart with regard to phone

22 numbers?

23 A   Yes, that's correct.

24 Q   Were the records you based this chart on voluminous?

25 A   Yes.

1   Q   Were they all obtained through subpoena from the phone

2   companies?

3   A   Yes, they were.

4   Q   Did you alter or manipulate those actual records in any way?

5   A   No, I did not.

6   Q   So, is this simply a summary of a particular date?

7   A   That's correct.  It's a summary of the information obtained.

8   Q   And is not meant to be all inclusive?

9   A   It is not, no.

10  Q   Thank you.  You may take the stand.

11          Sir, with regard to this investigation, was that your

12  only role?

13  A   Yes, it was my only role.

14          MS. MAGNELLI:  Thank you.

15          MR. TRAINOR:  Please leave those up.

16          MS. MAGNELLI:  If you would please answer any questions

17  from counsel.

18          MR. TRAINOR:  Thank you.

19                          CROSS-EXAMINATION

20  BY MR. TRAINOR:

21  Q   So you're saying every bit of information on these charts

22  came from phone records, correct?

23  A   Not every bit.  The phone numbers reflected came from --

24  Q   I'm not sure what exhibit number this is.  3a, Government's

25  Phone Exhibits 3a, this is a chart that you made?

1  A   That's correct.

2  Q   The last column on the right which has first names, that's

3  not on any phone records, is it?

4  A   It is not.

5  Q   That's information that was supplied to you by someone else?

6  A   That's correct.

7  Q   So you didn't find these names on any phone records, did

8  you?

9  A   That information was provided to me.

10  Q   All right.  But you never saw any records on that?

11  A   No.

12  Q   All right.  On Phone Exhibits 3, the parts that really you

13  saw no records on include the last column, which would be the

14  names, correct?

15  A   That's correct.

16  Q   And you saw no records of any of these names on them, Paul,

17  Lloyd, Adams, Shantia, Samantha?

18  A   I did not.

19  Q   But other than that, this illustrates cell tower locations

20  through which the calls here passed on that day --

21  A   That's correct.

22  Q   -- according to the records?

23  A   That's correct.

24  Q   All right.  Looking at Phone Exhibits 2a, again, there are

25  three columns.  In the first block of calls there's one column

1  with names in it.  That didn't come from any record, did it?

2  A   No.

3  Q   And in the second group of calls, 36 through 70, the column

4  to the far right did not come from any records?

5  A   None that I received.  They may have been --

6  Q   None that you ever saw?

7  A   -- the original records.

8  Q   All right.  And 71 through 102, the farthest column on the

9  right is not based on records that you saw?

10  A   Right.

11  Q   All right.  And, again, on Phone Exhibits 2, the top part of

12  this exhibit is clearly based on records that you saw and shows

13  the cell tower locations through which calls passed, correct?

14  A   That's correct.

15  Q   And these phone numbers come from records, but none of the

16  names shown on this exhibit come from any records that you saw?

17  A   That information was provided to me separately.

18  Q   All right.  But not from any records that you saw?

19  A   No.

20  Q   And, again, Government's Phone Exhibits 1a, the same is true

21  that Calls To and From column is not based on any record you

22  saw?

23  A   That's right.

24  Q   And, finally, Government's Exhibit No. Phone Exhibits 1, the

25  far right column is not based on any records that you saw nor

1  are any of the names associated with this exhibit?

2  A    That's correct.

3         MR. TRAINOR:  I think that's the last one, and I have

4  no further questions.

5         THE COURT:  All right.

6         MS. MAGNELLI:  Nothing further from this witness.

7         THE COURT:  All right.  You may stand down.  Thank you,

8  agent.

9         MR. FELTE:  Your Honor, the government's next witness

10 would be Paul Liquorie.

11        THE COURT:  All right.

12         PAUL LIQUORIE, GOVERNMENT'S WITNESS, SWORN

13        THE DEPUTY CLERK:  State your name loudly and clearly

14 into the microphone and spell your last name for the record.

15        THE WITNESS:  Paul Liquorie, L-i-q-u-o-r-i-e.

16                         DIRECT EXAMINATION

17 BY MR. FELTE:

18 Q    Good morning.

19 A    Good morning.

20 Q    Sir, can you tell the jury how you're employed?

21 A    I'm a lieutenant with the Montgomery County Department of

22 Police.

23 Q    How long have you been with the Montgomery County Police

24 Department?

25 A    Sixteen years.

1    Q    What is your current assignment?

2    A    My current assignment is as the deputy commander for the

3    Third District.

4    Q    Let me direct your attention to May of 2007.  What was your

5    assignment at that time?

6    A    At that time I was the detective sergeant and supervisor of

7    the vice and intelligence squad.

8    Q    As such, what were your duties?

9    A    The section is divided into two responsibilities.  One is

10   the intelligence side, which does homeland security and

11   intelligence functions.  The other one is the vice side of the

12   house and in that part we investigate crimes such as

13   prostitution, human trafficking and gambling.

14   Q    Now, in the course of your duties in May of 2007, were you

15   conducting an investigation concerning some minor females?

16   A    Yes.

17   Q    And as a side note, at that time in May 2007, what was the

18   legal age to purchase cigarettes in Maryland?

19   A    Eighteen years of age.

20   Q    Let me direct your attention specifically to May 18, 2007.

21   Did there come a point in time when you took two individuals

22   into custody pertaining to your investigation?

23   A    Yes.

24   Q    Who was that?

25   A    Lloyd Mack Royal, III, and Shantia Tibbs.

1  Q   How was it that you came to take those two individuals into

2  custody?

3  A   I had coordinated with another plain clothes team called the

4  Sixth District Special Assignment Team, which conducted a

5  traffic stop in Gaithersburg at Cross Country Lane and

6  Strawberry Knoll Road.

7  Q   And when you arrived, what did you observe?

8  A   I observed a white 1995 Toyota Camry had been stopped by the

9  other team and Mr. Royal and Ms. Tibbs were in custody.

10 Q   Do you see Mr. Royal in the courtroom here today?

11 A   I do.

12 Q   Can you please point to him and describe an article of

13 clothing he's wearing.

14 A   Yes.  He's to my right.  He's wearing the dark suit with the

15 white collared shirt.

16         MR. FELTE:  Your Honor, may the record reflect that the

17 witness has identified the defendant?

18         THE COURT:  All right.  So indicate.

19 BY MR. FELTE:

20 Q   What, if anything, did you recover from Mr. Royal at that

21 time?

22 A   I recovered a stone-studded ring, also an analog watch with

23 several stones around it, a cellular telephone, and a folding

24 knife.

25 Q   Let me show you what's been marked as and admitted as Royal

1  Exhibit 1a.  Do you recognize that?

2  A    I do.

3  Q    And what is that?

4  A    That's the ring I recovered from Mr. Royal.

5  Q    Let me show you what's been marked and admitted as Royal

6  Exhibit 2.  Do you recognize that?

7  A    I do.

8  Q    What is it?

9  A    That's the watch I recovered from Mr. Royal.

10        MR. FELTE:  May I approach, Your Honor?

11        THE COURT:  All right.

12 BY MR. FELTE:

13 Q    Mr. Liquorie, let me show you what's been marked Royal

14 Exhibit 3, cell phone.  Do you recognize that?

15 A    I do.

16 Q    And what is it?

17 A    It's the cell phone that I recovered from Mr. Royal.

18 Q    And Royal No. 4, do you recognize that?

19 A    I do.

20 Q    What is it?

21 A    It's the folding knife I recovered from Mr. Royal.

22 Q    This yellow tape around the knife, is this the Montgomery

23 County evidence tape that was subsequently placed on it?

24 A    It is.

25 Q    Now, regarding the cell phone, what action, if any, did you

1  take for that?

2  A    The cell phone was brought back to Montgomery County police

3  headquarters.  Once we were there, the information contained in

4  there was downloaded via a software program by one of the FBI

5  agents helping us with the case.

6  Q    Were you present when that happened?

7  A    I was.

8  Q    And from that information were you able to obtain the

9  contact list from that phone?

10  A    We were.

11  Q    Let me show you on your screen Government's Exhibit 3a.  Can

12  you read that, sir?

13  A    I can.

14  Q    Or do you need me to approach?  Do you recognize 3a?

15  A    I do.

16  Q    What is it?

17  A    It's the contact list that was a result of the information

18  contained in the phone that I recovered from Mr. Royal.

19  Q    And what phone number is that for?

20  A    I can't see the marking at the top.

21         MR. FELTE:  May I approach, Your Honor?

22         THE COURT:  Yes.

23         THE WITNESS:  The phone number is 202-286-7283.

24  BY MR. FELTE:

25  Q    And let me show you Royal Exhibit 3b.  Do you recall what

1  that is?

2  A    Yes.  This is, again, more of the contacts from within the

3  phone that I recovered from Mr. Royal.

4  Q    Now, with regards to Ms. Tibbs, did you recover any objects

5  from her?

6  A    Yes.

7  Q    Do you recall what you recovered?

8  A    A black address book which was contained within her purse.

9  Q    Sir, let me show you what's been marked and identified as

10 Cross Country Place 3 and ask if you recognize that.

11 A    I do.

12 Q    What is it?

13 A    It's the address book which I recovered from Ms. Tibbs'

14 purse.

15 Q    Now, did there come a point in your investigation subsequent

16 to these stops that you obtained by subpoena toll and subscriber

17 information for an individual known as Thomas Christopher King?

18 A    Yes.

19 Q    After obtaining that information, was there a point in time

20 when you executed a search warrant at 704 Clifftop Drive in

21 Gaithersburg, Maryland?

22 A    Yes.

23 Q    Do you recall when you executed that search warrant?

24 A    June 18, 2007.

25 Q    Let me show you what's been marked and admitted as Clifftop

1    Drive No. 1.  Do you recognize that?

2    A    I do.

3    Q    What is it?

4    A    That is the house at 704 Clifftop Drive Gaithersburg,

5    Maryland.

6    Q    Is that where you executed the search warrant?

7    A    It is.

8    Q    Let me show you what's been marked as Clifftop Drive 1a and

9    ask if you recognize that.

10   A    I do.  That is the interior main level of 704 Clifftop Drive

11   in Gaithersburg, Maryland.

12   Q    Now, when you execute a search warrant on a residence, do

13   you have a procedure that you follow?

14   A    Yes.

15   Q    What is that procedure?

16   A    First we insure that the residence is secure and safe for

17   the officers to enter.  After that's done, we take overall

18   photographs.  Those overall photographs are first taken of the

19   exterior of the house, demonstrating that, and then the interior

20   of the house, and they're taken in each of the rooms to show the

21   condition of the house prior to us starting the search.

22          As we search the house and we come across exhibits or

23   evidence that we're going to seize, the evidence is then marked

24   with an index card and labeled from the room it was in, and then

25   all those items that we retrieve are then subsequently bagged or

1   boxed.  We then fill out an inventory form and the inventory

2   form lists all the property that's going to be removed from the

3   house.  And then as the supervisor, in this case the raid

4   supervisor and the supervisor of the unit, it's my

5   responsibility to insure that the exhibits that are being

6   removed from the house are consistent with what we have in the

7   inventory as well.

8   Q   So you were the raid supervisor of the execution of the

9   search warrant?

10  A   I was.

11  Q   So, in that role, all of the evidence that was removed from

12  the residence came through you?

13  A   Correct.

14  Q   Let me show you what's been marked as Clifftop Drive 3a, a

15  photocopy of the front of a book.  Do you recognize that?

16  A   I do.

17  Q   What is that?

18  A   The title of the book is "The Pill Book."

19  Q   And do you know where that was recovered from in the

20  residence?

21  A   It was recovered from the master bedroom, what we labeled

22  bedroom No. 1 for the purposes of the search warrant.

23  Q   Let me show you a photo, what's been marked and admitted as

24  Clifftop Drive 4a.  Do you recognize that?

25  A   I do.

1  Q   What is it?

2  A   It's a pink woman's blouse.

3  Q   And where was that recovered?

4  A   Again, from bedroom No. 1.

5  Q   Let me show you Clifftop Drive 5a and ask if you recognize

6  that.

7  A   I do.

8  Q   What is it?

9  A   It's a black miniskirt.

10  Q   Where was that recovered?

11  A   From bedroom No. 1.

12  Q   And that's the master bedroom?

13  A   Yes, it is.

14  Q   Let me show you Clifftop Drive 6a and ask if you recognize

15  that.

16  A   I do.

17  Q   What is it?

18  A   It's a red and black miniskirt.

19  Q   Clifftop Drive 7a?

20  A   This is a denim top, women's top.

21  Q   And where was that recovered?

22  A   From the master bedroom of the Clifftop Drive address.

23  Q   Clifftop Drive 8a?

24  A   These are denim shorts that were recovered from the master

25  bedroom of the Clifftop Drive address.

1   Q   Clifftop Drive 9a?

2   A   This is a stocking leotard that was recovered from the

3   residence at Clifftop Drive.

4   Q   And where in the residence?

5   A   The master bedroom as well.

6   Q   Clifftop Drive 10a.

7   A   These are platform boots, black, that were recovered from

8   the master bedroom at Clifftop Drive.

9   Q   And Clifftop Drive 11a?

10  A   These are black stiletto boots that were recovered from the

11  master bedroom of Clifftop Drive.

12  Q   In fact, all the items that you've just identified came from

13  that one bedroom; is that correct?

14  A   That is correct.

15  Q   Now, after executing the search warrant, did you take any

16  action to attempt to identify any alleged customers of

17  commercial sex transactions?

18  A   Yes.

19  Q   Were you able to meet with any of these customers?

20  A   Yes.

21  Q   Who was that?

22  A   Adam Grieder and Mark Witherspoon.

23  Q   Let me show you what's been marked and admitted as D.C. No.

24  4.  Do you recognize the person in that photograph?

25  A   I do.

1  Q   Who is that?

2  A   Mark Witherspoon.

3  Q   And did you meet with him?

4  A   I did.

5  Q   Let me show you what's marked as Government's Exhibit

6  Holiday Inn 3 and ask if you recognize that?

7  A   Adam Grieder.

8  Q   Did you meet with him?

9  A   I did.

10 Q   Now, were you able to determine Adam Grieder's date of

11 birth?

12 A   Yes.  ████-1968.

13 Q   What, if anything, did you later learn about him?

14 A   That he passed away.  He died.

15 Q   Let me show you what's been marked -- I believe this is

16 Holiday Inn No. 4 and ask if you recognize -- actually, may I

17 approach, Your Honor?

18         THE COURT:  Yes.

19 BY MR. FELTE:

20 Q   Let me show you what's been marked as Holiday Inn No. 4 and

21 ask if you recognize that?

22 A   I do.

23 Q   What is it?

24 A   It's a death certificate for Adam Scott Grieder.

25         MR. TRAINOR:  Your Honor, we stipulate to the

1   admissibility of that.  We just haven't signed it yet.

2           THE COURT:  All right.  They're going to stipulate.

3           MR. FELTE:  Thank you, sir.  Please answer any

4   questions that counsel may have.

5                           CROSS-EXAMINATION

6   BY MR. TRAINOR:

7   Q   Adam Grieder died in Florida, did he not?

8   A   Yes.

9   Q   And there's a Florida record of certified death certificate,

10  correct?

11  A   Correct.

12  Q   You were in charge of the investigation at that time in

13  Montgomery County?

14  A   I was in charge of the vice intelligence section, yes, sir.

15  Q   And you told us some of the things you did.  Did you have

16  access to the case file?

17  A   I did.

18  Q   In fact, did you have control of it for a time?

19  A   I could get the -- the lead detective had control of it, but

20  I had access to it, yes, sir.

21  Q   Are you aware whether a Bursa .380 handgun was recovered in

22  the course of this investigation in Montgomery County?

23  A   Yes.

24  Q   And from whom was it recovered?

25  A   A subject the first name is Michael and I can't recall the

1   last name.

2   Q    If I may approach.  Let me show you something and I ask if

3   you can identify this and whether it refreshes your recollection

4   as to the person from whom the handgun was recovered.

5   A    Yes.

6   Q    It does refresh your recollection?

7   A    It does.

8   Q    And from whom was it recovered?

9   A    Michael Anderson.

10  Q    On or about what day?

11  A    July 5, 2007.

12  Q    And that's a Bursa .380 handgun with a clip inside?

13  A    Correct.

14  Q    And it was apparently in a black carrying case and had a

15  serial number attached to it?

16  A    According to the document, yes.

17           MR. TRAINOR:  All right.  No further questions.  Thank

18  you.

19           THE COURT:  All right.  Do we have any redirect?

20           MR. FELTE:  Very brief redirect.

21           THE COURT:  All right.

22           MR. FELTE:  May I approach the witness, Your Honor?

23           THE COURT:  Yes.

24                        REDIRECT EXAMINATION

25  BY MR. FELTE:

1  Q   Sir, in regards to that document that Mr. Trainor just

2  showed you, are you aware of whether this firearm was turned

3  over voluntarily?

4  A   Yes.

5  Q   And was it turned over voluntarily?

6  A   It was.

7  Q   And is the serial number for that handgun 214554?

8  A   Yes.

9            MR. FELTE:  Thank you.  Thank you, sir.

10           THE COURT:  All right.  Mr. Trainor -- do you have more

11  questions?

12           MR. FELTE:  No, sir.

13           THE COURT:  Is that it?

14           MR. FELTE:  Yes, sir, that's it.

15           THE COURT:  All right.  Thank you, detective.  You're

16  excused.

17           THE WITNESS:  Thank you, Your Honor.

18           MS. MAGNELLI:  Your Honor, if I may read into the

19  record another stipulation.

20           THE COURT:  All right.  Another stipulation.  All

21  right.

22           MS. MAGNELLI:  Your Honor, this would be labeled

23  Stipulation 6 and it's been signed by myself and Mr. Felte on

24  behalf of the government as well as the defendant and

25  Mr. Trainor, that the United States by Mr. Felte and I and the

1  defendant as well as his counsel, Mr. Trainor, stipulate and

2  agree that Government Exhibit Holiday Inn 4 is an authentic

3  death certificate for Adam Grieder issued by the state of

4  Florida Department of Health, Office of Vital Statistics, is

5  self-authenticating under Federal Rule of Evidence 902(1) and is

6  admissible pursuant to Federal Rule of Evidence 803(9) without

7  the testimony of a records custodian.  The parties further agree

8  that this stipulation shall be received as an exhibit, admitted

9  into evidence and shall be read to the jury.

10           THE COURT:  All right.

11           MS. MAGNELLI:  Your Honor, at this point the government

12  would ask for a brief recess.

13           THE COURT:  All right.  Let's take a recess, madam

14  clerk.  Take 15 minutes.

15           (Jury excused for a recess.)

16           THE COURT:  All right.  You wanted to take a recess?

17           MS. MAGNELLI:  Yes, Your Honor.

18           THE COURT:  Any legal issues we need to address?

19           MS. MAGNELLI:  I believe so.  Agent Velasquez is on

20  next and I believe Mr. Trainor had an objection about the lyrics

21  that were seized.

22           THE COURT:  All right.  Let's be seated.  Let's hear

23  your objection.  Which exhibits were they?  This was a result of

24  a search warrant?

25           MS. MAGNELLI:  Yes.

1          MR. TRAINOR:  This is a search warrant, I believe, in

2     2009.

3          MS. MAGNELLI:  February 3, 2009, Your Honor.

4          THE COURT:  All right.

5          MR. TRAINOR:  February 3, 2009, at 522 Carousel Court,

6     which is the home of Cierra Young, I believe, and on that date

7     Mr. Royal was in the house when the search warrant was executed.

8     Found in that house were certain pieces of paper, like yellow

9     legal pads and scraps with apparent rap lyrics on them.  Some of

10    those lyrics are offensive.

11         I would ask the court to review them and make a

12    determination under Federal Rule of Evidence 403 whether there

13    is any probative value and, if so, whether the inflammatory

14    nature of the lyrics is prejudicial enough to outweigh any

15    probative value.  We submit that it is and they should not be

16    admitted into evidence.  I'm not sure exactly what the exhibit

17    numbers are, but I believe they're in the section entitled --

18         THE COURT:  Is that Carousel Court?

19         MS. MAGNELLI:  Yes, Your Honor.

20         MR. TRAINOR:  -- Carousel Court.

21         THE COURT:  All right.  I've looked at them.  What more

22    do you have to say?

23         MR. TRAINOR:  Other than the lyrics, because they

24    were -- I mean, they were found in there in 2009.  There isn't

25    proof that I know of as to when they were written or, for that

matter, by whom, or if the defendant did write them, whether these lyrics were suggested to him by someone else. All we know is they were found in that residence some two years after these alleged sex trafficking offenses occurred.

THE COURT: All right. Anything else, Mr. Trainor?

MR. TRAINOR: That's all, Your Honor.

THE COURT: All right. Let's see what the government's argument is as to their relevance and how they're linked to this case.

MS. MAGNELLI: Well, Your Honor, first of all, I would note that the defense in their opening, their entire defense was that he was using this image to be a rapper and that it was all untrue, all this stuff that he was doing was untrue, but he was using this to try to bolster his image of being a rapper, and he made specific reference to rap lyrics and that they were thuggish and childish in the way that they were written.

With regard to them being probative, they are probative. In fact, there will be testimony that the defendant told people that he did these things, these very things so that he would gain experience that he could write about, that he could rap about, that his lyrics weren't fake.

With regard to who wrote the lyrics, it's one of the reasons we have all of these aliases. There will be more testimony about B and Blyss, but there will be additional testimony about the name Furious and sporadically throughout

1   these lyrics it shows authorship.

2          In addition, with regard to no idea who they might have

3   belonged to, when the agents went to seize these writings --

4   we're not offering it for the truth of the matter, but they did

5   speak with Cierra Young, and to see whether or not the documents

6   fell within the parameters of the search warrant only, they

7   asked Cierra Young whose are these and she said Lloyd's.  So, we

8   seized them because the owner of the house indicated that their

9   ownership was that of the defendant.

10         Lastly, I would note that in terms of being

11  inflammatory, there is nothing more inflammatory in these lyrics

12  than what this jury has already heard.  In fact, I would

13  submit -- and we're only pulling out a small segment of the

14  writings.  Most of the writings we have not pulled out at all.

15  I think there are 19 or 20 lyrics and there are probably three

16  times as many that are still sitting in an evidence box.  We

17  only chose the ones that we believed could be linked either by

18  alias or to the criminal activities.

19         So, Your Honor, I would submit that they are admissible

20  as probative, as relevant and that there will be evidence

21  showing the authorship of these lyrics.  And, again, the defense

22  has already made reference to these.

23         THE COURT:  All right.  Anything else, Mr. Trainor?

24         MR. TRAINOR:  Yes, Your Honor.  I know the government

25  doesn't intend to call Cierra Young because they released her.

1  So, I don't know how that links up.

2      If the government has a witness who will say that all

3  of his lyrics are based on his real experience in life, then

4  they ought to present that witness before they offer records

5  like these.  But this really adds nothing to the case.  It just

6  dirties up the image of Mr. Royal and we object under 403.

7      THE COURT:  All right.  Well, of course, I don't know

8  what the defense is putting on.  I have no idea what your

9  defense is or what you're presenting.  It is true that in your

10  opening to the jury you made reference to these things, and I

11  think the government has presented a reasonable basis for their

12  probative value and their relevance.  And, again, I don't think

13  it's that much different than what we've already heard.  I mean,

14  it is what it is.  And I don't know which witnesses the

15  government is going to present.  What witness are you

16  presenting?

17      MS. MAGNELLI:  I'm sorry.  For what, Your Honor?

18      THE COURT:  To identify these.  You are presenting a

19  witness?

20      MS. MAGNELLI:  We have witnesses who will indicate that

21  he writes rap lyrics, that he uses these particular aliases,

22  that he raps about things like guns, and that he has said he

23  doesn't rap about anything fake.  We're going to present an

24  individual by the name of Dontrell Singleton as well as the

25  defendant's cousin, Kureese Royal.

1              THE COURT:  Well, in light of that proffer,

2     Mr. Trainor, I think the government has properly requested their

3     introduction.  So, whatever weight they have, the jury will

4     assess it and you can cross-examine.  So, I'm going to go ahead

5     and allow it.  I'll overrule your objection as to relevance.

6     And, again, I've looked at it in connection with 403, and the

7     probative value I don't believe is outweighed by its prejudicial

8     effect.  It could help.  Who knows.

9              Any other issues?

10             MS. MAGNELLI:  Your Honor, that would just bring me to

11    my next issue.  The next witness after Agent Velasquez will be

12    Dontrell Singleton and I believe there's an objection as to his

13    testimony because he lived with the defendant after the time

14    frame of the conspiracy.  He over -- he didn't overhear.  He was

15    there for a conversation during which the defendant and another

16    individual by the name of Kwami discussed that the defendant

17    used to prostitutes females.  He will testify that the defendant

18    has told him that -- he used to rap with the defendant, what the

19    defendant's nicknames are and, in fact, that the defendant has

20    stated several times that he doesn't rap about anything that's

21    fake, he's done everything in his lyrics.

22             Dontrell will also say that he knows the defendant to

23    sell and use marijuana and has, in fact, smoked marijuana with

24    him and bought marijuana from him and, in fact, the same thing

25    with PCP.

1          THE COURT:  Which witness is that?

2          MS. MAGNELLI:  Dontrell Singleton.

3          THE COURT:  He's coming today?

4          MS. MAGNELLI:  He's here.

5          MR. TRAINOR:  Your Honor, what I'm not clear about is

6     whether Mr. Singleton will be testifying to things that happened

7     in 2008, 2009.

8          MS. MAGNELLI:  He will be testifying that he began

9     hanging out with the defendant before -- when he was 16 at the

10    beginning of 2008 and hung out with him until almost the end of

11    that year.  So, it started about six months after the time frame

12    of the conspiracy ends and it ends about two months before the

13    search warrant.

14         MR. TRAINOR:  We would object to these post-indictment,

15    post-conspiracy, post-offense observations by a 16-year old.  I

16    think we have to go through the 404(b), 403 analysis and if we

17    do that, it will not be probative of the charges before the jury

18    and will be more prejudicial than probative by a substantial

19    margin.

20         THE COURT:  Well, government, I don't understand why

21    you need all this.  I mean, is there some critical issue that's

22    out there that you haven't put in?  Why is it necessary?

23         MS. MAGNELLI:  Your Honor, in order for it to be

24    necessary under 404(b), it need not be absolutely necessary.  It

25    just needs to go to one of the elements of the offense and,

1    quite frankly --

2              THE COURT:  What element?

3              MS. MAGNELLI:  I'm sorry?

4              THE COURT:  What element?

5              MS. MAGNELLI:  All right.  Well, Your Honor, we have to

6    show knowledge and intent.  We have to show that the --

7    actually, for almost every charge we have to show knowledge and

8    intent.  We have to show -- and, quite frankly, the case law is

9    clear with regard to, for example, prior arrests or subsequent

10   drug dealings, that goes specifically to show that the defendant

11   knows the drug trade, he's willing to engage in a conspiracy,

12   he's done this before, he's done it subsequently, all of those

13   things.

14             When the defendant pled not guilty and, in fact, when

15   the defendant in his opening said that none of this was true, it

16   was all for an image, we were put to our paces to prove that he

17   knowingly and intentionally did all the things in the

18   indictment, including the prostitution.

19             MR. TRAINOR:  Actually, in the opening I didn't say

20   none of this was true.

21             MS. MAGNELLI:  Well, I'm summarizing.

22             MR. TRAINOR:  I said -- maybe the government took it

23   that way, but what I said was that there was a lot of negative

24   imagery going on in this case and I asked the jury not to be

25   distracted by it.

1        THE COURT:  How many other 404(b) evidence examples are
2   we coming up with besides Mr. Singleton?
3        MS. MAGNELLI:  Your Honor, if you recall, the 404(b)
4   motion from the government listed 12 categories.  At the end of
5   the day we will simply be putting on three witnesses, two of
6   which are the police officers we haven't talked about that I
7   submitted papers on and this is the only other 404(b) witness.
8   This is it.  And the government has now cut back its witness
9   list by two-thirds given some of the stipulations and how the
10  evidence is coming in.
11       THE COURT:  Again, Ms. Magnelli, I just think you're
12  overtrying the case.
13       MS. MAGNELLI:  I understand that, Your Honor, but --
14       THE COURT:  If the jury doesn't believe what you've put
15  on right now, they're not going to believe it and I just think
16  you're just putting too much on.
17       MS. MAGNELLI:  Your Honor, Mr. Singleton is a short
18  witness.  We have let at least five other witnesses go for
19  today.  And after Mr. Singleton, we have Agent Velasquez,
20  Dontrell and Kureese Royal for today and that's all that's lined
21  up.  And we do believe that we will finish on Tuesday.
22       THE COURT:  That's not the issue.  I don't care when
23  you finish.  But, again, you beat up -- it's too much.  It's
24  just too much you're putting on.  This is after the incident.
25       MS. MAGNELLI:  It's shortly, Your Honor --

1          THE COURT:  And it's certainly permissible, but I'm

2    going to use my discretion to keep it out.  I'm not going to

3    allow what Mr. Singleton has to say to come in.  I will allow --

4    I looked at the 404(b) evidence you gave me last night, the

5    incident of 2006.  That's on or around that time.  That seems

6    relevant.  But you get to the point it's just too much and it

7    just confuses things.

8          So, Mr. Dontrell Singleton, I'm not going to allow him.

9    I'm going to sustain Mr. Trainor's objection to that.

10         MR. TRAINOR:  Your Honor, when the time comes for that

11   2006 evidence, I would like to be heard on it.

12         THE COURT:  I'll hear you right now.  Now is your

13   chance.

14         MR. TRAINOR:  All right.  Your Honor, what we're

15   talking about is a disputed incident that occurred on May 2,

16   2006, which was months before the time range in the drug

17   conspiracy count.  According to the record the government has

18   produced, there was an arrest not only of the defendant but also

19   of a Michael Anderson who has not testified.  In the police

20   report there is evidence of or there's reference to Michael

21   Anderson selling drugs to someone else, Mr. Johnson.  It's all

22   outside of the alleged conspiracy.  Also included are the

23   certified records from the Circuit Court for Montgomery County,

24   Maryland.  There's virtually every docket entry there, which

25   shows that the defendant was charged with certain offenses which

were later nolle prossed by the prosecutor's discretion. It also includes information that the defendant missed court one day, had a bench warrant issued for him and what his bond was, that he had to post a $15,000 bond. It also shows that ultimately the case was disposed of by amending the charges to simple possession of marijuana for which Judge Beard gave the defendant probation before judgment.

Now, a charge of simple possession of marijuana is a misdemeanor that only carries a maximum penalty of one year in jail. Just by analogy to Federal Rule of Evidence 609, that would not be a conviction that could be used to impeach a witness because the maximum sentence would have to be in excess of a year.

For those reasons -- I mean, we're going to have a mini trial on this where they're going to have to bring in detectives who made the stop in 2006, the arrest. I would assume they're going to put on the chemist and try to prove the fact that drugs were, in fact, recovered in 2006, from whom they were recovered. And then we get to the conviction, which is what it is. It was a probation before judgment for a misdemeanor marijuana count. But all the records have all these extraneous matters in them that are no business of the jury and are highly prejudicial to the defendant.

So, we would object to the matters before the court right now based on the May 2, 2006, arrest.

1          THE COURT:  All right.  Let's see what the government

2     has to argue on this one.

3          MS. MAGNELLI:  Your Honor, I do think the time frame is

4     completely appropriate.  The case law is clear that incidents

5     that are 13 years old are still admissible for 404(b).  There's

6     only going to be the testimony of the two detectives, the one

7     that saw the hand-to-hand and the other one that recovered the

8     drugs from the defendant.  Given that the government only needs

9     to prove these by a preponderance of the evidence, we don't

10    intend to call the chemist.  There was a field test done.  We're

11    also putting on a drug expert who can review that evidence or

12    hear the description of what was retrieved and make an opinion

13    on that.  So, it's just going to be the two officers.

14         The officers are going to be very clear that one of the

15    officers was sitting in a 7-Eleven and looked behind him and saw

16    this hand-to-hand and specifically saw the defendant engage in a

17    hand-to-hand and then called the arrest team and it's the arrest

18    team that found not only the marijuana and more than a thousand

19    dollars in his pockets but also when the officers did put him on

20    the ground and then they picked him up, there was a bag of crack

21    cocaine under him.  The fact that there were other people there

22    is not dispositive.  That's going to be reflected in their

23    testimony.  The jury can weigh it if they want.

24         With regard to the record, it is what it is, that is,

25    the prior certified conviction that we got from Montgomery

1 County. If there's something specific that needs to be

2 redacted, the government is certainly willing to compromise on

3 that, but the record is what it is.

4         With regard to any other issue with 404(b), as always,

5 the court can give a fairly rigid limiting instruction to deal

6 with any other fallout that might be of concern.

7         MR. TRAINOR: Your Honor, the defense is not going to

8 concede that whatever was found in 2006 was, in fact, crack

9 cocaine. If the government intends to prove that, they ought to

10 have to prove it with a chemist and every witness in the chain

11 of custody.

12         THE COURT: Well, again, it's not going to be any mini

13 trial here. Again, we've handled these things before. It's the

14 incident that is relevant. I gave you relief on the evidence on

15 Mr. Singleton, Mr. Trainor. I'm keeping him out, his testimony,

16 but you can't keep everything out. This incident is very close

17 to the time frame and, as you know, the probative value is

18 clear. The government has to prove intent and knowledge. And

19 this is a drug case. I went through the papers on yesterday and

20 saw the incident and the specific identification, the arrest of

21 the defendant and, again, I don't think the testimony is going

22 to be that long. Certainly if there's a chemist that's going to

23 come in and indicate what the drugs were, certainly he can do

24 that. You can, of course, cross-examine him. But it's not

25 necessary, as I know it, for every officer in the chain of

1    custody to come in.

2            So, you can put whatever objections you want on there.

3    But, again, we can give an instruction at the time that it is

4    permitted so they can hear it and understand that to the extent

5    it's 404(b) evidence, it has limited use and consideration.

6    But, again, looking at it, it's certainly reliable.  And even

7    though there was a probation before judgment disposition, the

8    point of the matter is he pled guilty and he had a good attorney

9    at that time who got him a reasonable -- a very good plea.  I

10   don't fault him for that.  He was able to get that.

11           But an incident took place there in Montgomery County

12   and it was a possession with the intent to distribute and he had

13   cocaine on him.  That's the original -- I guess the original

14   charge.  Is that right?

15           MS. MAGNELLI:  I'm sorry?

16           THE COURT:  What was it, possession with intent on

17   cocaine or marijuana?

18           MS. MAGNELLI:  Yes, Your Honor.  There were several.

19   That was one of them.

20           THE COURT:  That's what he was charged with.  So, I

21   think a lot of the documents that the government put in this

22   package are not necessarily relevant.  I don't know what you

23   intend to put in.  I'm not sure what's relevant.  The entire

24   record, why is that relevant?  It depends on what the defense

25   cross-examines and what they challenge.  We'll listen to your

1    cross-examination and if he gets into a lot areas, it may be

2    necessary to put the additional records in to refute what the

3    defense is hinting at or suggesting.

4            So, I'll just reserve on how much of these records come

5    in, what's relevant.  But, again, I'll remind both of you it's

6    only 404(b) evidence and we ought not have a long trial there

7    and so forth.

8            So, as to those records, Mr. Trainor, I do believe that

9    it's relevant, necessary and reliable and it does not

10   necessarily -- it is not necessarily outweighed by its

11   prejudicial effect under 403.  So we're going to allow that.

12           MR. TRAINOR:  I understand the court's ruling.

13           THE COURT:  All right.  So, again, my ruling with

14   reference to Mr. Singleton and his testimony a year after the

15   incident and all that, that's not necessary.  I think the

16   government doesn't need it and I think it is overly prejudicial

17   when you get to that point.  My position is if what you have put

18   on right now is not convincing, then it's never going to be.

19   What else?

20           MS. MAGNELLI:  Nothing, Your Honor, just a short

21   recess.

22           THE COURT:  All right.  Let's go ahead and take another

23   10 minutes and then we'll come back.  We now know what to do

24   with Mr. Singleton.

25           (Recess from 10:52 to 11:10 a.m.)

1          THE COURT:  All right.  Thank you.  Let's be seated.

2    Anything else?

3          MS. MAGNELLI:  No, Your Honor.

4          THE COURT:  All right.  Well, let's bring in the next

5    witness and we'll bring the jury in.

6          MS. MAGNELLI:  Your Honor, I do have two stipulations I

7    can read before bringing in the witness.

8          THE COURT:  All right.  That will be fine.

9          MS. MAGNELLI:  But I can wait for the jury.

10          THE COURT:  All right.

11          (Jury present.)

12          THE COURT:  All right.  Let's be seated.  Thank you.

13          All right.  Yes.  You have stipulations, additional

14    stipulations?

15          MS. MAGNELLI:  Yes, Your Honor.  Before I call the next

16    witness, the government would read two additional stipulations.

17    This would be marked as Stipulation 1.  It has been entered into

18    by myself and Mr. Felte on behalf of the government as well as

19    Mr. Trainor and the defendant have signed it.  Essentially it

20    states that we have entered into a stipulation and agree that

21    the summary of records provided in the Attachment A to the

22    stipulation were made at or near the use of the telephone

23    described and were created and maintained in the ordinary and

24    regular conduct of the service provider's business, that the

25    record and information are admissible pursuant to Federal Rule

1    of Evidence 803(6) without the need for a records custodian to

2    testify, that the subscriber information accurately identifies

3    the subscriber of the phone during the pertinent time within the

4    charged conspiracy, that the records are also proper as a basis

5    for substantive summary evidence under Federal Rule of Evidence

6    1006, the summary charts.  However, the stipulation does not

7    address the identity of the individuals who actually used those

8    phone numbers.

9        With regard to Stipulation 5, marked as Stipulation 5,

10    myself and Mr. Felte on behalf of the government as well as

11    Mr. Trainor and Mr. Royal have signed this stipulation.

12    Essentially we stipulate and agree to the following, that

13    Government Exhibits Carousel Court 3 and 3a are photographs that

14    were seized from 522 Carousel Court on February 3, 2009, and

15    depict the defendant Lloyd Mack Royal, III, standing with a

16    bandana covering his face.  The parties further agree that this

17    stipulation shall be read as an exhibit admitted into evidence

18    and read to the jury, and that last paragraph also applies for

19    Stipulation 1.

20        THE COURT:  All right.  Ladies and gentlemen, those are

21    additional stipulations and you are to take those as facts, and

22    you will have those stipulations and those records associated

23    with the stipulations as evidence.

24        MS. MAGNELLI:  Your Honor, the government's next

25    witness would be Michelle Velasquez.

1        THE DEPUTY CLERK:  Please raise your right hand.

2        MICHELLE VELASQUEZ, GOVERNMENT'S WITNESS, SWORN

3        THE DEPUTY CLERK:  State your name loudly and clearly

4   into the microphone and spell your last name for the record.

5        THE WITNESS:  Michelle Velasquez, V as in Victor

6   e-l-a-s-q-u-e-z.

7        THE DEPUTY CLERK:  Thank you.

8                          DIRECT EXAMINATION

9   BY MS. MAGNELLI:

10  Q    Ms. Velasquez, where are you employed?

11  A    Federal Bureau of Investigation, Baltimore Division.

12  Q    In what capacity are you employed?

13  A    I am a special agent in the Rockville resident agency and

14  I'm also a member of the evidence response team.

15  Q    And how long have you been an agent?

16  A    For six years.

17  Q    Now, you indicated that you're a member of the evidence

18  response team.  What do those duties include?

19  A    The evidence response team may get called out for specific

20  situations or searches of different premises and once we get

21  there, we are responsible for collecting the evidence and

22  bagging it properly, making sure that it's checked into our

23  evidence control room.

24  Q    Do you have any other duties and responsibilities besides

25  being a member of the ERT?

1    A    I am a special agent and I investigate cyber crimes.

2    Q    I'm going to direct your attention to February 3rd of 2009.

3    Did you participate in the execution of searches in connection

4    with the arrest of Lloyd Mack Royal, III?

5    A    Yes, I did.

6    Q    Specifically, were you involved in the search of a residence

7    at 522 Carousel Court in Gaithersburg, Maryland?

8    A    Yes.

9            MS. MAGNELLI:  Your Honor, if I may, for the majority

10   of my testimony or her testimony, if I could be at the witness

11   stand.  I have evidence to show her.

12           THE COURT:  All right.  Sure.  Keep your voice up so

13   the jurors can hear your questions.

14   BY MS. MAGNELLI:

15   Q    Ma'am, I'm going to show you what's been marked as Carousel

16   Court 1.  Do you recognize that?

17   A    Yes.

18   Q    What is that?

19   A    That is the residence that we searched on that morning at

20   522 Carousel Court.

21   Q    I'm going to show you what's been previously identified --

22   I'm sorry -- marked as Photo 14.  Do you recognize who is in

23   that photo?

24   A    Yes.

25   Q    Who is that?

1   A   That is -- I believe her name is Cierra Young.

2   Q   How do you recognize her?

3   A   She was one of the individuals that was in the home when we

4   were executing our search.

5   Q   Is this a fair and accurate depiction of what she looks

6   like?

7   A   Yes.

8   Q   Was there also an adult male there?

9   A   Yes.

10  Q   Do you see that adult male in the courtroom today?

11  A   Yes.

12  Q   Can you identify an article of clothing that he is wearing?

13  A   He has a black suit on with a white button up shirt, dress

14  shirt.

15  Q   Okay.  And can you point to him, please?

16  A   Yes (indicating).

17          MS. MAGNELLI:  For the record, the witness has

18  identified the defendant.

19          THE COURT:  All right.

20  BY MS. MAGNELLI:

21  Q   Now, ma'am, on February 3, 2009, this was the day of both a

22  federal warrant and a search; is that correct?

23  A   Correct.

24  Q   Do you recall when approximately this happened?

25  A   Approximately 6:30ish a.m.

1   Q   Okay.  And who entered that home first?

2   A   FBI SWAT entered first.

3   Q   And why is that?

4   A   To make the residence safe and secure for anyone who would

5   come in after, especially the search team.

6   Q   Is that standard procedure?

7   A   Yes.

8   Q   And when did you enter the residence?

9   A   I entered the residence once the search team received a call

10  from those already on scene, which would have been FBI SWAT,

11  saying that the residence had been made safe and secure and we

12  were prompted to then go to the residence.

13  Q   Do you recall the interior of this hours?

14  A   Yes.

15  Q   Do you recall the basic setup?

16  A   Yes.

17  Q   Can you describe that?

18  A   When you walk in, it's the first floor.  There is a second

19  floor where the bedrooms were, and then there was a finished

20  basement.

21  Q   Ma'am, I'm going to show you what's been marked as Carousel

22  Court 1a, 1b, 1c and 1d.  Can you flip through those.  Going

23  back to 1a, do you recognize what's in this photo?

24  A   Yes.

25  Q   And what is it?

1   A    That is the eat-in area of the kitchen.

2   Q    Of this same house?

3   A    Yes.

4   Q    Is this a fair and accurate depiction of the way it looked

5   that day?

6   A    Yes.

7   Q    Showing you what's been marked as 1b, what is that?

8   A    That would be the stairs going down into the basement.

9   Q    Okay.  Fair and accurate depiction of the way those stairs

10  looked that day?

11  A    Yes.

12  Q    Carousel Court 1c, what is that?

13  A    That is a picture of the basement area.

14  Q    And is this a fair and accurate depiction of the way it

15  looked that day?

16  A    Yes.

17  Q    And 1d, what is that?

18  A    That is another picture of the basement area from a

19  different angle.

20  Q    Fair and accurate depiction?

21  A    Yes.

22  Q    With regard to this specific search of this specific house,

23  what was your role?

24  A    My role was a search team leader.

25  Q    What do you in that role?

1  A    In that role I'm responsible for making sure that anyone

2  who's been assigned a duty completes their duties properly, the

3  paperwork is filled out properly, the evidence is collected and

4  bagged properly, and then once we complete the execution of the

5  search, it is my responsibility to take all the evidence into my

6  possession and take it back to the FBI and to our evidence

7  control room.

8  Q    And what is the difference between a seizing and a locating

9  agent?

10  A    A locating agent would be a law enforcement officer who

11  locates the item of evidence in the area that's being searched

12  and the seizing agent would be the individual who then all the

13  evidence is released to at the end of the search and is

14  responsible for taking it back into a law enforcement secured

15  area.

16  Q    So, essentially as the seizing agent you get information

17  from locating agents, take that evidence and then log it?

18  A    Correct.

19  Q    The seized items from this house, were they then kept in law

20  enforcement vaults after that?

21  A    Yes.

22  Q    Were they tampered with in any way since today or since then

23  until today?

24  A    No.

25  Q    And is every item we're about to discuss an item that was

1    found in that residence?

2    A    Yes.

3    Q    I'm going to show you what's been marked as Carousel Court

4    6.    What is that?

5    A    That is an evidence label that would be placed on an item of

6    evidence once it is found.

7    Q    What kind of things are reflected on this?

8    A    An item number, the seizing agent, locating agent, where the

9    item was actually located at the premises, and a description of

10   the item.

11   Q    Now, when you left 522 Carousel Court, is this all the

12   evidence that was seized?

13   A    No.

14   Q    So, are these select pieces of that evidence?

15   A    Yes.

16   Q    And you're not going to testify about everything that was

17   seized; is that correct?

18   A    That's correct.

19   Q    Now, ma'am, Carousel Court 6a, was this an item that was

20   found in the house?

21   A    Yes.

22   Q    And can you tell me how you know that?

23   A    I know that because it's listed as item 3 and it states that

24   the search location was 522 Carousel Court.

25   Q    So, in other words, there were numerous items put in item 3,

1   this particular bag, and this was one of those items?

2   A    Yes.

3   Q    I'm going to show you what's been marked as Carousel Court

4   7.  If you would please take that.  What is that?

5   A    This is another evidence label for evidence item No. 7 of

6   various items that were collected.

7   Q    Again, this is the same kind of exhibit as the one you just

8   described?

9   A    Yes.

10  Q    And this is a label that would have been placed on a whole

11  bag?

12  A    Correct.

13  Q    And then certain documents would have been put in that bag?

14  A    Correct.

15  Q    And we're not going to discuss every document that was put

16  in that bag, are we?

17  A    No, we will not.

18  Q    Okay.  But these documents were found from this location at

19  this house on that date?

20  A    Correct.

21  Q    I'm going to ask you to look at Government's 7a, 7b, 7c, 7d,

22  7e, 7f, 7g, 7h, 7i, 7j, 7k, 7l, m, n, o, p, q and r.  If you

23  would please take a look at those.

24       MR. TRAINOR:  Your Honor, just for the record, the

25  defense does object to this series for the reasons stated

1   earlier.

2          THE COURT:  All right.  Overruled.

3          MS. MAGNELLI:  Does the defense wish me to further

4   identify each one for the court clerk or I'll do them --

5          MR. TRAINOR:  No.

6   BY MS. MAGNELLI:

7   Q   So, without talking about each of these individually, can

8   you tell me where these were found?

9   A   Those were found at the 522 Carousel Court address.

10  Q   And they were found in the location as indicated on this

11  sheet of paper which is marked Carousel Court 7 and which

12  reflects that these items came out of a bag that you labeled or

13  that was labeled by the FBI as No. 7?

14  A   Yes.  Yes, they were found in the basement.

15  Q   Now, do you recall what you were there to seize?  Was it

16  based on a particular written document?

17  A   Yes.

18  Q   What was it based on?

19  A   It was based on the search warrant and the items that were

20  listed within the search warrant that were within our purview to

21  seize that day.

22  Q   And did you read the search warrant?

23  A   Yes.

24  Q   Do you know from whom you were supposed to seize items?  In

25  other words, whose items were you allowed to seize?

1  A   We were allowed to seize items belonging to Mr. Royal.

2  Q   Now, without telling me what anyone told you, based on

3  conversations you had with occupants of the house, did you seize

4  these items?

5  A   Yes.

6  Q   I'm going to show you what's been marked as 7s and although

7  out of order, Carousel Court 2a, 2, 3 and 3a.  Can you tell me

8  if those items came from the same bag that these other documents

9  came from?

10  A   Yes.

11  Q   So they were also seized from the house?

12  A   That's correct.

13  Q   Finally, if you would please look at Carousel Court 8 and

14  tell me what that is.

15  A   This is another evidence label for evidence item No. 9.

16  Q   And what does that indicate?  What kind of information is on

17  that again?

18  A   It indicates an item description, where it was located

19  within the search premises and who located it.

20  Q   And if you would look at Carousel Court 8a.  Was this item

21  found in Carousel Court?

22  A   Yes.

23  Q   And this item was placed in the FBI bag labeled item 9?

24  A   That is correct.

25  Q   Agent Velasquez, did you conduct this search with any other

1  law enforcement agencies?

2  A    Yes.

3  Q    Is that standard sometimes?

4  A    Yes.

5  Q    Sometimes when you do conduct it, you need help from other

6  agencies?

7  A    That is correct.

8  Q    And what other agencies were assisting that day?

9  A    Montgomery County Police Department and Gaithersburg Police

10  Department.

11  Q    And they were locating agents?

12  A    Yes.

13  Q    I'm going to show you what's been marked as Carousel Court

14  5.  Do you recognize whether these were the items that the FBI

15  assumed custody from Montgomery County?

16  A    That is.

17  Q    Montgomery County that was there that night?

18  A    That was there that morning, yes.

19  Q    I'm sorry.  That morning.  And there's tape marked on here.

20  What does the tape say?

21  A    There's two sets of tape, one from Montgomery County Police

22  Department because they took the initial custody, and then

23  Federal Bureau of Investigation evidence tape.

24  Q    Okay.  And I'm just going to show you quickly what's been

25  marked as 5a and 5b.  Are these photographic representations of

1   these glass vials?

2   A    Yes.

3   Q    And were those taken because these were breaking, the glass

4   vials were breaking?

5   A    Yes.

6   Q    Agent, beyond this search that you were the seizing agent

7   on, do you have any involvement with this case?

8   A    No.

9         MS. MAGNELLI:  Thank you.  Please answer any questions.

10                        CROSS-EXAMINATION

11  BY MR. TRAINOR:

12  Q    Good afternoon or good morning still.  You were in charge of

13  the search team on February 3, 2009, correct?

14  A    That would be correct.

15  Q    And that was at 522 Carousel Court, which is in

16  Gaithersburg?

17  A    Correct.

18  Q    All right.  Certain items that you seized -- you were just

19  asked about item 7.

20  A    Yes.

21  Q    Now, that was a bag of some kind?

22  A    Yes.  It was a brown paper bag.

23  Q    In a plastic bin?

24  A    The items were found in a plastic bin in the basement of 522

25  Carousel Court.

1  Q   So, on February 3, 2009, you found some items in a plastic

2  bin with a paper bag inside of it in the basement of Carousel

3  Court?

4  A   The items were found by the locating agent -- the locating

5  law enforcement officer.  So, I don't know what the items looked

6  like when they were found in wherever they were found, the

7  location they were found.  They were found in a plastic bin

8  because that's what the evidence label states, that the locating

9  agent found them in a plastic bin, and then they were then

10 transferred into a brown paper bag, which would have been an

11 evidence bag of the FBI.

12 Q   So, what you're saying is they were -- according to the

13 agent who seized them and reported to you, that these items were

14 in the basement of 522 Carousel Court on February 3rd, '09?

15 A   That's correct.

16 Q   They were in some sort of a plastic bin, which you did not

17 see?

18 A   That would be correct.

19 Q   And that the agent transferred these item to a paper bag

20 which was then handed to you?

21 A   Yes, that would be correct.

22 Q   All right.  Now, these 7 series exhibits seem to be writings

23 of some kind?

24 A   That's correct.

25 Q   Do you know whether the FBI processed these items in any

1  way?

2  A   I do not know.

3  Q   You don't know whether any fingerprints were taken or

4  whether any handwriting analysis was done, do you?

5  A   I am not aware of any.

6  Q   Do you know if any test was done to determine when and by

7  whom they were written?

8  A   By test do you mean a lab test?

9  Q   Yes.

10 A   I'm not aware if a lab test was completed.  I'm only aware

11 of the verbal questioning that was completed while there.

12 Q   Well, I'm asking you about lab tests.

13 A   No lab tests I'm aware of.

14 Q   And you didn't question Mr. Royal, did you?

15 A   I did not.

16 Q   All right.  The series 8 exhibits -- excuse me.  8a, where

17 did that come from?

18 A   If I can check my evidence log real fast, please, or see the

19 evidence label.

20 Q   What I have is -- I have -- do you have the actual exhibit?

21 Where is that?

22         MS. MAGNELLI:  Your Honor, I think the evidence label

23 at this point speaks for itself.  It shows where it was located.

24         MR. TRAINOR:  Well, I'm not sure it does.

25 BY MR. TRAINOR:

1    Q   Here is the actual exhibit.  It's Government's Exhibit

2    Carousel Court 8, but it's numbered item 9.  That was confusing.

3    Where did that come from?

4    A   This came from room C, which would have been the dinette

5    area attached to the kitchen which was labeled room C, and it

6    was found in the china hutch.

7    Q   In the china hutch.  Did you see where it was?

8    A   No, I did not.

9    Q   Did you take the photographs?

10   A   I did not take the photographs.  I took the photo log.

11   Q   Let me show you one of the photographs, which I believe is

12   Carousel Court 1d.  Is that a photograph that was taken while

13   you were there?

14   A   Yes, it was.

15   Q   And is that the basement?

16   A   Yes, it is.

17   Q   In the foreground there appears to be a rifle.

18   A   Correct.

19   Q   Do you know that that was determined to be a BB gun?

20   A   No, I'm not aware of that.

21   Q   Well, was this item seized?

22           MS. MAGNELLI:  Your Honor, I'm sorry.  I think he has

23   the wrong exhibit photo.

24           MR. TRAINOR:  It's numbered 1d.

25           MS. MAGNELLI:  That one was replaced with this one.

1  That was not shown.

2          THE COURT:  All right.  Which one are we seeing?

3          MR. TRAINOR:  Well, the exhibit that I was showing the

4  agent is different from the one in my book that I was given.

5          THE COURT:  All right.  We'll strike the last question

6  and the last response.  All right.

7  BY MR. TRAINOR:

8  Q   So, 1d is a photograph of the basement as -- should have

9  been as it appeared when the agents first entered the house,

10 correct?

11 A   That would be correct.

12 Q   You mentioned item 5.  Do you know where that was seized

13 from?

14 A   I can look at my evidence log, if I may.

15         THE COURT:  Someone has to give her these exhibits.

16 Someone needs to give her the exhibit so she can see which one

17 you're talking about.

18 BY MR. TRAINOR:

19 Q   Item 5.  Was this seized by the FBI?

20 A   This was not seized by the FBI.

21 Q   Did you see it on February 3, 2009?

22 A   I know it had been seized from 522 Carousel Court, but it

23 was seized by Montgomery County Police Department.

24 Q   The question was did you see it on February 3, 2009?

25 A   This was not turned in to FBI custody, which would have been

1  turned in to me as the seizing agent.

2  Q   Did you see it on February 3, 2009?

3  A   Yes.

4  Q   Where did you see it?

5  A   I did not see it from its initial location.  I saw it when

6  it was brought upstairs to the main level where we were

7  collecting everything.

8  Q   Where did you see it?

9  A   I would have seen it then in C.  Room C is where we were set

10 up.

11 Q   All right.  So you don't know where this was seized from?

12 A   I do not.

13            MR. TRAINOR:  I have no further questions.

14            THE COURT:  Government.

15            MS. MAGNELLI:  Just briefly to clarify.

16                         REDIRECT EXAMINATION

17 BY MS. MAGNELLI:

18 Q   Agent Velasquez, if you can look at your monitor.  You just

19 identified this as Carousel Court 1c?

20 A   Correct.

21 Q   Do you see that letter on the wall?

22 A   Yes, I do.

23 Q   What is that?

24 A   That would be a room letter label.

25 Q   Why is that there, if you know?

1   A   When we enter a residence to execute a search warrant, each

2   room is labeled with a letter so if evidence is found in that

3   room, we can document which room it was found in.

4   Q   And that correlates to some of the information on the

5   evidence labels?

6   A   That would be correct.

7   Q   And you said that evidence was brought to you where you were

8   set up.  What does that mean?

9   A   We tried to find a place within the home to where we can

10  have our evidence kits, our bag, the processing area that the

11  locating agents can bring evidence to so we can log it in to our

12  paperwork and bag it, tag it appropriately and everything is in

13  one common location so nothing is scattered throughout the house

14  and we don't leave anything behind.

15  Q   And this is common procedure by the FBI?

16  A   Yes.

17          MS. MAGNELLI:  Thank you.  Nothing further.

18          THE COURT:  Mr. Trainor.

19          MR. TRAINOR:  Nothing based on that.

20          THE COURT:  All right.  You may stand down.  Thank you,

21  agent.  You're excused.

22          Do you have another witness?

23          MS. MAGNELLI:  Yes, Your Honor.

24          THE COURT:  All right.

25          THE DEPUTY CLERK:  Please raise your right hand.

1        KUREESE ROYAL, GOVERNMENT'S WITNESS, SWORN

2            THE DEPUTY CLERK:  State your name loudly and clearly

3    into the microphone and spell your last name for the record.

4            THE WITNESS:  Kureese Royal, R-o-y-a-l, K-u-r-e-e-s-e.

5                      DIRECT EXAMINATION

6    BY MR. FELTE:

7    Q    Sir, good afternoon.  In what year were you born?

8    A    1987.

9    Q    And your name is Kureese Royal; is that correct?

10   A    Yes.

11   Q    Are you any relation to Lloyd Mack Royal, III?

12   A    Yes.

13   Q    What relationship are you?

14   A    He's my cousin.

15   Q    Do you see him in the courtroom here today?

16   A    Yes.

17   Q    Would you please point to him and describe clothing he's

18   wearing.

19   A    He's wearing a suit.

20            MR. FELTE:  Your Honor, may the record reflect that the

21   witness has identified the defendant?

22            MS. MAGNELLI:  All right.  So reflect.

23   BY MR. FELTE:

24   Q    Mr. Royal, let me direct your attention to the year 2007.

25   Do you recall that?

1   A   Yes.

2   Q   Were you living at any point in 2007 with the defendant?

3   A   Yes.

4   Q   Where were you living at?

5   A   In Gaithersburg, Maryland.

6   Q   Do you recall what the address was?

7   A   522 Carousel Court.

8   Q   Let me show you what's been previously marked and admitted

9   as Carousel Court No. 1 and ask if you recognize that.

10  A   Yes.

11  Q   What is it?

12  A   That's the house where we lived.

13  Q   Is that where you lived with the defendant at?

14  A   Yes.

15  Q   Who else lived there?

16  A   His girlfriend Cierra and his daughter Madison.

17  Q   Now, sir, did there come a point in time when law

18  enforcement spoke to you concerning the defendant's activities?

19  A   Yes.

20  Q   Were you truthful with them at that time?

21  A   No.

22  Q   In fact, did you testify before a grand jury in April of

23  2009?

24  A   Yes.

25  Q   Were you completely truthful with the grand jury at that

1  time?

2  A    No.

3  Q    Why not?

4  A    I was protecting my cousin.

5  Q    Sir, after testifying before the grand jury, did you get an

6  attorney?

7  A    Yes.

8          MR. FELTE:  May I approach the witness, Your Honor?

9          THE COURT:  All right.

10 BY MR. FELTE:

11 Q    Sir, let me show you a letter dated June 17, 2009.  Do you

12 recognize that?

13 A    Yes.

14 Q    Do you know what that is?

15 A    Yes.

16 Q    What is it?

17 A    It's a proffer letter.

18 Q    Does your signature appear anywhere on this proffer letter?

19 A    Yes.

20 Q    Who else's signature appears on that proffer letter?

21 A    My lawyer.

22 Q    Was there a law enforcement witness as well?

23 A    Yes.

24 Q    And was there an Assistant United States Attorney as well?

25 A    Yes.

1   Q   What is your understanding of this proffer letter?

2   A   Whatever I say can't be used against me as long as I tell

3   the truth.

4   Q   Okay.  Were any other promises made to you?

5   A   No.

6   Q   Did anybody threaten you?

7   A   No.

8   Q   Did anybody say you would be charged?

9   A   No.

10  Q   Did anybody say you would not be charged?

11  A   No.

12  Q   Sir, do you have any nicknames?

13  A   Yes.

14  Q   What's your nickname?

15  A   K.D.

16  Q   Are you aware of whether Lloyd Royal has any nicknames?

17  A   Yes.

18  Q   What are those nicknames?

19  A   Furious, B and Blyss.

20  Q   And do you know where the nickname Furious comes from?

21  A   A rap name.

22  Q   Now, at the time that you knew the defendant from living at

23  Carousel Court, do you know if he was employed?

24  A   No.

25  Q   Do you know how he earned his money?

1  A   Yes.

2  Q   How is that?

3  A   Sold marijuana.

4  Q   Did you see that take place?

5  A   Yes.

6  Q   With regard to selling marijuana, what did you see take

7  place?

8  A   Sometimes I would see the exchange of marijuana and money.

9  Q   Between who and who?

10 A   Him and the customers.

11 Q   Now, during this time were you working?

12 A   Yes.

13 Q   What hours were you working?

14 A   Three p.m. to eleven p.m.

15 Q   These exchanges of marijuana for money that you saw the

16 defendant involved with, did you see these before you went to

17 work or after you went to work or both?

18 A   Both.

19 Q   Now, did you back in -- are you familiar with the term

20 "dipper"?

21 A   Yes.

22 Q   What is a dipper?

23 A   PCP.

24 Q   And have you ever seen anyone use a dipper?

25 A   Yes.

1   Q   How do you use a dipper?

2   A   You dip whatever it is that you're smoking into the fluid.

3   Q   And the fluid is what?

4   A   PCP.

5   Q   Have you ever seen anyone use a dipper?

6   A   Yes.

7   Q   Who is that?

8           THE COURT:  Mr. Royal, can you just move back a little

9   bit.  You're the only witness I had to have move back a little

10  bit.  Yes.  Not too far.  The others, I had them move forward.

11  That's about it.

12          THE WITNESS:  Okay.

13          MR. TRAINOR:  Your Honor, I'm objecting to the series

14  of questions that begin with "Have you ever."  If the government

15  can't establish that the time frame is within the indictment --

16          MR. FELTE:  I'll narrow it down.

17          THE COURT:  All right.  Narrow it down.  All right.  Go

18  to the next question.

19  BY MR. FELTE:

20  Q   Sir, back in 2007 when you lived with the defendant --

21  A   Yes.

22  Q   -- did you ever see --

23          MR. TRAINOR:  Objection.  He hasn't stated when in

24  2007.

25          THE COURT:  Time frame, a general time frame, a month.

1          MR. FELTE:  Sure.

2    BY MR. FELTE:

3    Q    Sir, do you recall the general time frame when you lived on

4    Carousel Court with the defendant?

5    A    Several months in the year 2007.

6    Q    And when you say several months, about how many months are

7    you talking about?

8    A    Between six and nine months.  I'm not really clear.

9    Q    Between six and nine months?

10   A    Yes.

11         THE COURT:  Do you know what part of the year when you

12   first started living there?  Do you know what part

13   approximately?

14         THE WITNESS:  No, not exactly.

15         THE COURT:  All right.

16   BY MR. FELTE:

17   Q    Do you know if this was before or after the summer of 2007?

18   A    I'm not -- I don't really remember.  Sorry.

19   Q    Let me ask you this.  Back in 2007, did you ever meet any

20   girls through the defendant?

21   A    Yes.

22   Q    Who did you meet?

23   A    A girl named Reddz and another girl.  I don't remember her

24   name.

25   Q    What did the girl that you knew as Reddz look like?

1   A    Young Caucasian girl.

2   Q    Let me show you photograph No. 10 previously marked and

3   admitted and ask if you look on your monitor if you recognize

4   the person in that photograph?

5   A    Yes.

6   Q    Who is that?

7   A    Reddz.

8   Q    And can you describe the other girl that you met?

9   A    Not exactly.  I don't remember her face.

10  Q    Okay.  What color was her skin?

11  A    She was a Caucasian girl as well.

12  Q    Do you recall if she was taller or shorter than Reddz?

13  A    Shorter.

14  Q    How did you meet Reddz?

15  A    She came over to my cousin's house one day with her

16  boyfriend.

17  Q    Which house was that at the time?

18  A    House in Germantown.

19  Q    Was it the Carousel Court address?

20  A    No.

21  Q    Who else lived there at that house at that time?

22  A    My cousin, his girlfriend Crystal and her son.

23  Q    Had you met Crystal before?

24  A    Yes.

25  Q    Let me show you a Photograph 13 and ask if you recognize the

1  person in that photograph.

2  A   Yes.

3  Q   Who is that?

4  A   Crystal.

5  Q   And so this was over at Crystal's house where?

6  A   Germantown, Maryland.

7  Q   Was Crystal home at the time?

8  A   No.

9  Q   And so how did you meet Reddz?

10 A   She came over with her boyfriend.  That's how I was

11 introduced to them.

12 Q   You were introduced to her and somebody as her boyfriend?

13 A   I was introduced to her by her boyfriend.

14 Q   Okay.  What, if anything, happened after you were introduced

15 to her?

16 A   After a while everybody was talking or whatever.  Her and my

17 cousin went upstairs.  They were up there for --

18 Q   And when you say your cousin, you're talking about the

19 defendant?

20 A   Yes.

21 Q   Okay.

22 A   And when they came back down, she then went back up the

23 stairs with her boyfriend and then when they came back

24 downstairs, her and -- her boyfriend and my cousin left.

25 Q   Okay.  Then what happened?

1   A   She came over to me and told me that she was going to take

2   care of me and then we went upstairs and had sex.

3   Q   You had sex?

4   A   Yes.

5   Q   What happened after that?

6   A   My cousin and her boyfriend came back in.  I went home.

7   Q   Did there come a point in time when you saw Reddz again?

8   A   Yes.

9   Q   Do you recall when that was or where that was?

10  A   We were at a Motel 6.

11  Q   Motel 6.  How did you get to the Motel 6 that day?

12  A   My cousin picked me up.

13  Q   And do you recall anybody else being with your cousin when

14  he came to pick you up?

15  A   No.

16  Q   Let me show you Motel 6 1 and ask if you recognize that?

17  A   Yes.

18  Q   What is that?

19  A   Motel 6.

20  Q   Is that where you saw Reddz again?

21  A   Yes.

22  Q   Did you go inside a hotel room at the Motel 6?

23  A   Yes.

24          MR. TRAINOR:  Objection to any further leading.

25          THE COURT:  Yes.  Let's not lead.  Yes.

1   BY MR. FELTE:

2   Q   When you got to the Motel 6, where, if anywhere, did you go?

3   A   Excuse me?

4   Q   When you got to the Motel 6, where, if anywhere, did you go?

5   A   Into the room.

6   Q   Let me show you Motel 6 1a and ask if you recognize that?

7   A   Yes.

8   Q   What is it?

9   A   The hotel room.

10  Q   How does this photograph compare to the layout or the setup

11  of the hotel room at the Motel 6 that you went into?

12  A   It's identical.

13  Q   Let me show you Motel 6 1b and ask if you recognize that.

14  A   Yes.

15  Q   What is it?

16  A   It's the hotel room.

17  Q   Is that view from a different angle?

18  A   Yes.

19  Q   Was there anything different about the hotel room that you

20  were in on that day as compared to this picture?

21  A   Yes.  There was a table in the room.

22  Q   And if you can put your finger on the location on the

23  monitor where the table was.

24  A   Right over here.

25  Q   Okay.  Now, when you and your cousin got to the motel room,

1  who else was there?

2  A   A girl named Shantia and the other two girls.

3  Q   And who were the other two girls again?

4  A   Reddz and another girl.  I don't remember what her name is.

5  Q   Who is Shantia?

6  A   Shantia is a girl I went to school with.

7  Q   So you knew her before this date?

8  A   Yes.

9  Q   Did you know her by any other names?

10  A   Honey.

11  Q   Let me show you Photograph No. 2 and ask if you recognize

12  that.

13  A   Yes.

14  Q   And who is that?

15  A   That's Shantia.

16  Q   Now, when you got to the hotel room and went inside, what

17  did you do?

18  A   Went into the room and I sat down on the bed and was talking

19  to Shantia.

20  Q   Okay.  What was everybody else doing?

21  A   The other two girls, they were in the shower.

22  Q   Okay.  Now, did there come a point in time when you saw them

23  later?

24  A   Yes.

25  Q   What was going on with them when you saw them later?

1   A   When I saw -- I walked back to look into the bathroom and

2   they were in the shower.  They were getting ready to get out of

3   the shower.

4   Q   Now, when they got out of the shower, do you ever recall if

5   they put on clothes or kept their clothes off?

6   A   They put on clothes.

7   Q   Was there a point in time when they took their clothes off?

8   A   Yes.

9   Q   What were you doing when they took their clothes off?

10  A   I was in the bed having sex with Shantia.

11  Q   When you were in the bed having sex with Shantia, where were

12  the two other girls?

13  A   In the other bed with my cousin having sex.

14  Q   Let me show you 1b again and could you please point to the

15  bed that you were in.

16  A   (Indicating.)

17        MR. FELTE:  For the record, he's pointing to the bed

18  that's closest to the window of 1b.

19  BY MR. FELTE:

20  Q   So your cousin and the other two girls were in the other

21  bed?

22  A   Yes.

23  Q   After you had sex with Shantia, what did you do?

24  A   Went to sleep.

25  Q   Is that where you woke up the next morning?

1   A    Yes.

2   Q    How did you get home the next morning?

3   A    My cousin took me home.

4   Q    When your cousin took your home, was anybody else in the

5   car?

6   A    No.

7   Q    After you left the hotel -- after you left the Motel 6 that

8   day, did you ever have a conversation with your cousin, the

9   defendant, about the girls?

10  A    Yes, we did.

11  Q    What was that conversation about?

12  A    He was talking about pimping the girls out.

13  Q    What did he say about pimping the girls out?

14  A    He just said he was go -- basically he was going to make

15  money off of them.

16  Q    Did he say how he was going to do it?

17  A    Yes.

18  Q    What did he say about that?

19  A    Well, I mean, he said he was going to pimp them out, which

20  means basically they're going to have sex for money.

21  Q    Did he say whether he could do that himself or whether he

22  had anybody helping him?

23  A    Yes, he had someone helping him.

24  Q    Who was that?

25  A    Mike Anderson and Shantia Tibbs and another girl.  I don't

1   remember her name.

2   Q   And another girl.  Did you ever meet that other girl?

3   A   Yes.

4   Q   Where did you meet her?

5   A   At her home.

6   Q   Do you recall where her home was at?

7   A   It's in Gaithersburg, Maryland.

8   Q   Have you been there before?

9   A   Yes.

10  Q   Let me show you what's been marked as Clifftop Drive 1 and

11  admitted and ask if you recognize that?

12  A   Yes.

13  Q   What is that?

14  A   That's where the girl lives.

15  Q   The other girl that was going to help him pimp out?

16  A   Yes.

17  Q   What did that other girl look like?

18  A   A Caucasian girl.

19  Q   Let me show you what has been marked as Photograph No. 3 and

20  ask if you recognize that?

21  A   Yes, that's her.

22  Q   That's the girl that was going to help Mr. Royal pimp them

23  out?

24  A   Yes.

25  Q   After the motel -- after seeing Reddz at Motel 6 again, did

1   you ever have any sexual contact with any of the women you met

2   through your cousin?

3   A   I'm sorry.  Say that again.

4   Q   Sure.  After Motel 6, did you ever have sexual contact with

5   any other women or girls that you met through your cousin?

6   A   Yes.

7   Q   Where was that?

8   A   One night he came to pick me up.  It was in the car.  The

9   girls were -- they were bragging between each other who was

10  better at oral sex, and my cousin, he encouraged them and then

11  it went from there.

12  Q   Okay.  And when you say it went from there, what happened?

13  A   Both girls performed oral sex on me.

14         MR. FELTE:  Thank you.  Please answer any questions

15  that counsel may have.

16                       CROSS-EXAMINATION

17  BY MR. TRAINOR:

18  Q   Mr. Royal --

19  A   Yes.

20  Q   -- you told us about the night at Motel 6 --

21  A   Yes.

22  Q   -- and you woke up the next morning and went home?

23  A   Yes.

24  Q   Where was home then?

25  A   I lived in Germantown.

1  Q   Where in Germantown?

2  A   In Brandonville.  It's the name of the neighborhood.

3  Q   You weren't living with the defendant --

4  A   No, not at the time.

5  Q   -- at the time of the Motel 6?

6  A   No.

7  Q   And you say that one time the two girls were bragging about

8  their sexual abilities and you were in a car?

9  A   Right.

10 Q   You said your cousin picked you up that day?

11 A   Right.

12 Q   When was that in relation to the time you went to the

13 Motel 6?

14 A   That was within the same time period.  Maybe within maybe

15 one or two weeks.

16 Q   So, was it before or after the Motel 6?

17 A   After.

18 Q   All right.  So, the weeks after the Motel 6 you weren't

19 living with your cousin either?

20 A   No.

21 Q   And that was April or May of 2007?

22 A   No.  I think it was prior to that.

23 Q   So you don't know when it was?

24 A   Not exactly by -- not the --

25 Q   But you know for certain in the time frame of the Motel 6

1   and the weeks following that that you were not living with your

2   cousin?

3   A    No.

4   Q    And you were not living at 522 Carousel Court?

5   A    No.

6   Q    So that the observations you made about him selling

7   marijuana that you testified to on direct examination were not

8   made during April or May of 2007?

9   A    I'm not clear of the dates of when this happened.

10  Q    You know whatever observations you testified to were made

11  after Motel 6?

12  A    Yes.  Yes.

13  Q    And they were made after the two weeks later when you were

14  with the girls again in the car?

15  A    Yes.

16          MR. TRAINOR:  May we approach, Your Honor?

17          THE COURT:  All right.

18          (At the bench:)

19          MR. TRAINOR:  Your Honor, at this time I move to strike

20  Mr. Royal's testimony regarding observations regarding selling

21  marijuana for a living at Carousel Court.  Clearly they were not

22  made during the April and May 2007 time frame.  The way the

23  government set up that question is asking him when you were

24  living at Carousel Court in 2007 did you see what your cousin

25  was doing.  It was really an unfair question.  It shouldn't have

1   been asked that way and it now is clear that it must have

2   happened -- it had to have happened after the period in question

3   that's charged by the indictment.

4            THE COURT:  All right.

5            MR. FELTE:  Judge, at the very least, this is 404(b)

6   and it's almost -- he indicated that he lived in 2007 at

7   Carousel Court for six to nine months.  So we're talking about

8   at the most just a couple of months after the time frame of the

9   indictment.  It would be highly relevant.  It would be highly

10  probative under 404(b) evidence as far as absence of mistake,

11  knowledge, intent and methods, and I would submit it's proper.

12           MR. TRAINOR:  It should never have come in that way and

13  it's a different kind of evidence.

14           THE COURT:  Well, this witness obviously is not quite

15  clear as to when.  The jury will have to assess whether the six

16  to nine months falls in that period.  He backed up when you put

17  him in a corner, Mr. Trainor, and he said I'm not sure on the

18  dates.  And, furthermore, I agree with Mr. Felte that it's part

19  and parcel of the overall scheme.  It gives us context.  At a

20  minimum, it certainly, as he said, would be 404(b) evidence.

21  But it also is part and parcel of the overall incident.  Before

22  or after, it's certainly relevant.  It gives proper context to

23  the things that took place.  And when you look at the other

24  testimony from other witnesses who testified about his drug

25  activities, certainly it is corroborative and cumulative.  So

1  there's no reason for me to strike that testimony.  And then, of

2  course, Mr. Felte has a right now on redirect, if he wishes, to

3  ask any other questions to see if this witness's recollection

4  can be refreshed or whatever.  So, overrule the objection.

5           MR. TRAINOR:  Thank you.

6           THE COURT:  All right.

7           (In open court:)

8  BY MR. TRAINOR:

9  Q   Mr. Royal, when you stayed at Carousel Court in

10  Gaithersburg, it was a house that Cierra Young had acquired,

11  correct?

12  A   Yes.

13  Q   She was the tenant there?

14  A   Yes.

15  Q   And you don't know when she acquired that house, do you?

16  A   No.

17  Q   You don't know whether it was before or after May of 2007,

18  do you?

19  A   No.  I don't remember.

20  Q   It could have been after May of 2007, couldn't it?

21  A   It's possible.

22  Q   So the time that you lived at that address you say for six

23  to nine months could have been after May 2007?

24  A   I don't remember.

25  Q   Did you move into that house when Cierra Young first

1    acquired it?

2    A    No.

3    Q    It was some time after she acquired it?

4    A    Yes.

5    Q    Do you know when she acquired it?

6    A    No.

7    Q    So, whenever she acquired it, how much time after that was

8    it that you moved in?

9    A    I'm not sure.

10   Q    You just don't know?

11   A    No.

12   Q    Okay.  You were asked about your cousin's nicknames and you

13   said he had a rap name.  What does that mean?

14   A    He's a musician.  He's an artist.

15   Q    Did he go to a studio and cut records?

16   A    Yes.

17   Q    And you have personal knowledge of that?

18   A    Yes.

19   Q    When you met this girl Reddz, your cousin wasn't living at

20   522 Carousel Court, was he?

21   A    No.

22   Q    Neither were you?

23   A    No.

24   Q    Who is Mike Anderson?

25   A    He's a close friend of my cousin's.

1  Q   Did you know him as Shy Mike?

2  A   No.

3  Q   What did you call him?

4  A   Mike.

5  Q   Did you spend much time with Mike?

6  A   Yes, I spent time with Mike.

7  Q   Did you spend time with him during that April and May 2007

8  time frame?

9  A   It's possible.  I don't --

10 Q   You just don't --

11 A   I'm not clear with dates, no.

12 Q   And when you were called before the grand jury originally,

13 you lied under oath, didn't you?

14 A   Yes.

15         MR. TRAINOR:  Thank you.  I have no further questions.

16         THE COURT:  All right.  Any redirect questions?

17         MR. FELTE:  No, Your Honor.

18         THE COURT:  All right.  You are excused, sir.  Thank

19 you.

20         Do you have another witness?

21         MS. MAGNELLI:  Your Honor, may we approach?

22         THE COURT:  Yes.

23         (At the bench:)

24         MS. MAGNELLI:  Your Honor, based on the court's prior

25 ruling, we do not have that witness.  We also have some travel

1  problems.  And so, the rest of our witnesses aren't going to be

2  here and not ready to testify until --

3          THE COURT:  Until when?

4          MS. MAGNELLI:  -- Tuesday.  We have six witnesses lined

5  up for Tuesday, but they're just not here yet.

6          THE COURT:  Okay.  Well, let's --

7          MS. MAGNELLI:  Some of them are officers and they're on

8  vacation.

9          THE COURT:  All right.  They're not here today and

10  won't be here today?

11          MS. MAGNELLI:  No, they're not.

12          THE COURT:  All right.  And this one witness is going

13  to take the rest of the day?

14          MS. MAGNELLI:  No.  Given the rulings from the court,

15  we released --

16          THE COURT:  I see.

17          MS. MAGNELLI:  -- that individual, which we thought

18  would take quite a while.

19          THE COURT:  Okay.  All right.  So we'll just tell the

20  jury that's it for today and we can talk about other things, and

21  we'll assure them that we're on schedule so they don't have to

22  worry about exceeding the time limit we gave them.  I'll mention

23  that to them.  All right.

24          MR. FELTE:  Thank you.

25          (In open court:)

1          THE COURT:  All right, ladies and gentlemen.  It looks

2    like we've got some scheduling and travel issues with other

3    witnesses.  So, there will be no additional witnesses today.

4    So, we will conclude the testimony today and ask that you come

5    back on Tuesday.

6          And, again, we assure you -- the attorneys have assured

7    me that they're still on schedule.  It will not go beyond what

8    we told you in terms of a trial date.  They're on schedule.  So,

9    I'll see you on Tuesday at -- what time, madam clerk?

10         THE DEPUTY CLERK:  9:30.

11         THE COURT:  9:30.  And don't discuss the case.  Don't

12   do any research or anything and we'll see you on Tuesday.

13         All right.  Thank you.

14         (Jury excused.)

15         THE COURT:  Why don't we be seated just for a second.

16   Are there any other evidentiary rulings that I need to address

17   for anticipation of testimony on Tuesday that you all know of?

18         MR. TRAINOR:  I don't know who's coming Tuesday.  So --

19         MS. MAGNELLI:  No, Your Honor.  I think we've addressed

20   all of the --

21         THE COURT:  No more 404(b)?

22         MS. MAGNELLI:  Well, we have the two officers and

23   that's it.

24         THE COURT:  Yes, but no additional?

25         MS. MAGNELLI:  No, I don't believe so.

1          THE COURT:  All right.  At what point are we going to

2     discuss the instructions?

3          MR. TRAINOR:  Your Honor, I would be prepared to do

4     that any time after the weekend.

5          THE COURT:  All right.

6          MR. TRAINOR:  I need to look at them this weekend.

7          THE COURT:  Okay.  Well, then, let's see.  The

8     government is going to put on about six witnesses, give or take,

9     on Tuesday?

10          MS. MAGNELLI:  Yes, Your Honor.  And just so the court

11     knows, we are no longer going to seek to put on Detective Tom

12     Stack as an expert.  So that's another issue we don't need to

13     address.

14          THE COURT:  All right.  So you anticipate resting on

15     Tuesday?

16          MS. MAGNELLI:  If all goes well.

17          THE COURT:  Yes, or Wednesday.  All right.  And I won't

18     hold you to it, Mr. Trainor, but do you have any idea how long

19     your defense will be?

20          MR. TRAINOR:  Well, I have to talk to Mr. Royal about

21     his options.

22          THE COURT:  All right.

23          MR. TRAINOR:  And other than that possibility of

24     putting the defendant on, we would not take much time at all,

25     Your Honor.

1    THE COURT:  All right.  I guess I'll have to read what

2  that means, won't take much time.  Okay.

3    MR. TRAINOR:  I can tell Your Honor that I don't

4  anticipate any more than a couple of hours, if that.

5    THE COURT:  All right.  Okay.  Great.  I think that's a

6  reasonable response.  Okay.  So, we'll, then -- depending on

7  what happens Tuesday, we'll discuss the instructions that the

8  government has given.  Do you have any instructions?

9    MR. TRAINOR:  Your Honor, I'd just like over the

10  weekend, but I would come prepared Tuesday morning with

11  instructions.

12    THE COURT:  All right.  You'll examine what the

13  government has offered and just see --

14    MR. TRAINOR:  If I have something to file, I'll file it

15  this weekend.

16    THE COURT:  Okay.  Fair enough.  All right.  Okay.

17    So, we'll go ahead and adjourn for today and see you on

18  Tuesday.  All right.  Thank you.

19    (Proceedings adjourned at 12:30 p.m.)

20                    CERTIFICATE OF REPORTER

21    I hereby certify that the foregoing is a true and

22  accurate transcript of proceedings in the above-entitled matter,

23  to the best of my knowledge and ability.

24                    _____/s/_____
                       Gloria I. Williams
25                     Official Court Reporter