UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION


UNITED STATES OF AMERICA        .    Criminal Case No. AW-09-0048
                                .
    v.                          .
                                .    Greenbelt, Maryland
LLOYD MACK ROYAL, III,          .
                                .
            Defendant.          .    Tuesday, March 23, 2010
. . . . . . . . . . . . . . . .      9:45 a.m.




TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE ALEXANDER WILLIAMS, JR.
UNITED STATES DISTRICT JUDGE, AND A JURY




APPEARANCES:

FOR THE GOVERNMENT:        SOLETTE A. MAGNELLI, ESQ.
                           Office of the United States Attorney
                           36 S. Charles Street
                           Baltimore, Maryland 21201

                           JAMES F. FELTE, JR., ESQ.
                           United States Department of Justice
                           950 Pennsylvania Avenue, N.W.
                           Washington, D.C. 20530

FOR THE DEFENDANT:         HARRY J. TRAINOR, ESQ.
                           Trainor, Billman, Bennett, Milko
                             and McCabe, LLP
                           116 Cathedral Street, Suite E
                           Annapolis, Maryland 21401


OFFICIAL COURT REPORTER:  GLORIA I. WILLIAMS  301-344-3228

COMPUTER-AIDED TRANSCRIPTION OF STENOTYPE NOTES

I  N  D  E  X

| GOVERNMENT'S WITNESSES | DIRECT | CROSS | REDIRECT |
| --- | --- | --- | --- |
| William Best | 13 | 19 | |
| Chad Eastman | 20 | 27 | |
| William Clutter | 28 | 32 | |
| Thomas C. King | 35 | 51 | 62 |
| Eugene Travis Melendez | 63 | 72 | 77 |
| Christopher Sakala | 78 | 113 | 114 |

DEFENSE MOTION FOR JUDGMENT OF ACQUITTAL - 117

DEFENSE RENEWED MOTION FOR JUDGMENT OF ACQUITTAL - 138

| DEFENDANT'S WITNESS | DIRECT | CROSS | REDIRECT |
| --- | --- | --- | --- |
| Harri Dean Cox | 127 | 132 | 136 |

1                    P R O C E E D I N G S

2           THE COURT:  Good morning.  Let's be seated.  Are we

3    ready for witnesses?

4           MS. MAGNELLI:  Your Honor, I just have a matter of

5    housekeeping.  I showed these exhibits to the defense attorney.

6    He has copies of these.  But just for purposes of preserving the

7    record with regard to some of these exhibits, if you recall,

8    there was an exhibit that the witness marked on and just for

9    purposes of making sure the record stays intact for years to

10   come, should it need be, I had pictures of those markings taken.

11   I have marked those Cinnamon Woods 3 just for identification to

12   stay with the court's record.  I also have a photograph of the

13   knife that's previously been admitted into evidence.  This has

14   been marked 4a.  And I have a picture of the firearm, just in

15   case, that's been marked Royal 1b, just for purposes of the

16   record.

17          THE COURT:  All right.

18          MR. TRAINOR:  We would not object to them coming in as

19   court's exhibits but not going to the jury.

20          MS. MAGNELLI:  That's fine.  Just for identification,

21   just to have them so that the record is complete.

22          THE COURT:  All right.  So, apparently the government

23   is not going to introduce them.

24          MS. MAGNELLI:  No.

25          THE COURT:  It's just for purposes of I.D.

1      MR. TRAINOR:  I don't have a problem with them being

2    preserved for that purpose.

3      THE COURT:  All right.

4      MR. TRAINOR:  I have a couple of issues that will

5    probably come up today.

6      THE COURT:  All right.

7      MR. TRAINOR:  Your Honor, this is the day that I

8    anticipate that the government is going to put on 404(b)

9    evidence regarding the defendant's similar act on May 2, '06,

10   which we objected to and the court heard a motion on that.  What

11   is not exactly clear is just how far they can go with that.  It

12   is our position that it is the similar act that is coming in

13   under 404(b) and not the consequence of that act.

14         There are two witnesses who are going to testify to an

15   incident in Gaithersburg in which what appeared to be a

16   hand-to-hand drug transaction was observed.  The defendant was

17   arrested with some marijuana on him and some crack cocaine

18   nearby or that they attribute to him.  Michael Anderson was

19   arrested and charged with distribution of marijuana on that day.

20   As I understand the court's ruling, the court is letting that

21   evidence in as 404(b) evidence.

22      THE COURT:  Evidence of that incident, yes.

23      MR. TRAINOR:  Yes.  What the government has given me

24   now is other exhibits they intend to offer.  We had mentioned

25   before the certified copy of the Montgomery County Circuit Court

1   record, which the government has redacted in part but not

2   completely.  We still object to that.  This record shows that

3   the defendant was indicted for felony drug charges which were

4   later amended to a misdemeanor possession of marijuana charge

5   and Judge Beard granted probation before judgment.  Misdemeanor

6   possession of marijuana carries only one year as a maximum

7   sentence and isn't normally an impeachable offense under Rule

8   609.

9          This record also shows bench warrant hearings.  It

10  shows that he was placed on a $15,000 bond, that he was given

11  credit for six days time served, and we object to that.  This is

12  a consequence of the similar act evidence and it also should be

13  kept out under Rule 403.  So, we want to make it clear that we

14  object to that record coming in.

15         I was also handed a copy of the original District Court

16  charging document following that event, which is not part of the

17  certified record from the Circuit Court.

18         THE COURT:  The District Court what?

19         MR. TRAINOR:  Standard Montgomery County District Court

20  charging document charging possession with intent to distribute

21  cocaine.  Now, this charging document was nolle prossed.  He

22  never entered a plea to it.  It doesn't prove the --

23         THE COURT:  Was he indicted later?

24         MR. TRAINOR:  He was subsequently indicted in the

25  Circuit Court but this District Court charging document is not

1   part of any Circuit Court record.  It's not a certified record

2   and it shouldn't come in anyway because it doesn't prove the

3   similar act.  It just shows a consequence of it, that what the

4   officer thought to charge him with was later nolle prossed.

5       THE COURT:  Well, as you and I know, the reason for the

6   nolle pros is because he was indicted.

7       MR. TRAINOR:  Well, I understand that.  I'm not asking

8   the court how, but I question how the District Court charging

9   document qualifies as 404(b) evidence.

10      THE COURT:  Well, I'm not sure what the government is

11  intending or wishes to put in and what's even relevant.  I mean,

12  there's an incident that occurred that bears upon the elements

13  of intent and knowledge and so forth, and certainly there's

14  going to be testimony of that.

15      Now, what documents the government needs, I'm not sure

16  what they need, and certainly a certified copy may be

17  sufficient, but all that other stuff, I'm not sure it's

18  necessary about bond and credit for time.  I'm not sure all

19  that's necessary unless, of course, on your cross of these

20  people you bring up what the plea was for and then at that point

21  you've opened the door and then the government, I believe, can

22  come back and show the original charge and so forth.

23      I'm only interested as presiding judge in the incident,

24  what it is, the hand-to-hand, and whatever the officer testified

25  to, but if you are going to get into what happened to the

1   charges and plea bargain and all that, I'm not sure all of that
2   is necessary.
3          So, let's see what the government wishes to -- what
4   documents you want to put in and what's relevant.  Yes.
5          MS. MAGNELLI:  Your Honor, for their direct testimony I
6   would be looking simply to put in four photographs.  I have
7   provided the defense with the documents and a stipulation that I
8   don't need a records custodian should I need them.  But as the
9   court has noted and as I've indicated, I don't intend to put on
10  everything with regard to this incident.  For example, I'm not
11  going to put on a chemist.  I don't have to prove this beyond a
12  reasonable doubt.  As the court noted, we're not going to have a
13  mini trial.  I'm going to put on one witness who saw the
14  hand-to-hand, one witness who made the arrest and retrieved
15  items from the defendant that were field-tested, and I have some
16  photos from the event and that's it.
17         THE COURT:  Well, that's not much, Mr. Trainor, and
18  we'll see what documents -- if that's all they're putting in,
19  these other items may not come in.
20         MR. TRAINOR:  Just so I know that my objection is
21  preserved.
22         THE COURT:  Yes.  Very well.
23         MR. TRAINOR:  And if anything comes up, I will object.
24         THE COURT:  All right.  You have an objection on the
25  "consequences."  I heard you.  All right.

1    MR. TRAINOR:  And one other thing that may or may not

2  be an issue, I noticed that Thomas Christopher King is on the

3  witness list for today and in reading his grand jury testimony

4  of -- well, he is the boyfriend who lived with Samantha

5  Bentolila, and there was a question put to him in the grand jury

6  did there come a time when your wife cheated on you basically,

7  and the consequence of that was that he says when Mr. Royal

8  found out about it, he offered to put a hit contract out on the

9  wife.  Now, that has not been noticed as 404(b).  I don't know

10  that the government even intends to introduce that, but because

11  I noticed it was in his grand jury, I wanted to raise it and

12  deal with that issue now rather than before the jury.

13    MR. FELTE:  We're not going to get into it, Judge.

14    THE COURT:  All right.

15    MR. TRAINOR:  Thank you.

16    THE COURT:  Okay.  Well, let's keep it short and hope

17  that neither side -- well, certainly the defense doesn't open

18  any doors for anything.  So, let's be careful.

19    MR. TRAINOR:  I hear you, Your Honor.

20    THE COURT:  All right.  I know you are.  You're a

21  careful attorney.  I've known you for many years, Mr. Trainor.

22    All right.  Let's go ahead and bring the jury in.

23    MS. MAGNELLI:  Your Honor, I'll also be reading a

24  stipulation to the jury first.

25    THE COURT:  All right.  Great.  And I guess I should

1  give a 404(b) instruction.  Is this the first --

2          MR. TRAINOR:  Your Honor, I have a --

3          THE COURT:  You have one?  All right.

4          MR. TRAINOR:  I have prepared one that if I may pass it

5  up, Your Honor.

6          THE COURT:  Yes.  Sure.

7          MR. TRAINOR:  It's based on Sand and Siffert.

8          THE COURT:  All right.  It's similar to the

9  government's proposed 61 on page 87 of your instructions, but

10  you have the dates inserted here of the May 2nd incident.

11          MR. TRAINOR:  That's all I tried to do was to focus it

12  on what it is we're talking about.

13          THE COURT:  Sure.  Now, are these the first series of

14  witnesses?  This is the 404(b) that's coming in?

15          MS. MAGNELLI:  Yes, Your Honor, the first two

16  witnesses.

17          THE COURT:  All right.  Well, I think it's appropriate

18  to give an instruction, and unless the government has any

19  objection to this limiting instruction, I'll give it now and

20  I'll give it later in my final instructions.

21          (Jury present.)

22          THE COURT:  All right.  Let's be seated.

23          Good morning, ladies and gentlemen.  We're going to

24  continue our trial testimony today.  The government, I believe,

25  has stipulations we'll receive.

1    MS. MAGNELLI:  Yes, Your Honor.  If I may, this has

2  been marked Stipulation No. 8 entered into by myself and

3  Mr. Felte on behalf of the government as well as Mr. Trainor and

4  the defendant, Mr. Royal, all signatures being noticed on the

5  exhibit, that the United States of America as well as the

6  defendant stipulate and agree to the following, that Government

7  Exhibit Firearm 1 is a .380 Bersa handgun and magazine bearing

8  serial number 214554 which will or is designed to or may be

9  readily converted to expel a projectile by the action of an

10  explosive and therefore meets the definition of a firearm under

11  federal law.  The parties further agree that this stipulation

12  shall be received as an exhibit, admitted into evidence and read

13  to the jury.

14    THE COURT:  All right.  Again, ladies and gentlemen,

15  the purpose of stipulations would be to avoid the need to call

16  witnesses when the parties agree to certain facts that have to

17  be addressed by you.  So those stipulations are to be treated as

18  facts.

19    Any other stipulations?

20    MS. MAGNELLI:  Not at this time, Your Honor.

21    THE COURT:  All right.  Now, ladies and gentlemen, I

22  need to give you an instruction on the law.  I'm going to give

23  you this instruction as well as other instructions certainly at

24  the end of the case, end of the testimony, but one of the things

25  that the government has requested is to introduce what we call

1   similar acts.  These are alleged acts that took place not

2   necessarily within the time frame of the events and acts alleged

3   in the indictment but are similar, and one of the reasons that

4   courts allow this evidence of other acts is that the jury may --

5   they don't have to, but the jury may consider these other acts

6   in connection with the obligation of finding such things as

7   knowledge and intent and so forth.  You'll have to find those,

8   and you may, but need not, consider evidence of similar acts.

9   But you have to be careful that you do not consider this

10  evidence as what we call propensity evidence, meaning that

11  because he did something else, he probably did that.  That's not

12  what you can do and I'm going to read you an instruction that

13  would preclude that.

14          So, here is the instruction I'm going to give you.

15  And, as I said, you don't have to take a whole lot of notes

16  because you'll see it again.  The government is offering

17  evidence tending to show that on May 2nd of 2006, the defendant

18  engaged in conduct that is similar to one of the drug-related

19  offenses charged in this indictment.  In that connection, again,

20  let me remind you that Mr. Royal is not on trial for committing

21  any act on May 2, 2006.  The act is not alleged in the

22  indictment.

23          Accordingly, you may not consider the evidence you are

24  about to hear regarding what the defendant may have done on May

25  2, 2006, as a substitute for proof that the defendant committed

1  any act that is charged in the indictment.  Nor may you consider

2  this evidence as proof that the defendant has a criminal

3  personality or bad character.  This evidence being admitted or

4  you are about to hear is admitted for a more limited purpose and

5  you may consider that only for its limited purpose.

6        If you determine that the defendant committed a drug-

7  related offense charged in the indictment and the similar acts

8  alleged to have been committed on May 2, 2006, as well, then you

9  may, but you need not, draw an inference that in doing the drug-

10  related acts charged in the indictment, the defendant acted

11  knowingly and intentionally and not because of some mistake,

12  accident or other innocent reasons.

13        Evidence of prior or subsequent similar acts may not be

14  considered by you for any other purpose.  Specifically, you may

15  not use this evidence to conclude that because the defendant

16  committed the other act, he must also have committed the acts

17  charged in the indictment.

18        So, again, ladies and gentlemen, it's a limited purpose

19  only and, as I said, two of the issues that you have to consider

20  in these charges is whether the defendant acted knowingly and

21  intentionally.  Again, I'll give you more instructions on that.

22  And so, you may, but need not, consider this evidence to help

23  you consider whether the defendant acted knowingly and

24  intentionally in connection with the acts alleged in the

25  indictment.

1          All right.  Do you have witnesses?

2          MS. MAGNELLI:  Yes, Your Honor.  The government calls

3    to the stand Sergeant William Best.  And if I may, Your Honor, I

4    can't seem to get the ELMO screen to work.

5          THE COURT:  Can't get the screen to work, Madam clerk.

6          All right.  The witness can come in.  He can remain

7    seated until we check on this screen.

8          MS. MAGNELLI:  Magic touch, Your Honor.

9          THE COURT:  All right.  That's why they assigned me the

10   best clerk in the courthouse right there.  My deputy clerk,

11   she's the best.  All right.

12         THE DEPUTY CLERK:  Please raise your right hand.

13         <u>WILLIAM BEST, GOVERNMENT'S WITNESS, SWORN</u>

14         THE DEPUTY CLERK:  State your name loudly and clearly

15   into the microphone and spell your last name for the record.

16         THE WITNESS:  It's William Best, B-e-s-t.

17                      DIRECT EXAMINATION

18   BY MS. MAGNELLI:

19   Q    Sir, how are you employed?

20   A    Currently I'm employed with Gaithersburg Police.

21   Q    And what is your title?

22   A    I'm a sergeant.

23   Q    And how long have you been employed with Gaithersburg

24   Police?

25   A    About 12 years.

1    Q    What did you do before that?

2    A    Before that I was with Secret Service, Uniform Division.

3    Q    And, sir, with Gaithersburg, can you explain to the jury,

4    please, what are your duties and responsibilities?

5    A    I'm the sergeant in charge of the Street Crimes Unit.  We

6    deal with violent crimes and drug transactions.

7    Q    Do you actually manage a team?

8    A    Yes, ma'am.

9    Q    And you mentioned some of the things that the Street Crimes

10   Unit does, and that includes narcotics investigations?

11   A    Yes, ma'am.

12   Q    How many investigations dealing with narcotics have you done

13   since being with Gaithersburg?

14   A    Several hundred.

15   Q    And in those several hundred transactions, can you tell us

16   some of the types of things you've investigated and seen?

17   A    We normally investigate street transactions, transportation.

18   We do search warrants that deal with narcotics trafficking and

19   dealing and narcotics use.

20   Q    You said transactions.  What kind of transactions are you

21   seeing?

22   A    Normally we see the street transactions, which are commonly

23   referred to as the hand-to-hand transaction.

24   Q    Can you explain to the jury what a hand-to-hand means?

25   A    Normally from our point of view, a hand-to-hand transaction

1    appears to be one person has a controlled dangerous substance.

2    They reach out and put the controlled dangerous substance in

3    somebody else's hand and in return they get an amount of money.

4    Q    And since 2003 approximately how many of these hand-to-hand

5    transactions have you seen?

6    A    More than 50.

7    Q    I'm going to draw your attention to May 2nd of 2006.  On

8    that date did you have occasion to observe the defendant, Lloyd

9    Mack Royal, III?

10   A    Yes, ma'am.

11   Q    And where did you see him?

12   A    He was at a 7-Eleven on Snouffer School Road in

13   Gaithersburg.

14   Q    From what vantage point did you see him?

15   A    I was observing him from inside my car, over my right

16   shoulder.

17   Q    Can you tell us, please, where you were positioned with

18   regard to the defendant?

19   A    Sure.  We were in a 7-Eleven parking lot.  There were two

20   rows of cars where you could drive down the center.  My car was

21   facing Snouffer School Road and the 7-Eleven was to my back and

22   I was in my car facing Snouffer School, looking over my right

23   shoulder back at the 7-Eleven in the parking lot.

24   Q    Okay.  And where, if anywhere, did you see the defendant?

25   A    I saw the defendant pull in.  He parked pretty close to

1  right in front of the 7-Eleven.

2  Q   Which way was his car facing, if you recall?

3  A   It was facing towards the 7-Eleven.

4  Q   So, to be clear, your trunks were pointing at each other but

5  divided by almost a lane of travel through the 7-Eleven parking

6  lot?

7  A   Yes, ma'am.

8  Q   Approximately how far were you from his car?

9  A   Maybe 20 yards or so.

10  Q   And could you see that vehicle clearly?

11  A   Yes, ma'am.

12  Q   What were the lighting conditions, if you recall?

13  A   It was dark outside, but the 7-Eleven interior lights were

14  on and they're very bright and it lights up I guess the first

15  row of parking spaces there.

16  Q   Okay.  Based on your vantage point, what exactly did you

17  see?

18  A   Well, as I said, I was looking over my shoulder and I

19  observed the defendant pull in in a vehicle.  He was the driver.

20  He was facing the 7-Eleven.  He got out of the driver's side

21  along with a passenger who got out of the passenger side and

22  they stepped up onto the sidewalk.  They moved off to the right

23  side of their car and then two other individuals approached from

24  off to the side somewhere.  I don't recall where.

25  Q   What did you see next, sir?

1  A    There was what looked like greetings.  There was shaking

2  hands or, you know, smacking hands.  I couldn't hear anything

3  that was being said at the time.  It looked cordial.  I saw the

4  defendant.  I was focusing on him.  He extended a hand out and I

5  couldn't tell what was in the hand, but he extended a hand out

6  and it looked like one of the people from the two that came up

7  took whatever was in the hand, looked down for a moment, and

8  then another exchange took place where the other person reached

9  out and appeared to hand something to the defendant.

10 Q    And, again, could you hear what was going on, sergeant?

11 A    No, ma'am.

12 Q    What happened next?

13 A    At that time the passenger and the defendant went into the

14 7-Eleven for a short amount of time, maybe five minutes.

15 Q    And this whole time were you watching consistently?

16 A    Yes, ma'am.

17 Q    Are you relaying this information to anyone?

18 A    Yes, ma'am.

19 Q    To whom are you relying this information?

20 A    The rest of my team, and there were a couple of extra

21 uniformed officers out there.  But I was relaying what was going

22 on to all the officers that were set up around the 7-Eleven at

23 the time.

24 Q    And at some point did the defendant and this passenger

25 emerge from the 7-Eleven?

1   A   Yes, ma'am.

2   Q   What, if anything, did you see?

3   A   The two came out.  The defendant and the passenger came out,

4   and the confrontation between the two originally that I saw that

5   came out of the side of the 7-Eleven, the atmosphere was

6   different.  An argument started.  It's best described as two

7   guys bumping chests together and there was a lot of yelling.  I

8   could tell that it was yelling because the windows were up in my

9   car and I couldn't hear them talking before and now they were

10  yelling.  I could hear like muddled, you know, kind of yelling

11  what was going on.  I couldn't hear exactly what they were

12  saying, but the atmosphere was completely different than when

13  they first met.

14  Q   In response to what you saw, what did you do?

15  A   At that time I thought the best interest was to have the

16  team come in.  I believed that a fight was going to start and it

17  just seemed the most prudent thing to bring the rest of the team

18  in and handle the situation as we had seen it.

19  Q   Do you recall whether or not Corporal Eastman responded to

20  that scene?

21  A   Yes, ma'am.

22  Q   Now, did you yourself have any contact with the defendant?

23  A   No, ma'am, I didn't.

24  Q   Do you know that the person doing the exchange was

25  identified as Lloyd Mack Royal, III?

1   A   Yes, ma'am.

2   Q   Once you called in the arrest team, did you leave it to the

3   arrest team to sort of take on the next phase of this?

4   A   Yes, ma'am, I did.

5        MS. MAGNELLI:  If you would answer questions from the

6   defense.

7        THE WITNESS:  Yes, ma'am.

8                          CROSS-EXAMINATION

9   BY MR. TRAINOR:

10  Q   Sergeant Best, so, your observations were made -- all of

11  your observations that you've testified to were made from your

12  automobile, correct?

13  A   Yes, sir.

14  Q   Were you in charge of this team that was out there?

15  A   Yes, sir.

16  Q   You saw the defendant driving a Honda; is that correct?

17  A   Yes, sir, I believe so.

18  Q   And the passenger was Michael Anderson, was he not?

19  A   I believe that's who he was identified as.

20  Q   You said that Mr. Royal and his passenger got out of the

21  vehicle and eventually met up with two other gentlemen?

22  A   Yes, sir.

23  Q   Was one of those gentleman Termaine Johnson?

24  A   I'm not sure on the first name but the last name Johnson I

25  believe is correct.

1    Q    There was a Johnson that was one of the other two?

2    A    Yes, sir.

3    Q    You didn't see any guns or weapons, did you?

4    A    No, sir, I didn't.

5             MR. TRAINOR:  No further questions.

6             THE COURT:  All right.  Government.

7             MS. MAGNELLI:  Nothing further, Your Honor.

8             THE COURT:  All right.  Thank you, sergeant.  You may

9    stand down.  You're excused.

10            THE WITNESS:  Thank you, Your Honor.

11            THE COURT:  Next witness.

12            MS. MAGNELLI:  Your Honor, Corporal Chad Eastman.

13            Your Honor, it's going to be just a moment before

14   Corporal Eastman gets here.

15            THE COURT:  All right.

16            (Pause.)

17            THE DEPUTY CLERK:  Please raise your right hand.

18            CHAD EASTMAN, GOVERNMENT'S WITNESS, SWORN

19            THE DEPUTY CLERK:  State your name loudly and clearly

20   into the microphone and spell your last name for the record.

21            THE WITNESS:  Corporal Chad Eastman, E-a-s-t-m-a-n.

22                        DIRECT EXAMINATION

23   BY MS. MAGNELLI:

24   Q    Sir, can you tell us your occupation?

25   A    I'm a police officer with the Gaithersburg Police

1   Department.  I've been a police officer for 16 years and I'm

2   currently assigned to the K-9 section.

3   Q   Okay.  Before being with Gaithersburg, who were you a police

4   officer with?

5   A   With the Metropolitan Police Department in D.C.

6   Q   Now, sir, as part of your responsibilities in Gaithersburg,

7   what kinds of things do you do?  What are your duties?

8   A   Currently I'm a K-9 handler.  I work with a patrol dog who's

9   also trained in narcotic detection.

10  Q   Do you also assist in investigations where the K-9 is not

11  needed?

12  A   Yes, I do.

13  Q   All right.  Have you participated in the investigation of

14  narcotics both with and without your K-9?

15  A   I have.

16  Q   And approximately how many such investigations have you been

17  a part of?

18  A   Several hundreds at least.

19  Q   Sir, when you come across a narcotics investigation, what

20  kind of tools does the police department use?

21  A   Other than the dog, we can use our own training and

22  experience to identify what we believe to be controlled

23  dangerous substances.

24  Q   Is there anything else that can assist you in the field?

25  A   We also have -- field testers is what we call them.  They're

1  chemical analysis packets that we can use to identify what we

2  believe to be controlled dangerous substances.  It's a

3  preliminary test.

4  Q   A preliminary test.  And you do that on scene?

5  A   Correct.

6  Q   Have you ever used those field tests before?

7  A   I have.

8  Q   How many times?

9  A   Hundreds of times.

10  Q   For what types of drugs?

11  A   Cocaine, crack, marijuana, heroin, ecstasy, methamphetamine.

12  Q   I'm going to draw your attention to May 2nd of 2006.  On

13  that date were you called to a location with regard to Lloyd

14  Mack Royal, III?

15  A   I was.

16  Q   What location were you called to, sir?

17  A   It was the 7-Eleven on Snouffer School Road.

18  Q   Can you spell that for the record.

19  A   S-n-o-u-f-f-e-r.

20  Q   When you arrived, were you the first officer on the scene?

21  A   I was not.

22  Q   What did you do, if anything, when you arrived?

23  A   I assisted officer John Mason in taking the defendant,

24  Mr. Royal, into custody.

25  Q   Had you been directed to that location by someone?

1  A    Yes.  Sergeant Traybest.

2  Q    Was he your supervisor at the time?

3  A    He was.  At that time I was assigned to the Street Crimes

4  Unit.

5  Q    And what, if anything, did you actually do once you got

6  there?

7  A    Well, once I arrived on the scene, I assisted Officer Mason

8  with removing Mr. Royal from the car.  He was not being

9  cooperative.  He had to be forcibly removed from the car and

10 placed on the ground face down into a prone position.

11 Q    When you say "prone position," what exactly does that mean?

12 A    Lying flat on the ground.

13 Q    And what, if anything, happened next?

14 A    Mr. Royal was not following directions.  I had told him

15 several times to get on the ground, get on the ground, show your

16 hands.  He did not.  When he was forced to the ground, his hands

17 remained at his waist like around his belly button, his waist,

18 beneath him.

19 Q    Beneath his person?

20 A    Yes.

21 Q    And what did you do next, if anything?

22 A    At that point we forcefully removed his hand for fear that

23 there was a weapon there that he may use against us.

24 Q    You didn't find a weapon, though, did you?

25 A    We did not.

1  Q   Okay.  So what happened next?

2  A   Once he was taken into custody, placed into the handcuffs,

3  we stood him up, and where Mr. Royal had been laying on the

4  ground there was a large bag of what we believed to be crack

5  cocaine lying on the ground below him.

6  Q   And what, if anything, did you do next?

7  A   We also identified U.S. currency and a bag of what we

8  believed to be marijuana hanging out of his waistband.

9  Q   Just to make sure that we're clear, where did you get the

10  currency from?

11  A   From his waistband, his belt line.

12  Q   Where did you get the suspected marijuana from?

13  A   Again, at his waistband, at the belt line.

14  Q   Okay.  And did you assist in removing anything from the

15  vehicle?

16  A   Yes.  Once he was secured, there was also -- we had begun

17  searching the vehicle.  There was also a small baggie of what we

18  believed to be powder cocaine lying on the driver's floorboard.

19  Q   Okay.  What did you do with these items you just testified

20  about, the suspected controlled dangerous substances?

21  A   They were field-tested on the scene.  All of them did test

22  positive for their suspected substances.

23          MR. TRAINOR:  Objection to field test results.

24          THE COURT:  Overruled.

25  BY MS. MAGNELLI:

1  Q   I'm sorry.  Just one more time.  What did you do with them?

2  A   We field-tested the substances.  I field-tested the

3  substances.

4  Q   You field-tested them?

5  A   I field-tested them.

6  Q   And what did the field test indicate.

7  A   Positive for the cocaine, the crack, and the marijuana.

8  Q   Was some of the scene photographed?

9  A   Yes, ma'am, it was.

10 Q   I'm going to show you what's been marked as Photo 6.  If you

11 would please take a look at that and tell me if you're familiar

12 with what's in that photo.

13 A   Yes.  This is Mr. Royal.

14 Q   And when was that taken?

15 A   This was taken shortly after the time he was taken into

16 custody.

17 Q   On May 2, 2006?

18 A   Yes, ma'am.

19 Q   Is that a fair and accurate depiction of the way he looked

20 that night?

21 A   Yes.

22 Q   And I'm going to ask you to look at Photos 17 and 18.  If

23 you would please tell me if you recognize what's in those

24 photos.

25 A   Both of these are -- one is more of a distant shot.  The

1   other is more of a close-up shot of the suspected cocaine that

2   was on the floorboard of the vehicle Mr. Royal was driving at

3   the time.

4   Q   And with regard to that vehicle, do you know what kind of

5   vehicle it was?

6   A   Small beige four-door.

7   Q   These are fair and accurate depictions of what you saw in

8   the vehicle?

9   A   Yes, ma'am.

10  Q   I'm going to show you what's been marked as Photo 19 and if

11  you would tell me if you're familiar with what's in that photo.

12  A   Yes.  This is a picture of the suspected substances that we

13  recovered from Mr. Royal as well as the U.S. currency.

14  Q   And they were all placed in this bag?

15  A   Yes, ma'am.

16  Q   And this is a fair and accurate depiction of the items that

17  you took off of the defendant that night?

18  A   Yes.

19  Q   What is that?

20  A   Appears to be a ring.

21  Q   Did you ultimately through your investigation determine who

22  was the passenger of that vehicle?

23  A   Yes.

24  Q   Do you recall his full name?

25  A   Michael Dwayne Johnson -- I'm sorry.  Anderson.  Anderson.

1   Sorry.

2   Q   Was there a Johnson there that night?

3   A   Yes, there was.

4   Q   As you sit here, do you remember the name of the passenger?

5   A   Yes.  I had other dealings with him as well.

6   Q   Okay.  Did you also learn to whom that vehicle belonged?

7   A   I remember her name was Cierra.  I don't recall her last

8   name.

9   Q   And did you have any further contact with the defendant that

10  night?

11  A   No, I did not.

12          MS. MAGNELLI:  Nothing further.

13          THE COURT:  All right.  Mr. Trainor, any questions?

14                      CROSS-EXAMINATION

15  BY MR. TRAINOR:

16  Q   No guns or weapons of any kind recovered, correct?

17  A   No, sir.

18  Q   Did you have contact with a Termaine Johnson that night?

19  A   I did not have contact with him, but he was present on the

20  scene.

21  Q   So, your job really was just to come and effect the arrest,

22  correct?

23  A   Yes, sir.

24  Q   And beyond that, it was not your case, was it?

25  A   I did handle the paperwork for the case, but I was not

1   witness to the events that led to the arrest.

2           MR. TRAINOR:  Nothing further.

3           THE COURT:  Government.

4           MS. MAGNELLI:  Nothing, Your Honor.

5           THE COURT:  All right.  Thank you, Corporal Eastman.

6   You may stand down.

7           THE WITNESS:  Thank you, Your Honor.

8           THE COURT:  Do you have another witness?

9           MS. MAGNELLI:  We do, Your Honor, Detective Wally

10  Clutter.  And I just want to make sure for the record that I

11  identified Photo 16, not 6.

12          THE COURT:  All right.

13          WILLIAM CLUTTER, GOVERNMENT'S WITNESS, SWORN

14          THE DEPUTY CLERK:  State your name loudly and clearly

15  into the microphone and spell your last name for the record.

16          THE WITNESS:  Detective William Clutter, C-l-u-t-t-e-r.

17          THE DEPUTY CLERK:  Thank you.

18                      DIRECT EXAMINATION

19  BY MR. FELTE:

20  Q   Good morning, sir.

21  A   Good morning, sir.

22  Q   How are you employed?

23  A   I'm currently employed by Montgomery County Police

24  Department.

25  Q   How long have you been with the Montgomery County Police

1  Department?

2  A   Since 1985.

3  Q   What is your current assignment?

4  A   I'm a detective with the Vice and Intelligence Section.

5  Q   Let me direct your attention back to May 21, 2007.  What was

6  your assignment at that time?

7  A   I was in the Vice and Intelligence Section as an

8  investigator.

9  Q   Did there come a point in time when you assisted in the

10  execution of a search warrant on 8835 Cross Country Place in

11  Gaithersburg?

12  A   Yes, sir, I did.

13  Q   Let me show you what's been marked and admitted as Cross

14  Country Place 1 and ask if you recognize that.

15  A   Yes, I do.  That was the residence that we went to to serve

16  the search warrant.

17  Q   What was your role in the execution of that search warrant?

18  A   To assist in searching the residence.

19  Q   Did you collect any evidence from that search warrant?

20  A   I located evidence and collected evidence, yes.

21  Q   Let me show you what's been marked and admitted as Cross

22  Country Place 2 and ask if you recognize that.

23  A   Yes, I do.

24  Q   What is it?

25  A   It is an address book that I located in a top drawer of a

1  desk in a bedroom in the residence.

2  Q   Now, on that same date, on May 21st, did you also execute a

3  search warrant on a Toyota Camry with Maryland plates Zebra Leo

4  Victor 223?

5  A   Yes, I did.

6  Q   Where did that execution of the search warrant take place?

7  A   It was the rear of the Rockville police station.

8  Q   And what was your role in the execution of that search

9  warrant?

10  A   In searching the vehicle and recording any property

11  recovered from the vehicle.

12  Q   Let me show you what's been marked as Government's Exhibit

13  Royal 5 and ask if you recognize this.

14  A   Yes, sir, I do.

15  Q   And what is it?

16  A   Property that I found in the trunk of the vehicle.

17  Q   Now, sir, let me direct your attention to July 5th of 2007.

18  At that point in time did you make any effort to recover a

19  handgun?

20  A   Yes, sir, I did.

21  Q   Let me show you what's been marked and admitted as Firearm

22  2.

23          And, if I could, may I approach the witness?

24          THE COURT:  Yes.

25  BY MR. FELTE:

1   Q   Do you recognize that exhibit?

2   A   Yes, sir, I do.

3   Q   What is it?

4   A   It's a form that Montgomery County police uses when

5   returning property or recovering property from someone.

6   Q   And did you use that form on that day?

7   A   Yes, sir, we did.

8   Q   What action did you take in regards to that recovery of --

9   excuse me -- the firearm form?

10  A   We met with Michael Anderson at his residence, which is at

11  402 Girard Street, No. 302 in Gaithersburg, Montgomery County,

12  Maryland, and as a result of the investigation he voluntarily

13  turned over his Bersa .380 semi-automatic handgun to us.

14  Q   Okay.  Detective, let me show you what's been marked as

15  Firearm No. 1 and ask if you recognize that.

16  A   Yes, I do.

17  Q   And what is it?

18  A   This is the handgun that Mr. Anderson turned over to us.

19  Q   And where did he retrieve that from?

20  A   It was in his apartment.  It was in a -- the actual gun was

21  in a locked gun case that he retrieved from a back bedroom.

22  Q   Other than the gun, was there anything else that you recall

23  being in that case?

24  A   Yes.  There was a clip with bullets inside of the case,

25  which is right here.

1  Q   And let me show you Firearm Exhibit 1a and ask if you

2  recognize that.

3  A   Yes, sir.  These were the bullets that were inside the clip

4  that was inside the locked gun case.

5  Q   What procedure do you follow, if any, when you recover

6  magazines with bullets in them?

7  A   With the magazine, we just unload them manually.  It's in a

8  clip and we just clip them out with our thumb.

9  Q   Okay.  So the bullets are separated from the gun?

10  A   Yes, and the clip.

11         MR. FELTE:  Okay.  Please answer any questions that

12  counsel has.

13         THE WITNESS:  Yes, sir.

14         MR. TRAINOR:  Thank you.

15                    CROSS-EXAMINATION

16  BY MR. TRAINOR:

17  Q   Detective Clutter, your involvement was with the execution

18  of a search warrant at 8835 Cross Country Place; is that

19  correct?

20  A   Yes, sir.  I assisted, yes, sir.

21  Q   That's one of the things you did?

22  A   Yes, sir.

23  Q   You were actually physically present there?

24  A   Yes, sir, I was.

25  Q   Did you determine who lived there at that time?

1  A   I did not, no, sir.

2  Q   All right.  So, you have no idea?

3  A   I don't recall who lived there.  I just was assisting.

4  Q   All right.  Did you go throughout the house?

5  A   We probably had areas that we did.  We --

6  Q   So you don't know the layout or how many bedrooms there were

7  or so forth?

8  A   Not that I recall offhand, but that's how we mark rooms,

9  Bedroom 1, 2, 3.

10  Q   Let me ask you about the firearm that you recovered from

11  Michael Anderson on July 5th of '07.  Correct?

12  A   Yes, sir.

13  Q   At that time you say Mr. Anderson had a firearm, the .380

14  Bersa, stored at his house in a holding case, correct?

15  A   Yes, sir.

16  Q   So, you know that not only did he have possession of it at

17  that time, but it was also registered in his name?

18  A   I did know that, yes, sir.

19  Q   All right.  So, Michael Anderson purchased the weapon?

20          MR. FELTE:  Objection on relevancy.

21          THE COURT:  Yes.  Unless he knows.

22  BY MR. TRAINOR:

23  Q   You know that?

24  A   I know it was registered to him.

25  Q   And it was registered to him?

1   A   That's what I meant, yes, sir.

2   Q   And he purchased it from a dealer, correct?

3   A   I would have to look at the registration form that Maryland

4   State Police supplies.  It usually tells on the form where he

5   purchased it, but I'm not sure where he purchased it.

6   Q   Do you have that with you?

7   A   I do not, no.

8           MR. TRAINOR:  Court's indulgence.

9           THE COURT:  All right.

10  BY MR. TRAINOR:

11  Q   When someone purchases a firearm from a dealer, they have to

12  fill out a form and send it to the Maryland State Police,

13  correct?

14  A   Sir, this is not my expertise.  I know that you have to do

15  some paperwork, but I'm not exactly sure what.

16  Q   All right.  There was such a form in this case, was there

17  not?

18  A   If you ran his name and license number, driver's license

19  number, through Maryland State Police database, it will show

20  that he owned a handgun or registered a handgun to his name.

21  Q   Which was the .380 Bersa in this case?

22  A   Yes, sir.

23          MR. TRAINOR:  All right.  Thank you.

24          THE COURT:  Government, do you have any other

25  questions?

1        MR. FELTE:  No redirect, Your Honor.

2        THE COURT:  All right.  Thank you.  You may stand down.

3        THE WITNESS:  Thank you, Judge.

4        THE COURT:  Yes.  Next witness, please.

5        MR. FELTE:  That would be Thomas Christopher King.

6        THE COURT:  Which witness is this?

7        MR. FELTE:  Thomas Christopher King, Your Honor.

8        THE COURT:  Thank you.

9        THE DEPUTY CLERK:  Please raise your right hand.

10        THOMAS C. KING, GOVERNMENT'S WITNESS, SWORN

11        THE DEPUTY CLERK:  State your name loudly and clearly

12   into the microphone and spell your last name for the record.

13        THE WITNESS:  Thomas King, K-i-n-g.

14        THE COURT:  Move a little closer, Mr. King, to the mike

15   so I can hear.  Thank you, sir.

16                        DIRECT EXAMINATION

17   BY MR. FELTE:

18   Q   Sir, what is your middle name?

19   A   Christopher.

20   Q   What name do you go by?

21   A   Chris.

22   Q   In what year were you born?

23   A   1975.

24   Q   Do you have any nicknames?

25   A   Pic.

1   Q   Could you spell that?

2   A   P-i-c.

3   Q   Sir, let me approach and show you what's been marked as

4   Document Exhibit 4.  Do you recognize that?

5   A   Yes.

6   Q   Do you know what it is?

7   A   Proffer agreement.

8   Q   Does your signature appear anywhere on this agreement?

9   A   Yes.

10  Q   Who else's signature appears on that agreement?

11  A   My attorney.

12  Q   Anyone else?

13  A   Officer Dupouy.

14          THE COURT:  Pull the mike closer to him.

15          THE WITNESS:  Officer Dupouy.

16  BY MR. FELTE:

17  Q   That's spelled D-u-p-o-u-y.  And do you see an Assistant

18  United States Attorney's signature on that as well?

19  A   Yes.

20  Q   What is your understanding of this proffer letter?

21  A   To tell the truth and any information won't be used against

22  me.

23  Q   Any information --

24  A   That I give, truthful information that I give.

25  Q   Has anybody made you any other promises?

1   A    No.

2   Q    Has anybody said that you'd be charged for any offenses?

3   A    No.

4   Q    Has anybody said that you would not be charged for any

5   offenses?

6   A    No.

7   Q    Sir, let me direct your attention back to April and May of

8   2007.  Do you recall where you were living at that time?

9   A    704 Clifftop Drive, Gaithersburg.

10  Q    And what are some of the streets around that residence?

11  A    Muddy Branch Road.

12  Q    Let me show you what's been marked as Clifftop Drive No.

13  1 -- if you would look on your monitor -- and ask if you

14  recognize that.

15  A    Yes.

16  Q    What is it?

17  A    That's the house on Clifftop.

18  Q    Is that a fair and accurate representation of how it looked

19  when you lived there?

20  A    Yes.

21  Q    Let me show you Clifftop Drive 1a and ask if you recognize

22  that.

23  A    Yes.

24  Q    What is it?

25  A    Dining room.

1    Q    Dining room of your residence?

2    A    Yes.

3    Q    Is that a fair and accurate representation of the layout?

4    A    Yes.

5    Q    Let me show you Clifftop Drive 1b.  Do you recognize that?

6    A    The backyard.

7    Q    Is that a fair and accurate representation of just the

8    layout of the backyard?

9    A    Yes.

10   Q    And who lived at the Clifftop residence with you?

11   A    Jimmy Williams; John Riffle; my son's mother, Samantha; and

12   my son.

13   Q    And what is Samantha's last name?

14   A    Bentolila.

15   Q    Now, do you know an individual by the name of Lloyd Mack

16   Royal?

17   A    Yes.

18   Q    Do you see him in the courtroom today?

19   A    Yes.

20   Q    Could you please point to him and describe something he's

21   wearing.

22   A    Black suit, white shirt.

23            MR. FELTE:  Your Honor, may the record reflect that the

24   witness has identified the defendant?

25            THE COURT:  All right.  So indicate.

1  BY MR. FELTE:

2  Q   How did you meet him?

3  A   Through my brother.

4  Q   What's your brother's name?

5  A   Jason King.

6  Q   Do you know how long you've known Mr. Royal?

7  A   Since before '99.

8  Q   What other names do you know the defendant by?

9  A   Blyss or B.

10 Q   Now, prior to April 2007, for what reasons did you have

11 contact with the defendant?

12 A   To buy drugs.

13 Q   What kind of drugs?

14 A   Cocaine.

15 Q   What kind of cocaine?

16 A   Powder.

17 Q   Why did you buy it from the defendant?

18 A   Because it was the best around.

19 Q   Had you bought cocaine from anyone else before that?

20 A   Yes.

21 Q   Who was that?

22 A   My brother.

23 Q   Your brother Jason?

24 A   Yes.

25 Q   Do you recall when you started buying cocaine from the

1    defendant?

2    A    Around October of '06.

3    Q    How much would you buy from him at any one time?

4    A    One to seven grams.

5    Q    And how much would you pay when you bought those amounts?

6    A    One to $600.

7    Q    How often were you buying?

8    A    Every weekend, sometimes during the week.

9    Q    How would you order or buy your cocaine from the defendant?

10   A    I'd call on the cell phone.

11   Q    When you would call on the cell phone, what, if anything,

12   would you say?

13   A    Would ask about the Xbox game.

14   Q    Why would you ask about an Xbox game?

15   A    So that we weren't outright asking for cocaine on the phone.

16   Q    Whose idea was it to use an Xbox game code?

17   A    Lloyd's.

18   Q    Where would you go to actually get this cocaine from the

19   defendant?

20   A    Crystal's house.

21   Q    Who is Crystal?

22   A    It was his girlfriend.

23   Q    Have you met her?

24   A    Yes.

25   Q    Let me show you Photograph No. 13 and ask if you recognize

1   that person.

2   A    Yes.

3   Q    Who is that?

4   A    Crystal.

5   Q    Let me show you Government's Photograph Misty Meadows 1 and

6   ask if you recognize that.

7   A    Yes.

8   Q    What is that?

9   A    Crystal's house.

10  Q    Is that where you'd go to meet the defendant?

11  A    Yes.

12  Q    Now, other than going to Crystal's house to meet the

13  defendant to buy cocaine, did you ever accompany the defendant

14  anywhere else to get cocaine?

15  A    Yes.

16  Q    Where?

17  A    Some townhouses off of Mateny Drive and some apartments off

18  of Crystal Rock.

19  Q    When you would accompany the defendant to some townhouses at

20  Mateny Drive, what would happen?  How would you get the cocaine?

21  A    Give the money and he would go get it.

22  Q    Well, after you gave him the money, where did he go?

23  A    I don't know.

24  Q    Did you see who he interacted with?

25  A    No.

1   Q   Is that the same for when you'd go to Crystal Rock and

2   Father Hurley as well?

3   A   Yes.

4   Q   Now, did you ever discuss with the defendant getting cocaine

5   from any other places outside of Maryland?

6   A   He had said that he was going to New York to get it.

7   Q   And what, if anything, were you involved in this?

8   A   Nothing.

9   Q   Did you ever go to New York?

10  A   No.

11  Q   Were you ever asked to go to New York?

12        MR. TRAINOR:  Objection to leading.

13        THE COURT:  Yes.  Sustain the objection.  Rephrase the

14  question.

15        MR. FELTE:  Yes, sir.

16  BY MR. FELTE:

17  Q   What, if anything, did the defendant ever say to you about

18  New York?

19  A   He had asked if I would pick a car up and bring it back and

20  there would be something in it.

21  Q   What was your understanding of what would be in it?

22  A   There would be coke in it.

23  Q   Did you actually do that?

24  A   No.

25  Q   Now, did you ever discuss music with the defendant?

1   A    Yes.

2   Q    What kind of music did you discuss with the defendant.

3   A    Rap music.

4   Q    Did the defendant ever make any comments concerning rap

5   music?

6   A    Just that he couldn't rap about something if he hadn't done

7   it.

8   Q    Now, did there come a point in time when you began having

9   difficulty getting in touch with the defendant?

10  A    Yes.

11  Q    Do you recall when that was?

12  A    It was before April of '07.

13  Q    Did you come to a solution as far as these difficulties in

14  getting touch with the defendant?

15  A    I would add him to my cell phone plan.

16  Q    What steps did you take to add the defendant to your cell

17  phone plan?

18  A    We went to the Nextel store off of 118 in Germantown and

19  added him to the plan.

20  Q    Who chose the phone number for the plan?

21  A    He chose the number.

22  Q    Mr. King, let me show you what's been marked as Phone

23  Exhibit No. 5.  Do you recognize the number 202-286-7283?

24  A    Yes.

25  Q    What number is that?

1   A    It was the number for Lloyd's phone.

2   Q    Was this the number that was added to your plan?

3   A    Yes.

4   Q    Your address at the time was 704 Clifftop Drive,

5   Gaithersburg, Maryland?

6   A    Yes.

7   Q    Let me show you what's been marked as Phone Exhibit No. 6.

8   Do you recognize the number 240-793-4690?

9   A    Yes.  That was Samantha's phone number.

10  Q    Please keep your voice up.

11  A    Samantha's phone number.

12  Q    Was that also on your plan as well?

13  A    Yes.

14  Q    Was that for a cell phone?

15  A    Cell phone, yes.

16  Q    Let me show you Phone Exhibits 7 and 7a.  Do you recognize

17  the number 240-246-3463?

18  A    Yes.

19  Q    What number was that?

20  A    That was my cell phone number.

21  Q    On this same plan?

22  A    Same plan.

23  Q    Now, when you put the defendant on your cell phone plan,

24  what was your understanding of what the defendant would do?

25  A    He would pay his bill at the beginning of the month each

1  month because it was a set price.

2  Q    How long did you keep him on the plan?

3  A    Less than a month.

4  Q    Why did you take him off the plan?

5  A    He never paid for the first month and he was still hard to

6  reach.

7  Q    You indicated that you started buying cocaine from the

8  defendant in October of 2006.  How long did you continue buying

9  cocaine from the defendant?

10  A    Probably couple of months or more.

11          THE COURT:  What was that?

12          THE WITNESS:  Couple months or more.

13  BY MR. FELTE:

14  Q    When did you stop buying cocaine?

15  A    Stopped being able to get in touch with him.

16  Q    Was that before or after you canceled his subscription to

17  your phone?

18  A    That was before I canceled the phone.

19  Q    And do you recall when you added him to the phone?

20  A    April, May '07.

21  Q    Okay.  So this was some time between October and around

22  April?

23  A    It was more like April.

24  Q    Let me approach and show you what's been marked as

25  Government Phone Exhibit 6a.  Do you recognize the phone number

1    301-330-8258?

2    A    Yes.

3    Q    What phone number is that?

4    A    That was the home phone number.

5    Q    Now, did there come a point in time when the defendant

6    started spending time at your residence on Clifftop?

7    A    Yes.

8    Q    Do you recall when that was?

9    A    April, May '07.

10   Q    And how are you able to remember that?

11   A    It was after my son's birthday.

12   Q    And what month is your son's birthday?

13   A    April.

14   Q    Why were you hanging out with the defendant?

15   A    To get more drugs.

16   Q    Do you remember the first time that the defendant came to

17   your residence?

18   A    Yes.

19   Q    Did he come alone or with someone?

20   A    He brought some people with him.

21   Q    Who did he bring with him?

22   A    Stephanie and Melissa.

23   Q    Let me show you Photograph No. 10 and ask if you recognize

24   that person.

25   A    Yes.

1    Q    Who is that?

2    A    Melissa.

3    Q    Let me show you Photograph No. 11 and ask if you recognize

4    that.

5    A    Yes.  Stephanie.

6    Q    Do you recall what you did the first time the defendant

7    brought Stephanie and Melissa to your residence?

8    A    We did coke and drank all night.

9    Q    After that night did you ever see Melissa or Stephanie

10   again?

11   A    Yes.

12   Q    Do you recall when?

13   A    I don't think they left for a couple of days.  Melissa left

14   the first night.  Stephanie stayed.

15   Q    Now, regarding Melissa, was there ever a point in time when

16   she stayed or lived at your residence?

17   A    Yes.

18   Q    Do you recall for about how long she lived at your

19   residence?

20   A    I believe it was less than two weeks.

21   Q    How did she come to live at your residence?

22   A    Lloyd asked if she could stay because she had nowhere to go

23   and in exchange she would help out around the house.

24   Q    Did you agree with that?

25   A    Yes.

1  Q   Now, was there ever a point in time when Stephanie was at

2  your residence that she had some health issues?

3  A   Yes.

4  Q   What happened with that?

5  A   After staying up all night and most of the day doing coke

6  and drinking, I heard a commotion on the front porch and walked

7  out and she was having a seizure.

8  Q   Where did the cocaine come from?

9  A   From Lloyd.

10 Q   Did you ever see Stephanie do any of that cocaine?

11 A   We were all doing it.

12 Q   Did you see how much cocaine Stephanie had done?

13 A   Not an exact amount, but we had done quite a bit.

14 Q   And after you saw her having a seizure, what was done?

15 A   She was brought inside.  She came out of it fairly quickly

16 and we asked if she wanted to go to the hospital.  She said no.

17 Q   Now, back in April, May of 2007 -- well, back in April and

18 May of 2007, what vehicle was Sammy driving?

19 A   A white Chevy Suburban.

20 Q   Do you recall what vehicle the defendant was driving?

21 A   A white Toyota Camry.

22 Q   Do you ever recall a time when the defendant borrowed that

23 Suburban?

24 A   Yes.

25 Q   Do you recall what was going on when the defendant borrowed

1  that Suburban?

2  A   He was going to be making a trip to D.C.  There were like

3  five people going and they wouldn't really fit in the Camry.

4  Q   Do you recall the five?

5  A   It was Lloyd, Shy Mike, Honey, Stephanie and Melissa.

6  Q   Who is Shy Mike?

7  A   A friend of Lloyd's.

8  Q   Do you recall what the girls were wearing that night?

9  A   Clothes probably described as slutty.

10 Q   Do you know where those clothes came from?

11 A   Borrowed from Samantha.

12 Q   Now, did the defendant wear any jewelry that you're aware

13 of?

14 A   He had his pinky ring.

15 Q   And what, if anything, would you see the defendant do with

16 that pinky ring?

17 A   The girls would never kiss him.  They would kiss his ring.

18 Q   Let me show you Photograph No. 12 and ask if you recognize

19 that person.

20 A   Yes.

21 Q   Where, if anywhere, have you seen her before?

22 A   She came to my house for a barbecue.

23 Q   Who did she come with?

24 A   She came with Lloyd and Melissa.

25 Q   Let me show you Photograph No. 9 and ask if you recognize

1   that person.

2   A    Yes.

3   Q    Who is that?

4   A    The Pharmacist.

5   Q    You know him as The Pharmacist?

6   A    Yes.

7   Q    Where have you seen him before?

8   A    He also came to the barbecue.

9   Q    Did you ever overhear any conversations concerning the

10  pharmacist involving the defendant?

11  A    Yes.  He mentioned that he had a friend that worked at a

12  pharmacy.  He wanted to know what types of pills he could get

13  that would sell.

14  Q    And who was present when this conversation was taking place?

15  A    Myself and Samantha.

16  Q    Did you tell him or did you provide any advice as far as

17  what pills could be sold?

18  A    I just knew Percocet and Vicodin and that's what I told him.

19  Q    That's what you said?

20  A    Yes.

21        MR. FELTE:  Thank you.  Go ahead and answer any

22  questions that counsel may have.

23        THE COURT:  All right, Mr. Trainor.

24        MR. TRAINOR:  Your Honor, could I have five minutes?

25        THE COURT:  Sure.  All right.  Let's go ahead and take

1    a little break, madam clerk.  Let's take a break.

2              (Jury excused for a recess.)

3              THE COURT:  All right.  Let's take 10 minutes.

4              (Recess from 10:52 to 11:10 a.m.)

5              THE COURT:  Have your witness come back.

6              (Jury present.)

7              THE COURT:  All right.  Thank you.  Let's be seated.

8              MR. TRAINOR:  May I proceed, Your Honor?

9              THE COURT:  Yes.

10         THOMAS C. KING, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

11                        CROSS-EXAMINATION

12   BY MR. TRAINOR:

13   Q    Mr. King, I'm Harry Trainor.  Up until this time, you and I

14   have never spoken, have we?

15   A    No.

16   Q    So I'm clear, you are Jason King's older brother, correct?

17   A    Yes.

18   Q    And you no longer live with Samantha?

19   A    No.

20   Q    But during the time that you testified about, you and she

21   lived together?

22   A    Yes.

23   Q    And you have a child in common?

24   A    Yes.

25   Q    But you're still talking to her?

1   A    Sometimes.

2   Q    Talk to her recently?

3   A    No.

4   Q    Not at all?

5   A    Very rarely.

6   Q    All right.  You told us about your brother Jason.  How old

7   is Jason?

8   A    Thirty-three.

9   Q    And he was a drug dealer; am I right?

10  A    He was.

11  Q    He was your source of cocaine for a while, correct?

12  A    Sometimes.

13  Q    All right.  He also had a dream of being a rapper; am I

14  right?

15  A    So I've heard.

16  Q    All right.  And you met Mr. Royal through Jason in 1999?

17  A    Before '99.  Before '99.  I don't know exactly what date but

18  it was before.

19  Q    All right.  Would it be in the late nineties?

20  A    Yes.

21  Q    All right.  And Mr. Royal, as far as you know, had an idea

22  that he could be a rapper, correct?

23  A    Yes.

24  Q    All right.  You knew Mr. Royal to be the kind of guy that

25  sort of put on a show personality-wise in front of people, new

1    people, correct?

2    A    Somewhat.

3    Q    He puffed himself up?  For example, he claimed this pinky

4    ring that he wore was platinum and diamonds, right?

5    A    Right.

6    Q    And that was the kind of personality he had?

7    A    Right.

8    Q    All right.  Now, you told us about cocaine.  It was a big

9    part of your life for some time, correct?

10   A    Right.

11   Q    You would get cocaine from your brother and you got cocaine

12   through Mr. Royal at times, correct?

13   A    Right.

14   Q    Now, there was a time when you could go to Crystal Brown's

15   house and get some cocaine, correct?

16   A    Yes.

17   Q    And you did that five or six times, didn't you?

18   A    I don't know exactly how many times.

19   Q    But you've been there more than once?

20   A    Right.

21   Q    And there were times when you would get in touch with

22   Mr. Royal to take you to get some cocaine, right?

23   A    Right.

24   Q    And basically what he would do is take your money and go in

25   and get some cocaine for you and bring it back --

1  A   Basically.

2  Q   -- so you didn't have to go in?

3  A   No.

4  Q   And you testified here that you would give Mr. Royal

5  somewhere between 100 and $300 -- excuse me -- 100 and $600,

6  correct?

7  A   Right.

8  Q   But when you testified before the grand jury in this matter

9  in April of 2009, you testified that you would give him between

10  100 and $300, correct?

11  A   I believe so.

12  Q   All right.  Not $600?

13  A   It just depended on the amount.

14  Q   But you were asked a question, "How much would that cost

15  you," and you said "Between 100 and 300," in April, didn't you?

16  A   Right.

17  Q   You would use cocaine mostly on weekends?

18  A   Right.

19  Q   And Samantha would use it with you, correct?

20  A   Yes.

21  Q   During the months of April and May of 2007, you weren't

22  working, were you?

23  A   I was just starting to.

24  Q   When did you start to work?

25  A   I'd slowly started working.  I'd just started up a company.

1  Q    A tow truck driver?

2  A    Transporting cars, yes.

3  Q    With a tow truck?

4  A    No.  A truck and a trailer.

5  Q    All right.  You had a hard time reaching Lloyd Royal on his

6  phone, correct?

7  A    Right.

8  Q    And that's because the only thing he had was one of these

9  prepaid phones that you have to buy minutes on, correct?

10  A    Right.

11  Q    And he would run out of minutes?

12  A    Right.

13  Q    And then you couldn't reach him?

14  A    Right.

15  Q    So what you did was in an effort to be able to reach him,

16  you bought a phone, a Nextel phone, correct?

17  A    No.  He had the phone.  I just added him to the plan.

18  Q    All right.  So he had a phone which you added to the plan

19  which incurred a cost for you?

20  A    Right.

21  Q    But he never had the money to pay you or he never gave it to

22  you, did he?

23  A    He just never paid me.

24  Q    You told us about meeting up with Melissa and Stephanie,

25  correct?

1   A   Meeting at my house?

2   Q   At your house.

3   A   Yes.

4   Q   And that's where you met them, correct?

5   A   Right.

6   Q   They came over to your house one night and it was late?

7   A   Right.

8   Q   And you and Samantha had been doing cocaine?

9   A   Yes.

10  Q   And these people showed up and stayed till the next day or

11  the day after that, correct?

12  A   Right.

13  Q   Was this the time that Stephanie had what you described as a

14  seizure?

15  A   Yes.

16  Q   So, you went outside and she was convulsing?

17  A   Right.

18  Q   And you offered to take her to the hospital and she said no,

19  it wasn't necessary?

20  A   Right.

21  Q   You tried to give her some first aid or some care?

22  A   Samantha did.

23  Q   Samantha?

24  A   Yes.

25  Q   Now, Samantha was a strong-willed person, correct?

1   A    Yes.

2   Q    She would bark orders and you'd better do that?

3   A    Sometimes.

4   Q    You'd better follow them?

5   A    Basically.

6   Q    She was in control, correct?

7   A    Yes.

8   Q    You told us about the night that you loaned the Suburban to

9   Mr. Royal and several other people to go to D.C., correct?

10  A    Right.

11  Q    And you were home that night, correct?

12  A    Yes.

13  Q    And you participated in the decision to loan the Suburban,

14  correct?

15  A    Yes.

16  Q    I mean, it was your Suburban and Samantha's Suburban,

17  correct?

18  A    Right.

19  Q    And you were there the whole evening and saw that Samantha

20  and Shantia Tibbs, also known as Honey, were helping these

21  girls, Melissa and Stephanie, get dressed, correct?

22  A    Right.

23  Q    And you knew that they were putting on Samantha's clothing?

24  A    Right.

25  Q    And you knew that Samantha and to some extent Shantia Tibbs

1  were both putting makeup on the girls, correct?

2  A   Right.

3  Q   And you were there the whole time?

4  A   Yes.

5  Q   And it was your understanding that they were going to all go

6  to the District of Columbia to a club?

7  A   Right.

8  Q   Is that right?  And you stand by that today?

9  A   Yes.

10 Q   That was your understanding and you were right there the

11 whole time, correct?

12 A   Right.

13 Q   Was Melissa living with you at this time?

14 A   No.

15 Q   Was this before she lived with you?

16 A   Yes.

17 Q   How soon after this D.C. trip was it that Melissa began

18 living with you?

19 A   Within a few days.

20 Q   And then she lived with you for a week or two, took care of

21 your son?

22 A   Right.

23 Q   This night that Samantha was putting on makeup for the

24 girls, the only time that happened was the night that you loaned

25 the Suburban to go to D.C., correct?

1    A    Right.

2    Q    And while Samantha was putting makeup on Melissa, you saw

3    her slap Melissa's face, didn't you?

4    A    Yes.

5    Q    But it was always your understanding that they were just

6    going to a club in D.C., correct?

7    A    Right.  I don't know that they ever said club.  They just

8    said downtown.

9    Q    You recall testifying before the grand jury on April 29,

10   2009, don't you?

11   A    Right.

12   Q    And you were asked if there came a point in time when you

13   loaned the Suburban to Lloyd, correct?

14   A    Yes.

15   Q    And you were asked to tell about that.  Do you remember?

16   A    Right.  I remember.

17   Q    And you testified then that they were going to go out to the

18   club, correct?

19   A    Right.

20   Q    That's what you testified to under oath on April 29, 2009,

21   correct --

22   A    Yes.

23   Q    -- that they were going to a club?

24   A    Yes.

25   Q    And that was your clear understanding of what was going on,

1    correct?

2    A    Yes.

3    Q    And you know that the person who drove was Michael Anderson,

4    correct?

5    A    Yes.

6    Q    The guy you called Shy Mike?

7    A    Shy Mike.

8    Q    These clothes of Samantha's, she didn't buy those specially

9    for this one occasion, did she?

10   A    No.

11   Q    In fact, she had had these clothes since early in 2006,

12   correct?  She would order them from a company called Wicked

13   Temptations?

14   A    Yes.

15   Q    And she ordered them in your name, correct?

16   A    Possibly.

17   Q    So they were sent to you, correct?

18   A    To our home.

19   Q    You remember having a barbecue in your backyard.  Was that

20   around Memorial Day?

21   A    I couldn't say for sure.

22   Q    But it was during April or May?

23   A    Yes.

24   Q    Of 2007?

25   A    Yes.

1  Q   And you identified a picture of a person you called The

2  Pharmacist, correct?

3  A   Yes.

4  Q   There was a time when you didn't overhear, you actually

5  participated in a conversation about The Pharmacist, correct?

6  A   Yes.

7  Q   It was your understanding he was a friend of Lloyd's; am I

8  right?

9  A   Yes.

10 Q   And it was your understanding that he, The Pharmacist,

11 worked in a drugstore?

12 A   Yes.

13 Q   And that he could get certain kind of pills from that

14 drugstore, correct?

15 A   Right.

16 Q   And it was you who suggested that he try to get Percocet and

17 Vicodin, correct?

18 A   Right.

19 Q   Now, you entered into a proffer agreement with the

20 government on March 6, 2009?

21 A   I'm not sure of the exact date but, yes.

22 Q   All right.  Whatever date is shown on the document itself is

23 the day you entered into it?

24 A   Right.

25 Q   And although that document doesn't specifically say that you

1   will not be charged with any crime, the fact is you have not

2   been charged with any crime, have you?

3   A    No.

4            MR. TRAINOR:  I have no further questions.

5            THE COURT:  Government.

6            MR. FELTE:  Just a few questions, Your Honor.

7                      REDIRECT EXAMINATION

8   BY MR. FELTE:

9   Q    You didn't actually travel to D.C. with the defendant, Shy

10  Mike and the other girls as well, did you?

11  A    No.

12  Q    You don't actually know where they went, right?

13  A    No, I don't.

14  Q    The clothes that Sammy bought that Mr. Trainor asked you

15  about, Wicked Temptations --

16  A    Yes.

17  Q    -- did you and Samantha use those?

18  A    Yes.

19           MR. FELTE:  Thank you.

20           THE COURT:  Mr. Trainor, anything else?

21           MR. TRAINOR:  Not based on that.

22           THE COURT:  All right.  You may stand down.  Thank you,

23  sir.  You're excused.

24           Do we have another witness?

25           MR. FELTE:  We do, Your Honor.  Eugene Melendez.

1            THE COURT:  All right.

2            We have a note from the jury and they just wanted

3    clarification here.  "Assume judge's instructions before

4    Sergeant Best only referred to the three policemen and the last

5    witness referring to actual indictment in the case and should be

6    considered."  And I'm not sure exactly what you're saying but,

7    again, the similar incidents, similar evidence instruction was

8    to be taken with reference to the two officers who talked about

9    an incident on May 2, 2006.  So, I think there were just a

10   couple, as I recall, witnesses and that's what that instruction

11   referred to, that incident that was talked about on May 2, '06.

12   Was it May 2nd?

13           MS. MAGNELLI:  Yes, Your Honor.

14           THE COURT:  Yes.  I think there were just two officers

15   out of Gaithersburg that addressed that.  Okay.  All right.

16        EUGENE TRAVIS MELENDEZ, GOVERNMENT'S WITNESS, SWORN

17           THE DEPUTY CLERK:  State your name loudly and clearly

18   into the microphone and spell your last name for the record.

19           THE WITNESS:  My name is Eugene Travis Melendez, last

20   name M-e-l-e-n-d-e-z.

21           THE DEPUTY CLERK:  Thank you.

22                         DIRECT EXAMINATION

23   BY MR. FELTE:

24   Q    Sir, in what year were you born?

25   A    1990.

1    Q    Do you know an individual named Lloyd Royal?

2    A    Yes.

3    Q    Do you see him in the courtroom here today?

4    A    Yes.

5    Q    Can you please point to him.

6    A    Right here (indicating).

7    Q    And can you describe what he's wearing?

8    A    White shirt, top button missing, a black coat.

9         THE COURT:  All right.  The record will reflect he's

10   been identified.  The defendant has been identified.  All right.

11   BY MR. FELTE:

12   Q    How do you know him?

13   A    Through my oldest brother, Michael Anderson.

14   Q    Let me show you Photograph No. 4.  Who is that?

15   A    That's my oldest brother.

16   Q    And is he a half brother, full brother?

17   A    Half brother.  We have the same mother, different fathers.

18   Q    Okay.  How did you come to know the defendant through your

19   brother, Mr. Anderson?

20   A    About nine years ago -- nine years ago -- I was going on

21   12 -- I was introduced through my oldest brother.

22        THE COURT:  Could you come up a little closer so I can

23   hear, to the mike.  Just get closer to the mike.  All right.

24   Repeat your testimony.

25   BY MR. FELTE:

1  Q   Go ahead.  How were you introduced?

2  A   Through my oldest brother about nine years ago.

3  Q   Now, by what names do you know the defendant by?

4  A   I was introduced to him as Blyss.  I know him as Blyss,

5  Furious and Lloyd.

6  Q   And in what context do you know him by the name Furious?

7  A   When he would rap, through his raps.

8  Q   Now, would you ever hang out with the defendant?

9  A   Yes.

10 Q   When you would hang out with him, where would that be?

11 A   In his girlfriend Cierra's basement.

12 Q   At the time where were you living?

13 A   Directly across the street.

14 Q   Let me show you what's been marked as Carousel Court No. 1.

15 Do you recognize that?

16 A   Yes.

17 Q   What is that?

18 A   That's Cierra's home.

19 Q   Is that where you would hang out with the defendant?

20 A   Yes.

21 Q   And did you ever meet Cierra?

22 A   Excuse me?

23 Q   Did you ever meet Cierra?

24 A   Yes.

25 Q   Other than Cierra, have you ever met any other girls through

1  the defendant?

2  A   Yes.

3  Q   Do you recall when?

4  A   Early 2007.

5  Q   Do you recall where?

6  A   We were at a gas station, Shell gas station in old town

7  Gaithersburg.

8  Q   When you say "we," who is "we"?

9  A   Me and my best friend Michael.

10 Q   And what happened at that time?

11 A   Lloyd pulls up in a car with a Caucasian female in the

12 passenger seat and I noticed him before they noticed me, but

13 they pull up and I hear them in a dispute, Lloyd and the female,

14 and I caught his attention and he offered us a ride, you know,

15 "Come on over," and I agreed, you know.  Me and my best friend

16 got in the back seat and --

17 Q   What, if anything, did you hear about the dispute between

18 the defendant and this female?

19 A   They were arguing over cigarettes.

20      MR. TRAINOR:  Objection.

21 BY MR. FELTE:

22 Q   What, if anything, did you --

23      THE COURT:  Sustain the objection.  Lay a better

24 foundation.

25      MR. FELTE:  Yes, sir.

1   BY MR. FELTE:

2   Q   What, if anything, did you hear the defendant say?

3   A   They were arguing over cigarettes.  Lloyd had got upset

4   because she didn't have any and told her to go get some out of

5   the store.

6   Q   What kind of language was he using at that time?

7   A   Vulgar, cursing a lot.

8   Q   What was the tone of his voice?

9   A   Upset.

10  Q   Let me show you Photograph No. 10 and ask if you recognize

11  that.

12  A   Yes.

13  Q   How do you recognize that?

14  A   That's the female that was in the car.

15  Q   Did you ever know her name?

16  A   No.

17  Q   Did this female leave the car?

18  A   Yes.

19  Q   What, if anything, was said by the defendant concerning that

20  female when she left the car?

21  A   As she got out of the car and went into the store, Lloyd

22  asked if we wanted to have sex with her and he said that we

23  could have sex with her for a hundred dollars and get the head

24  for 50 or --

25  Q   When you say get head for 50, what are you talking about?

1    A    Suck, like suck on the penis basically.

2    Q    Okay.

3    A    And I just brushed it off and she returned to the car.

4    Q    Now, were any other girls mentioned?

5    A    Yes.

6    Q    What was mentioned?

7    A    He said if that one wasn't appealing, he had several more

8    like her, he has a Russian girl, a black girl, and a couple of

9    other white girls.

10   Q    Now, did this girl return to the car?

11   A    Yes.  She returned to the car with the cigarettes.

12   Q    With the cigarettes?

13   A    Yes.

14   Q    Now, did you ever see the defendant with any jewelry that

15   you remember?

16   A    Yes.  Actually, at that particular moment she returned to

17   the car and she was really remorseful for, I guess, not having

18   cigarettes, and in exchange, I guess, he told her to kiss his

19   ring.

20   Q    Did she do that?

21   A    Yes.

22   Q    Let me show you what's been marked as Royal 1a, a

23   photograph.  Do you recognize that?

24   A    Yes.

25   Q    What is it?

1    A    That's the ring.

2    Q    The ring she kissed?

3    A    Yes.

4    Q    Now, did you ever have a conversation with the defendant

5    again about the topic of money for sex?

6    A    Brief conversation and --

7    Q    Where did that happen?

8    A    Cierra's basement.

9    Q    And what was said?

10   A    Just basically he asked me did I want to take him up -- did

11   I think about taking him up on his offer and I said no, and he

12   asked about my older brother, Anthony Jackson.

13   Q    Not Michael Anderson?

14   A    No, not Michael.  Asked did he ever think about his offer,

15   and I told him I'll ask him and I'll get back to him.

16   Q    Did you ever get back to him?

17   A    No.

18   Q    Now, prior to meeting this girl shown in the photograph, I

19   believe you indicated some time in early 2007 --

20   A    Correct.

21   Q    -- did you ever hang out with the defendant over at Cierra's

22   house?

23   A    Yes.

24   Q    At that point in time what would you do when you would hang

25   out?

1    A    Smoke.

2    Q    Smoke what?

3    A    Marijuana.

4    Q    Where did the marijuana come from?

5    A    His -- him.

6    Q    Who is "him"?

7    A    Blyss.

8    Q    Now, other than the marijuana you smoked, did you ever see

9    any other marijuana in the house?

10   A    Yes.

11   Q    In relation to when you saw the defendant with the girl at

12   the gas station, how much time before did this happen?

13   A    About five months -- five or six months.

14   Q    So, five or six months prior to when you saw him at the gas

15   station?

16   A    Correct.

17   Q    What would you see in regard to marijuana?

18   A    I would see large amounts, small amounts.

19   Q    When you say large amounts, what are you talking about?

20   A    Large amounts, freezer ziplock bags filled with marijuana.

21   Q    I believe you were making a motion with your hand.  I

22   couldn't -- could you --

23   A    Large ziplock bags, the ones that you store meat in.

24   Q    Okay.  That you'd store meat in?

25   A    Correct.

1   Q   And could you make that -- could you show me with your

2   hands?

3   A   (Indicating.)

4           MR. FELTE:  Judge, may the record indicate it's about

5   12 inches by -- what was the --

6           THE WITNESS:  Probably a little shorter than 12 inches.

7   About 10.

8   BY MR. FELTE:

9   Q   About 10?

10          THE COURT:  Give or take.  All right.

11  BY MR. FELTE:

12  Q   And you mentioned smaller bags.  What did those bags look

13  like?

14  A   Smaller ziplock bags, sandwich bags, ones you would store

15  sandwiches in.

16  Q   Okay.  Now, what, if anything, would you see the defendant

17  doing with these bags of marijuana?

18  A   I would see him scale it, put it on scales.

19  Q   What kind of scales did you see?

20  A   There was a larger scale, one that you would weigh meat on.

21  It's fairly big, about 10 inches by six, has a circular tray on

22  the top.

23  Q   And what would he do with the marijuana on that scale?

24  A   He would just, you know, take it from the larger bags and

25  put it on the scale and transport it into the smaller ziplock

1   sandwich bags.

2   Q   Did you see any other scales?

3   A   Yes.  There was a smaller one, smaller black one about

4   four-by-five.  It was all black and had a silver square tray on

5   the top.

6   Q   What, if anything, was done with the smaller black scale?

7   A   I suppose to weigh smaller amounts.  I'd never seen it used.

8   Q   You only saw him use the big scale?

9   A   Yes.

10  Q   Okay.  How many times did you see the defendant do this as

11  far as with these bags of marijuana and weighing them on the

12  scale?

13  A   Excuse me.  Can you repeat that?

14  Q   How many times did you see this happen?

15  A   Actually using the scale, only once.

16  Q   Okay.  How many times did you see the large bags of

17  marijuana?

18  A   A couple of times.  About two.

19          MR. FELTE:  Thank you. Please answer any questions

20  counsel may have.

21                      CROSS-EXAMINATION

22  BY MR. TRAINOR:

23  Q   You go by Travis; is that correct?

24  A   That's correct.

25  Q   And you are the younger brother of Michael Anderson,

1  correct?

2  A   Correct.

3  Q   Also known as Shy Mike, right?

4  A   I've never heard of that.

5  Q   Never heard of that?

6  A   No.

7  Q   He's a pretty big guy?

8  A   Yes.

9  Q   And he would be best described as a friend of Mr. Royal's,

10 correct?

11 A   Correct.

12 Q   And you've known Mr. Royal through your brother Michael

13 Anderson --

14 A   Correct.

15 Q   -- for nine years at least, right?

16 A   Yes.

17 Q   And you knew Mr. Royal to be involved in rap --

18 A   Yes.

19 Q   -- music?  You would rap with him at times, wouldn't you?

20 A   There has been one time.

21 Q   Right.  You said you would hang out with Mr. Royal in

22 Cierra's basement; is that right?

23 A   Correct.

24 Q   So that would be when Cierra lived on Carousel Court,

25 correct?

1   A    Correct.

2   Q    522 Carousel Court?

3   A    I'm not sure of the number.

4   Q    But you lived across the street from Cierra's house on

5   Carousel Court?

6   A    Correct.

7   Q    And at the time that you would hang out with Mr. Royal at

8   Carousel Court, Cierra Young lived there with her daughter

9   Madison and with Lloyd Royal, correct?

10  A    Correct.

11  Q    So, just to be clear, when you hung out with Mr. Royal, you

12  hung out with him at Cierra Young's house on Carousel Court and

13  Mr. Royal was living in that house, correct?

14  A    Correct.

15  Q    And these conversations that you related to the court and

16  the jury, many of them took place at Cierra Young's house on

17  Carousel Court when Mr. Royal was living there, correct?

18  A    Correct.

19  Q    And all of these observations that you made about marijuana

20  at Carousel Court were made while Mr. Royal, Cierra and Madison

21  were living at that address, correct?

22  A    Correct.

23  Q    So, when you say you smoked marijuana at Cierra's house,

24  that would be when Mr. Royal was actually living there, correct?

25  A    Yes.

1    Q    Now, during the time that you've known Mr. Royal, you have

2    never seen him with a firearm, have you?

3    A    No.

4    Q    But your brother Michael keeps firearms, doesn't he?

5    A    Correct.

6    Q    And Michael had a .380 Bersa handgun, didn't he?

7    A    I'm not sure what type of gun it was.  I know he has a

8    handgun, though.

9    Q    He had several guns, didn't he?

10   A    No.  I only know about one.

11   Q    You only knew about one handgun.  Do you know what it looked

12   like?

13   A    Yes.

14   Q    It had a clip in the handle?

15   A    Correct.

16   Q    That was Michael's handgun that he kept at his house,

17   correct?

18   A    Yes.

19   Q    Now, the time frame of all this -- you told us about an

20   incident that you claim that happened at a gas station.  I think

21   you said it was a Shell station --

22   A    Correct.

23   Q    -- with your good friend Mike.  That's not your brother

24   Mike.  That's Mike Marshall, right --

25   A    Correct.

1  Q    -- a different Mike?  He was more your age?

2  A    Yes.

3  Q    And you said that happened in early 2007?

4  A    Correct.

5  Q    And that all these observations that you made about

6  marijuana and scales and the conversations you had at Cierra's

7  house all happened five to six months before you made that

8  observation, right?

9  A    Correct.

10  Q    That would have been some time in 2006, correct?

11  A    Yes, late 2006.

12  Q    And you're sure of those dates, aren't you?

13  A    I am sure.

14  Q    So you're saying that in 2006 Mr. Royal was living on

15  Carousel Court?

16  A    Correct.

17  Q    And you would see him there every time you went over there?

18  A    Yes.

19  Q    And he clearly had all of his things there and stayed there?

20  A    Correct.

21  Q    That's where he slept?

22  A    Yes.

23        MR. TRAINOR:  No further questions.

24        THE COURT:  All right.  Let's see if there's any

25  redirect questions.

1                          REDIRECT EXAMINATION

2      BY MR. FELTE:

3      Q    Mr. Melendez, how long did you hang out with the defendant

4      in total?

5      A    Total?

6      Q    Yes.

7      A    How long?

8      Q    Yes.

9      A    Within a day or all together --

10     Q    Well, no.

11     A    -- years?

12     Q    How long have you known him?

13     A    Well, I've known him for nine years.

14     Q    And then did you start hanging out with him after you met

15     him?

16     A    Not right after.  Years down the road.  About six years

17     later --

18     Q    About six years later?

19     A    -- after I met him.

20     Q    So, it was a few years later?

21     A    Yes.

22     Q    When you saw marijuana at Carousel Court, what did that

23     marijuana look like?

24     A    Green like a plant, like marijuana.

25             MR. FELTE:  Okay.  No further questions.

1          THE COURT:  All right.  Anything further?

2          MR. TRAINOR:  No, Your Honor.

3          THE COURT:  All right.  You may stand down, sir.  Thank

4    you.

5          Next witness, please.

6          MS. MAGNELLI:  Your Honor, Sergeant Chris Sakala.

7          THE DEPUTY CLERK:  Please raise your right hand.

8          CHRISTOPHER SAKALA, GOVERNMENT'S WITNESS, SWORN

9          THE DEPUTY CLERK:  State your name loudly and clearly

10   into the microphone and spell your last name for the record.

11         THE WITNESS:  Christopher Sakala.  Last name is

12   S-a-k-a-l-a.

13         THE DEPUTY CLERK:  Thank you.

14                      DIRECT EXAMINATION

15   BY MS. MAGNELLI:

16   Q   Sergeant, can you tell us where you are employed, please.

17   A   With the Montgomery County Police Department.

18   Q   And how long have you been employed there?

19   A   Since 1981.

20   Q   In what capacity, sir?

21   A   From 1981 to 1987 I was a patrol officer with the Silver

22   Spring District.  From 1987 to '89 I was assigned as a drug

23   investigator with our Narcotics Section.  From 1989 to 2005 I

24   worked for our Major Narcotic Conspiracy Unit.  And 2005 I was

25   promoted to sergeant, went back to patrol for two years, in 2007

1  came back to the unit I used to work in but now currently am the

2  supervisor for that unit.

3  Q   If my math is right, have you been a police officer for 29

4  years?

5  A   Yes.

6  Q   And of those 29 years have you been involved in narcotics

7  cases for 23?

8  A   Yes.

9  Q   Now, during your 23 years in narcotics investigations, did

10 you have occasion to run into different kinds of narcotics

11 cases, large and small?

12 A   Yes.

13 Q   And can you tell us about some of the cases that you've

14 seen?

15 A   I've worked just about every kind of case from the smallest

16 drug deal on the street to the largest traffickers, to

17 international traffickers, to even doing interviews with people

18 who are the lowest users in the food chain, couriers.  Just

19 about anybody associated with the drug trade I've had

20 investigations with or contact with.

21 Q   And were those investigations limited to Montgomery County,

22 Maryland?

23 A   No.

24 Q   Can you tell us some of the other states you've investigated

25 or your investigations have led you to?

1   A    Yes.  During my career I've been assigned with different

2   federal task forces.  Montgomery County is not a source area for

3   drugs.  So, any sizeable drug dealer you're going to investigate

4   in Montgomery County is going to take you almost immediately out

5   of the county.  Short area would be Washington, D.C., but you

6   soon find that your cases are going to go to New York, in the

7   early nineties, Miami, primarily now southwest border.  Canada

8   is even a source city, upstate New York.

9   Q    Can you just briefly explain to the jury what a source city

10  is?

11  A    With the exception of marijuana, there's not a whole lot --

12  there are no drugs that are manufactured in Maryland.  Cocaine

13  is manufactured out of the state and you're going to go back to

14  what we call source city where the drugs are imported into the

15  country.  Again, back in the early eighties and nineties, that

16  was primarily New York and Miami.  Primarily now it's the

17  southwest border of the United States and the border with Mexico

18  and the border with Canada where you see most of the

19  importation.

20          So, you're investigating a trafficker who has a source

21  of supply and usually that source of supply is moving closer to

22  that source city where the drugs are imported into the country.

23  Q    Can you tell us about some of the investigative techniques

24  you've employed in these numerous investigations?

25  A    Just about every investigative technique out there,

1  including direct buys, doing undercover work, buys with

2  informants, search warrants, surveillance, a lot electronic

3  interceptions, use of surveillance cameras, more recently GPS

4  trackers, analyzing phone records, bank records, financial

5  statements, talking to witnesses and cooperators, debriefing

6  defendants.  Any type of source of information or evidence you

7  can gather in a case you use.

8  Q   Have you experienced something called a hand-to-hand?

9  A   I'm sorry?

10 Q   What is a hand-to-hand?

11 A   A hand-to-hand is just a simple buy.  Literally the drugs go

12 from the hand of the trafficker to the person buying, whether

13 that's an undercover officer or a cooperating informant or just

14 somebody that you witness the hand-to-hand with.

15 Q   Sir, you mentioned search warrants.  How many search

16 warrants have you either obtained or been involved in, if you

17 know?

18 A   I've probably personally obtained over a thousand.  Involved

19 with, I couldn't even begin to estimate.

20 Q   These are all narcotics-related, correct?

21 A   Correct.

22 Q   Now, in the course of your 23 years have you come into

23 contact with different types of illegal controlled dangerous

24 substances?

25 A   Yes.

1   Q    What kind of drugs have you run into?

2   A    It runs the gamut, but marijuana, cocaine, base cocaine or

3   crack cocaine, PCP, heroin, methamphetamine, ecstasy,

4   pharmaceutical pills, hash, LSD, GHB.  Again, there's probably

5   not too many illicit new drugs that we haven't done cases on.

6   Q    And you mentioned interviewing individuals who are connected

7   into drug trafficking.  Why would you do something like that?

8   A    They're usually the best sources of information on the drug

9   trade, certainly on that particular drug organization.  You're

10  getting information directly from the people involved.  If you

11  think of it, if you want to know what goes on at a Wal-Mart, you

12  interview a Wal-Mart employee and they'll tell you what goes on

13  there.  So, if you're working a drug organization and you're

14  interviewing a principal member of that organization, that

15  person is in the best position to tell you how that organization

16  works.

17  Q    What kinds of things do you learn by talking to these

18  individuals?  Specifically, what subjects matter do you cover?

19  A    You get very basic, what kind of drugs are they selling,

20  what price are they selling at, where are they selling at, who

21  are the sources of supply, who are the customers, what's the

22  method of transportation, how they talk on the phone, what code

23  words they use.  Really, the more -- you can't do a thorough

24  enough debriefing on someone who's going to give you that kind

25  of information.

1    Q    Do you learn things about, when you say prices, the prices

2    for a certain quantity?

3    A    Correct.

4    Q    Do you also learn techniques that are being used to avoid

5    detection?

6    A    Yes.

7    Q    Through these interviews and through your investigations,

8    have you learned certain terms or slang, some of which might be

9    universal?

10   A    Yes.

11   Q    Can you tell us about some of those?

12   A    There are certain drugs -- if you take marijuana, the

13   nicknames are fairly common.  Almost anybody is going to know

14   them, reefer, bud, kine bud, Mary Jane, pot, skank weed.  I

15   mean, those are the kind of universal ones.  You may have other

16   terms that are very specific to a case.  You have two

17   individuals who will use a code word to mean something that

18   would only be known to those two people.  But there are a lot of

19   universal ones, too.

20   Q    Now, sir, have you had occasion to testify in court as an

21   expert in narcotics before?

22   A    I have, yes.

23   Q    Are you regularly consulted by prosecutors sometimes to get

24   opinions before a case is charged?

25   A    Yes.

1    Q   Can you tell us about some of those experiences where you've

2    been qualified or consulted?

3    A    In Montgomery County quite commonly a prosecutor before

4    indicting a case will talk to one of our expert witness, people

5    that the department has deemed an expert witness in narcotics,

6    to determine the appropriate charge in the case.

7    Q   Would that include you?

8    A   Yes.  And we do that on a routine basis.  It provides

9    guidance for the prosecutor on specific drug amounts or what

10   they may be dealing with, especially if they're not experienced

11   in narcotics.  And then we also provide expert witness testimony

12   in court when necessary.

13   Q   What about your testimony?  When have you been qualified as

14   an expert in narcotics before?

15   A    In the District and Circuit Courts of Montgomery County; in

16   federal court here in Maryland in Greenbelt and before this

17   courthouse opened, in Baltimore; in federal court in Washington,

18   D.C.; what's called the Eastern District of Virginia, which I

19   believe is Northern Virginia; and I also believe New York, Miami

20   and California.

21   Q   Now, have you ever sat in on witness testimony to help you

22   form an opinion?

23   A   Yes.

24   Q   And why would you do that?

25   A   When you're presenting an opinion, you try to gather as much

1  evidence as you can to make that a qualified opinion, and

2  frequently the evidence presented by witnesses you hear in court

3  is some of the best evidence you're going to hear because you're

4  usually hearing from witnesses who have firsthand knowledge of

5  what's going on.

6  Q   Is this the type of information that's regularly relied upon

7  in your field?

8  A   I'm sorry?

9  Q   Is this the type of information that an expert in your field

10  would regularly rely upon?

11  A   Yes, along with your experience and your knowledge of the

12  drug trade.

13  Q   And have you ever given an opinion converting, for example,

14  street prices into quantities or quantities into street prices?

15  A   Yes.

16  Q   Have you ever given an opinion with regard to whether or not

17  a particular quantity is consistent with personal use or

18  distribution?

19  A   Yes.  That's the routine opinion that's almost always what

20  you're asked to do is look at an amount of drugs or evidence

21  seized and is it personal use or something else, distribution or

22  possession with intent to distribute.

23  Q   Have you ever given an opinion as to whether the description

24  of the substance is consistent with what a particular narcotic

25  might actually be?

1    A    Yes.

2    Q    And, sir, when you're listening to the testimony to help you

3    formulate these opinions, what kinds of things are significant?

4    What's the basis of your opinion when drawing from witness

5    testimony?

6    A    You're looking to what the person is saying with an eye on

7    what you know to be the reality of the drug world.  You know,

8    for example, I think that all of us know generally what a car

9    might cost and if they were talking about buying a car and they

10   said that -- they were testifying that they bought a Toyota for

11   a million dollars, you might think that's not really what

12   happened, but if they talk about buying a car and they went down

13   to the local Toyota dealership and signed a contract for 25,000,

14   you would know that would be the ballpark price of a car.

15         You do the same thing with narcotics.  You know what

16   the prices are, how they're packaged, what they look like, you

17   know, the source areas for the period of time that they're

18   talking about and does that fit into the pattern of what you

19   know to be true based on your investigations and things you've

20   seen firsthand.

21   Q    And formulating opinions based on your knowledge, training

22   and experience, your 23 years out in the field and witness

23   testimony, these are the kinds of opinions you've offered as an

24   expert in court before?

25   A    Yes.

1      MS. MAGNELLI:  Your Honor, at this point the government

2  tenders the sergeant as an expert in narcotics trafficking,

3  especially with regard to terms, identification, pricing and

4  quantities.

5      THE COURT:  Let's see if Mr. Trainor has anything.

6      MR. TRAINOR:  No objection.

7      THE COURT:  No objection, no inquiry?  All right.

8  He'll be received as an expert in the areas you've designated.

9      MS. MAGNELLI:  Thank you, Your Honor.

10 BY MS. MAGNELLI:

11 Q   Sergeant, can you tell us a little bit about how drug

12 dealers run their businesses based on your 23 years.

13 A   Drug dealing is not any different than any other business.

14 They're in to it make money for the most part and they're taking

15 a quantity of drugs, whatever it is, and usually buying it at a

16 wholesale level or a bulk level, then breaking it down,

17 repackaging it and selling it in smaller quantities.  That way

18 they thereby make profit, and that profit can be in terms of

19 money, it can be in terms of extra product that they have that

20 they want to use for their own personal use.  But they're in it

21 to gain a profit just like any other business.

22 Q   And what is the significance of repackaging?

23 A   If you think of a large package of marijuana, say, a pound

24 package, which would come in a gallon size baggie, you would

25 take that down -- your average dealer would take it, break it

1   down into smaller quantities, maybe down to ounce bags or maybe

2   even smaller, and they can then sell their smaller quantities at

3   a price where they make more money on the pound.  So the pound

4   might cost them a thousand dollars for commercial grade

5   marijuana, but when they sell 16 ounces out of that pound or,

6   say, if they sell it for a hundred bucks a piece, then you're

7   looking at $600 profit.  They're taking larger amounts,

8   repackaging it, weighing it, and putting smaller amounts for

9   sale.  That's all they're doing.

10  Q   What, if anything, does the act of repackaging tell you with

11  regard to a particular individual?

12  A   Repackaging is something that is seen exclusively in people

13  who are trafficking in drugs.  Sellers -- excuse me -- buyers

14  who are using the drugs for their personal use, they don't

15  repackage drugs.  There's really no reason to do so.  So,

16  repackaging is something you see in traffickers, not in users.

17  Q   Now, what, if anything, have you learned in your experience

18  about how drug dealers might communicate with other individuals

19  in their network or use other individuals in the network?

20  A   I'm sorry.  I didn't catch the last part.

21  Q   How they communicate or use other people in their network.

22  A   Traffickers need other people around them to assist them in

23  the business and it can be done in any number of ways, but no

24  drug trafficker exists in a vacuum without the assistance of

25  other people.  Whether it's either a source or a customer as

1    just a very simple example, they need other people to assist

2    them.  Usually you'll see that in terms of they'll supply cell

3    phones in other people's names, cars will be in other people's

4    names, apartments rented in other names, stash locations in

5    other people's names.  They'll use all those people to assist

6    them.  It could be using people to buy money orders so they can

7    pay for things.  But generally you're going to have -- with any

8    trafficker you're going to have a ring of people around them

9    that will assist them in the drug business, either wittingly or

10   unwittingly.

11   Q    And what are some of the reasons that they do that?

12   A    The main reason is to avoid detection of law enforcement.

13   Back in the late eighties and early nineties when people had

14   pagers instead of cell phones but we would almost routinely see

15   the cell phone or pager that would be in the drug trafficker's

16   name.  Today we almost completely disregard the subscriber for a

17   phone because it's never in their name.  It's rarely even in a

18   real name or any name at all.  So, you have the people that

19   supply phones or get phones for the trafficker.

20   Q    And what is your experience with regard to how many phones a

21   trafficker might use?

22   A    Nowadays not only do they have multiple phones, but they

23   drop phones a lot.  They may use a phone for two, three months,

24   drop it, get another phone.  They may have two, three phones at

25   a time and deal with different customers on different phones.

1   They may have a phone dedicated solely to their source.  So,

2   multiple phones and changing phones a lot is pretty standard

3   operating procedure.

4   Q    You mentioned earlier stash locations.  What is that?

5   A    It's a location that's usually not directly tied to the

6   trafficker that the trafficker will use to secrete items that

7   are important to him or her, money, drugs, weapons, anything

8   along those lines.  Storage lockers is a common stash location,

9   but apartments, vacant apartments, apartments rented by somebody

10  else.  Anything can be used to secrete something that the

11  trafficker wants ready access to but doesn't want it easily tied

12  to him or her.

13  Q    What, if anything, is your experience with the portability

14  of a drug dealer's equipment and network?

15  A    A lot of traffickers, especially on the lower level,

16  basically their organization that they have is what they have on

17  their person, whether it's the money or drugs and they can move

18  from one house to another.  It makes it difficult when we're

19  doing investigation if you're trying to work on a trafficker

20  working out of a particular house and he might be working out of

21  this house one day, another house the next day.  So, a lot of

22  times they tend to be very nomadic or changing locations

23  frequently.

24  Q    Sir, I'm going to ask you about a few specific drugs at this

25  moment.  Are you familiar with marijuana?

1  A    Yes.

2  Q    And based on your knowledge, training and experience, can

3  you tell us some characteristics of marijuana, such as the

4  nickname, what it looks like?

5  A    Marijuana is a -- again, I think we went through some of

6  them -- weed, pot, Mary Jane, reefer, skunk, dope.  It could be

7  almost any probably hundreds of names.  But it's a plant,

8  actually a weed that is used and packaged to be smoked normally,

9  inhaled, sold in anything from gram quantities up to ton

10 quantities for the largest importers.  It comes in generally two

11 grades.  One is called commercial grade, which is your low level

12 quality of marijuana.  That could be a thousand dollars a pound

13 or more, 800, 1,200.  All the way up to high quality or high

14 grade marijuana and that could be up to four to $6,000 a pound.

15 Q    Can you tell me some of the ways marijuana or some of the

16 items that are used to smoke marijuana?

17 A    Usually it's something as simple as a pipe, a water pipe or

18 what's called a bong can be used, rolling papers to make hand-

19 rolled cigarettes or joints or J's, commonly as to, I guess, 10

20 years, 15 years what they call as a blunt or short for Phillie

21 blunt, but it's just a hand-rolled cigar.  So it's a bigger

22 hand-rolled amount of marijuana is a common way to ingest

23 marijuana.  And you can even bake it in brownies and eat it.

24 Q    Based on your experience or -- you just talked about a

25 blunt.  How much marijuana approximately can you fit into a

1   blunt?

2   A    That depends on again how big a blunt do you want to make,

3   but I usually see a few grams.

4   Q    And what about -- you mentioned a J is a cigarette; is that

5   correct?

6   A    It would be generally smaller because you're dealing with a

7   smaller amount.  You're dealing with cigarette rolling papers.

8   Q    And approximately how much marijuana could you fit into

9   that?

10  A    Maybe a gram or two.

11  Q    You described marijuana as a weed.  What color is it?

12  A    Usually it can go from anywhere from a very bright green for

13  the high quality marijuana to a brown for some of the more

14  commercial quality lower grade marijuana.

15  Q    What does it smell like?

16  A    Smells like marijuana.  It's, I guess, a pungent sweet

17  smell.

18  Q    Is it distinctive?

19  A    Yes, very distinctive.  Once you smell it, you really don't

20  forget it.

21  Q    And what types of effects does marijuana have?

22  A    It's a depressant, calming effect, some people would say

23  euphoric, also stimulates hunger.  A common characteristic

24  you'll see is that it gives people the munchies.  They'll get

25  something to eat.

1   Q   Now, sir, you've testified that it can come in freezer bags;

2   is that right, gallon size?

3   A   Yes.  Gallon freezer bag, that's the normal packaging for a

4   pound of marijuana, yes.

5   Q   And the smaller bags, what are they like?

6   A   Sandwich bags you can get, and then you can put anything

7   down to, you know, couple ounces to couple grams, a gram,

8   whatever you're weighing out.

9   Q   You said weighing out.  What other types of equipment does a

10  drug dealer use?

11  A   For marijuana?

12  Q   Yes, sir.

13  A   Primarily they're just going to use packaging materials and

14  a scale.  You could use a grinder to make the marijuana easier

15  to smoke, but generally you're just going to see -- not counting

16  people who are growing marijuana but just selling it, you're

17  just going to see your packaging materials and scales.  There's

18  really no cutting agent with marijuana.

19  Q   What are the typical quantities and prices for marijuana in

20  this area?

21  A   Anything from a gram to, you know, hundreds of pounds.  I

22  think the largest we saw was maybe a half ton in this area that

23  I've seen that we've seized, but I'm sure that if you wanted a

24  ton and knew the right people and had the money, you could

25  probably get it here.

1  Q   And the smallest types of amounts, what kind of prices and

2  quantities are we talking about there?

3  A   Again, depending on the quality of marijuana and what amount

4  you were buying, but, you know, 20 dollars for a dime bag,

5  hundred bucks for an ounce, $300 could be for a good once of

6  marijuana, seven, 800 for high quality.  It depends on your

7  relationship.  Price in the drug deal depends on your

8  relationship with your dealer and the quality of the drugs

9  you're buying.

10  Q   Sir, I'm going to turn your attention now to cocaine.  You

11  testified you're familiar with cocaine and crack cocaine; is

12  that right?

13  A   Yes.

14  Q   Based on your experience, what are some of the nicknames for

15  these substances?

16  A   When you're talking about powder cocaine, you're talking

17  about powder, snow, toot, blow, commonly referred to as girl.

18  Crack cocaine is -- usually rock is the most universal one,

19  hard.  Powder cocaine would be referred to as soft.

20  Q   And you've heard the term eight-ball?

21  A   Yes.

22  Q   What is that?

23  A   Eight-ball is a common street term for an eighth of an ounce

24  or 3.5 grams of cocaine.

25  Q   What kind?

1    A    It could be either one.  It primarily would refer to powder,

2    but you could also refer to an eight-ball as crack cocaine, too.

3    Q    Now, you mentioned powder cocaine and crack cocaine.  What

4    does powder cocaine look like?

5    A    What does it look like?

6    Q    What does it look like?

7    A    It's just a white powder.  In its more pure form, it can be

8    a hard, chalky substance before it's broken down, but primarily

9    a white powder.

10   Q    And what does crack cocaine look like?

11   A    It's a hard substance.  It's usually a little bit of an off-

12   white color.  If you picture macadamia nuts, that's kind of what

13   crack looks like.

14   Q    Why do they call it crack?

15   A    When you smoke it, it makes a crackling sound.

16   Q    And what are the ways in which powder and crack cocaine are

17   ingested?

18   A    There are two different ways.  For powder cocaine it's

19   absorbed through the bloodstream, usually inhaled through the

20   nose.  It's water soluble.  So it can be mixed with water and/or

21   heroin and shot into the veins, injected.  Crack cocaine is

22   converted.  So it can be burned and that way the fumes are

23   actually inhaled.  It's not water soluble.  Crack cocaine is

24   primarily used with some type of heat source, a lighter, and

25   smoked.

1    Q    Okay.  And when you snort a line of cocaine, what does that

2    mean?  Can you describe what that is to the jury?

3    A    Yes.  If you take a -- primarily a line of cocaine is put on

4    some type of a solid surface, usually glass or mirror, and a

5    line or several lines of cocaine -- if you picture little worms

6    or little tiny snakes are cut out on the mirror or the glass and

7    then the person will normally inhale that line using a straw or

8    a rolled up dollar bill.  They can even inhale it directly into

9    their nose and that's called doing lines.

10   Q    What is the most common way to inhale the smoke from crack

11   cocaine?

12   A    Probably a pipe but, you know, you can make a pipe out of

13   almost anything.  You could make it out of a folded up tin can,

14   punch a few holes in it and that'll work, too.  But a glass pipe

15   is what you see.  But you can do it on probably -- you can do it

16   on a piece of tin foil.

17   Q    All right.  What types of effects does cocaine have?

18   A    It's a stimulant.  It makes people high, more activated.

19   You hear -- I think we heard testimony about people staying up

20   for a long period of time doing cocaine.  That's what you

21   normally get with cocaine whereas, again, marijuana would be

22   more of a mellow drug.

23   Q    Does cocaine sort of have an adrenaline-like effect?

24   A    Very much so, yes.  It's a stimulant.

25   Q    And how does cocaine come packaged generally?

1   A    Powder cocaine in its import form is packaged into bricks

2   called kilograms.  It's 2.2 pounds of weight.  And from that

3   point it's broken down usually into packaging materials, plastic

4   baggies.  Depending on how far you're breaking it down, it can

5   be gallon size zip bags.  When you get down to eight-balls and

6   grams, it's typically in a corner of a plastic bag which is

7   knotted and torn off.  But that's primarily -- when you get down

8   to gram quantities that we don't seem as much any more, they

9   have what's called snow seals, which is just a pharmaceutical

10  envelope that's folded, a piece of paper that's folded to keep

11  the cocaine from running out, but that's probably not as

12  prevalent as it has been in the past now days.

13  Q    What about crack, how does crack come?

14  A    Crack can be packaged in almost anything.  You can see it in

15  glass vials.  You can see it in plastic baggies.  I can hand you

16  a piece of crack because, you know, the powder is not running

17  through my fingers.  I could wrap it in a tissue.  It can be in

18  just about anything.  It can -- anything, really.  It's not like

19  powder cocaine where you've got to worry about the powder going

20  everywhere.

21  Q    What other equipment might a drug dealer use with cocaine?

22  A    In addition to -- like we talked with marijuana, you could

23  have scale, but unlike marijuana you have a cutting agent, which

24  is usually some type of inert white powder and typically a

25  trafficker is going to mix the inert white powder and he'll take

1   his one ounce of cocaine that he bought and he might make 1.5

2   ounces or 1.2 or two ounces, however much he wants to cut it,

3   and then he'll weigh it out again and repackage it.

4   Q    Sir, if you know, how do you cook cocaine into crack?

5   A    It's a relatively simple process, though it does get -- you

6   know, people do tend to mess it up sometimes.  It's the

7   application of heat to cocaine powder with water and baking soda

8   sometimes.  It's typically done now days in a microwave or a

9   Pyrex dish.  Used to be way back when it would be on the stove,

10  but I think most traffickers take the simple route now and cook

11  it in a microwave.

12  Q    What are some typical weights and prices for cocaine in this

13  area?

14  A    Recently -- actually, since the crackdown in Mexico, the

15  price has really skyrocketed in this area on cocaine.  Kilograms

16  are probably in the mid -- low to mid $30,000 range.  The basic

17  price for -- if you look at all the time in the last 20 years if

18  you want -- the base unit for cocaine is a gram of cocaine and

19  if you want to figure out what cocaine is worth, a hundred

20  dollars a gram is always a good, you know, benchmark to use.  It

21  might be sometimes 80 dollars, sometimes 120, but around a

22  hundred dollars a gram down at the street level price.

23  Q    Would 60 to a hundred dollars for a cram of cocaine be

24  consistent with what you know?

25  A    Sure, sure.  And generally right now I think the gram prices

1  are probably a little lower.  I don't know that the quality is

2  all that good.  But generally right now the gram prices are a

3  little lower.

4  Q   What about an eight-ball?  How much is in an eight-ball?

5  A   That's 3.5 grams.  That's an eighth of an ounce of cocaine

6  and you could see a low price, say, in D.C. or parts of Prince

7  George's County might see 125, 135.  You might go to northern

8  Montgomery County 275, 300.  Frederick County, maybe it could be

9  a little over 300.  So, it depends on where you're buying it.

10  But you could go from 125 to 275 depending on where you're

11  buying or what quality you're buying.

12  Q   So, is it consistent with your knowledge, training and

13  experience that an eight-ball going for 120 or $160 in

14  Montgomery County?

15  A   Oh, sure.

16  Q   Is that consistent?

17  A   Oh, sure.

18  Q   Sir, I'm going to ask you if we could turn now to PCP for a

19  few minutes.  What does that stand for?

20  A   Phencyclidine.

21  Q   And based on your experience, what are some nicknames for

22  this substance?

23  A   Water, embalming fluid, boat, love boat, green, angel dust.

24  I'm sure there's a few more, but those are the ones that most

25  everybody knows.

1   Q    Have you ever heard the term cigarette or dipper?

2   A    Yes.

3   Q    And what does that refer to?

4   A    A dipper is a cigarette dipped in PCP and smoked, liquid PCP

5   and smoked.

6   Q    Same as cigarette?

7   A    Using a cigarette, yes.

8   Q    And what does it look like?

9   A    PCP is a clear liquid, looks like water.  It's got the same

10  consistency as water.

11  Q    And what, if any, smell does it have?

12  A    It's got a very, very distinctive chemical odor.  Again,

13  once you smell it, you'll never forget it.  Gives me a headache

14  immediately smelling it.

15  Q    What is it most often compared to?

16  A    Compared to?

17  Q    The smell.

18  A    A lot of people call it different things, but one of the

19  things you hear is embalming fluid and you hear ether every once

20  in a while, but I don't think it really smells like ether.

21  Q    Does it have a strong chemical odor?

22  A    Very, very strong chemical odor.

23  Q    And you mentioned cigarettes.  Can you tell me how you get

24  PCP on a cigarette?

25  A    Just dip the cigarette in the PCP liquid and smoke it.  It's

1   absorbed.

2   Q    What effects does PCP have?

3   A    PCP is a hallucinogenic.  It's a disassociative drug.  It

4   can result in very strong reactions to the user.  Loss of

5   memory, violent outbursts are not uncommon at all.  It's a

6   hallucinogenic.

7   Q    And how does it come packaged?

8   A    Generally in its liquid form -- it can come in powder or

9   pill but generally in its liquid form it's in some type of glass

10  container.  Early nineties, late eighties, vanilla extract

11  bottles were very common.  Now days you mostly see it in glass

12  jars or vials that you typically see in the lab.

13  Q    What are the typical quantities and prices for PCP in this

14  area?

15  A    In this area, for an ounce of PCP you'd see between three

16  and $400 up to, you know, a soda bottle, which is 16 ounces

17  would be considerably more and we really don't see a lot of

18  gallon size sales of PCP lately, but that obviously would be

19  quite a bit more.  But you'd get for a marijuana dipped

20  cigarette maybe 20 dollars, 50 dollars.  Again, it depends on --

21  unlike marijuana and cocaine, whoever is making the PCP, you

22  could have a vastly different reaction or quality because it's

23  made in a lab and different chemists will be using it different

24  ways.  The quality of the PCP is really going to depend on the

25  price.

1   Q   And based on your knowledge, your training and experience,

2   how much would a quarter ounce go for?

3   A   A quarter ounce?

4   Q   Yes.

5   A   It could go anywhere from a hundred to 150.  I don't think

6   it could go 200 but, you know, a hundred bucks would probably be

7   a good ballpark.

8   Q   Sir, I'm going to show you a few items.  I'm going to put

9   them on the ELMO so it will be on your monitor.  I'm going to

10  show you what's been marked as Carousel Court 5.  I'm going to

11  take one vial.  Do you see that, sir?

12  A   Yes.

13  Q   Based on your knowledge, training and experience, have you

14  ever seen anything like this before?

15  A   Yes.  It's your typical glass vial we were just talking

16  about.

17  Q   And when you say typical glass vial, what are you referring

18  to?

19  A   The ones we were just talking about that are commonly used

20  for packaging of PCP liquid.

21  Q   Sir, I'm going to show you the entire contents of this box,

22  to the best of my ability.  Do you have an opinion as to whether

23  there's anything significant about this box that would indicate

24  consistency with personal use or distribution?

25         MR. TRAINOR:  Objection.

1        THE COURT:  Overruled.

2        THE WITNESS:  This would be consistent with

3   distribution.  There would be no reason for someone to repackage

4   their own liquid PCP.

5   BY MS. MAGNELLI:

6   Q   Sir, I'm going to show you two additional photos.  I'm going

7   to show you what's been marked as Photo 18.  Based on your

8   knowledge, training, experience, is there anything significant

9   about the way this item looks?

10  A   I think we talked about the common way to package powder

11  cocaine earlier.

12       MR. TRAINOR:  Objection.

13       THE COURT:  Do you want to come and put something on

14  the record?

15       MR. TRAINOR:  Yes, Your Honor.

16       (At the bench:)

17       THE COURT:  Yes, sir.

18       MR. TRAINOR:  Your Honor, my objection to Carousel

19  Court 5 and to Photo No. 18 is that in the disclosure, the Rule

20  16 disclosure, this witness gave categories of things he would

21  testify about.  These opinions were not disclosed prior to trial

22  and I think we're entitled under the rules of evidence and under

23  the discovery rules to have his opinion prior to trial.  We were

24  told he would testify about terms and practices but never told

25  what his opinion was.

1        THE COURT:  Well, I don't have the disclosure here.  I

2   mean, I haven't seen it.  But what do you have to say?

3        MS. MAGNELLI:  Your Honor, quite clearly he was going

4   to give opinions.  He's not going to give an opinion as to what

5   is in the bag, just that the packaging is consistent, and I

6   think he can do that.

7        MR. TRAINOR:  There was no notice that he was going to

8   give that opinion.

9        THE COURT:  What did you think he was going to testify,

10  what opinion?

11       MS. MAGNELLI:  Your Honor, he also knew this witness

12  was going to sit in on witness testimony.  He was going to form

13  opinions based on witness testimony.

14       THE COURT:  I'm just trying to get an idea of what did

15  you think he was going to be an expert on.

16       MR. TRAINOR:  He's an expert on drugs, but I'm entitled

17  to know what his opinion is before trial.  I'm hearing his

18  opinion now for the first time.  And it's not for the defense to

19  guess what his opinion might be.  It's for the government to

20  disclose it and it hasn't been done in this case.

21       THE COURT:  All right.  Anything else?

22       MR. TRAINOR:  That's all I have.

23       THE COURT:  All right.  I believe that what he has

24  supplied and what he was engaged for here today includes what he

25  has just opined, and I think it's a reasonable -- it would be

1   reasonable for all parties to assume that these were the kinds

2   of things and opinions that he would be testifying to.  I think

3   it's adequately covered in the Rule 16 disclosure the government

4   gave on the general expert relative to this detective in the

5   area of drug trafficking, drug packaging, et cetera.  So, I

6   think it's a reasonable basis for him to make these opinions.

7          And, furthermore, Mr. Trainor, I don't believe you were

8   ambushed or prejudiced in any way by these things that he was

9   going to testify to.

10          MR. TRAINOR:  I understand the court's ruling.  Just so

11  we don't have to come back again, there may be other questions

12  like this.  When I object, that would be the basis of my

13  objection.

14          THE COURT:  And the court will make sure that the

15  record reflects your objection to any additional opinions along

16  these lines.

17          MR. TRAINOR:  Thank you, Your Honor.

18          THE COURT:  All right.  Thank you.

19          (In open court:)

20          THE COURT:  All right.  Overrule the objection.

21  BY MS. MAGNELLI:

22  Q   Sir, based on your knowledge, training and experience, is

23  this packaging consistent with anything?

24  A   Yes.

25  Q   What is it?

1    A    Again, as we talked about earlier on how you package

2    cocaine, putting it in the corner of a plastic baggie, tying a

3    knot and tearing it off, that would be what it looks like.

4    Q    I'm going to show you what's been marked as Photo 19.  Now,

5    without giving me an opinion as to what exactly this is, is

6    there anything about this photo that is significant with regard

7    to drug trafficking?

8    A    Yes.

9    Q    What is significant in this photo?

10   A    The object next to the money, the white object again appears

11   to be packaged the same way with the corner of the plastic

12   baggie torn off and tied in a knot, and then the other substance

13   would have the appearance of marijuana.

14   Q    And, finally, sir, I'm going to show you what's been marked

15   as Carousel Court 1d.  Is there anything about this photo that

16   is significant to you with regard to your knowledge, training

17   and experience in drug trafficking?

18   A    Yes.

19   Q    What in this photo is significant to you?

20   A    The "Scar Face" poster on the left wall.

21   Q    Why is that significant?

22   A    The overwhelming majority of search warrants we have done,

23   especially in the last five or 10 years, all have references to

24   the movie "Scar Face."

25              MR. TRAINOR:  Objection.  Move to strike.

1          THE COURT:  Yes, I'll strike that.  I'm not sure it's

2   particularly relevant.  Sustain the objection.

3   BY MS. MAGNELLI:

4   Q   Sir, did you sit in and listen to testimony throughout this

5   case?

6   A   On some of the witnesses, yes.

7   Q   Yes.  Did you have occasion to listen to a witness by the

8   name of Shantia Tibbs?

9   A   Yes.

10  Q   And how well could you hear her testimony?

11  A   She was soft-spoken, but I could hear her pretty well.

12  Q   And where were you sitting during these testimonies?

13  A   The second row behind the government's table.

14  Q   How often did you leave the room during the five testimonies

15  you listened to or the five testimonies that I'm going to ask

16  you about?

17  A   I heard all their testimony.

18  Q   And right now I'm going to direct you to Ms. Tibbs again.

19  Based on your training and experience, was there anything

20  significant to you in her testimony with regard to drug

21  trafficking?

22          MR. TRAINOR:  Object.

23          THE COURT:  Yes.  Make a proffer.  You've got to make a

24  proffer on that.

25          (At the bench:)

1          THE COURT:  That's real general.  I'm not sure where

2    you're going.  Make a proffer so we'll know.

3          MS. MAGNELLI:  Your Honor, with regard to all these

4    five testimonies, Sergeant Sakala sat in on the testimony.  He

5    heard them describe the substance.  He heard them describe the

6    packaging.  He heard quantities.  He heard prices.  And he's

7    going to give opinions as to whether it's consistent with what

8    he knows marijuana looks like, he knows prices to be, he knows

9    quantities to be, what a pound of marijuana might sell for.  So,

10   it's all these witnesses' testimony and saying whether or not

11   they're consistent with what he knows or doesn't know.

12         THE COURT:  That to me is tantamount to him testifying

13   to their veracity, whether they're telling the truth or not.

14   The jury heard their testimony and they heard what he said.

15   What more can he add?

16         MS. MAGNELLI:  Well, Your Honor, there are some witness

17   who just testified about, you know, it was in a large gallon

18   size bag, and this expert can then say, well, that's going to be

19   about a pound, it's going to cost about this much.  So, there

20   are definitely some things I feel he's going to add to it.

21         THE COURT:  Well, do you want to say something?

22         MR. TRAINOR:  Your Honor, I don't know who these five

23   witnesses were.  They could not possibly have been disclosed

24   prior to trial, and they were not.  I think it's tantamount to

25   testifying that the defendant is guilty.

1        THE COURT:  He's not going that far.  But, again, if

2   you have some general categories such -- as I remember they

3   testified about a blunt, they testified about packaging, some

4   prices, you know, if you can just kind of generalize that all

5   the witnesses mentioned that and say what is that indicative of,

6   I mean, that's fine, but --

7        MS. MAGNELLI:  I can restrict him to price and

8   quantities but, for example, Mr. King just testified that he

9   bought one to $600 a week of cocaine and he doesn't always give

10  an amount and I can have the expert confirm that.

11       MR. TRAINOR:  He said he bought one to seven grams.

12       MS. MAGNELLI:  But I also believe there are things like

13  Crystal Brown who said she loaned this guy $2,500 and she

14  doesn't know how much he bought for that, and that would be an

15  amount that the sergeant can testify about.

16       THE COURT:  Ms. Magnelli, I don't know if that's

17  necessary.  The jury has heard her testimony that she gave him

18  $2,500 to go to New York, go to Queens and get something.  So,

19  what is unclear about that?  What's unclear about that?  How is

20  her testimony unclear?

21       MS. MAGNELLI:  Because he can cover prices to

22  quantities and quantities to prices and we can get a further

23  understanding of whether these -- what exactly we're talking

24  about, how much PCP, how much cocaine, how much marijuana.  If

25  the court says he can't testify about the marijuana, then I'll

1  just limit him, because he's testified about general matters,

2  but this is --

3          THE COURT:  I would prefer that you limit his

4  testimony.  Your theory is that the jury needs a further

5  explanation.  That's fine.  He can testify to that, but any and

6  everything that these witnesses testified that he's going to say

7  is indicative of drug trafficking or whatever, I just don't

8  think it's appropriate.

9          MS. MAGNELLI:  That's fine.  I would just note for the

10  record, though, that Mr. Trainor knew at the beginning -- he

11  knew that the expert was going to sit in throughout the trial

12  and listen to testimonies.  So, he was on notice that this was

13  going to happen.  It's not like he was ambushed with regard to

14  this.

15          THE COURT:  I've already mentioned he wasn't ambushed.

16  I understand that.  But I'm just wondering about the need to get

17  into all this.

18          MS. MAGNELLI:  I understand.

19          MR. TRAINOR:  Your Honor, I was told that he would sit

20  in the courtroom and form his opinion and in my papers I

21  complain about that, because it's inappropriate for him to form

22  an opinion that wasn't disclosed prior to trial.

23          THE COURT:  All right.  Well, with my admonition and

24  instructions to limit the testimony and limit it down to a few

25  questions that clearly will help the jury, we'll let you

1   proceed.

2           MS. MAGNELLI:  Okay.

3           THE COURT:  All right.

4           (In open court:)

5           MS. MAGNELLI:  Court's indulgence one moment.

6   BY MS. MAGNELLI:

7   Q   Sir, if we could go back to marijuana.  You were sort of

8   telling us about packaging of marijuana and how it might come.

9   Do you recall that?

10  A   Yes.

11  Q   Okay.  I just want to ask you a few more specific questions

12  about that.  What are some of the -- we were talking about

13  freezer ziplock bags.  Do you recall that?

14  A   Yes.

15  Q   Based on your knowledge, your training and experience, how

16  much can a ziplock bag hold of marijuana?

17  A   A gallon ziplock bag or a freezer bag is one pound of

18  marijuana.

19  Q   And, sir, you were testifying earlier about source cities

20  and you mentioned New York.

21  A   Yes.

22  Q   And you mentioned one of the reasons people would go to New

23  York is because that's closer to where the items are coming into

24  the country; is that correct?

25  A   Well, they go to New York because it's cheaper.  They're not

1   paying for transportation from New York to Maryland.  So, you

2   get the drugs cheaper.  You make more money.

3   Q   What kind of prices do you see with drugs coming from New

4   York?

5   A   What drug?

6   Q   Let's say cocaine.

7   A   Just to take, like, currently if you look at a price of 30

8   to 35,000 a kilogram of cocaine, New York you could probably get

9   it in the high twenties.  So, for the inconvenience or risk of

10  driving up and down the New Jersey Turnpike, you might save, you

11  know, four or $5,000.

12          MS. MAGNELLI:  Court's indulgence.

13  BY MS. MAGNELLI:

14  Q   Sir, if I could ask you just a couple more questions on

15  phencyclidine.  You were testifying that people put it on

16  cigarettes?

17  A   Yes.

18  Q   Based on your knowledge, training and experience, do you

19  have any idea how much PCP a cigarette can hold?

20  A   I'm sure if you left it there to absorb, it could probably

21  hold a little bit more but depends on how long you're leaving it

22  there to absorb and also how it's applied.  It can also be

23  sprayed, which is commonly done on parsley and marijuana as

24  opposed to dipped.  So it could be if you leave it there for a

25  short period of time -- there's no way to really estimate that,

1   no.

2   Q   Okay.  So, with regard to a dipped cigarette, it can have

3   different levels of saturation?

4   A   Oh, sure, sure.

5   Q   And, again, a typical vial for PCP is going to hold

6   approximately what kind of quantity?

7   A   The normal -- obviously it depends on the size of the vial,

8   but normally what we see is one-ounce vials, but I think those

9   we were looking at were half that.  So, just depends on what

10  size the vial is, what quantity of drugs you're selling.

11  Q   And a half ounce would go for, based on your testimony

12  about, $150?

13  A   150, one to 200, again, depending on the quality, who you're

14  dealing with, where you're making the purchase at.

15       MS. MAGNELLI:  Nothing further.  If you would answer

16  his questions.

17                     CROSS-EXAMINATION

18  BY MR. TRAINOR:

19  Q   Good afternoon, sir.

20  A   Good afternoon.

21  Q   It is afternoon.  Other than the opinions you expressed in

22  the case, you had no involvement with the investigation of this

23  case, did you?

24  A   I did not, no.

25  Q   And these prices that you opined on during your testimony

1  are prices based on current conditions, correct?

2  A    I think that's what I was asked about, yes.

3           MR. TRAINOR:  No further questions.

4           THE COURT:  All right.  Government, do you have

5  anything else?

6                    REDIRECT EXAMINATION

7  BY MS. MAGNELLI:

8  Q    Do you have experience about the prices in 2007?

9  A    Sure.

10 Q    And do those opinions vary widely between your opinion today

11 or your opinion in 2009 and your opinion from 2007?

12 A    No.  Prices were much cheaper in 2007.

13           MS. MAGNELLI:  Nothing further.

14           THE COURT:  All right.  Mr. Trainor?

15           MR. TRAINOR:  Nothing, Your Honor.

16           THE COURT:  All right.  Thank you.  You may stand down.

17           THE WITNESS:  Thank you, Your Honor.

18           THE COURT:  Is there another witness?

19           MS. MAGNELLI:  Your Honor, if we may approach.

20           THE COURT:  Yes.

21           (At the bench:)

22           MS. MAGNELLI:  Your Honor, we just have some

23 housekeeping matters with regard to court exhibits and then the

24 government is going to rest.

25           THE COURT:  All right.  I guess we'll go ahead and let

1  you take care of -- what housekeeping matters do you have?

2  Something before the jury?

3      MS. MAGNELLI:  No.  They're court exhibits just to

4  preserve the record, nothing to go back to the jury.

5      THE COURT:  All right.  Okay.  And you have no more

6  witnesses?

7      MS. MAGNELLI:  That's going to be it.

8      THE COURT:  All right.  So you will rest.  And you'll

9  make whatever motions you want to make and then we'll send the

10 jury out and come back.  Are you ready to start your case?

11     MR. TRAINOR:  Just about.  I need some minutes with my

12 client in private and I have to talk -- frankly, I believe he

13 will not testify, but I need to confirm that.  And there may be

14 one relatively brief witness, but I'd like to have a few minutes

15 to consider that.

16     THE COURT:  All right.  We'll do that that before

17 lunch.  You can do that before -- well, we're going to break

18 here in a minute just as soon as the government has rested and

19 then I'll let the jury go and come back at two.  We'll have

20 about 20 minutes.  We can talk about your motion and then the

21 remaining time you can have with your client and make your

22 decision.

23     MR. TRAINOR:  That will be perfect.  Thank you, Your

24 Honor.

25     THE COURT:  All right.  Okay.

1          (In open court:)

2          THE COURT:  All right.  Do you have any further

3   witnesses?

4          MS. MAGNELLI:  No, Your Honor.

5          THE COURT:  All right.  So the government is now

6   resting their case, ladies and gentlemen, and at this point

7   we'll just go ahead and take a lunch break, be back at two.  I

8   will tell you the defense, and that will be my instructions, has

9   no burden at all.  They don't have to put anything on if they

10  don't what to.  They may, but they'll make that decision

11  themselves.

12         And so, at this point we will go ahead and take a

13  rather long lunch break because I've got legal motions I've got

14  to address with the attorneys.

15         All right.  We'll see you back at 2 o'clock.

16         (Jury excused for the luncheon recess.)

17         THE COURT:  All right.  Let's be seated.

18         MS. MAGNELLI:  Your Honor, just some housekeeping

19  matters.

20         THE COURT:  Yes.

21         MS. MAGNELLI:  Just to preserve the record, Your Honor,

22  the government has a few court exhibits, clearly not to be

23  published to the jury, just for housekeeping to maintain the

24  record.  I believe there's no objection by Mr. Trainor.

25         These will be Government's -- or Court Exhibit Royal

1   2a.  It's just a picture of the watch.  There will be Cross

2   Country Place 2a and 2b, which were photographs of the address

3   book, the floral address book that is already in evidence, and

4   photographs Cross Country Place 3a, 3b, 3c, and 3d, which are

5   photographs of the black address book already in evidence.

6        Your Honor, that would be it in terms of housekeeping.

7        THE COURT:  All right.  And, of course, at some point

8   we have certain items that simply do not go back.  We don't let

9   weapons go and back, and any other matters they want to see they

10  can come back and see.

11       All right.  So, Mr. Trainor, the government has now

12  rested.  Do you have any motions under Rule 29 you wish me to

13  consider?

14       MR. TRAINOR:  Your Honor, I will make a motion for

15  judgment of acquittal as to all counts.  I understand that the

16  court views the evidence now in the light most favorable to the

17  government, but generally we will argue that the evidence is

18  insufficient to sustain a conviction on all counts, and other

19  than that we'll submit.

20       THE COURT:  All right.  Well, as you have correctly

21  noted, the court has to look at the evidence at this point in

22  the light most favorable to the nonmoving party and that's the

23  government in this case, and when I look at these eight counts

24  in this second superseding indictment, it appears as though the

25  government has presented sufficient evidence to warrant the

1   court denying the motion.

2          Again, a lot of these -- a lot of the testimony or

3   things that we have heard here in the last five days all go to

4   weight, but I think the government has presented sufficient

5   evidence on each of the eight counts to prevent me from taking

6   this matter from the jury.  I'm not able to do that legally or

7   factually.  So the motion will be denied, Mr. Trainor.

8          All right.  So, Mr. Trainor needs, mister marshals, a

9   few minutes with his client.  We will ask the government and the

10  witnesses to leave the defense here for a few minutes.  They can

11  discuss what witnesses they wish to bring up and we'll see you

12  back here at 2 o'clock.

13         (Luncheon recess at 12:45 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1               AFTERNOON SESSION               (2:10 p.m.)

2          THE COURT:  All right, Mr. Trainor, yes, sir.

3          MR. TRAINOR:  Your Honor, I just looked for my witness

4     and she is not out there at the moment.

5          THE COURT:  All right.

6          MR. TRAINOR:  I talked with her over the lunch hour.

7     We're going to only present one witness.

8          THE COURT:  All right.

9          MR. TRAINOR:  May I step out and --

10         THE COURT:  You want to step out?  Yes, go ahead.  Step

11    out.  There's no point in bringing them.  Don't bring the jury

12    in yet.

13         (Pause.)

14         THE COURT:  Still waiting?

15         MR. TRAINOR:  Your Honor, I told the witness to be here

16    at 2 o'clock.

17         THE COURT:  We'll wait a few minutes.

18         While we're waiting, are we ready to go with our

19    closings?

20         MR. TRAINOR:  What we were hoping is that we could have

21    a conference on the instructions --

22         THE COURT:  First?

23         MR. TRAINOR:  -- and then maybe close in the morning.

24         THE COURT:  All right.  Okay.  We can do that.  All

25    right.

1           MR. TRAINOR:  I think we are both on the same page.

2           THE COURT:  Are you all in agreement with that?

3           MS. MAGNELLI:  Yes, Your Honor, we are.

4           THE COURT:  Okay.  Mr. Trainor, will you have your

5   client make some representations on the record with reference to

6   his testifying or not testifying so we'll know?

7           MR. TRAINOR:  I'll be happy to do that now.

8           THE COURT:  Yes, let's go ahead and do that now.

9           MR. TRAINOR:  Mr. Royal, do you understand that you

10  have the absolute right to testify in this case?

11          THE DEFENDANT:  Yes, I do.

12          MR. TRAINOR:  And have we talked about that on numerous

13  occasions?

14          THE DEFENDANT:  Yes, we have.

15          MR. TRAINOR:  Have I answered all your questions about

16  your decision to testify or not to testify?

17          THE DEFENDANT:  Yes, you have.

18          MR. TRAINOR:  Do you have any questions now about that?

19          THE DEFENDANT:  No.

20          MR. TRAINOR:  Have you made a decision regarding

21  whether you wish to testify in this case today?

22          THE DEFENDANT:  Yes, I have.

23          MR. TRAINOR:  What is that decision?

24          THE DEFENDANT:  Not to.

25          MR. TRAINOR:  Are you certain of that?

1           THE DEFENDANT:  Yes, I am.

2           THE COURT:  Do you have any questions to the court as

3    to whether you should testify or not?  Any questions to me?

4           THE DEFENDANT:  No, I don't.

5           THE COURT:  All right.  So he has decided not to

6    testify.  And we'll certainly make an appropriate instruction to

7    the jury to that effect.

8           All right.  We'll just wait a few more minutes and

9    we'll let the jury go home just as soon as we hear this

10   testimony.

11          MR. TRAINOR:  Yes.  And this actually should not take

12   very long.  I predict 20 minutes or less overall.

13          THE COURT:  Is this your client, Mr. Tuminelli?

14          MR. TUMINELLI:  I'm sorry, Your Honor?

15          THE COURT:  Is this your client testifying?

16          MR. TUMINELLI:  No.

17          THE COURT:  You're just here observing?

18          MR. TUMINELLI:  I just thought I could learn something

19   from Ms. Magnelli.

20          MR. TRAINOR:  Your Honor, may I step out again?

21          THE COURT:  Yes, go ahead.

22          (Pause.)

23          THE COURT:  Mr. Trainor, yes, sir.

24          MR. TRAINOR:  Your Honor, I have just looked through

25   the courthouse.  I met with the defendant's mother over the

1    lunch hour.  I last saw her actually about 1:30.  Her daughter

2    said something about going to the bank in the half hour they

3    had.

4              THE COURT:  Do you have a cell number?

5              MR. TRAINOR:  Maybe I do.

6              MS. MAGNELLI:  We probably do.

7              MR. TRAINOR:  I think I have one, yes.

8              THE COURT:  Why don't you go ahead and call and see if

9    they're on the way back or whatever.  I'll tell the marshals

10   that we'll just take a little short break.

11             MR. TRAINOR:  Let me see if I can reach her by cell

12   phone.  May I step out to do that?

13             THE COURT:  All right.  We'll wait.  I'll give you

14   another few more minutes and then we'll decide whether we're

15   going to take a break and wait.

16             MR. TRAINOR:  Thank you, Your Honor.

17             (Pause.)

18             MR. TRAINOR:  Your Honor, I connected.  What happened

19   is they went out to the bank and got involved -- they were not

20   in an accident, but they were behind an accident.  The road is

21   blocked.  They feel that they're five minutes away --

22             THE COURT:  All right.

23             MR. TRAINOR:  -- from the courthouse, which probably

24   means 10 minutes.

25             THE COURT:  Okay.

1          While we're waiting, anything about the instructions?

2    I did download the proposed limiting instruction.  I don't know

3    if the government has had a chance to see that.  Some of the

4    requests we can talk about, but certainly there seems to be a

5    missing reasonable doubt instruction.  I don't think the

6    government submitted one.

7          MR. TRAINOR:  Well, we are asking for it.

8          THE COURT:  Yes.  I'm not sure the government submitted

9    one.  I haven't looked at it that closely, but I didn't see one

10   in the government's submission.

11         MR. TRAINOR:  There is a presumption of innocence and

12   burden of proof.  We submitted a --

13         THE COURT:  Did the government say anything about

14   presumption of innocence at all?

15         MR. FELTE:  It's in instruction No. 9.

16         THE COURT:  All right.  Yes, that's it.  Okay.

17         MS. MAGNELLI:  Your Honor, we are making certain edits.

18   Some of them were just gender issues.

19         THE COURT:  Sure.  I haven't looked at it that well.

20         MS. MAGNELLI:  But I do think that there's some that

21   are indisputably withdrawn, such as No. 18 --

22         THE COURT:  Yes.

23         MS. MAGNELLI:  -- No. 23 and No. 24.

24         THE COURT:  Okay.  Yes, clearly.  Whichever ones you

25   don't feel are necessary -- you want to delete 18?  That's

1  admission of defendant?

2  　　　　　MS. MAGNELLI:  Yes, Your Honor.  Unless we call a

3  particular witness on rebuttal, we're not going to need 18.

4  　　　　　THE COURT:  All right, 18.

5  　　　　　MS. MAGNELLI:  23 is when the defendant testifies.

6  　　　　　MR. TRAINOR:  I agree that both of those should be out.

7  　　　　　MS. MAGNELLI:  And 24 is impeachment by a felony

8  conviction.  I don't think there's been any evidence of anything

9  like that.

10  　　　　　THE COURT:  All right.  Okay.  We'll just talk about

11  some of the defendant's requests, see which ones the government

12  can agree to and which ones you won't.  Are you just making this

13  request for reasonable doubt for the record, because I know the

14  Fourth Circuit has told us --

15  　　　　　MR. TRAINOR:  Your Honor, I took out all the language

16  that defines it and just made the reasonable doubt request based

17  on the language in the instruction that does not define it.

18  　　　　　THE COURT:  Well, I've seen that language before.  I

19  don't know if it's in the, quote, reasonable doubt instructions.

20  It's somewhere.  Let's go back to government's 9 and let's see

21  what we have in there.  Well, back in instruction 8, of course,

22  you have some language, "If you have a reasonable doubt" --

23  that's in 8, just before -- "you should not hesitate for any

24  reason" --

25  　　　　　MR. TRAINOR:  What our requested instruction No. 3 adds

1   is that the burden never shifts to the defendant.  We don't

2   ask -- we don't offer any definition of reasonable doubt, which

3   has been frowned upon, I know.  I think it's just the bare

4   bones.

5           THE COURT:  All right.  Well, a lot of it is set forth

6   in instruction 9 -- some of it.  In fact, most of it is there,

7   shifting and so forth.  We'll see.

8           All right.  While we're waiting for the witness --

9   let's see -- instruction 1 for the defense, "Consider only the

10  charges," does the government have a problem with incorporating

11  that?

12          MR. FELTE:  No, Your Honor.

13          THE COURT:  All right.  We'll get that in somewhere.

14  No. 2, "Multiple counts," that's not a problem, is it?

15          MR. FELTE:  Judge, ordinarily it's not, but I think in

16  this case you have the use of a firearm being a crime of

17  violence, that actually is a predicate.  If they found the

18  defendant not guilty on those crimes, they are tied.  So, I

19  think in that regard it's misleading a little bit.

20          THE COURT:  All right.  Well, with that proviso, we can

21  talk about that.

22          All right.  No. 3 we have to debate a little more.

23  "Number of witnesses and uncontradicted testimony," government

24  doesn't have any problem with that, Mr. Trainor.  What about

25  "Bias and hostility"?

1     MR. TRAINOR:  Well, there was a fair number of jurors

2  who don't think highly of Mr. Royal and I think that's a pattern

3  instruction from Sand that applies to this case.

4     THE COURT:  Is the witness here yet?  Not yet?  Not

5  yet?  All right.

6     What's the government's position on bias and hostility?

7     MR. FELTE:  Judge, I think this is covered by jury

8  instruction 21.  That's the general "Witness credibility"

9  instruction.  It talks about you can consider the circumstances

10  and all that.  I think that places too much emphasis.

11     THE COURT:  All right.  We'll take a look at that.

12  "Witness credibility" is pretty long.  It's usually a couple of

13  pages, two or three pages.  So we'll see whether that's covered

14  in there.

15     All right.  "Unindicted co-conspirator as government

16  witness," government?

17     All right.  See if the witness is ready, Mr. Trainor.

18     Is that her?

19     MR. TRAINOR:  Yes.  May I be excused?

20     THE COURT:  Yes.  Go ahead.  We'll get back to this.

21     (Pause.)

22     MR. TRAINOR:  We are ready, Your Honor.

23     THE COURT:  She can take a seat there.

24     All right.  Let's bring the jury back.

25     (Jury present.)

1          THE COURT:  All right, ladies and gentlemen, thank you.

2   Let's be seated.

3          All right.  As I indicated before you left for lunch

4   that the defense has no burden whatsoever.  The government has

5   the sole burden of proving guilt beyond a reasonable doubt, but

6   it's the defense's choice whether they want to present any

7   witnesses.

8          Mr. Trainor, do you have any witnesses you wish to

9   present?

10         MR. TRAINOR:  Thank you, Your Honor.  We would like to

11  call a witness.  The defense would call Harri Cox.

12         THE COURT:  All right.

13         THE DEPUTY CLERK:  Please raise your right hand.

14         HARRI DEAN COX, DEFENDANT'S WITNESS, SWORN

15         THE DEPUTY CLERK:  State your name loudly and clearly

16  into the microphone and spell your last name for the record.

17         THE WITNESS:  My name is Harri Dean Cox, C-o-x.

18         THE DEPUTY CLERK:  Thank you.

19                        DIRECT EXAMINATION

20  BY MR. TRAINOR:

21  Q   Ms. Cox --

22         THE COURT:  That's spelled H-a-r-r-i?

23         THE WITNESS:  Yes.

24         THE COURT:  All right.

25  BY MR. TRAINOR:

1  Q   Ms. Cox, where do you currently reside?

2  A   I live on Fort Meade, Maryland.

3  Q   And the court that you live on is Thorson Court?

4  A   Yes, it is.

5  Q   How old are you today?

6  A   I am 52 years old.

7  Q   How long have you lived at Thorson Court?

8  A   About five years.

9  Q   And do you have children?

10 A   Yes, I do.

11 Q   And please give me their names and ages.

12 A   Sommer Lynesse Royal, she's 31.  Lloyd Mack Royal, he's 29.

13 Nicholas Antoine Royal, he is 26.  Jonathan -- Jonathan -- I

14 have two boys.  Middle names are confusing to me.  Jonathan

15 Harold Arledge, he's 18.  And Michael Wayne Arledge, he's 16.

16 Q   Ms. Cox, so you are the defendant's mother?

17 A   Yes, I am.

18 Q   Lloyd is your son.  Where was Lloyd born?

19 A   He was born in Germany, in Wiesbaden, Wiesbaden Army Medical

20 Center.

21 Q   Were you in the military at that time?

22 A   Yes.  I was stationed in Germany at the time.

23 Q   Now, you've been living on Fort Meade for five years now?

24 A   Yes.

25 Q   So that goes back to 2005 or so?

1  A    Yes.

2  Q    Who is Kureese Royal?  What, if any, relation to you is he?

3  A    From my first marriage, he is my ex-husband's sister's

4  daughter's son.

5  Q    Did there come a time when Kureese Royal came to live with

6  you?

7  A    Yes.  He was about 11 or 12 years old when he came to stay

8  with me.

9  Q    And about how old is he now?

10 A    He is 22 now.

11 Q    So, Kureese lived with you from the time he was 11 or 12

12 until when?

13 A    It had to be around 17.

14 Q    Now, did you keep track of Kureese just as you would one of

15 your children?

16 A    Yes.

17 Q    Do you know where he was living in early 2007, let's say, in

18 the first half of 2007, prior to June?

19 A    He was staying with his girlfriend, Azzeray (phonetic).

20 Q    And where was that?

21 A    In Germantown.

22 Q    In Germantown, Maryland.  Are you familiar with the address

23 known as 522 Carousel Court in Gaithersburg?

24 A    Yes.  Yes.

25 Q    All right.  Is that in the neighborhood that your daughter

1  Sommer lives in?

2  A   Yes, it is.

3  Q   How far apart is Sommer's house from 522 Carousel Court?

4  A   They're in the same complex.  When you walk out onto

5  Sommer's deck, Cierra's deck is right beside each other, catty

6  corner.

7  Q   Now, directing your attention to April and May of 2007.  Did

8  Cierra Young live at 522 Carousel Court at that time?

9  A   No, she didn't.

10  Q   How do you know that?

11  A   Because she didn't get moved in until June -- 1 June is when

12  her lease started at that address.

13  Q   And is that an address you've been to a number of times?

14  A   Yes.

15  Q   Besides Cierra, who you say moved in June 1st of 2007, who

16  else lived there?

17  A   Her and Madison, her daughter.

18  Q   Who is Madison?

19  A   That's her daughter and Lloyd's daughter.

20  Q   When was Madison born?

21  A   She was born on June 12, 2006.

22  Q   Now, you're certain that Cierra moved into that address, 522

23  Carousel Court, on June 1st --

24  A   Yes.

25  Q   -- of 2007?

1    A    Of 2007.

2    Q    Did there come a time that your son Lloyd Royal lived at

3    that address, 522 Carousel Court?

4    A    Yes.

5    Q    And when did he begin living there?

6    A    The latter part of that year.

7    Q    Of 2007?

8    A    2007.

9    Q    And do you know what month that was?

10   A    Around November, October, November time frame.  It was

11   just -- around October or November.

12   Q    Did there come a time when Kureese Royal moved into that

13   address with Lloyd, Cierra and Madison?

14   A    Yes, after Lloyd lived there.

15   Q    How long after Lloyd lived there?

16   A    Probably about a month or so.

17   Q    So you know Cierra Young moved into that address June 1st --

18   A    Yes, she did.

19   Q    -- 2007.  Lloyd Royal moved in months after that?

20   A    Yes.

21   Q    And Kureese Royal moved in after Lloyd moved in?

22   A    Right.

23   Q    And you're sure of that?

24   A    Yes.

25   Q    Prior to June 1st of 2007, let's say, in the months of April

1  and May of 2007, do you know where Lloyd Royal lived at that

2  time?

3  A   Around April he was living with Crystal.

4  Q   Would that be -- did you visit him at Crystal Brown's house?

5  A   Yes, I did.

6  Q   Approximately how many times did you visit there?

7  A   About 10, 11, 12, somewhere.

8              MR. TRAINOR:  Your witness.

9                          CROSS-EXAMINATION

10 BY MR. FELTE:

11 Q   Good afternoon.

12 A   Hello.

13 Q   Now, Ms. Cox, you indicated that -- do you know exactly when

14 Cierra moved into Carousel Court?

15 A   Yes.

16 Q   Were you there to help her move in?

17 A   I was over her house right after she moved in, because she

18 didn't have that much furniture and my daughter gave her

19 furniture from the house.

20 Q   Are you aware that her lease actually started and she was

21 making pro rata payments from May of 2007?

22 A   She had gotten her approval for the house, but she didn't

23 really move in until after.  Her lease was signed -- her lease

24 actually was signed for her to move in on the 1st of June.

25 Q   But she was able to be there in the middle of May; is that

1  correct?

2  A   The young lady allowed her to hand-carry some of her stuff

3  into the house around the first week or the end of May.

4  Q   Would May 18th sound about that right?  Her lease said May

5  18.

6  A   I don't know that date.  I cannot say that.

7  Q   So you don't know when she actually started moving stuff

8  into the house or staying there; is that right?

9  A   I know that she was staying there in the first of June

10  because I was over her house around that time.

11  Q   But prior to that, you are aware that the owner allowed her

12  to come over and spend time there earlier than that?

13  A   No, I would not know that because I'm not seeing -- she

14  moved in.  I just know she moved in on the 1st.

15  Q   But maybe I misunderstood you --

16  A   You can ask the owner, but I'm telling you that I know that

17  she was in there the 1st of June.

18  Q   But the owner allowed her to come over there earlier?

19  A   I don't know what the owner did.

20          MR. FELTE:  May I approach the witness, Your Honor?

21          THE COURT:  Yes.

22  BY MR. FELTE:

23  Q   Have you seen any leases for this property?

24          THE COURT:  I didn't hear the question.

25  BY MR. FELTE:

1   Q   Have you seen any leases for the property in question?

2   A   No.

3   Q   Do you recognize Cierra Young's signature?

4   A   No, I don't recognize her signature because I don't know her

5   signature.

6   Q   Okay.  But there is a signature --

7   A   That means she signed.

8   Q   -- dated May 19, 2007, for pro rata payments beginning May

9   18, 2007?

10  A   No, I don't know that.

11      THE COURT:  I'm not hearing.  Let me hear the question

12  and the answer.

13  BY MR. FELTE:

14  Q   You were not aware of pro rata payments beginning May 18,

15  2007?

16  A   No.

17  Q   You were not aware of the signature of a Cierra Young dated

18  May 19, 2007?

19  A   No, because I was not there for all that.

20  Q   You weren't there?

21  A   No.  I just know when she was in.

22  Q   Okay.  Now, you mentioned Crystal Brown?

23  A   Yes.

24  Q   Was that Lloyd's girlfriend back in April of 2007?

25  A   Yes.

1  Q   And do you recall how long they dated?

2  A   Months, since about October of the year before.

3  Q   Your best recollection is October 2006?

4  A   Yes.

5  Q   And you're aware that from Crystal Brown's mother Lloyd got

6  a car; is that right?

7  A   Yes.

8  Q   That was the white Toyota Camry?

9  A   Yes.

10 Q   Now, you indicated that Kureese, he actually grew up for a

11 substantial portion of his childhood in your home; is that

12 right?

13 A   Correct.

14 Q   And you're aware at the time when he actually moved in with

15 your son Lloyd?

16 A   Yes.

17 Q   He lived with him approximately six to eight months; is that

18 right?

19 A   About that time.

20 Q   Okay.

21 A   In '08 -- '07, '08.

22 Q   Now, you indicated when I was asking you about the lease --

23 there were obviously a lot of times when you just weren't there

24 and you didn't see everything that happened?

25 A   Right.  That's why I said I can't answer what I don't see.

1   Q   So you weren't aware of what your son was doing on many

2   nights in April or in May; is that correct?

3   A   No, because he was not living at my home.

4   Q   He wasn't living with you, right?

5   A   Right.

6   Q   So you don't know everything that happened with regard to

7   him?  You weren't there; is that right?

8   A   That is true.

9           MR. FELTE:  Thank you, ma'am.

10                          REDIRECT EXAMINATION

11  BY MR. TRAINOR:

12  Q   But you know that your son was not living at Carousel Court

13  in April and May of 2007?

14  A   Correct.

15  Q   And you're certain that he didn't move into that place until

16  later in the year, after the summer of 2007?

17  A   Yes.

18          MR. TRAINOR:  Thank you.

19          THE COURT:  Any other questions?

20          MR. FELTE:  No, Your Honor.

21          THE COURT:  All right.  Thank you.  You may stand down.

22  Thank you.

23          Do you have any other witnesses?

24          MR. TRAINOR:  Court's indulgence.

25          No further witnesses.  The defense rests.

1          THE COURT:  All right.  So, ladies and gentlemen, they

2    rest.

3          Government, do you have any rebuttal witnesses?

4          MR. FELTE:  No, Your Honor.

5          THE COURT:  All right.  Then, ladies and gentlemen, the

6    testimony is now concluded and what remains, of course, is I'll

7    give you the instructions on the law and then we'll have final

8    arguments by the parties as to their views on what has been

9    presented and proven and so forth, and then you'll have the case

10   for your deliberation.

11         I'm going to spend some time this afternoon with the

12   attorneys going over instructions that I intend to give to you

13   and I'll have them ready by tomorrow at 9:30 for you.  And I'm

14   going to send in with you three copies of those instructions and

15   you'll each have a copy of the verdict sheet and you'll each

16   have a copy of the second superseding indictment here.

17         So, I don't see any reason to detain you this

18   afternoon.  The case is over.  All testimony is over.  If you

19   can come back tomorrow at 9:30 and we'll have my instructions

20   and then after that we'll have final arguments by the attorneys.

21         All right, madam clerk, they're excused until 9:30

22   tomorrow morning.

23         (Jury excused.)

24         THE COURT:  Let's be seated again.  Mr. Trainor, do you

25   want to renew your motions?

1          MR. TRAINOR:  Yes.  Thank you, Your Honor.  I would,

2     now that all the evidence is concluded, renew my motion for

3     judgment of acquittal and submit at this point.

4          THE COURT:  All right.  Does the government have

5     anything you'd like to say at all in reaction to the renewed

6     motion for judgment of acquittal?

7          MS. MAGNELLI:  Your Honor, we don't have anything

8     additional to add.

9          THE COURT:  All right.  Again, Mr. Trainor, we believe

10    that the evidence is sufficient at this point to send these

11    questions to a jury, and as a matter of law I don't think

12    there's any bases for this court to take it from the jury.  So,

13    your renewed motion under 29 will be denied.

14         All right.  Let's see.  Let's go back to Mr. Trainor's

15    instructions first, unless the government has some additional

16    ones that's out.

17         MS. MAGNELLI:  I think the only ones that for certain

18    need to come out --

19         THE COURT:  Okay.  All right.

20         MS. MAGNELLI:  -- are 18, 23 and 24.

21         THE COURT:  All right.  Let's go through Mr. Trainor's

22    proposed instructions right now.  "Consider only the charges,"

23    proposed instruction No. 1, the government can include that

24    somewhere.

25         It seems like it's almost other crimes, "You've heard

1  evidence of other acts allegedly committed," and, actually,

2  Mr. Trainor, we have that in instruction 61.

3        MR. TRAINOR:  It's our position that that deals with

4  the 404(b) similar act evidence.  There is also evidence of sex

5  with minors and things that are not charged in the indictment.

6        THE COURT:  Well, it was introduced.  I instructed them

7  that it was for a limited purpose only.  I didn't do an

8  instruction other than the 404(b).

9        MR. TRAINOR:  That's correct.

10       THE COURT:  So, again, where would you put this?

11       MR. FELTE:  Judge, I would just add the point that

12  Mr. Trainor's comments about having sex with minors, it's not a

13  specific charge, but it is part of the crime because it does

14  create the climate of fear, Your Honor, and goes to control.

15  So, it is relevant as far as arguing.

16       THE COURT:  All right.  Do you want that included

17  there?

18       MR. FELTE:  No, Judge.  I think that --

19       THE COURT:  61?

20       MR. FELTE:  Yes, 61 I believe is the appropriate

21  instruction, Your Honor.

22       THE COURT:  All right.  Mr. Trainor -- and you all

23  don't have to stand.  This is just informal here.  Let's see.  I

24  think the first sentence is certainly relevant there.  I mean,

25  I've used that sentence before, "not charged with committing any

crime other than the offenses contained in the indictment." I

mean, we certainly could put that in there.

MR. TRAINOR:  It's a standard pattern instruction from

Sand.

MR. FELTE:  Judge, I believe in government's

instruction 61 it does say, "Let me remind you that the

defendant is not on trial for committing any acts not alleged in

the indictment."

THE COURT:  All right.  Okay.  Well, unless you can

tell me, Mr. Trainor, as to why it's not covered or what have

you, I'm going to go ahead and not include that instruction.

MR. TRAINOR:  Well, what I would say is that

instruction No. 61 deals with that one area, similar acts

evidence.  This is not similar acts evidence that we're talking

about.  It is something that would be probably offensive to the

jury.  It would be an emotionally charged issue and I think that

the jury has to be cautioned that they should consider only the

charges.  It's a standard instruction from Modern Federal Jury

Instructions based on verbatim instruction 3-3.  It's an

accurate statement of the law and it applies to this case.

THE COURT:  Well, what is the limited purpose that we

need to explain for the rest of it?  What do you want me to

explain?  I'm not sure.

MR. TRAINOR:  Well, actually, I would agree to strike

"the limited purpose," but the first two sentences and --

1          THE COURT:  What do you mean by that second sentence?

2     I have no problem with the first sentence.  That's a good

3     sentence.

4          MR. TRAINOR:  Court's indulgence a moment.

5          THE COURT:  Yes.

6          MR. TRAINOR:  I was working on this Sunday.

7          THE COURT:  All right.

8          MR. TRAINOR:  Your Honor, I'm not going to press on

9     that instruction.

10         THE COURT:  All right.  Okay.

11         MR. TRAINOR:  In fact, I will withdraw it.

12         THE COURT:  All right.  Okay.  No. 1 is withdrawn.

13    Okay.

14         Let's go to 2, "Multiple counts."  Where is that

15    instruction you normally see where it's eight counts?  Is that

16    in here?  I don't think we have it.  Is there any problem with

17    that?

18         MR. FELTE:  Judge, the one problem I do have is that

19    because the charge for use of a firearm in the commission of a

20    crime of violence, the jury is instructed that if they do not

21    find any crimes of violence -- for example, that would be Count

22    One, Count Two and Count Three in this case -- then they are

23    specifically to disregard --

24         THE COURT:  Yes.  What count is that?  Is that the

25    firearm in furtherance of -- and if the jury find him not guilty

1  of the four, then they're to disregard that offense and move

2  right to the drug charge.

3          MR. TRAINOR:  That's right, but still they have to

4  decide each count separately.

5          THE COURT:  Sure.

6          MR. TRAINOR:  And the court's instruction on the

7  firearm certainly clarifies that.  I don't see this as --

8          THE COURT:  What you can do, Mr. Felte, is perhaps make

9  some reference to that instruction.  I think that instruction

10  should go.  I agree.  But if you want to make -- except for

11  whatever instruction that I talk about later, to the extent it's

12  inconsistent with that.  Let's see.  What instruction is that?

13  Is that just before 5?  What instruction is it?

14          MR. FELTE:  That would be the limiting instruction at

15  49.

16          THE COURT:  49?  All right.  Limiting instruction.  I'm

17  not sure -- I agree with Mr. Trainor.  They're not necessarily

18  inconsistent and I understand the government's caution, but they

19  are separate.

20          MR. FELTE:  Judge, would you like us to then add a

21  sentence referencing instruction 49 or leave it alone?

22          THE COURT:  We're going to give 49.  We have to give

23  49.  You can make some reference there.  I won't call it an

24  exception, but make some reference that the court will give

25  further instructions with reference to section 49, limiting

1   instruction.

2           MR. TRAINOR:  When we get to 49 I do have a problem.

3           THE COURT:  All right.  Okay.  Great.  We're going to

4   go ahead and include -- somewhere put in there multiple counts,

5   one defendant, instruction 2.

6           Mr. Trainor, your client certainly is welcome to

7   remain.  If he doesn't want to remain for this work session, he

8   can leave.  That's up to him.  But if he wants to remain, he can

9   remain.

10          MR. TRAINOR:  He's indicated to me would he like to

11  remain.

12          THE COURT:  All right.  Okay.

13          The next one is "Reasonable doubt," instruction No. 3,

14  and I believe the government made reference to instruction 9.

15          MR. FELTE:  That's right, Judge, and even instruction 8

16  does make some reference to beyond a reasonable doubt.

17          THE COURT:  Instruction 8?

18          MR. FELTE:  It is primarily 9, but even instruction 8

19  does make a reference to reasonable doubt at the bottom.

20          THE COURT:  Yes.  I think 8 and 9, Mr. Trainor,

21  incorporate both of those principles.  I'm going to go ahead and

22  overrule that or deny that request for instruction No. 3,

23  proposed instruction No. 3.

24          All right.  Jury instruction No. 4 defense has

25  suggested, "Number of witnesses."  What's the government's

1  position on that?

2          MR. FELTE:  Judge, no objection.

3          THE COURT:  All right.  We'll include proposed

4  instruction No. 4.  If you all can redo the instructions there.

5          All right.  Instruction No. 5, "Bias and hostility," we

6  have a fairly long instruction 21 which deals with witness

7  credibility and on page 23 --

8          MR. TRAINOR:  We are objecting to the government's 21

9  as written.

10         THE COURT:  You object to 21?

11         MR. TRAINOR:  As it's written.  What the government has

12  done is taken the standard instruction and added the last four

13  paragraphs out of their own authorship.  It lessens their

14  burden.

15         THE COURT:  How does it lessen it?

16         MR. TRAINOR:  Beginning with "Inconsistencies or

17  discrepancies in the testimony" --

18         THE COURT:  Well, I've been giving it for 15 years and

19  I've never been reversed on that.  So, I'm not sure why I would

20  change that now.

21         MS. MAGNELLI:  Your Honor, just to note, there are some

22  instructions that we changed things like gender.  21 is one of

23  them.  I don't know if the court wants a copy of the revised

24  version.

25         THE COURT:  Well, I've looked at this before.  I don't

1  see a problem with this.  The jury needs to have a number of

2  things they need to consider when you're talking about

3  credibility of witnesses and there ought be something about bias

4  and hostility.  I'm not sure there was any hostile witnesses,

5  but there were certainly some that possibly had bias, and you

6  have that described on page 23, "How much you choose to believe

7  a witness may be influenced by the witness's bias."

8        MR. TRAINOR:  It doesn't instruct the jury to view the

9  testimony with caution or weigh it with care or subject it to

10  searching scrutiny.  They're using 7-1 as modified.  This is the

11  next instruction in Sand, 7-2, which should be read after it.

12        THE COURT:  I don't have a problem with it.  Yes.  I

13  mean, there's nothing wrong with it.  Is there anything wrong

14  with it?

15        MS. MAGNELLI:  Which instruction?

16        THE COURT:  With 7-2, "Bias and hostility."  I mean, to

17  the extent the jury --

18        MS. MAGNELLI:  Your Honor, what becomes evident in the

19  defense instructions is that there is a continuous -- there are

20  a lot of instructions that sort of parse out jury instruction

21  No. 21.  It's all covered.  It's a standard instruction.  It

22  directs the jury to ask lots of questions, and I think that a

23  lot of the defense instructions just sort of parse it all out.

24        MR. TRAINOR:  That is the defendant's theory of the

25  case.  That's the theory of his defense, that the witnesses are

1  not credible, and we've asked for only standard instructions on

2  witness credibility and this is one of them.

3  THE COURT:  Well, I would suggest to the government

4  that you can put this language in 21.  You can put it in there

5  on page 23.  I think it's covered.  I'm looking at page 23.

6  "Does the witness have some incentive, loyalty or motive that

7  might have caused him or her to shade the truth, or does the

8  witness have some bias, prejudice or hostility that may have

9  caused the witness to give you something" -- I mean, it's

10  covered.  That's not necessary.  I think it's covered in 21.

11  And you certainly will be allowed to argue that if that's your

12  theory of the case, bias and hostility.  You've got language in

13  here to authorize you to do that.

14  All right.  The next one is "Unindicted co-conspirator

15  as government witness."  Where is that?

16  MR. TRAINOR:  That would be, for example, Shantia

17  Tibbs.

18  THE COURT:  Do we have anything -- you have an

19  accomplice called by the government on instruction 26.

20  MR. FELTE:  Judge, we also, I guess, have the general

21  "Witness credibility" instructions, and I believe this

22  instruction is written not correct as well because you also have

23  some co-conspirators such as Michael Anderson who the government

24  evidence showed passed the gun.  He wasn't called.  But the way

25  this instruction is written, it doesn't fit that either.

1      Judge, we have an instruction concerning those who

2  testified pursuant to plea agreements or proffer letters and I

3  believe between that and the "Witness credibility" instruction,

4  it would cover these situations.

5      MR. TRAINOR:  For the record, we disagree and request

6  the instruction as written.

7      THE COURT:  Well, this is a separate instruction and we

8  do have an unindicted co-conspirator as a government witness and

9  I don't see a problem with this instruction.  We'll probably put

10  it right after instruction either "Interest" on 22 or the

11  "Accomplice," 26.

12      MS. MAGNELLI:  Your Honor, for the record -- just for

13  the record, we would note that I believe Mr. Trainor is in part

14  referring to Shantia Tibbs.  She was charged by the state.  Just

15  to note for the record that she is not somebody who comes to

16  this court with completely clean hands as a co-conspirator.

17      THE COURT:  And the bottom line is?

18      MS. MAGNELLI:  Your Honor, I just want to make sure

19  that that's clear, that it came out in her testimony that she

20  was charged in another courthouse.

21      THE COURT:  But she's unindicted here?

22      MS. MAGNELLI:  She is, Your Honor, but in case there's

23  a question later, she was charged in another courthouse, as came

24  out in the evidence.

25      THE COURT:  All right.  Of course, both of you can

1  argue that.  That's fine.  But I think I'm going to go ahead and

2  include 6.  You can either add 6 to 26 or you can put it as a

3  separate one, but that's an instruction -- I think I'm going to

4  include that.

5       All right.  What's this "Informal immunity of

6  government witness"?  Government's position on that?

7       MS. MAGNELLI:  Your Honor, I went back to my office and

8  it appears that it's standard to give a combined proffer/plea

9  agreement instruction and I have obtained a combined one and I

10  have it to submit to the court for consideration.

11       THE COURT:  All right.  Do you want to give us that?

12  Is that going to include this informal immunity?

13       Again, you don't have to stand.  Just sit down.  Don't

14  keep standing up.

15       Do you have one that's going to cover informal

16  immunity?

17       MS. MAGNELLI:  Yes, Your Honor.  I'm just trying to

18  grab it right now.  I've given Mr. Trainor a copy of that.

19       MR. TRAINOR:  I'm reading it.

20       THE COURT:  All right.  I believe there ought to be

21  some instruction with reference to informal immunity.  Is that

22  it?  Yes, this looks like it, okay.  "Co-conspirator's plea

23  agreements, immunity, accomplices."  Okay.

24       MR. TRAINOR:  Your Honor, if I could just be given

25  about 30 seconds, I'll finish reading it.

1            THE COURT:  Okay.  All right.

2            MR. TRAINOR:  I do think that defendant's jury

3    instruction No. 7 is covered in the combined one that the

4    government has offered.

5            THE COURT:  All right.  So, you'll withdraw your

6    request?

7            MR. TRAINOR:  I will as to defendant's jury instruction

8    No. 7.

9            THE COURT:  All right.  No. 7 is withdrawn.

10           Madam clerk, you were out, but to the extent that you

11   didn't know, defense renewed their motion for 29.  I denied it.

12           All right.  Okay.  Great.  So that takes care of that.

13   We'll add that somewhere in there.  That's instruction No. 7.

14           No. 8, "Witness using drugs."

15           MR. TRAINOR:  Your Honor, I modified this so that

16   there's no suggestion that a witness was on drugs at the time

17   they testified or was addicted to drugs, but there are many

18   witness who were on various drugs at the time they observed

19   things they testified about.

20           THE COURT:  What's the government's position on this?

21           MR. FELTE:  Judge, I think this is covered by the

22   "Witness credibility" instruction, 21.  It says specifically to

23   consider the circumstances of each witness.

24           THE COURT:  No.  I think you need more specificity.

25   You need more specificity here.  This case did involve a lot of

1    people allegedly smoking all kinds of stuff during the time that

2    they were getting the -- allegedly getting the girls ready and

3    all kinds of stuff going on.  So, I think this is appropriate,

4    and you all can argue what you want to argue.  Include No. 8 as

5    requested.

6            "Government witness, not proper to consider guilty

7    pleas."  What's this?

8            MR. TRAINOR:  This may be in that combined instruction.

9            MS. MAGNELLI:  As is the next instruction, No. 10, the

10   plea agreement.

11           THE COURT:  Yes.  Both of these are covered by your

12   combined?

13           MR. TRAINOR:  I think 9 and 10 are covered.

14           THE COURT:  What's that?

15           MR. TRAINOR:  I think defendant's 9 and 10 have been

16   covered, now that I look at it.

17           THE COURT:  All right.  Okay.  And you can reread it

18   again and later on this evening if it doesn't -- all right.

19           "Law enforcement witness," do you all have one?  If you

20   don't have one, we should include that.  You didn't have a lot

21   of law enforcement on certain issues but --

22           MS. MAGNELLI:  There certainly was no evidence of an

23   attack because of interest in the outcome of the case, paragraph

24   2.

25           THE COURT:  Yes, but it's a standard -- I mean, it's a

1 | standard instruction.  I think I'll include that, No. 11.

2 | Include No. 11.

3 | "Prior perjury."

4 | MR. TRAINOR:  There are at least two witnesses who

5 | admitted that they had testified falsely under oath about this

6 | case.

7 | THE COURT:  And the government's position here?

8 | MR. FELTE:  Judge, we submit.

9 | THE COURT:  What's that?

10 | MR. FELTE:  We submit it to the court.

11 | THE COURT:  Yes.  I mean, if he's going to argue

12 | that -- he should have a right to argue it and you all can argue

13 | the reasons why.  The jurors heard the witnesses indicate that

14 | they did and why they did.  And so, include that.

15 | "Submitting the indictment," I intend to do that.

16 | MR. TRAINOR:  Just so it's covered somehow.

17 | THE COURT:  That's already covered, isn't it?  If

18 | not --

19 | MR. TRAINOR:  I don't know that it's covered.

20 | MS. MAGNELLI:  It might not have been.

21 | THE COURT:  I've already told them, but instruction 28,

22 | you can just add those things in there.

23 | MS. MAGNELLI:  To which instruction?

24 | THE COURT:  28, "Introduction to the charges."  If you

25 | want to add it there, you can.

1          MS. MAGNELLI:  Yes, Your Honor.

2          THE COURT:  Add 13 or pertinent language.

3          All right, 14.  14 I think is covered in the conspiracy

4     instruction.

5          MR. TRAINOR:  It's covered for conspiracy and the

6     conspiracy instruction.  It's covered for aiding and abetting

7     and the aiding and abetting instruction.  This is -- if the

8     government intends to argue that he's a principal in the first

9     degree in drug distribution, we would request this instruction.

10          THE COURT:  What's the government's position?  I

11     haven't heard that.  If you're going to argue that he is a what,

12     principal in a what, first degree?

13          MR. TRAINOR:  First degree principal in drug

14     distribution.

15          THE COURT:  What is he charged with, possession with

16     intent to distribute?

17          MS. MAGNELLI:  And distribution.

18          THE COURT:  And distribution.

19          MR. TRAINOR:  One sentence, correct statement of the

20     law.

21          THE COURT:  Well, it's not incorrect.  My only concern

22     is whether it was covered, but I'm not opposed to it.

23          MR. TRAINOR:  It's covered in two different contexts.

24          THE COURT:  I'm not opposed to it.  All right.  Put it

25     in.  Where do you want it?

1          MR. TRAINOR:  Before the instruction on the elements of

2     any charge.

3          THE COURT:  Of what charge?

4          MR. TRAINOR:  It's hard for me to know exactly what the

5     government's order is at this point, but if we could do it after

6     the credibility instructions.

7          THE COURT:  All right.  That will be fine.

8          MR. TRAINOR:  Somewhere in there.

9          THE COURT:  Just before you get to the charges?

10         MR. TRAINOR:  Yes.

11         THE COURT:  All right.  If the government can stick it

12    somewhere in there.

13         All right.  "Unanimity of theory."

14         MR. TRAINOR:  We think this is important because the

15    sex trafficking counts are charged on an either/or basis.  It

16    can be either force, fraud or coercion or by age, and we need to

17    have a jury that's unanimous as to the theory on these counts.

18    We can't have six by age and six by force.  So, I think they

19    need to be instructed on that.

20         MR. FELTE:  Judge, this is covered actually in two

21    instructions, instruction No. 42 primarily but also in

22    instruction 40 as well.

23         MR. TRAINOR:  Can you give me those numbers again,

24    please?

25         MR. FELTE:  40 and 42, and more extensively in 42.

1        THE COURT:  I'm looking at 42.  "To find the second

2    element, you must agree unanimously in how the element is

3    satisfied.  Either the defendant knew that force, fraud or

4    coercion would be used or that the defendant knew that the

5    person was under the age of 18 years old."

6        Let's see what 40 says.

7        MR. FELTE:  The second element of 40.

8        THE COURT:  Yes, 42 pretty much explains 40, that

9    element.  All right, Mr. Trainor.

10        MR. TRAINOR:  Well, as long as that's made clear in the

11    instructions --

12        THE COURT:  And you can argue that.

13        MR. TRAINOR:  -- and I will, and will explain, and

14    perhaps when we get to the verdict sheet you could explain that

15    to the jury.

16        THE COURT:  All right.  Okay.  So that's Mr. Trainor's

17    instructions.

18        All right.  Let's go through the government's.  And

19    we're going to send in to the jurors each a copy of the second

20    superseding indictment, 12 copies of that, and 12 copies of the

21    verdict sheet.  We'll deal with the verdict sheet after we

22    finish the government's submissions.

23        All right, Mr. Trainor, which ones do you --

24        MS. MAGNELLI:  Your Honor, if I may.  I'm sorry.

25    Before we get started, I have a revised verdict sheet.  And,

1    also, with regard to some of the instructions, I have revised

2    instructions.  We did not have a chance to revise all the gender

3    reference issues, things of that nature, but I believe what I'm

4    about to hand up covers the more substantive changes.

5         THE COURT:  All right.  Has Mr. Trainor received a

6    copy?

7         MS. MAGNELLI:  He's received a copy of -- well, I'm

8    going to get make copy for him.

9         THE COURT:  All right.  If you can give me a copy,

10   Mr. Felte.

11        All right.  We'll get to the verdict sheet later, but

12   let's look at these changes as we go.  I have here revised

13   instructions 47, 48, 50 and 51.

14        MS. MAGNELLI:  We should also have 46.

15        MR. TRAINOR:  I have a 46 as well.  I have 46, 47, 50

16   and 51.  I don't have a 48.

17        THE COURT:  All right.  This is 46.  All right.

18        MS. MAGNELLI:  Your Honor, if we could have leave as we

19   collate all these instructions later to change a "his" to a

20   "her" or "her" to a "his."

21        THE COURT:  Sure.  We'll get -- in fact, I assume that

22   after this meeting you'll work on them and then send Mr. Trainor

23   a copy immediately so he'll have it and then I'll read it

24   tonight myself this evening, and then to the extent there's any

25   issues, we can come in at 9 o'clock and we can put something on

1   the record or make any last minute additions.

2          MR. TRAINOR:  If I could have it this evening, I'd be

3   all right.

4          MS. MAGNELLI:  As soon as it's ready.

5          THE COURT:  Yes.  And then send in any comments that

6   you have.  That'll be fine.

7          MS. MAGNELLI:  Does the court wish me to ECF file them

8   or just e-mail them?

9          THE COURT:  I can do it either.  Which is more

10  convenient for you?

11         MS. MAGNELLI:  I sit at the same computer for either

12  one.

13         THE COURT:  It doesn't matter to the court.

14         MS. MAGNELLI:  I'll probably just ECF it to make sure.

15         THE COURT:  Yes, go ahead and do that.  That's fine.

16         MR. TRAINOR:  And then if we have objections, should we

17  ECF them?

18         THE COURT:  Sure.

19         MR. TRAINOR:  All right.  We'll do that.

20         THE COURT:  That way when I come in in the morning, I

21  can get the objections and we can be prepared at 9 o'clock.

22  Let's try to meet at nine before the jury comes in.

23         MR. TRAINOR:  But if we have an exception to an

24  instruction you've already ruled on --

25         THE COURT:  Yes.  You can just make an exception.

1          MR. TRAINOR:  -- we'll wait until the time comes.

2          THE COURT:  We'll certainly allow you to do that.

3          MR. TRAINOR:  All right.

4          THE COURT:  All right.  So, go ahead and make your

5    exceptions.

6          MR. TRAINOR:  Your Honor, I have no objections up

7    to 11.

8          THE COURT:  To what?

9          MR. TRAINOR:  My first objection is jury instruction

10   No. 11, which is modified from -- substantially modified from

11   the form instruction.

12         THE COURT:  On the variance?

13         MR. TRAINOR:  Yes.  I think the court should go with

14   the standard instruction, but if the court doesn't do that,

15   certainly the second sentence, "The proof need not establish

16   with any certainty the exact date of the specific acts," that is

17   gross overemphasis.  There has to be some certainty.  It doesn't

18   have to be with certainty, but to say it doesn't need to be

19   established with any certainty is offensive to the defense.  The

20   standard instruction 3-12 from Sand and Siffert is a neutral

21   instruction and that's the one we think should be given.

22         THE COURT:  Well, I don't have it.  What does it say?

23         MR. TRAINOR:  I have it right here.

24         THE COURT:  What do you propose?

25         MR. TRAINOR:  3-12 in Sand is simply this.  "While we

1 are on the subject of the elements, I should draw your attention

2 to the fact that it does not matter if the indictment charges

3 that a specific act occurred on or about a certain date and the

4 evidence indicates that, in fact, it was on another date.  The

5 law only requires a substantial similarity between the dates

6 alleged in the indictment and the date established by testimony

7 or exhibits," which is a much closer to neutral instruction.

8            THE COURT:  Well, government?

9            MR. FELTE:  I believe that last sentence in there is

10 "the law only requires a substantial similarity."

11           MR. TRAINOR:  Why do we put in "The proof need not

12 establish with any certainty the exact date"?  That's argument.

13           THE COURT:  All right.  Why do we need that sentence?

14 Take that sentence out.

15           MR. FELTE:  Yes, sir.

16           THE COURT:  All right.  Take that sentence out.  You

17 got that, Mr. Felte?

18           MR. FELTE:  Yes, sir.

19           THE COURT:  Take that sentence out.  All right.

20           MR. TRAINOR:  Instruction No. 12 is "Specific

21 investigative techniques not required."  We object to the last

22 paragraph, which is not in the standard instruction.  It tends

23 to lessen the government's burden.  It tells the jury what is

24 not required, which is basically argument by the government.

25           THE COURT:  I'm going to overrule that exception.  That

1    doesn't do anything.  I don't think it's necessary for the

2    government to present all the witnesses.  I'm going to overrule

3    that objection to 12.

4         MR. TRAINOR:  All right.

5         THE COURT:  The objection to the last paragraph of 12,

6    I overrule that.  Next one.

7         MR. TRAINOR:  Instruction No. 17, "Search warrants," we

8    take the position it's not appropriate to tell the jury that the

9    court has determined that the searches in this case were valid

10   and legal.

11        THE COURT:  Well, I don't want the jury to go off on

12   any question about the legitimacy of the search warrants,

13   because those are matters that are determined by the court.  And

14   so, I'm going to overrule the objection to that, 17.

15        What's the next one?

16        MR. TRAINOR:  Has the government withdrawn No. 18?

17        MR. FELTE:  Yes.

18        THE COURT:  18 is out.  All right.

19        MR. TRAINOR:  The court may have already ruled on this.

20   I believe the court has ruled on No. 21.

21        THE COURT:  Yes.

22        MR. TRAINOR:  And I would take exception at the

23   appropriate time.

24        THE COURT:  Yes.  Your point was that it went far

25   beyond the standard.

1      MR. TRAINOR:  Yes.

2      THE COURT:  But I think those are reasonable statements

3  of the law and I think the jury will be helped with that.  So

4  I'm going to leave 21 as is.

5      MR. TRAINOR:  I understand that instruction 24 is

6  withdrawn.

7      THE COURT:  24 is withdrawn.  "Impeachment by felony

8  conviction," that's out.

9      MR. TRAINOR:  Court's indulgence just a moment.  I need

10  to find an instruction.

11      THE COURT:  We also know that 23 is out.  All right.

12      MR. TRAINOR:  On instruction No. 25, I think, it looks

13  to me that the government may have left a sentence out of the

14  standard instruction and I just want to double-check that.

15      No objection.

16      THE COURT:  All right.  25, no objection.

17      And the government came up with that new

18  "Co-Conspirator's plea agreement, immunity, accomplice

19  testimony."  You'll number that wherever it fits somewhere in

20  there.  Give it a new number.

21      MR. FELTE:  Yes, sir.

22      THE COURT:  All right.

23      MR. TRAINOR:  I'm looking at No. 33 at the moment.  I

24  thought I might have had an objection there.  If I could be

25  given a moment.

1          33 is the "Existence of agreement" instruction.  What

2    the government left out of that instruction is the last sentence

3    of the second paragraph is just dropped from the pattern

4    instruction that says, "What the government must prove is that

5    there was a mutual understanding, either spoken or unspoken,

6    between two or more people to cooperate with each other to

7    accomplish an unlawful act."  We argue that that sentence should

8    be put back in.

9          THE COURT:  Well, I've used that sentence before.  Why

10   was that taken out?

11         MS. MAGNELLI:  Your Honor, again, some of these are

12   just standard from the office.

13         THE COURT:  I'll put it back in.  If Mr. Trainor

14   requests it back in, put that sentence back in.

15         MS. MAGNELLI:  Can I just hear the first couple of

16   words of that again?

17         MR. TRAINOR:  It is the last sentence in the standard

18   instruction in paragraph 2.  "What the government must prove is

19   that there was a mutual understanding."

20         MS. MAGNELLI:  Okay.

21         THE COURT:  Yes.  That's normal.

22         MR. TRAINOR:  Moving on --

23         THE COURT:  I'm looking at -- you have in 33, "Indeed,

24   it is sufficient for the government to the show that the

25   conspirators tacitly came to a mutual understanding to

1  accomplish an unlawful act by means of a joint plan or common

2  design," and then that sentence comes in?  Is that where it is

3  or is that the same thing?

4          MR. TRAINOR:  I'm sorry, Your Honor.  I just lost my

5  place.

6          THE COURT:  Okay.  I was just reading from the

7  government's proposed 33, which was the last sentence in the

8  second paragraph.  I just didn't want any duplication.  That's

9  all.

10          MR. TRAINOR:  It comes after the "common design."

11          THE COURT:  Okay.  All right.  So, the next sentence.

12  You want that next sentence.  All right.  Great.  Got it.

13          While you're looking, in my courtroom the first juror

14  called is the foreperson.  So, if you would change 64.  They're

15  not going to select a foreperson, but in my courtroom the first

16  juror called is designated as the chairperson.  So you have to

17  change that first sentence.

18          MR. FELTE:  Yes, sir.

19          THE COURT:  Juror No. 1.

20          MS. MAGNELLI:  Do they know that, Your Honor?

21          THE COURT:  What's that?

22          MS. MAGNELLI:  They don't know that?

23          THE COURT:  No, they don't know it.  They never know

24  it.

25          MR. FELTE:  Would you like us just to strike that

1  sentence or just advise them that --

2  THE COURT:  No.  Juror No. 1 will be the foreperson.

3  That's all.  And I'll explain that.  Some judges do it

4  differently.  Sometimes they let elections or they just

5  arbitrarily select one, but in my courtroom the first juror

6  called is the foreperson.

7  MS. MAGNELLI:  Thank you.

8  MR. TRAINOR:  Your Honor, the next objection would be

9  to instruction No. 41.  Actually, the government has written

10  their own instruction on sex trafficking.  I do agree that there

11  does not appear to be a standard Sand instruction.

12  THE COURT:  In 41?  First element of sex trafficking?

13  MR. TRAINOR:  Our position is that reading the statute

14  is enough and that all these definitions that they've put in of

15  words that are common to all of us, such as "recruit" and

16  "transport" and "provide" are not necessary.

17  THE COURT:  Well, we've got to explain to them these

18  two approaches.  So, do you have some other language in there

19  that we can put in that you --

20  MR. TRAINOR:  Well, I would read them the statute and

21  the elements as set forth in the statute and the definitions

22  that are in the statute.

23  THE COURT:  Well, I think I'm going to overrule that.

24  If that's the objection, I'm going to overrule it.  I read this

25  the other day.  They seem like they capture what the

1 requirements are. If there's some misstatement of the law or

2 some wrongful statement of the law, tell me and you can reread

3 it again this evening, but I think these are reasonable

4 questions of the law.

5      MR. TRAINOR: I understand. No. 42, the second element

6 of sex trafficking, our position is -- on page 57, for example,

7 the second to last paragraph goes off into arguments about

8 victims' special vulnerabilities, their mental condition, things

9 like that that are really not part of this case and that that is

10 argument and should not be in the court's instruction.

11      THE COURT: I don't know what you all are going to

12 argue, what you're not going to argue. What is that, the

13 definition of coercion?

14      MR. TRAINOR: Well, in considering whether force, fraud

15 or coercion should be sufficient to cause a person to engage in

16 commercial sex acts, and it goes through examples of arguments,

17 that a victim is specially vulnerable. There isn't evidence of

18 special vulnerability.

19      THE COURT: Well, it says "if any."

20      MR. TRAINOR: I'm sorry?

21      THE COURT: It says "if any."

22      MR. TRAINOR: Well, if any.

23      MS. MAGNELLI: Yes, if any.

24      MR. TRAINOR: Well, we object to that.

25      THE COURT: All right. I'm going to overrule that.

1    Again, I think these are reasonable statements and expressions

2    of the law and depending on which side argues what, you'll have

3    something to argue it or not argue.

4         MR. TRAINOR:  On that same instruction the government

5    has on page 58, the first full paragraph, an instruction that

6    they may also consider whether the defendant's conduct gave rise

7    to a climate of fear and overcame the will of the alleged

8    victim.  That is argument and should be made as an argument and

9    not as a jury instruction.

10        THE COURT:  Well, again, the jury can certainly look at

11   that and in this type of case I suspect the government is going

12   to argue that.

13        MR. TRAINOR:  I would think so.

14        THE COURT:  Yes, if they can, and you can argue just

15   the contrary.  So, again, overrule the objection there.

16        MR. TRAINOR:  Finally on that instruction on page 59,

17   the same instruction, the government in the second to last

18   paragraph inserts -- the second and the final -- second to the

19   last and the final paragraphs of that instruction are on willful

20   blindness, which I don't think is applicable to this case.

21        THE COURT:  On page 59?

22        MR. TRAINOR:  Yes, Your Honor.  It's the last two

23   paragraphs of that instruction.

24        MR. FELTE:  Judge, that's in regards to the defendant's

25   knowledge of age.  You can't turn a blind eye.  And that's

1   supported by extensive Fourth Circuit case law.

2          MR. TRAINOR:  I just don't think this is a willful

3   blindness case.

4          THE COURT:  Well, you know, again, the evidence seems

5   to be that I heard, and I'm not the fact finder, but I've

6   certainly heard numerous instances where the defendant was told

7   their age, knew their age, and I certainly heard that.  But by

8   the same token, the jury may not accept that testimony and they

9   may have to look at willful blindness.  It may or may not be

10  appropriate here, but I don't see any harm in expressing that.

11  So, overrule that.

12         MR. TRAINOR:  We object to government's requested

13  instruction No. 46, which is a Pinkerton charge.

14         THE COURT:  What's your basis?

15         MR. TRAINOR:  We'll take exception at the appropriate

16  time, but if the court is going to give that instruction, we

17  would ask for the whole instruction, including the final

18  paragraph, which is omitted in the government's modified

19  instruction.  The final paragraph of Sand 19-13 includes, "If,

20  however, you are not satisfied as to the existence of any of

21  these five elements, then you may not find the defendant guilty

22  of the substantive crime unless the government proves beyond a

23  reasonable doubt that the defendant personally committed or

24  aided and abetted the commission of the substantive crime

25  charged."  And if we're going to give that instruction, we

1  should give the whole instruction and not just --

2          THE COURT:  Is there any reason why we shouldn't give

3  the whole instruction?

4          MR. FELTE:  Judge, I think it's covered just before we

5  go into the elements.  The government is required to prove those

6  five elements beyond a reasonable doubt.

7          THE COURT:  Yes . Mr. Trainor has a point that that

8  instruction, as I recall it, does end at that last paragraph,

9  "If you do not prove."  So, I agree with Mr. Trainor.  Include

10 that final paragraph in that Pinkerton.

11         MR. FELTE:  Yes, sir.

12         THE COURT:  One of the problems, Mr. Trainor, as you

13 know, why we put these alternative theories in, no one knows

14 what each side is going to argue.  You very well could argue

15 there's no direct action and so forth.  So, I think you have to

16 put these things in just in case.

17         All right.  Next one.

18         MR. TRAINOR:  No. 49, a limiting instruction.  Let me

19 see if I can articulate this.

20         THE COURT:  "If the government fails to prove Counts

21 One through Three" --

22         MR. TRAINOR:  I think it -- what the problem is is that

23 if the jury finds the defendant guilty of Counts One through

24 Three based on age alone, then Counts One through Three are not

25 crimes of violence because physical force would not be an

1  element of the offense as is required by 18 U.S.C. Section 16.

2  So, this instruction to be complete would have to advise the

3  jury of that fact.

4        THE COURT:  Where did this one come from, 35 you say?

5  What's the government's position?

6        MR. FELTE:  Judge, the government does address that

7  later on in jury instruction 51 acknowledging Mr. Trainor's

8  point.  Usually it's the court's practice to designate certain

9  crimes as crimes of violence or not.  In this particular case,

10  because the crimes could be committed based upon solely by age

11  or perhaps there was force, fraud and coercion, perhaps they

12  just found fraud, then the government has actually subjected

13  itself to I think an enhanced burden in this case and states in

14  instruction 51 that crime of violence means a felony offense

15  that has as an element the use, attempted use or threatened use

16  of physical force against that person.  So, then, the jury will

17  actually have to find that.

18        THE COURT:  All right, Mr. Trainor.

19        MR. TRAINOR:  I don't know.  I just think it's

20  confusing.

21        THE COURT:  Well, what would you suggest that we need

22  to do to make it very clear that the two different theories --

23        MR. TRAINOR:  I would say at the end of paragraph 2 --

24        THE COURT:  Instruction 49?

25        MR. TRAINOR:  Yes, Your Honor, that if the jury finds

1   the defendant guilty of Counts One through Three based on age

2   alone -- well, strike that.  Let me take a look again at 51 and

3   see if that's covered.

4          THE COURT:  Yes.  It almost seems as though it would be

5   more helpful to you to have it.

6          MR. TRAINOR:  I think it might be more helpful to keep

7   it out of 49 and maybe keep it in 51 and argue it.

8          THE COURT:  Yes.  I would think so.  All right.  So,

9   you're withdrawing your objection?

10         MR. TRAINOR:  Yes.  That's the end of my objections on

11  jury instructions, Your Honor.

12         THE COURT:  All right.  Let's see.  Now, we have 61,

13  which is the 404(b).

14         MS. MAGNELLI:  I'm sorry.  Can you repeat that, Your

15  Honor.

16         THE COURT:  61 is your 404(b) evidence.  We have that.

17  I'll give that again.  I've already given it once when it was

18  given on the May 2nd incident, but I'll give it again.

19         MR. TRAINOR:  Thank you.

20         THE COURT:  Now, anything else, government?  I think

21  we've answered all of the objections that Mr. Trainor has

22  submitted.

23         MR. FELTE:  No, Your Honor.

24         THE COURT:  And you've changed the instruction on Juror

25  No. 1.

1          MS. MAGNELLI:  Yes, Your Honor.  We have that.

2          THE COURT:  All right.  And so, what we would call

3    these would be "Jury Instructions."  And we'll go to the verdict

4    sheet in a second.  And, of course, you're going to eliminate

5    all of the citations.  They would be eliminated on the revised

6    copy.  Okay.  The table of contents is fine.  The table of

7    contents, that's fine.

8          All right.  Now, let's go to the verdict sheet.

9    Mr. Trainor, did you get 46?  Did we go through that?  Are you

10   all right with 46?

11         MR. TRAINOR:  Could I see that?  I'll take a moment.

12         THE COURT:  Yes, 46, I didn't look at that yet,

13   "Liability for offenses of co-conspirators."  That's a new 46.

14         MR. TRAINOR:  That's the Pinkerton argument that I

15   asked that it be right from the book.

16         THE COURT:  Yes.  We're going to add that last

17   paragraph.

18         MR. TRAINOR:  At least that last sentence.

19         THE COURT:  Yes, that last paragraph.  All right.

20         MS. MAGNELLI:  Your Honor, the only thing that we

21   changed is we changed "her" to "him."

22         THE COURT:  Okay.  Great.

23         MS. MAGNELLI:  And "a defendant" to "the defendant."

24         THE COURT:  Sure.

25         MR. TRAINOR:  And we're going to put that last sentence

1  back in?

2         MS. MAGNELLI:  Yes.

3         THE COURT:  All right.  Now, I have a verdict sheet

4  with 14 questions.

5         MS. MAGNELLI:  I believe that's the current one, yes,

6  Your Honor, the one we just handed up.

7         THE COURT:  You have two choices as to Count Two.  All

8  right.  "No. 6, If you find the defendant guilty of Count Four,

9  please answer the following question.  If you find the defendant

10  not guilty of Count Four, please skip question 7 and proceed to

11  question 8."

12         All right.  Question 4, it's in there on the first

13  page, "If you find the defendant not guilty on Count Three,

14  please skip question 5 and proceed to 6."  Okay.

15         MR. TRAINOR:  Your Honor, questions 13 and 14, small

16  point, but it seems to me that how do you -- "How do you find

17  the defendant as to distribution of controlled substances,

18  cocaine, to a person under age 21," the only one charged.

19         THE COURT:  Right.

20         MR. TRAINOR:  And the same on 14.  Instead of

21  "persons," I think it should be "a person" as to each one

22  specifically as to --

23         THE COURT:  Do you all have any problem with that?

24         MS. MAGNELLI:  No.  It's the way it's charged in the

25  indictment.

1          THE COURT:  "Persons"?

2          MS. MAGNELLI:  It's the caption under the count even

3   though the language is very clear that it's a person under 21.

4          THE COURT:  All right.  Do you want to put "a person"?

5          MS. MAGNELLI:  That's fine.

6          THE COURT:  All right.  As to each.  All right.  What

7   else?

8          MR. TRAINOR:  That's all I have, Your Honor.

9          THE COURT:  Does the government have any other issues?

10          MR. FELTE:  No, Your Honor.

11          THE COURT:  All right.  Well, government, you can work

12   on those and I would appreciate if you'd send over, if you can,

13   if you do it before 6 o'clock, a hard copy.  If not, I'll see it

14   when I come in.

15          MS. MAGNELLI:  Your Honor, the only problem with that

16   is Mr. Felte has no access to the instructions.  So, I do all

17   the edits myself.

18          THE COURT:  I see.  Okay.  So we're talking about

19   tomorrow.  We're talking about tomorrow.  All right.  Okay.

20   Then I'll get it as early as you can get it to me tomorrow.

21          MS. MAGNELLI:  I will, Your Honor.  Send a hard copy to

22   chambers?

23          THE COURT:  Yes.  I usually get in around quarter of

24   eight.  So, whenever you get it.

25          MS. MAGNELLI:  I'll probably be here by 6:30.  So, I'll

1 be here.  It will be ready.

2         THE COURT:  All right.  As soon as you can.  I'll make

3 a point of getting it so I can read it.  And, Mr. Trainor, you

4 can read yours I suspect tonight.

5         MR. TRAINOR:  I'll try.

6         THE COURT:  All right.  Okay.  So this conclude this.

7 You want me to give the instructions first, I assume?

8         MS. MAGNELLI:  Yes, Your Honor.

9         MR. TRAINOR:  Yes.

10         THE COURT:  All right.  I'll give the instructions

11 first.  How much time, government -- Mr. Felte, are you giving

12 the closing?

13         MR. FELTE:  Judge, I'll do first close.  Ms. Magnelli

14 will do rebuttal close.

15         THE COURT:  How much time do you need for your closing,

16 the first part of it?

17         MR. FELTE:  If we could have maybe two hours between

18 us.

19         THE COURT:  What?

20         MR. FELTE:  Two hours between both of us.

21         THE COURT:  How much time do you need?

22         MR. TRAINOR:  I certainly don't need two hours.  You

23 know, Judge, I doubt that I'll talk for an hour, but I suspect

24 over a half hour.

25         THE COURT:  It seems to me that you don't need two

1   hours.  We'll give the government an hour and we'll give the

2   defense an hour, and then we'll give you have 30 minutes if you

3   want to come back and rebut anything.  So, you have an hour and

4   a half.

5           MR. FELTE:  Yes, sir.

6           THE COURT:  And you can cut it up any way you want to

7   cut it up.  If you want to take 50 and 40, you can do that.  But

8   the jury doesn't want to hear all that.  So, Mr. Trainor, we'll

9   give you up to an hour.  You can take what you want to take.

10  And we'll give the government an hour and then 30 minutes.  So,

11  you have an hour and a half --

12          MR. FELTE:  Yes, sir.

13          THE COURT:  -- total, and you can cut it up whichever

14  way you want to cut it up.

15          Madam clerk, remind me of that so I can time that.

16          All right.  This concludes this this afternoon.  We'll

17  see you all in the morning at 9:30, I guess.

18          MS. MAGNELLI:  9 o'clock?

19          THE COURT:  Yes, let's come in at nine.  Can you get

20  here at nine or 9:15.

21          MR. TRAINOR:  I can get here at nine.  That's not

22  unreasonable.

23          THE COURT:  Okay, 9 o'clock.  Let's see if everything

24  is in order with the instructions and the verdict sheet and

25  there's no more changes.  And I would say, Mr. Trainor, if you

1   have any other exceptions, the sooner you let them know, the

2   better because there's no point in them doing a runoff.  They

3   don't need to run off anything until we have a final product.

4   And then when we have a final product, then what I need,

5   government, would be three copies of the instructions for the

6   jury, the court reporter has a copy, the clerk has a court, and

7   then defense and the court.

8             MR. FELTE:  Seven copies, Your Honor?

9             THE COURT:  Okay.  And then each juror will get a copy

10   of the second superseding indictment.

11             MS. MAGNELLI:  We have those copies already.

12             THE COURT:  All right.  And each a copy of the verdict

13   sheet.  Each juror will get a copy.  And remind me to release

14   the alternates after I give that question.

15             All right.  Thank you.

16             (Proceedings adjourned at 3:55 p.m.)

17                         CERTIFICATE OF REPORTER

18           I hereby certify that the foregoing is a true and

19   accurate transcript of proceedings in the above-entitled matter,

20   to the best of my knowledge and ability.

21

22

23                             /s/

24                             Gloria I. Williams
                              Official Court Reporter

25