UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION


| UNITED STATES OF AMERICA | . | Criminal Case No. AW-09-0048 |
| | . | |
| v. | . | |
| | . | Greenbelt, Maryland |
| LLOYD MACK ROYAL, III, | . | |
| | . | |
| Defendant. | . | Wednesday, March 24, 2010 |
| . . . . . . . . . . . . . . . . | | 9:25 a.m. |


TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE ALEXANDER WILLIAMS, JR.
UNITED STATES DISTRICT JUDGE, AND A JURY



APPEARANCES:

FOR THE GOVERNMENT:          SOLETTE A. MAGNELLI, ESQ.
                             Office of the United States Attorney
                             36 S. Charles Street
                             Baltimore, Maryland 21201

                             JAMES F. FELTE, JR., ESQ.
                             United States Department of Justice
                             950 Pennsylvania Avenue, N.W.
                             Washington, D.C. 20530

FOR THE DEFENDANT:           HARRY J. TRAINOR, ESQ.
                             Trainor, Billman, Bennett, Milko
                               and McCabe, LLP
                             116 Cathedral Street, Suite E
                             Annapolis, Maryland 21401



OFFICIAL COURT REPORTER:  GLORIA I. WILLIAMS   301-344-3228

COMPUTER-AIDED TRANSCRIPTION OF STENOTYPE NOTES

<u>I  N  D  E  X</u>

<u>JURY INSTRUCTIONS</u>  -  14
                      - 150


<u>CLOSING ARGUMENTS</u>

  Government          - 88

  Defense            - 113

  Government Rebuttal - 141

<u>NOTE FROM JURY</u> - 160


<u>JURY'S VERDICT</u> - 164

1                    P R O C E E D I N G S

2          THE COURT:  All right.  Do we have any reactions here?

3          MR. TRAINOR:  Not from the defense.

4          MS. MAGNELLI:  There are no changes.

5          THE COURT:  All right.  Now, let me just ask a couple

6    of questions -- I've had a chance to look at it -- because the

7    jury may have similar questions.  First of all, do we need to

8    have -- on pages 38 through 44 you've repeated what's in the

9    indictment, the means and manner.  Do we need all that if we've

10   given them copies of the indictment?  Do we need to have all

11   that?

12         MR. TRAINOR:  I would say not.  It just seems very

13   difficult to read to the jury.

14         THE COURT:  Yes.  I mean, you can put that last

15   paragraph on page 44, the relevant statute and so forth, but I'm

16   not sure we need on page 38 -- the means and manner and all of

17   that, again, are set forth in the indictment, which we're going

18   to give them.  They can read the second superseding.  So, I'm

19   not sure you need all that there.

20         MR. TRAINOR:  If the court would just tell the jury

21   they will have the indictment.

22         THE COURT:  Yes, they'll have it.  They'll have it at

23   their disposal.  That's my suggestion, just to cut down on that.

24   Have you all made copies yet?

25         MS. MAGNELLI:  We didn't because we noted that the --

1          THE COURT:  Yes.

2          MS. MAGNELLI:  The only problem with this is that we

3     had some serious formatting issues.  So, the copy of the jury

4     instructions is on my desk top and I'm going to have to find a

5     way to get that to my legal assistant.

6          THE COURT:  It's no big deal.  If it's too much

7     trouble --

8          MS. MAGNELLI:  It'll just take me a few minutes.

9          THE COURT:  If it's too much trouble -- but that's just

10    a suggestion I have.

11         And then we need to change the cover sheet to say "Jury

12    Instructions" and not "United States Instructions."

13         MS. MAGNELLI:  Sure.

14         THE COURT:  We don't want the jury to think this is the

15    government's show.

16         Now, I just have one question because I wasn't quite

17    clear and you all can help me out.  In instructions -- looking

18    at the verdict sheet I noticed that instructions 43, I think,

19    and 45 or whatever, they give instructions on "or" or "both."

20    The jury may find either the consent or force, fraud or

21    coercion.  They can unanimously agree on that theory or they

22    also can unanimously agree on the defendant knew they were under

23    18.  How do we know whether the jury is going to determine

24    either unanimously or both unanimously, because there's only one

25    question in questions 4 -- let me see.

1          MS. MAGNELLI:  Yes, Your Honor.  The way the government

2     phrased it was that essentially if they find the defendant

3     guilty of the minor --

4          THE COURT:  All right.

5          MS. MAGNELLI:  -- then they would find guilt, and then

6     the special interrogatories, "Did you find" --

7          THE COURT:  "Do you also find unanimously beyond a" --

8     yes -- "whether effected by force, fraud or coercion."

9          MS. MAGNELLI:  We can separate it out if the court --

10         THE COURT:  I'm just wondering in case there's any

11    dispute as to what the jury's findings are here because, again,

12    on questions 5, 7 and 3 -- 3, 5 and 7 you ask the question on

13    force, fraud and coercion, but the question as to whether

14    defendant knew the "or," the "either" is not -- for me it's not

15    clearly set forth.  I just want to know what the jury is doing

16    here.

17         MR. TRAINOR:  That was my concern when I asked for the

18    unanimity of theory instruction, which I think is covered.

19         THE COURT:  It's covered.  Yes, it's definitely

20    covered.

21         MR. TRAINOR:  But what I'm concerned about is just

22    that, that I think we should ask them the second question as

23    well, do they find it based on age.  Obviously the difference is

24    a mandatory minimum sentence of five years.

25         THE COURT:  Again, it just raised something with me.

1   And maybe the government is satisfied that if they do find guilt

2   on that that it's implicit in that, that you have the --

3          MS. MAGNELLI:  May I suggest instead of adding a second

4   question, because I don't think you can find him guilty unless

5   you find either/or, that in question 2, "How do you find him as

6   to Count Two with regard to a minor," or something like that

7   rather than he's guilty, and then -- I mean, does that make more

8   sense?

9          THE COURT:  Again, you all can talk about it.  It just

10  raised a concern for me.  That's all.

11         MR. TRAINOR:  Well, I'd be happy to talk about it.  I

12  think that we could just add a second interrogatory for each of

13  those three counts and make it clear that they have to be

14  unanimous on one or both.

15         MR. FELTE:  Judge, I think it is implicit because, as

16  the court has noted, the government stresses that in two

17  separate instructions that they must be unanimous on both.

18         THE COURT:  I realize that.  I realize that.  It's in

19  both of those instructions.  I think it was 43 and 45.  Is that

20  what it was?

21         MR. FELTE:  It is 43 and 45.  You're correct.

22         THE COURT:  Yes.  I looked at it.  I read it.  I reread

23  it.  And, as I said, I think you make it clear, but I just

24  didn't want any confusion as to what's in the minds of the jury.

25  I'm satisfied with that, but I just brought it up.  If you think

1  it's sufficient, then, that's fine, and give Mr. Trainor any

2  additional thoughts he may have on it.

3       MR. TRAINOR:  I would like to see a second

4  interrogatory on each of the three sex trafficking counts asking

5  if they have found the defendant guilty of Count Two, do you

6  find that the offense was -- do you find that the defendant

7  knowingly --

8       THE COURT:  Whatever the language is, yes.

9       MR. TRAINOR:  From the statute.

10       THE COURT:  Yes.  Sure.

11       MR. FELTE:  Judge, actually, it's a little bit

12  convoluted, but the reason for that, the "effected by force,

13  fraud and coercion," Your Honor, in the special verdict form is

14  to specifically address the case of United States v. Todd, which

15  is a Ninth Circuit case currently pending before the Supreme

16  Court and there is a little bit of different language in the

17  statute of 1591 and it talks about in the guilt phase the two

18  prongs of being a minor or force, fraud and coercion, and then

19  when it talks really about the penalties, it talks about was it

20  effected by force, fraud and coercion.  I think it's maybe a

21  peculiarity with the way the statute is drafted, but just to

22  allay any concerns about any sentencing issues, that's why the

23  government wanted to take that extra step and put that language

24  in.  That is currently on appeal with the Supreme Court.  I

25  think it's the government's position that it's not needed, but

1  out of an abundance of caution, we wanted to put that language

2  in.

3        THE COURT:  You want to put it in?

4        MR. FELTE:  Just the way it's written now, "effected by

5  force, fraud or coercion."  I don't believe a second

6  interrogatory is necessary.

7        MR. TRAINOR:  Well, we do.

8        THE COURT:  Well, you have the defendant knew, A, that

9  force, fraud or coercion would have caused the person, or that

10  the person was under the age of 18 years and was caused to

11  engage in a commercial sex act.  I mean, is there any problem in

12  adding that?

13        MR. FELTE:  On the special verdict form, Your Honor?

14        THE COURT:  Yes.  Is there any problem in adding that?

15        MR. FELTE:  Judge --

16        THE COURT:  I know you think it's not necessary but,

17  again --

18        MR. FELTE:  Judge, just the fact that I guess we do

19  have 14 questions on the verdict form.

20        THE COURT:  What's that?

21        MR. FELTE:  I guess the verdict form is kind of getting

22  long and convoluted.

23        THE COURT:  Well, the longevity, that doesn't bother

24  me.  I just want to make sure that the jury is given sufficient

25  questions and specificity so they can let me know what they have

1  found and what they haven't found.  I don't want this issue to

2  be just springing up later as to what was in the minds of the

3  jury.  And it just seems to me if it's not a problem, we can

4  just add that.

5          MR. TRAINOR:  Thank you, Your Honor.

6          THE COURT:  Give me any reasons -- how is that harmful

7  to the government?  Yes, that's the question I'm asking.

8          MR. FELTE:  No.  I understand what the court is saying

9  and --

10         THE COURT:  With reference to -- you can just say with

11 reference to the count if you find guilt and just ask the two

12 questions.  You can have an A and a B.

13         MR. FELTE:  Yes, Your Honor.

14         THE COURT:  Yes, you can have an A and a B, and they

15 can say no as to one or they can say yes or they can say yes as

16 to both.  And the instructions are clear.  They can be "or" or

17 both.

18         MR. FELTE:  Yes, Your Honor.

19         THE COURT:  Yes.  Let's go ahead and do that on the

20 verdict form.  Let's go ahead and change that.  Do you need some

21 time?

22         MR. FELTE:  We will need just a few minutes to make

23 that change.

24         THE COURT:  All right.  So, that's all I had.  Yes.

25 And the cover page should be "Jury Instructions," as I said.

1  And I would simply suggest on those three questions that you

2  have an A and a B, and I'll explain to the jury.  Just to make

3  sure that their decisions are very clear as to what they're

4  finding and not finding, we should add that.  So, that's what I

5  thought.  I don't have any other comments.

6          MR. TRAINOR:  Your Honor, the cover page, "Respectfully

7  submitted by the United States Attorney" is not necessary.

8          THE COURT:  None of that.  I really think that it

9  should just be "Jury Instructions."

10         MR. TRAINOR:  On the first page in big letters.

11         THE COURT:  Yes, that's it, "Jury Instructions."  Yes,

12  that's it.  And then the table of contents is fine and the rest

13  of it.

14         So, let the government do that.  As I said, I'm about

15  ready.

16         MR. TRAINOR:  When the government is ready with that,

17  we are ready as well.

18         MS. MAGNELLI:  Your Honor, again, because of the

19  formatting issues we had, once I get the disk to my legal

20  assistant, she'll make these changes, but it will change all the

21  instructions --

22         THE COURT:  The numbers and everything.

23         MS. MAGNELLI:  -- pages, and those have to be changed

24  manually.  The function where it does it automatically was not

25  working.  So it will take her a few minutes to go through and

1  change all the page numbers.

2       THE COURT:  Meanwhile, I guess I can begin going

3  through the instructions with the jury.  Is there any problem

4  with that?

5       MS. MAGNELLI:  I have no problem with that.

6       THE COURT:  I'm going to give them copies of it.  We

7  aren't changing any numbers, are we?

8       MS. MAGNELLI:  Not of the instructions, just the pages.

9       THE COURT:  Just page numbers will change.  Yes, sure.

10  And then the verdict sheet, by the time I get to the verdict

11  sheet, which is something I'll go over after there's been final

12  arguments, you'll have a new copy for me.

13       MS. MAGNELLI:  Yes, Your Honor.

14       MR. TRAINOR:  Your Honor, may I just request that we

15  have a short break between Mr. Felte's argument and my argument?

16       THE COURT:  All right.  Okay.  Well, I guess I can

17  start my instructions with the jury if you all are ready.  I can

18  start going through that because it's going to take over an

19  hour.  I think I have sufficient notes here.  Are you all ready?

20       MS. MAGNELLI:  Yes, Your Honor.  I can give you the

21  government's copy of the instructions if you need another copy.

22       THE COURT:  No.  I have my copy.  Again, the final

23  pages will change, but I've gone through them and I'm prepared

24  now to go through it with the jury.

25       Bring them in.

1        Mr. Trainor, you can put any additional exceptions on

2   the record either after I finish or at some appropriate time.

3   If you'd like to reassert them or --

4        MR. TRAINOR:  I will ask to approach, if that's all

5   right.

6        THE COURT:  Yes, sure.  We can do that after we take

7   the break or if I'm in error on giving something or if I make a

8   mistake, you all can interrupt me.  That's not a problem.

9        MR. TRAINOR:  Certainly.

10       (Jury present.)

11       THE COURT:  All right.  Let's be seated.

12       Good morning, ladies and gentlemen.  We want to tell

13  you what we're going to do today.  I've spent some time with the

14  attorneys going over my instructions and I now have them down

15  pat.

16       You will be given three copies of these instructions

17  for you to have along with the evidence back in the room while

18  you're deliberating.  I'm going to go through these

19  instructions.  There's some 68 of them.  The first 30 of the

20  instructions will be general instructions that apply in any

21  criminal case and instructions 31 through 65 will be

22  instructions that apply in this case, these offenses that are

23  alleged.  And then the shortest of the instructions will be

24  three of them, 66 through 68, which would essentially be the

25  mechanics of your deliberation.  They'll take about two minutes

1   to do.

2          These instructions will probably take a total of an

3   hour, hour 15 minutes, I suspect.  I'm going to slowly go over

4   them.  You don't have to take, as I say, a lot of notes because

5   you're going to have, again, three copies of what I'm giving you

6   now and I'm also going to give each of you a copy of the

7   indictment for you to look at.  There are eight offenses and --

8   alleged offenses and there are a verdict sheet, some 14

9   questions that will assist you in your deliberations to focus

10  you as to what you have to do.

11         After I finish the instructions here, the first part of

12  the instructions or first two parts, questions 1 through 65, I'm

13  going to take a short break and the attorneys then will begin.

14  The government will go first because they have the burden here,

15  and I've allotted them, the government, Mr. Felte, about an hour

16  to do his closing, and then we'll give Mr. Trainor up to an

17  hour, if he wishes, to give his closing argument, and then under

18  the law, because the government has the burden of proof here,

19  they would always be given an opportunity called rebuttal to

20  rebut anything that the defense has brought up in their closing

21  and they would have up to 30 minutes for that.  So that's the

22  format.

23         And after they finish, I will then do the two, three

24  minutes of the mechanics of the deliberations, and we'll then be

25  finished and I'll swear in the marshal who will take charge of

1  you in your deliberations.  A marshal will sit outside, if you

2  need anything or notes.  And before you retire to deliberate, I

3  will make sure that the 12 jurors who are seated are prepared

4  and willing to deliberate for as long as necessary in this case,

5  and then if you do, then we will discharge the three alternates.

6  They will be able to leave.

7       So, that essentially is what will happen.  So, I just

8  give you an overview.  So, let's go through the instructions.

9       Ladies and gentlemen, you are about to enter your final

10  duty, which is to decide the fact issues in this case.  Before

11  you do that, let me instruct you on the law.  You must pay

12  attention to that now.  I'll go as slowly as I can to make sure

13  that I'm as clear as possible.

14       I told you at the start of the trial that your

15  principal function during the taking of testimony would be to

16  listen carefully and to observe each witness who testified.

17  You've done that.  We're all pleased with that.  Your interest

18  has never flagged and it's evident that you followed the

19  testimony with close attention.  I'd ask that you pay attention

20  to these instructions.

21       You've now heard all the evidence in this case and you

22  will now soon here the final arguments of the lawyers for the

23  parties.  Again, I am instructing you as to the law.  It's your

24  duty to accept these instructions of law and apply them to the

25  facts as you determine them, just as it has been my duty to

1   preside over the trial and decide what testimony and what

2   evidence is relevant under the law for your consideration.

3           As to legal matters, you must take the law as I give it

4   to you.  If any attorney during his or her closing states a

5   legal principle different from anything that I am now stating to

6   you in these instructions, it is my instructions that you must

7   follow.

8           You shouldn't single out any instruction as alone

9   stating the law, but you should consider my instructions as a

10  whole when you retire to deliberate in the jury room.

11          You should not, any of you, be concerned about the

12  wisdom of any rule that I state.  Regardless of any opinion you

13  or I may have about what the law may be or ought be, it would

14  violate your sworn duty to base a verdict upon any other view of

15  the law other than what I am now giving you.

16          Your final role is to pass upon and decide the factual

17  issues that are in the case.  You, the members of the jury, are

18  the sole and exclusive judges of the facts.  You pass upon the

19  weight of the evidence.  You determine the credibility of the

20  witnesses.  You resolve such conflicts as there may be in the

21  testimony, and you draw whatever reasonable inferences you

22  decide to draw from the facts as you determine them.

23          I'll later talk about credibility or believability of

24  the witnesses.

25          In determining the facts, you must rely on your own

recollection of the evidence.  What the lawyers may have said in

their opening statements or what they may say in their closing

statements, what they said in their objections, what they said

in their questions, none of that is evidence.  In this

connection, you should bear in mind that a question put to a

witness is never evidence.  It's only the answer which is

evidence.  Nor is anything that I may have said during this

trial or may say during the instructions with respect to a

factual matter to be taken by you in substitution for your own

independent recollection.

Again, what I am saying to you or what I say to you is

not evidence.  The evidence before you consists of the answers

given by the witnesses, the testimony they gave, as you recall

it, and any exhibits that were received in evidence.  No

questions.  Again, you may consider stipulations of the parties

as evidence.  Anything I struck from the record or told you to

disregard, that also would not be evidence.

Since you are the sole and exclusive judges of the

facts, I do not mean to indicate any opinion as to the facts or

what your verdict should be.  The rulings I have made during

this trial are not any indication of my views of what your

decision should be as to whether or not the guilt of the

defendant has or has not been proven beyond a reasonable doubt.

I ask you to draw no inference from the fact that on

occasions I asked questions of certain witnesses.  Sometimes I

1  didn't hear the witnesses or they weren't clear to me.  These

2  questions were only intended for clarification or to expedite

3  matters and certainly were not intended to suggest any opinion

4  on my part as to the verdict you should render or whether any of

5  the witnesses may have been more credible than any other

6  witness.

7          You are expressly to understand that the court --

8  that's me -- has no opinion as to the verdict you should render

9  in this case.  As to the facts, ladies and gentlemen, you are

10  the exclusive judges.  You are to perform the duty of finding

11  the facts without bias or prejudice as to any party.

12          In determining the facts, again, you are reminded that

13  before each of you were accepted and sworn to act as a juror,

14  you were asked certain questions concerning competency and

15  qualifications, fairness and freedom from prejudice or bias.  On

16  the faith of those answers you were accepted by the parties.

17  Those answers, therefore, are binding on each of you now, as

18  they were then, and should remain with you until you retire or

19  you are discharged from this case.

20          Instruction 5.  You are to perform the duty of finding

21  the facts without bias or prejudice as to any party.  You are to

22  perform your final duty in an attitude of complete fairness and

23  impartiality.

24          The case is important to the government for the

25  enforcement of criminal laws as a matter of prime concern for

1    the community or to the community.  Equally, it is important to

2    the defendant, who is charged with serious crimes.

3         The fact that the prosecution is brought in the name of

4    the United States entitles the government to no greater

5    consideration than that accorded to any other party to a suit or

6    litigation.  By the same token, the government is entitled to no

7    less consideration.  All parties, whether government or

8    individual, stand as equals at the bar of justice.

9         Now, it is my duty -- excuse me -- it is the duty of

10   the attorney for each side to make an objection when the other

11   side offers testimony or other evidence which the attorney

12   believes is not proper under the rules of evidence.  The lawyers

13   have the right and the duty to ask me, the court, to make

14   rulings of law and to request conferences at the bench out of

15   your hearing.  That happened a couple of times during this trial

16   and sometimes we were delayed bringing you back in because I was

17   reviewing and deciding certain legal issues.  All those

18   questions of law must be decided by me, the court.  You should

19   not show any prejudice against an attorney or his or her client

20   because the attorney objected to the admissibility of evidence

21   or asked for a conference out of the hearing of the jury or

22   asked the court, me, for a ruling on the law.

23        As I've already indicated, my rulings on the

24   admissibility of evidence does not indicate any opinion about

25   the weight or effect of such evidence.

1    You, ladies and gentlemen, are the sole judges of the

2    credibility of all witnesses and the weight and effect of all

3    evidence.

4    Again, your verdict should be based solely on the

5    evidence developed at trial or lack of evidence.

6    It would be improper for you to consider in reaching

7    your decision as to whether the government sustained its burden

8    of proof any personal feelings you may have about a defendant's

9    race or religion or national origin or sex or age.  All persons

10   are entitled to the presumption of innocence and the government

11   has the burden of proof I'll discuss shortly.

12   It would be equally improper for you to allow any

13   feelings you may have about the nature of the crimes charged to

14   interfere with your decision-making process.  Your verdict must

15   be based exclusively on the evidence or lack of evidence in this

16   case.

17   Under your oath as jurors you are not to be swayed by

18   sympathy.  You are to be guided solely by the evidence in the

19   case, and the crucial, hard core question that you must ask

20   yourselves as you sift through the evidence is this:  Has the

21   government proven the guilt of the defendant beyond a reasonable

22   doubt?

23   It is for you alone to decide whether the government

24   has proven that the defendant is guilty of the crimes charged

25   solely on the basis of the evidence and subject to the law as I

1 am now charging you.

2      It must be clear to you now that once you let fear or

3 prejudice or bias or sympathy interfere with your thinking,

4 there is always a risk that you will not arrive at a true and

5 just verdict.

6      If you have a reasonable doubt as to the defendant's

7 guilt, you should not hesitate for any reason to find a verdict

8 of acquittal.  But, on the other hand, if you should find that

9 the government has met its burden of proving the defendant

10 guilty beyond a reasonable doubt, you should not hesitate

11 because of sympathy or any other reason to render a verdict of

12 guilty.

13      Although the defendant has been indicted, you must

14 remember that an indictment is only an accusation.  It's not

15 evidence.  The defendant here has pleaded not guilty to this

16 indictment.  As a result of the defendant's plea of not guilty,

17 the burden is on the prosecution to prove guilt beyond a

18 reasonable doubt.  This burden never shifts to the defendant for

19 the simple reason that the law never imposes upon a defendant in

20 a criminal case the burden or duty of calling any witness or

21 producing any evidence.

22      The law presumes a defendant to be innocent of all the

23 charges against him.  I therefore instruct you that the

24 defendant is presumed by you to be innocent throughout your

25 deliberations until such time, if ever, you as a jury are

1   satisfied that the government has proven him guilty beyond a
2   reasonable doubt.

3          The defendant here begins the trial with a clean slate.
4   This presumption of innocence alone is sufficient to acquit a
5   defendant unless you as jurors are unanimously convinced beyond
6   a reasonable doubt of his guilt after a careful and impartial
7   consideration of all the evidence in the case.  If the
8   government fails to sustain its burden, you must find the
9   defendant not guilty.

10         This presumption was with the defendant when the trial
11  began and remains with him now as I speak to you and will
12  continue with the defendant into your deliberations unless and
13  until you are convinced that the government has proven the
14  defendant guilty beyond a reasonable doubt.

15         Instruction 10.  The fact that one party called more
16  witnesses and introduced more evidence than the other does not
17  mean that you should necessarily find the facts in favor of the
18  side offering the most witness.  By the same token, you do not
19  have to accept the testimony of any witness who has not been
20  contradicted or impeached if you find the witness not to be
21  credible.

22         You also have to decide which witnesses to believe and
23  which facts are true.  To do this you must look at all the
24  evidence, drawing on your own common sense and personal
25  experience.  After examining all the evidence, you may decide

1   that the party calling the most witnesses has not persuaded you

2   because you do not believe its witnesses or because you do

3   believe the fewer witnesses called by the other side.  In a

4   moment I'll discuss the criteria for evaluating credibility.

5        For the moment, you should keep in mind that the burden

6   of proof is always on the government and the defendant is not

7   required to call any witness or offer any evidence and is

8   presumed to be innocent.

9        You may not draw any inference, favorable or

10  unfavorable, towards the government or the defendant on trial

11  from the fact that certain persons were not named as defendants

12  in the second superseding indictment which you'll have a copy of

13  to read.  The fact that certain persons were not indicted must

14  play no part in your deliberations.  Whether a person should be

15  named as a co-conspirator or indicted as a defendant, that's a

16  matter within the sole discretion of the United States Attorney

17  and the grand jury.

18       Therefore, you may not consider in any way in reaching

19  your verdict as to this defendant the fact that one or two or

20  none beyond the defendant was on trial.

21       The indictment here contains a total of eight counts.

22  Each count charges the defendant with a different crime.  You

23  must consider each count separately and return a separate

24  verdict of guilty or not guilty for each.  Whether you find the

25  defendant guilty or not guilty of one offense should not affect

1   your verdict on any other offense or charge.  And I'll give you

2   a further limiting instruction in a few minutes.

3        While we're on the subject of the second superseding

4   indictment, I should draw your attention to the fact that the

5   second superseding indictment charges that specific acts and

6   offenses occurred on or between certain dates.  It is sufficient

7   if the evidence in this case establishes that the offenses were

8   committed on dates reasonably near the dates alleged in the

9   second superseding indictment.  The law only requires a

10  substantial similarity between the dates alleged in the second

11  superseding indictment and the dates established by the

12  testimony or the exhibits.

13       During the trial you may have heard testimony of

14  witnesses and you may hear arguments by counsel that the

15  government did not utilize specific investigative techniques.

16  For example, some seized items may not have been submitted for

17  fingerprint analysis or chemical analysis may not have been done

18  on every item.  You may consider these facts in deciding whether

19  the government has met its burden of proof because, as I told

20  you, you should look at all of the evidence or lack of evidence

21  in deciding whether a defendant is guilty.  However, you are

22  also instructed that there is no legal requirement that the

23  government use any of these investigative techniques -- specific

24  investigative techniques to prove its case.  For example, there

25  is no requirement to attempt to take fingerprints or that the

1    government offer fingerprints in evidence.  Law enforcement

2    techniques are not our concern -- your concern.  Your concern,

3    as I said, is to decide whether or not on the evidence or lack

4    of evidence the defendant's guilt has been proven beyond a

5    reasonable doubt.

6         Moreover, the law does not require that the prosecution

7    call all witnesses or all persons who have been present at any

8    time or place involved in the case or who may appear to have

9    some knowledge of the matters at issue in this trial.  Nor does

10   the law require the prosecution to produce as exhibits all

11   papers and all things mentioned in the evidence.

12        Instruction 15.  There are two types of evidence which

13   you may properly use in deciding whether a defendant is guilty

14   or not guilty.  One type of evidence is called direct evidence.

15   Direct evidence is where a witness testifies as to what he or

16   she saw, heard or observed.  In other words, when a witness

17   testifies about what is known to him or her of his own knowledge

18   by virtue of her own senses, what he sees, feels, touches or

19   hears, that's called direct evidence.

20        Circumstantial evidence is evidence which tends to

21   prove a disputed fact by proof of other facts, and there is an

22   example which I'll give.  Assume that when you came into the

23   courthouse this morning the sun was shining and it was a nice

24   day.  Assume there's no way for you to look outside of this

25   courtroom.  As you are sitting here, someone walks in with an

umbrella which is dripping wet.  Someone else then walks in with

a raincoat which is also dripping wet.  Now, you can't look

outside the courtroom and you cannot see whether or not it is

raining.  So you don't have any direct evidence of that fact.

However, on the combination of facts which I've asked you to

assume, it would be reasonable and logical for you to conclude

that it's raining.

That's all there is to circumstantial evidence.  You

infer on the basis of reason and experience and common sense

from an established fact the existence or the nonexistence of

some other fact.

Circumstantial evidence is of no less value than direct

evidence, for it is a general rule that the law makes no

distinction between direct and circumstantial evidence but

simply requires that before convicting a defendant, the jury

must be satisfied of the defendant's guilt beyond a reasonable

doubt from all the evidence in the case.

The evidence in this case consists of the sworn

testimony of the witnesses, the exhibits received in evidence,

and any stipulations that you heard.  Exhibits which have been

marked for identification but not received will not be

considered by you back in the room.  They're not evidence.  Only

those exhibits received may be considered as evidence.

Similarly, anything I asked you to disregard or I

struck from the record, again, not evidence.  Only the

1    witnesses' answers are evidence and you are not to consider a

2    question as evidence.  Statements by the lawyers that they're

3    going to make in their closing, that's not evidence, nor was the

4    evidence in the openings -- nor was any statements by counsel in

5    opening evidence.

6           You should consider the evidence in the light of your

7    own common sense and experience and you may draw whatever

8    reasonable inferences from the evidence.  Anything you may have

9    seen or heard about this case outside the courtroom is not

10   evidence and must be entirely disregarded.

11          Again, lawyers' questions are not evidence.  I'll just

12   give you an example.  At times in some trials lawyers on

13   cross-examination may have incorporated into a question a

14   statement which assumed certain facts to be true and asked the

15   witness if the statement was true.  If the witness denies the

16   truth of the statement and there is no evidence in the record

17   proving the assumed fact is true, then you may not consider the

18   fact to be true simply because it was asked by the lawyer.  An

19   example would be this:  When did you stop cheating on your

20   taxes?  Well, you know, that's a misleading question because

21   there's no evidence that you cheated but the question said when

22   did you stop cheating on your taxes.  You would not be permitted

23   as a juror to consider as true the assumed fact that the witness

24   ever cheated on his taxes unless the witness himself indicated

25   he had or unless there's some evidence in the record that he had

1   cheated.  So, that's a reason why questions are not evidence.

2   It's only the answers.

3          We've already talked earlier about a stipulation.  A

4   stipulation is an agreement among the parties that a certain

5   fact is true.  You should regard such agreed fact as true.

6          You have heard or may have heard testimony in this case

7   regarding evidence seized by the government during the execution

8   of a search warrant.  You are hereby instructed that it is the

9   responsibility of the court, the judge, alone to decide the

10  validity and the legality of the search warrant and other

11  searches and the court has previously determined in this case

12  that the searches in this case were valid and legal.  But it's

13  up to you to decide what significance, if any, the evidence

14  seized may have in this case.

15         Instruction 20.  The defendant did not testify in this

16  case.  Under our constitution, as I mentioned to you, a

17  defendant has no obligation to testify or to present any other

18  evidence because it is the prosecution's burden to prove a

19  defendant guilty beyond a reasonable doubt of.  That burden

20  remains with the prosecution throughout the entire trial and

21  never shifts to the defendant.  A defendant is never required to

22  prove that he is innocent.

23         You may not attach any significance to the fact that

24  Mr. Royal did not testify.  No adverse inference against

25  Mr. Royal may be drawn by you because he did not take the

1   witness stand.  You may not consider this against him or any

2   defendant in any way in your deliberations in the jury room.

3          During the trial -- during the final arguments you may

4   hear the attorneys use the term "inference."  They may say in

5   their arguments, final arguments, and ask you to infer on the

6   basis of your reason, experience and common sense from one or

7   more established facts the existence of some other fact.

8          An inference, of course, is not a suspicion or a guess.

9   An inference is a reasoned, logical decision to conclude that a

10  disputed fact exists on the basis of another fact which you know

11  exists.

12         There are times when different inferences may be drawn

13  from facts whether proved by direct or circumstantial evidence.

14  The government may ask you to draw one set of inferences while

15  the defense asks you to draw another.  It is for you and you

16  alone to decide what inferences you will draw.  The process of

17  drawing inferences from facts in evidence is not guesswork.

18  It's not speculation.  An inference is a deduction or conclusion

19  which, you the jury, are permitted to draw but not required to

20  draw from the facts which have been established by either direct

21  or circumstantial evidence.  In drawing inferences you should

22  exercise your common sense.

23         So, while you are considering the evidence presented to

24  you, you are permitted to draw from the facts which you find to

25  be proven such reasonable inferences as would be justified in

1 light of your own experience.

2       Here again, let me remind you that whether based upon

3 direct or circumstantial evidence or upon the logical,

4 reasonable inferences drawn from such evidence, you must be

5 satisfied of the guilt of the defendant beyond a reasonable

6 doubt before you may convict the defendant.

7       Now, ladies and gentlemen, the next series of

8 instructions, of course, deal with credibility of witnesses and

9 you'll have to make some decisions as to the credibility of

10 witnesses, who to believe, how much to believe, and what happens

11 when there are conflicts, inconsistencies, et cetera.

12       So, I'm going to give you instructions 23 through 30

13 and they will all deal with witness credibility, which is what

14 you'll have to do.  So, let's start them.

15       You've had an opportunity to observe all the witnesses.

16 It's now your job to decide how believable each witness was in

17 his or her testimony.  You are the sole judges of the

18 credibility of each witness and the importance of his or her

19 testimony.  It must be clear to you by now that you are being

20 called upon to resolve various factual issues under the second

21 superseding indictment in the face of the very different

22 pictures painted by the government and the defense.  You will

23 now have to decide where the truth lies, and an important part

24 of the decision will involve making judgments about the

25 testimony of the witnesses you have listened to and observed.

In making those judgments you should carefully scrutinize all of the testimony of each witness, the circumstances under which each witness testified, and any other matters in evidence which may help you to decide the truth and the importance of each witness's testimony.

Your decision whether or not to believe a witness may depend on how the witness impressed you. Was the witness candid, frank and forthright? Or did the witness seem as if he or she was hiding something or being evasive or suspect in some way? How did the way the witness testified on direct examination compare with the way the witness testified on cross-examination? Was the witness consistent in his or her testimony or did he or she contradict himself or herself? Did the witness appear to know what he or she was talking about and did the witness strike you as someone who was trying to report his or her knowledge accurately?

How much you choose to believe a witness may be influenced by the witness's bias. Does the witness have a relationship with the government or with the defendant which may affect how he or she testified? Does the witness have some incentive or some loyalty or some motive that might cause him or her to shade the truth or does the witness have some bias, prejudice or hostility that may have caused the witness, consciously or not, to give you something other than a completely accurate account of the facts he or she testified to?

1      Even if the witness was impartial, you should consider

2  whether the witness had an opportunity to observe the facts he

3  or she testified about and you should also consider the

4  witness's ability to express himself or herself.

5      Ask yourself whether the witness's recollection of the

6  facts stands up in the light of all the other evidence.

7      In other words, what you must try to do in deciding

8  credibility is to size a person up in light of his or her

9  demeanor, the explanations given, and in light of all the

10 evidence in the case just as you would in any important matter

11 where you were trying to decide if a person is truthful,

12 straightforward and accurate in his or her recollection.

13      In deciding the question of credibility, remember that

14 you should use your common sense, your good judgment and your

15 experience.

16      Inconsistencies or discrepancies in the testimony of a

17 witness or between the testimony of different witnesses may or

18 may not cause you to discredit such testimony.  Two or more

19 persons witnessing an incident or a transaction may see or hear

20 it differently.  An innocent misrecollection, like a failure of

21 recollection, is not an uncommon experience.  In weighing the

22 effect of a discrepancy always ask yourself whether it pertains

23 to a matter of importance or an unimportant detail and whether

24 the discrepancy results from innocent error or intentional

25 falsehood.

Throughout the trial you have heard witnesses testify to facts they failed to mention or omitted in prior statements. You may consider such prior omissions as inconsistent statements when deciding the credibility of the witness.  In deciding what effect to give to such an omission, you should consider whether the omitted fact is an important or unimportant detail and whether it is the type of matter one would normally expect another to remember when asked about an event.  You should also consider any explanation offered by the witness to explain the omission and consider the explanation the same as you would any other aspect of a witness's testimony.  You should also consider whether the witness had a full and complete opportunity to explain everything on the earlier occasion.  An omission from a statement, like any inconsistency in testimony, may result from an innocent failure of recollection or deliberate falsehood.

If you find that a witness has testified willfully and falsely with regard to any matter at trial, you may choose to reject any part or all of said witness's testimony.

After making your own judgment, you should give the testimony of each witness such credibility as you think it is fairly entitled to receive, if any.

There has been evidence that several witnesses at the trial lied under oath at another proceeding.  I must warn you that the testimony of these witnesses should be viewed cautiously and weighed with great care.  It is, however, for you

1  to decide how much of his or her testimony, if any, you wish to

2  believe.

3       You may not infer that the defendant is guilty of

4  participating in criminal conduct merely from the fact that he

5  was present at the time the crime was committed and had

6  knowledge that it was committed.

7       In evaluating the credibility of the witnesses, you

8  should take into account any evidence that the witness who

9  testified may benefit in some way from the outcome of the case.

10 Such an interest in the outcome creates a motive to testify

11 falsely and may sway the witness to testify in a way that

12 advances his or her own interest.

13      Therefore, if you find that any witness whose testimony

14 you are considering may have an interest in the outcome of this

15 trial, then you should bear that factor in mind when evaluating

16 the credibility of his or her testimony and accept it with great

17 care.  This is not to suggest that every witness who has an

18 interest in the outcome of a case will testify falsely.  Again,

19 it is up to you to decide to what extent, if at all, the

20 witness's interest has affected or colored his or her testimony.

21      You have heard evidence that a witness or witnesses

22 made a statement on an earlier occasion which the lawyers may

23 argue is inconsistent with the witness's trial testimony.

24 Evidence of a prior inconsistent statement was placed before you

25 for the limited purpose of helping you to decide whether to

believe the trial testimony of the witness.  If you find that the witness made an earlier statement that conflicts with his or her trial testimony, you may consider that fact in deciding how much of his or her trial testimony, if any, to believe.  In making this determination, you may consider whether the witness purposely made a false statement, or whether it was an innocent mistake, whether the inconsistency concerns an important detail, or whether it had to do with a small detail, or whether the witness had an explanation for the inconsistency, or whether the explanation appealed to your common sense.

Again, it is exclusively your duty, based upon all the evidence and your own good judgment, to determine whether the prior statement was inconsistent and, if so, how much, if any, weight to be given to the inconsistent statement in determining whether to believe all or part of the witness's testimony.

All right.  Instruction 27 is an instruction again dealing with witnesses, but it's more focused on co-conspirators, plea agreements, immunity and accomplice testimony.  That's instruction 27.

In this case there has been testimony from various government witnesses who have pled guilty or who have testified at this trial that they were actually involved in planning and carrying out the crime or crimes charged in the second superseding indictment.  That is, that they were accomplices. The government argues, as it is permitted to do, that it must

take the witnesses as it finds them, and the government argues
that only people who themselves take part in criminal activity
have the knowledge required to show criminal behavior by others.
Indeed, certain criminal conduct never would be detected without
the use of accomplice testimony.  For those reasons, the law
allows the use of accomplice testimony.  Indeed, it is the law
in federal courts that the testimony of accomplices may be
enough in itself for conviction if the jury finds that the
testimony establishes guilt beyond a reasonable doubt.

I have given you some general considerations in the
last few minutes on credibility and I'm not going to repeat all
of them, nor will I repeat the arguments made on both sides.
However, let me say a few things that you may want to consider
during your deliberations on the subject of accomplices and on
the subject of witnesses who testify pursuit to plea agreements.
However, you should bear in mind that a witness who has entered
into such an agreement has an interest in the case different
from any ordinary witness.  A witness who realizes that he or
she may be able to obtain his or her own freedom or receive a
lighter sentence by giving testimony favorable to the
prosecution does have a motive to testify falsely.  Therefore,
you must examine his or her testimony with caution and weigh it
with great care.  If after scrutinizing his testimony you decide
to accept it, you may give it whatever weight, if any, you find
it deserves.

1    You should ask yourselves whether these so-called

2    accomplices would benefit more by lying or more by telling the

3    truth.  Was their testimony made up in any way because they

4    believed or hoped that they would somehow receive favorable

5    treatment by testifying falsely or did they believe that their

6    interests would be best served by testifying truthfully?

7    If you believe that the witness was motivated by hopes

8    of personal gain, was the motivation one which would cause him

9    or her to lie or was it one which would cause him or her to tell

10   the truth?  Did this motivation color his or her testimony?

11   The government has called as witnesses people who are

12   named by the prosecutors as co-conspirators who were not charged

13   as defendants.  For this reason you should exercise caution in

14   evaluating their testimony and scrutinize it with great care.

15   You should consider whether they have an interest in the case

16   and whether they have a motive to testify falsely.

17   In other words, ask yourselves whether they have a

18   stake in the outcome of this trial.  As I have indicated, their

19   testimony may be accepted by you if you believe it to be true,

20   and it is up to you, the jury, to decide what weight, if any, to

21   give the testimony of these unindicted co-conspirators.

22   In sum, you should look at all of the evidence in

23   deciding what evidence -- excuse me -- in deciding what credence

24   and what weight, if any, you will want to give to these

25   witnesses.

1       Additionally, while we are on the subject of witnesses

2  who have testified pursuant to plea agreements, let me instruct

3  you on the following.  There is evidence that the government

4  agreed in those plea agreements to bring the witness's

5  cooperation to the attention of the sentencing court in exchange

6  for the witness's agreement to plead guilty and testify

7  truthfully, completely and fully at this trial.  There's also

8  evidence that the government agreed not to prosecute the witness

9  for crimes which he or she may have admitted in interviews with

10 the government where the information was not previously known to

11 the government.  There is also evidence that the government

12 agreed to dismiss certain related charges against a witness in

13 exchange for that witness's guilty plea.

14      The government is permitted to enter into these kinds

15 of plea agreements and to make these kinds of promises and the

16 government is entitled to call as witnesses people to whom these

17 promises are given.  You, in turn, ladies and gentlemen, may

18 accept the testimony of such witness.  You are instructed that

19 you may convict a defendant on the basis of this testimony alone

20 if it convinces you of the defendant's guilt beyond a reasonable

21 doubt.  In considering such testimony, you are instructed that

22 you are to draw no conclusion or inferences of any kind about

23 the guilt of any defendant on trial from the mere fact that the

24 government witness pled guilty to the same or similar charges.

25 That witness's decision to plead guilty was a personal decision

1   about his or her own guilt and has nothing to do at all with the

2   defendant here on trial.

3       There has been evidence introduced at trial that the

4   government called as a witness one or more persons who was using

5   drugs when the events he or she observed took place.  I instruct

6   you that there is nothing improper about calling such a witness

7   to testify about events within his or her personal knowledge.

8   On the other hand, his or her testimony must be examined with

9   greater scrutiny than the testimony of any other witness.  The

10  testimony of a witness who was using drugs at the time of the

11  events he or she is testifying about may be less believable

12  because of the effect the drugs may have on his or her ability

13  to perceive the events in question.  If you decide to accept his

14  or her testimony, after considering it in light of all the other

15  evidence in the case, then you may give it whatever weight, if

16  any, you find it deserves.

17      You have also heard the testimony of a law enforcement

18  official or law enforcement officials.  The fact that a witness

19  may be employed by a government agency as a law enforcement

20  official does not mean that his or her testimony is necessarily

21  deserving of more or less consideration or greater or lesser

22  weight than that of any ordinary witness.  At the same time, it

23  is quite legitimate for the defense to try to attack the

24  credibility of a law enforcement officer on the grounds that his

25  or her testimony may be colored by a personal or professional

1   interest in the outcome of the case.  It is your decision, after

2   reviewing all the evidence, whether to accept the testimony of

3   the law enforcement witness and give that testimony whatever

4   weight, if any, you find it deserves.

5        Instruction 30.  You have heard testimony from certain

6   persons or maybe one person who was qualified as an expert.  An

7   expert is allowed to express his or her opinion on those matters

8   about which he or she has special knowledge and training.

9   Expert testimony is presented to you on the theory that someone

10  who is experienced in the field can assist you in understanding

11  the evidence or in reaching an independent decision on the

12  facts.

13       In weighing the expert's testimony, you may consider

14  the expert's qualifications, his or her opinions, his or her

15  reasons for testifying as well as all other considerations that

16  ordinarily apply when you are deciding whether or not to believe

17  a witness's testimony.  You may give the expert testimony

18  whatever weight, if any, you find it deserves in light of the

19  evidence in the case.  You should not, however, accept this

20  witness's testimony merely because he or she is an expert, nor

21  should you substitute it for your own reason, judgment and

22  common sense.  Determination of the facts in this case rests

23  solely with you.

24       So, ladies and gentlemen, those are the first part of

25  my instructions.  I give them in all criminal cases so the jury

will pretty much know some fundamental things.  I've told you

who has the burden in this case.  The government has the burden.

The defendant has no burden.  Defendant doesn't have to take the

stand, doesn't have to present any witnesses.  I've also told

you what the evidence in this case is, the testimony,

stipulations, exhibits you'll have.  And I've also told you that

there are certain instructions, 22 through 30, which help you

evaluate the witnesses in this case and assess them.  So, you

have all of that.  I've told you what your duty is.  I've told

you what my duty is.  So, those are general instructions, 1

through 30, that apply in any criminal case.

I'm now going to get specific now in the next

instructions, 31 through 65.  I'm going to get specific as to

the law, the charges in this case, and we can go through that

and then we'll take a break after that.

So, let's begin.  We will now consider the crimes with

which the defendant is charged in this second superseding

indictment.  Again, the alleged crimes are charged in what we

call a count.  I'm going to send a copy of the second

superseding indictment in the jury room for you to read and

review during your deliberations.  You may use it to determine

the crimes which the defendant is charged with committing.

You are reminded, however, that an indictment is not

an -- is only an accusation.  It's not evidence and you may not

use it as any proof of the charges -- of the conduct charged.

1    Let's see.  All right.  Let's go now to instruction 32,

2    Count One.  In Count One of the superseding indictment Mr. Royal

3    is charged with conspiracy to commit sex trafficking between

4    April 2007 and continuing through in and about May 2007.

5         Specifically, the second superseding indictment alleges

6    as follows.  You'll have a copy of it.  Beginning at least in

7    April 2007 and continuing through in or about May 2007, in the

8    state and District of Maryland and elsewhere, the defendant,

9    Lloyd Mack Royal, III, also known as Blyss or B or Furious,

10   together with others known and unknown to the grand jury, did

11   knowingly in and affecting interstate and foreign commerce

12   combine, conspire, confederate and agree to commit an offense

13   against the United States, namely, to recruit, entice, harbor or

14   transport, provide and obtain by any means a person and benefit

15   financially and by receiving anything of value from

16   participating in a venture engaged in such acts, knowing that

17   force, fraud and coercion would be used to cause the person to

18   engage in a commercial sex act, and knowing that the person had

19   not obtained the age of 18 years and would be caused to engage

20   in a commercial sex act.  All of this is a violation, they

21   allege, of Section -- Title 18, United States Code 1591(a).

22        And, ladies and gentlemen, Count One, the conspiracy

23   here, has a number of overt acts which you can read.  It talks

24   about the means and manner of the conspiracy in the indictment

25   and it lists a number of overt acts which you can read at your

1  convenience.  I'm not going to go through them because they're
2  set forth in the second superseding indictment.

3          The relevant statute on this subject is Title 18,
4  United States Code, 371, which provide as follows:  If two or
5  more persons conspire to commit any offenses against the United
6  States and one or more such persons do an act to effect the
7  object of the conspiracy, each shall be guilty of a crime.

8          Now, ladies and gentlemen, the defendant again is
9  charged with having been a member of a conspiracy to violate
10  certain federal law.  I'll tell you about what a conspiracy is.
11  A conspiracy is a kind of criminal partnership.  That is, a
12  combination or agreement of two or more persons to join together
13  to accomplish some unlawful purpose.

14          The crime of conspiracy to violate federal law is an
15  independent crime.  It is separate and distinct from the actual
16  violation of any specified federal laws or specific federal
17  laws, which the law refers to as substantive crimes.

18          You may find the defendant guilty of the crime of
19  conspiracy to commit an offense against the United States even
20  though the substantive crime, which was the object of the
21  conspiracy, was not actually committed.  Moreover, you may also
22  find a defendant guilty of conspiracy despite the fact that he
23  was incapable of committing a substantive offense.

24          Congress has deemed it appropriate to make conspiracy,
25  standing alone, a separate crime even if the conspiracy is not

1  successful.  This is because collective criminal activity poses

2  a greater threat to the public safety and welfare than

3  individual conduct and increases the likelihood of success of a

4  particular criminal venture.

5       An individual need not join a conspiracy at its

6  inception or remain active in it until it ends to be found

7  guilty of the conspiracy.  Moreover, each person joining the

8  conspiracy is taken to adopt and is bound by the prior acts and

9  statements of other conspirators made in furtherance of the

10 conspiracy and during its pendency even if made before the

11 individual in question may have joined the conspiracy.

12      So, instruction 35 are the elements of conspiracy.

13 Let's talk about that.  In order to prove the crime of

14 conspiracy in this Count One, the government must prove the

15 following elements of the crime beyond a reasonable doubt, and

16 there are four of them.  Here they are.

17      First, beginning in at least April 2007 and ending in

18 or about May 2nd that two or more persons entered into the

19 particular unlawful agreement charged in the conspiracy count

20 you are considering;

21      Second, that the defendant knowingly and willfully

22 became a member of the conspiracy;

23      Three, that one of the members of the conspiracy

24 knowingly committed at least one of the overt acts charged or

25 set forth in the second superseding indictment;

1      And, fourth, that an overt act or acts which you find

2  to have been committed was or were committed to further some

3  objective of the conspiracy.

4      So I'll take those four elements separately.  The first

5  element which the government must prove beyond a reasonable

6  doubt to establish the offense of conspiracy is that two or more

7  persons entered the unlawful agreement charged in the

8  indictment.  In order for the government to satisfy this

9  element, you need not find that the alleged members of the

10  conspiracy met together and entered into any express or formal

11  agreement.  Similarly, you need not find that the alleged

12  conspirators stated in words or writing what the scheme was, its

13  object or purpose or every precise detail of the scheme or the

14  means by which its object or purpose was to be accomplished.

15  Indeed, it is sufficient that the government show that the

16  conspirators tacitly came to a mutual understanding to

17  accomplish an unlawful act by means of a joint plan or common

18  design.

19      What the government must prove is that there was a

20  mutual understanding, either spoken or unspoken, between two or

21  more persons to cooperate with each other to accomplish an

22  unlawful act.

23      You may, of course, find that the existence of an

24  agreement to disobey or disregard the law has been established

25  by direct proof.  However, since conspiracy is by its very

1  nature characterized by secrecy, you may also infer its

2  existence from the circumstances of this case and the conduct of

3  the parties involved.

4         In a real sense, then, in the context of conspiracy

5  cases, actions often speak louder than words.  In this regard

6  you may in determining whether an agreement existed here

7  consider the actions and statements of all those you find to be

8  participants as proof that a common design existed on the part

9  of the person charged and the co-conspirators to act together

10  for the accomplishment of an unlawful purpose.

11         All right, the second element.  The second element

12  which the government must prove beyond a reasonable doubt --

13  Count One -- to establish the offense of conspiracy is that the

14  defendant knowingly, willfully and voluntarily became a member

15  of the conspiracy.  If you are satisfied that the conspiracy

16  charged in the indictment existed, you must next ask yourselves

17  who the members of the conspiracy are.  In deciding whether the

18  defendant was, in fact, a member of the conspiracy, you should

19  consider whether the defendant knowingly and intentionally

20  joined the conspiracy.  Did he participate in it with knowledge

21  of its unlawful purpose and with the specific intention of

22  furthering its business or objectives as an associate or worker?

23         In that regard, it has been said that in order for a

24  defendant to be deemed a participant in a conspiracy, he must

25  have a stake in the venture or its outcome.  You are instructed

1  that while proof of a financial interest in the outcome of the

2  scheme is not essential, if you find that the defendant had such

3  an interest, that is a factor which you may properly consider in

4  determining whether or not the defendant was a member of the

5  conspiracy charged in the indictment.

6          As I mentioned earlier, before the defendant can be

7  found to have been a conspirator, you must first find that he

8  knowingly joined the unlawful agreement or plan.  The key

9  question, therefore, is whether the defendant joined the

10 conspiracy with an awareness of at least some of the basic aims

11 and purposes of the unlawful agreement.

12         It is important for you to note that the defendant's

13 participation in the conspiracy must be established by

14 independent evidence of his own acts or statements and the

15 reasonable inferences which may be drawn from them.

16         A defendant's knowledge is a matter of inference from

17 the facts proved.  In that connection, you are instructed that

18 to become a member of the conspiracy, a defendant need not have

19 known the identities of each and every member, nor need he have

20 been apprised of all of their activities.  Moreover, a defendant

21 need not have been fully informed as to all of the details or

22 the scope of the conspiracy in order to justify an inference of

23 knowledge on his or her part.  Furthermore, a defendant need not

24 have joined in all of the conspiracy's unlawful objectives.

25         The extent of a defendant's participation has no

1   bearing on the issue of a defendant's guilt.  A conspirator's

2   liability is not measured by the extent or duration of his

3   participation.  Indeed, each member may perform separate and

4   distinct acts and may perform them at different times.  Some

5   conspirators play major roles while others play minor parts in

6   the scheme.  An equal role is not what the law requires.  In

7   fact, even a single act may be sufficient to draw the defendant

8   within the ambit of the conspiracy.

9        I want to caution you, however, that the defendant's

10  mere association with one or more members of the conspiracy does

11  not automatically make a defendant a member.  A person may know

12  or be friendly with a criminal without being a criminal himself.

13  Mere similarity of conduct or the fact that they may have

14  assembled together and discussed common aims and interests do

15  not necessarily establish proof of the existence of a

16  conspiracy.

17       I want also to caution you that mere knowledge or

18  acquiescence without participation in the unlawful plan is not

19  sufficient.

20       Moreover, the fact that the acts of a defendant,

21  without knowledge, merely happen to further the purposes or

22  objectives of the conspiracy does not make a defendant a member.

23  More is required under the law.  What is necessary is that the

24  defendant must have participated with knowledge of at least some

25  of the purposes or objectives of the conspiracy and with the

1  intention of aiding in the accomplishment of those unlawful

2  ends.

3          In sum, the defendant, with an understanding of the

4  unlawful character of the conspiracy, must have intentionally

5  engaged, advised or assisted in it for the purpose of furthering

6  the illegal undertaking.  He would thereby become a knowing and

7  willing participant in the unlawful agreement, that is to say, a

8  conspirator.

9          The third element which the government must prove

10  beyond a reasonable doubt is that at least one of the overt acts

11  set forth or charged in the indictment was knowingly committed

12  by at least one of the conspirators at or about the time and

13  place alleged.

14          Now, an overt act need not itself be criminal conduct.

15  What is necessary is that it be a step that furthers or carries

16  out or promotes the conspiratorial scheme.

17          An overt act need not be committed by the defendant on

18  trial.  It is sufficient for the government to show that any of

19  the conspirators knowingly committed an overt act in furtherance

20  of the conspiracy.  This is because the law views the act of one

21  conspirator as the act of all.

22          In order for the government to satisfy this element as

23  to Count One, it is not required that all of the overt acts

24  alleged be proven.  You must find that at least one of the

25  alleged acts was committed and your decision as to which one

1  must be unanimous.

2          The fourth element, again, for Count One is this.  The

3  fourth element which the government must prove beyond a

4  reasonable doubt is that the overt act was committed for the

5  purpose of carrying out the unlawful agreement.  In order for

6  the government to satisfy this burden, they must prove beyond a

7  reasonable doubt that at least one overt act was knowingly and

8  willfully done by at least one conspirator in furtherance of

9  some object or purpose of the conspiracy as charged in the

10  indictment.

11          In this regard you should bear in mind that an overt

12  act standing alone may be innocent or lawful, as we mentioned

13  before.  Frequently, however, an apparently innocent act sheds

14  its harmless character if it is a step in carrying out or

15  promoting, aiding or assisting in the conspiratorial scheme.

16  You are therefore instructed that the overt act does not have to

17  be -- does not have to be an act which in and of itself is

18  criminal and constitutes -- or constitutes an objective of the

19  conspiracy.

20          Now, you've heard this word "intent" and "knowingly."

21  Let me give you a couple of instructions here.  Instruction 40,

22  proof of intent.  Intent ordinarily may not be proved directly

23  because there is no way of fathoming or scrutinizing the

24  operations of the human mind, but you may infer the defendant's

25  intent from the surrounding circumstances.  You may consider any

1  statements made or any acts done or omitted by the defendant and

2  all other facts and circumstances in evidence which indicate the

3  state of mind.

4  You may infer, but you are certainly not required to

5  infer, that a person intends the natural and probable

6  consequences of acts knowingly done or knowingly omitted.  As

7  stated before, it is entirely up to you to decide what facts to

8  find from the evidence.

9  Knowingly.  In order to sustain its burden of proof,

10  the government must prove that the defendant acted knowingly.  A

11  person acts knowingly if he acts intentionally and voluntarily

12  and not because of ignorance or mistake or accident or

13  carelessness.  Whether the defendant acted knowingly may be

14  proven by the defendant's conduct and by all of the facts and

15  circumstances surrounding the case.

16  All right.  So that ends Count One.  So let's go to

17  Count Two.  Again, Counts Two through Four.  In Counts Two

18  through Four the defendant is charged with sex trafficking and

19  here is how the second superseding indictment reads as to Count

20  Two:

21  From in or about April 2007, continuing through in or

22  about May 2007, in the District of Maryland and elsewhere, the

23  defendant, again, Lloyd Mack Royal, III and his aka's, did

24  knowingly, in and affecting interstate and foreign commerce,

25  recruit, entice, harbor, transport, provide and obtain by any

means a person, namely, M.P., and did benefit financially and by receiving anything of value from participation in a venture engaged in such acts, knowing that force, fraud and coercion would be used to cause M.P. to engage in a commercial sex act and knowing that M.P. had not obtained the age of 18 and would be caused to engage in a commercial act.

Count Three is basically the same except that it substitutes the letters S.T. as the person in Count Three, same dates, in or about April 2007, in the District of Maryland and so forth.

Count Four has a different date but it's the same offense. It says here in Count Four in or about May 2007, in the District of Maryland, again, the defendant Lloyd Mack Royal, III, and the aka's, did knowingly, in and affecting interstate and foreign commerce, recruit, entice, harbor, transport, provide and obtain by any means the person, namely, and here the person is I.L., and did benefit financially and by receiving anything of value from participation in a venture engaged in such acts, et cetera, again, knowing that I.L. had not obtained the age of 18 and would be caused to engage in a commercial act.

So, as to Counts Two and Three the relevant date I believe was April 2007. Count Four, same count except the date is May 7. And all three counts have different initials which you can look at.

Now, the relevant statute for these three counts, Two,

1  Three and Four, would be Title 18, United States Code, Section

2  1591(a) and here is what it provides essentially:

3      Whoever knowingly, in or affecting interstate or

4  foreign commerce, recruits, entices, harbors, transports,

5  provides or obtains by any means a person or; two, benefits

6  financially or by receiving anything of value from participation

7  in a venture which is engaged in an act described in violation

8  of paragraph one, knowing that force, fraud or coercion would be

9  used to cause the person to engage in a commercial sex act; or

10 that the person has not obtained the age of 18 years and would

11 be caused to engage in a commercial sex act, shall be guilty of

12 a crime.  That's the statute.  It's there for you to read.

13     All right.  I'm moving to instruction 43.  I'm now

14 going to give you the elements that are necessary under these

15 counts, Two, Three and Four.

16     So, starting with instruction 43, to find the defendant

17 guilty of sex trafficking as charged in Counts Two, Three and

18 Four, you must find that the government has proven each of the

19 following elements beyond a reasonable doubt.  Here they are.

20     First you must find that the defendant knowingly

21 recruited, enticed, harbored, transported, provided or obtained

22 a person; or the defendant knowingly benefited financially or by

23 receiving something of value from participating in a venture

24 that recruited, enticed, transported, provided or obtained a

25 person; and then, second, that the defendant knew, A, that

force, fraud or coercion would be used to cause the person to engage in commercial act; or, B, that the person was under the age of 18 years and was caused to engage in a commercial sex act, with all of you agreeing as to whether A or B or both had been proven beyond a reasonable doubt.  And then the third element is that defendant's acts were in or affecting interstate commerce.

So let me discuss these three elements for the sex trafficking offenses set forth in Counts Two, Three and Four.

All right.  Let's look at the first count -- the first element first.  The first element of the crime of sex trafficking requires that the defendant either, A, knowingly recruited, enticed, harbored, transported, provided or obtained a person or, B, knowingly benefited financially or by receiving something of value from participating in a venture that did one of these things.

So, there are two different ways for the government to satisfy the first element of sex trafficking.  The first is by proving that the defendant himself knowingly engaged in one of a list of prohibited trafficking activities I just read, and the second way is proving that the defendant knowingly took part in a venture that engaged in one of those trafficking activities and that the defendant benefited financially or by receiving a thing of value from participation in that venture.

The first way to satisfy the first element is proving

that the defendant himself knowingly recruited, enticed,
harbored, transported, provided or obtained a person.  In
considering whether the defendant did any of these things, you
are instructed that the ordinary, everyday definition of those
terms apply.

"Recruit" means to seek to enroll.  "Harbor" means to
give or afford shelter to.  "Transport" means to take or convey
from one place to another.  "Provide" means to furnish, supply
or make available.  "Obtain" means to gain possession of or
acquire.  "Entice" means to attract, to induce or to lure using
hope or desire.

To prove the first element of sex trafficking in the
second alternative or the alternative way, the government need
not prove that the defendant himself engaged in any of the
trafficking activities such as recruiting, or enticing, or
harboring, or transporting, or providing, or obtaining.  The
government need only prove in the second alternative that there
was a venture that engaged in one of those activities, that the
defendant knowingly participated in some way in that venture and
that the defendant knowingly benefited, either financially or by
receiving a thing of value from the venture.

In considering whether the defendant participated in
such a venture, you are instructed that a venture is defined as
any group of two or more individuals associated in fact, whether
or not as a legal entity.  You may find that a defendant

1   participated in a venture prohibited by the sex trafficking laws

2   if the defendant took part in that venture in any way.  The

3   defendant may be, but need not be, one of the people who formed

4   the venture.  Likewise, a defendant need not be an organizer or

5   main participant in the venture and need not have participated

6   throughout the length of the venture.  It is enough if the

7   defendant took some part in the venture for any period of time

8   while the venture was still ongoing even if the part he played

9   was minor and even if it was not related to the actual

10  recruiting, or enticing, or harboring, transporting, providing

11  or obtaining of a person for commercial sex acts.

12          To benefit financially or by receiving a thing of value

13  from a venture, a defendant must receive some form of profit,

14  benefit, value or advantage, no matter how minor, from the

15  venture.

16          All right.  Let's look at instruction 45, the second

17  element of sex trafficking.  The second element of sex

18  trafficking requires that the government prove beyond a

19  reasonable doubt that the defendant knew that force, fraud or

20  coercion would be used to cause a person to engage in a

21  commercial sex act or that the defendant knew that the person

22  engaging in the commercial sex act was not yet 18 years old and

23  was caused to engage in a commercial sex act.

24          To find that the second element is satisfied, you must

25  agree unanimously as to how the element is satisfied.  In other

1   words, it's not enough for some of you to find that the

2   defendant knew that force, fraud or coercion would be used while

3   others find that the defendant knew the person was under 18.

4   You must agree unanimously on at least one of these things,

5   either that the defendant knew that force, fraud or coercion

6   would be used or that the defendant knew that the person was

7   under the age of 18.  You may agree unanimously as to both, but

8   for this element to be met, you must agree unanimously on at

9   least one.

10          And, of course, ladies and gentlemen, there will be a

11  question on the verdict sheet to assist you as you review the

12  evidence and make that determination.  So these questions will

13  be designed to help you to do this review.

14          The term "commercial sex act" means any sex act on

15  account of which anything of value is given to or received by

16  any person.  The thing of value may be money or any other

17  tangible or intangible thing of value that may be given to or

18  received by any person, regardless of whether the person who

19  receives it is the person performing the commercial act.

20          The term "force" means any form of power, or violence,

21  or physical pressure directed against another person.

22          The term "fraud" means any deliberate act of deception,

23  trickery or misrepresentation.

24          The term "coercion" means any threats of serious harm

25  to or physical restraint against any person or any scheme, plan

1  or pattern intended to cause a person to believe that failure to

2  perform an act would result in serious harm to or physical

3  restraint against any person or any abuse or threatened abuse of

4  law or the legal process.

5       Threats of serious harm, which I just mentioned as one

6  definition of coercion, includes threats of both physical and

7  nonphysical types of harm.  They include threats of any

8  consequences, whether physical or nonphysical, that are

9  sufficient under all of the surrounding circumstances to compel

10 or coerce a person to perform commercial sex acts that she would

11 not have otherwise been willing to perform.

12      Abuse or threatened abuse of the law or legal process

13 means use or threatened use of the law or legal process, whether

14 civil or criminal, against another person primarily to

15 accomplish a purpose for which the law was not designed, in

16 order to put pressure on another person to compel her to take

17 some action or refrain from taking some action.

18      In considering whether force, fraud or coercion would

19 be sufficient to cause a person to engage in commercial sex

20 acts, you may consider not only the totality of the defendant's

21 conduct under all of the surrounding circumstances but also the

22 alleged victim's special vulnerabilities, if any.  By this I

23 mean that you may consider any aspect of the alleged victim's

24 age or background, station in life, physical and mental

25 condition, experience or education, or any inequalities between

1    the alleged victim and the defendant or any others working in

2    concert with him.  Simply put, you may ask whether an alleged

3    victim was vulnerable in some way such that the use of force or

4    fraud or coercion would have been enough to compel a reasonable

5    person in the same circumstances to engage in commercial sex

6    acts.

7            Now, to prove sex trafficking the government need

8    not -- the government does not need to link each of the threats

9    allegedly made or actions allegedly taken against an alleged

10   victim to any particular commercial sex act performed by her.

11   Rather, it is sufficient if the government has shown that the

12   defendant's use of threats, force, fraud, deception, or coercion

13   were sufficient to compel or were sufficient to give rise to a

14   climate of fear that would compel a reasonable person in the

15   alleged victim's situation to comply with the defendant's

16   demands in light of the totality of the defendant's conduct, the

17   surrounding circumstances, and any vulnerabilities of the

18   victim.

19           You may also consider whether the defendant's conduct

20   gave rise to a climate of fear that overcame the will of the

21   alleged victim.  A climate of fear that overcame the will of the

22   victim may arise not only from the defendant's threats and other

23   acts directed at the victim herself but also from conduct

24   directed at others of which the victim is aware.

25           The government need not prove physical restraint, such

1   as the use of chains or barbed wire or locked doors, in order to

2   establish the offense of sex trafficking.  The fact that an

3   alleged victim may have had an opportunity to escape is

4   irrelevant if a defendant placed her in such fear or

5   circumstances that she did not reasonably believe she could

6   leave.  A victim who has been placed in such fear or

7   circumstances that she is afraid to leave is under no

8   affirmative duty to try to escape.

9           If an alleged victim was threatened or made to suffer

10  certain consequences in connection with prostituting for the

11  defendant, either as punishment or to create a climate of fear

12  that overcame her will and compelled her service, that may be

13  sufficient to establish the fraud, force, or coercion element of

14  this crime.

15          The fact that an alleged victim may have initially

16  acquiesced to provide services for a defendant does not preclude

17  a finding that the victim was compelled to engage in

18  prostitution thereafter.  For example, if a victim unwillingly

19  began to engage in prostitution, then wanted to withdraw but was

20  forced to remain and perform acts of prostitution against her

21  will by force, fraud or coercion or through threats of serious

22  harm, or by scheme, pattern or plan intended to cause her to

23  believe that her refusal would result in serious harm to her or

24  another person, then that service became involuntary.

25          When a person is paid a salary or wage -- whether a

1   person is paid a salary or wage is not determinative of the

2   question of whether that person has been compelled to engage in

3   sex trafficking.  In other words, if a person is compelled to

4   engage in a commercial sex act through force or fraud or

5   coercion, such service is involuntary, even if she is paid or

6   compensated for the work.

7          Now, the government may prove the defendant's knowledge

8   that a person was under a particular age by proving beyond a

9   reasonable doubt that the defendant actually knew that the

10  person was under a particular age or that the defendant was

11  willfully blind to what otherwise would have been obvious to

12  him.

13         In determining whether the defendant was willfully

14  blind, you should not find the defendant -- you should not find

15  the defendant guilty if all the evidence proves is mistake or

16  even careless disregard.  However, you may conclude that the

17  knowledge element has been proven if the evidence shows that the

18  defendant deliberately and purposely closed his eyes to avoid

19  what was taking place around him.

20         The third element, ladies and gentlemen, for Counts

21  Two, Three and Four.  To satisfy the third and final element of

22  the crime of sex trafficking, again, Counts Two, Three and Four,

23  the government must prove beyond a reasonable doubt that a

24  defendant's sex trafficking activities were or that the

25  activities of the sex trafficking venture in which the defendant

1  knowingly participated either was in interstate commerce or

2  affected interstate commerce.  The government does not have to

3  prove both.

4       "Interstate commerce" means the flow of commerce or

5  business activities between a state at any point outside of that

6  state -- and any point outside that state.  Acts and

7  transactions which are economic in nature and cross state lines

8  are "in" interstate commerce.

9       Transporting people across state lines for a commercial

10 purpose is interstate commerce.  Acts and transactions which are

11 economic in nature and affect the flow of money in the stream of

12 commerce to any degree, however minimal, also affect interstate

13 commerce.

14      To show that a defendant's conduct affected interstate

15 commerce, it is not necessary for the government to prove that a

16 defendant specifically knew or intended that the recruiting,

17 enticing, harboring, transporting, providing, or obtaining of a

18 person to engage in commercial sex acts would affect interstate

19 commerce.  It is only necessary that the natural consequences of

20 such conduct would be to affect interstate commerce in some way,

21 even if minor.

22      If you find beyond a reasonable doubt that a defendant

23 or the defendant's recruitment, enticement, harboring,

24 transportation, providing, or obtaining of a person for the

25 purpose of engaging in commercial acts involved the crossing of

1   state lines or was economic in nature and otherwise affected the

2   flow of money in the stream of commerce to any degree, however

3   minimal, you may find that the third element of the offense of

4   sex trafficking has been satisfied.

5        Now, also, ladies and gentlemen, with reference to

6   Counts Two, Three and Four, there's an alternative method for

7   looking at the offenses there.  In Counts, Two, Three and Four

8   the defendant is charged not only with the substantive offenses

9   charged in that count, but the defendant also is charged with

10  aiding and abetting the commission of that offense, and that

11  statute is Section 2(a) of Title 18, and it provides that

12  whoever commits an offense against the United States or aids, or

13  abets, or counsels, or commands, or induces, or procures its

14  commission is also punishable as a principal.

15       And I'll give you the instructions on aiding and

16  abetting, which is instruction 48.  Under the aiding and

17  abetting statute, it's not necessary for the government to show

18  that a defendant himself physically committed the crime with

19  which he is charged in order for you to find the defendant

20  guilty.

21       A person who aids or abets another to commit an offense

22  is just as guilty of the offense as if he committed it himself

23  as a principal.

24       Accordingly, you may find a defendant guilty of the

25  offense charged if you find beyond a reasonable doubt that the

government has proved that another person actually committed the
offense with which the defendant is charged and that the
defendant aided or abetted that person in the commission of the
offense.

As you can see, the first requirement is that you find
that another person has committed the crime charged.  Obviously,
no one can be convicted of aiding and abetting the criminal acts
of another if no crime was committed by the other person in the
first place.  But if you do find that a crime was committed,
then you must consider whether the defendant aided or abetted
the commission of the crime.

In order to aid or abet another to commit a crime, it
is necessary that the defendant willfully and knowingly
associate himself in some way with the crime and that he
willfully and knowingly seek by some act to help make the crime
succeed.

Participation in a crime is willful if action is taken
voluntarily and intentionally or, in the case of a failure to
act, with the specific intent to fail to do something the law
requires to be done; that is to say, with a bad purpose either
to disobey or to disregard the law.

The mere presence of a defendant when a crime is being
committed, even coupled with knowledge by the defendant that a
crime is being committed, or the mere acquiescence by a
defendant in the criminal conduct of others, even with guilty

knowledge, is not sufficient to establish aiding and abetting.

An aider and abettor must have some interest in the criminal

venture.

And so, to determine whether the defendant aided or

abetted the commission of the crime with which he is charged ask

yourselves these questions:

One, did he participate in the crime charged as

something he wished to bring about?  Two, did he associate

himself with the criminal venture knowingly and willfully?

Three, did he seek by his actions to make the criminal venture

succeed?  And, four -- well, that's it.  If he did, then the

defendant is an aider and abettor and therefore guilty of the

offense.

If, on the other hand, your answers to these three

questions are no, then the defendant is not an aider and an

abettor and you must find him not guilty.

And then, finally, ladies and gentlemen, with reference

to Counts Two, Three and Four, there's a third method for you to

look at and consider with reference to those counts.  There is

one last method by which you may evaluate the possible guilt of

the defendant on the charges in Counts Two, three and four.  A

conspirator is responsible for offenses committed by another

conspirator if the defendant was a member of the conspiracy when

the offense was committed and if the offense was committed in

furtherance of or as a foreseeable consequence of the

1   conspiracy.

2           If in light of the instructions I've already given you

3   regarding Count One you find beyond a reasonable doubt that the

4   defendant was a member of the conspiracy charged in Count One

5   and thereby guilty on the conspiracy count, then you may also,

6   but you don't have to, find that the defendant guilty -- find

7   that defendant guilty of the substantive crimes charged here in

8   Counts Two through Four, provided you beyond a reasonable doubt

9   each of the following elements -- that's a typo -- against --

10  excuse me.  It's not a typo -- against her.

11          Let me rephrase this again, ladies and gentlemen.  If

12  in light of the instructions I gave you regarding Count One you

13  find beyond a reasonable doubt that the defendant was a member

14  of the conspiracy charged in Count One and thus guilty of the

15  conspiracy count, then you may also, but you are not required

16  to, find that the defendant -- find the defendant guilty of the

17  substantive charge against -- I guess that should be "him" -- in

18  Counts Two through Four, provided you find beyond a reasonable

19  doubt each of the follow elements:

20          First, the crime charged in the substantive count under

21  consideration was committed; second, the person or persons you

22  find actually committed the crime were members of the conspiracy

23  you found existed in Count One; three, the crime was committed

24  as part of the common plan and understanding you found existed

25  among the conspirators in Count One; fourth, the defendant was a

1   member of the conspiracy at the time the crime was committed;

2   and, fifth, the defendant could have reasonably foreseen that

3   the sex trafficking in the count you are considering might have

4   been committed by his co-conspirators.

5         So, if you find all of the elements exist beyond a

6   reasonable doubt, then you may find the defendant guilty of the

7   sex trafficking count even though he did not personally

8   participate in the acts constituting the crime or did not have

9   actual knowledge of it.

10        The reason for this rule is that under the law a

11   co-conspirator who commits a substantive crime pursuant to a

12   conspiracy is deemed to be the agent of the other conspirators.

13   Therefore, in the eyes of the law, all of the co-conspirators

14   bear criminal responsibility for the commission of the crimes of

15   their co-conspirators and the acts of one conspirator become the

16   acts of all.

17        Therefore, if you have found the defendant guilty of

18   the conspiracy and if you find beyond a reasonable doubt that

19   during the time the defendant was a member of the conspiracy

20   another conspirator or other conspirators committed an offense

21   charged in the other counts of the indictment in furtherance of

22   or as a foreseeable consequence of that conspiracy, then you may

23   find the defendant guilty of those other counts charged in the

24   indictment even though the defendant may not have participated

25   in or have actual knowledge of any of the acts which constitute

1    the offenses described in these counts.

2        Otherwise, you may find the defendant guilty of an

3    offense only if you find beyond a reasonable doubt that he

4    personally committed or aided and abetted the commission of that

5    offense.

6        If, however, you are not satisfied as to the existence

7    of any of these five elements, then you may not find the

8    defendant guilty of the substantive crime unless the government

9    proves beyond a reasonable doubt that the defendant personally

10   committed or aided and abetted the commission of the substantive

11   crime charged.

12       So, ladies and gentlemen, that's a -- instruction 49 is

13   a third method for you to review in determining the guilt or not

14   guilt of Counts Two, Three and Four.  Again, it's based on the

15   theory of liability of co-conspirators.

16       Now, I'll give you instruction 50, which, again, the

17   defendant may be responsible for the acts of co-conspirators if

18   the elements explained above are satisfied.  However, the

19   defendant is not responsible for the conduct of another if

20   before the commission of an offense he effectively ends his

21   effort to promote or facilitate the commission of the offense by

22   one of the following means:

23       One, wholly depriving him prior efforts of

24   effectiveness in the commission of the crime, or giving timely

25   warning of the proper -- to the proper law enforcement

1  authorities, or during an affirmative act that is inconsistent

2  with the object of the conspiracy and is done in such a way that

3  the co-conspirators are reasonably likely to know about it

4  before they carry through with further acts of the conspiracy,

5  or making proper effort to prevent the commission of the crime.

6          These are circumstances if you find they existed where

7  the defendant has withdrawn from the conspiracy and he wouldn't

8  be responsible for that if you find those to be the facts.

9          If you find that the defendant engaged in one of these

10  acts I've just mentioned, then you should find the defendant not

11  responsible for the acts or offenses of his co-conspirators for

12  which he might otherwise be responsible as I've explained.

13          If a defendant does not effectively end his efforts to

14  promote or facilitate commission of the offenses by one of these

15  means, merely ceasing to actively participate in the conspiracy

16  or in the unlawful act is not sufficient to establish withdrawal

17  from the conspiracy and the defendant could be or remains liable

18  for acts of co-conspirators in accordance with the elements I've

19  outlined below.

20          So, again, instruction 50 can be read with instruction

21  49.  Again, you can't find the defendant liable under that

22  theory of a co-conspirator's efforts if he has withdrawn from

23  the conspiracy or he has satisfied these elements set forth in

24  instruction 50.

25          All right.  Moving on to instruction 51, Count Five

1    now.  I'm finished with Counts Two, Three and Four.  Count Five

2    of the superseding indictment charges the defendant with

3    possessing a firearm during and in relation to a crime of

4    violence, specifically, a conspiracy to commit sex trafficking,

5    in violation of Title 18, Section 371 as set forth in Count One

6    of the superseding indictment, and sex trafficking has been

7    described in Counts Two and Three of the superseding indictment.

8    Only Two and Three for this Count Five.

9            So, Count Five of the indictment, here is how it reads:

10           In or about April 2007, in the District of Maryland and

11   elsewhere, the defendant, again, Lloyd Mack Royal, III, and his

12   aliases, did knowingly possess a firearm in furtherance of and

13   used and carried a firearm during and in relation to a crime of

14   violence for which he may be prosecuted in a court of the United

15   States, that is, conspiracy to commit sex trafficking in

16   violation of 18 U.S.C. 371 as alleged in Count One and the sex

17   trafficking offenses set forth in Counts Two and Three of the

18   superseding indictment.

19           The relevant statute is Title 18, United States Code,

20   924.  It provides as follows:

21           Any person who, in furtherance of any crime of violence

22   for which the person may be prosecuted in a court of the United

23   States, possesses a firearm shall be guilty of the crime.

24           Okay.  Under Count Five the defendant is charged with

25   possessing, using or carrying a firearm in furtherance of a

1  crime of violence, which is charged in Counts One, Two and

2  Three.  And, again, you don't look at this in connection with

3  Count Five.  The government has not charged this Count Five --

4  possession of this firearm in furtherance of in Count Five.

5  It's got the initial of the person, "I" something, but Count

6  Five is not applicable, only Counts One, Two and Three.

7        If upon all the evidence you find the government has

8  failed to prove Count One, Count Two or Count Three beyond a

9  reasonable doubt, then you will proceed no further as to Count

10 Five.  Count Five is to be considered only if you find that the

11 defendant is guilty under Counts One, Two and Three.

12        In reaching your verdict as to Count Five, you may

13 consider the evidence of Count One, Count Two and Count Three

14 only for the purpose of determining whether the element of Count

15 Five -- elements of Count Five have been satisfied.

16        So let's be a little more specific.  Again, in order to

17 satisfy its burden of proof as to this Count Five, the

18 government must prove and must establish each of the following

19 elements beyond a reasonable doubt:

20        First, that the defendant committed a crime of violence

21 as charged in the indictment, which is a crime for which he

22 might be prosecuted in a court of the United States; and, two,

23 that the defendant knowingly possessed a firearm in furtherance

24 of that crime of violence.

25        The first element, again, the government must prove

beyond a reasonable doubt is that the defendant committed a

crime of violence for which he might be prosecuted in a court of

the United States.

    The defendant is charged in Count One of the

superseding indictment with conspiracy to commit sex trafficking

in Counts Two and Three.  Let me repeat that.  The defendant is

charged in Count One of the second superseding indictment with

conspiracy to commit sex trafficking and in Counts Two and Three

with sex trafficking.

    "Crime of violence" means a felony offense that has an

element -- has as an element the use, attempted use, or

threatened use of physical force against the person or property

of another.

    You are instructed that Counts One, Two and Three are

all felony offenses.  If you find that either Counts One, Two or

Three were committed by the use, attempted use, or threatened

use of physical force, then that offense is a crime of violence.

    In reaching your verdict you must unanimously -- you

must be unanimous as to which count, if any, the government has

proven beyond a reasonable doubt to be a crime of violence in

accordance with the definition I've just given you.  And, again,

there will be a question to that effect on your verdict sheet.

    The second element that the government must prove

beyond a reasonable doubt is that the defendant knowingly

possessed a firearm in furtherance of the crime of violence

1    charged in Count One.

2          Again, a firearm is any weapon that will or is designed

3    to or may be readily converted to expel a projectile by the

4    action of an explosive.

5          Correct me if I'm wrong.  Was there a stipulation to

6    that effect?

7          MS. MAGNELLI:  Yes, Your Honor, there was.

8          MR. TRAINOR:  Yes.

9          THE COURT:  So that element, whether it's a firearm,

10   really is not in --

11         MS. MAGNELLI:  No, Your Honor.  And may we approach on

12   one other issue?

13         THE COURT:  Yes.  You want to approach?  Yes.

14         (At the bench:)

15         MS. MAGNELLI:  Your Honor, somehow they didn't make it

16   into the finals, but the fact is the government charged

17   "possessed, used or carried."  So, right now Mike Pauze is

18   drafting the next instruction, the one, Your Honor, on firearm,

19   what "possession" means, what "use" means, what "carry" means.

20   So, Mr. Pauze is drafting it right now.

21         THE COURT:  Which one is that?

22         MS. MAGNELLI:  The one you're reading.

23         THE COURT:  The one I'm reading, 55?

24         MS. MAGNELLI:  I don't remember the number, the one

25   that talks about the definition of "possessing."  We're adding

1    "using" and "carrying."

2         THE COURT:  Did I pass that yet?

3         MR. TRAINOR:  Was that an instruction that was approved

4    yesterday?

5         MS. MAGNELLI:  It was one that was in my original stack

6    and I don't know what happened.

7         MR. TRAINOR:  Did we discuss it yesterday?

8         MS. MAGNELLI:  I don't know if it was in that stack.  I

9    don't have that stack any more, but it was in my original stack.

10   We can argue about it, but we charged it.  So I think --

11        THE COURT:  It's on the way in?  I'm just trying to see

12   if I've gotten to it yet.

13        MS. MAGNELLI:  I think, if I may, Your Honor, it's the

14   one you're actually on.

15        THE COURT:  Which one is it?

16        MS. MAGNELLI:  I think the language is going to go

17   right where this line is.

18        MR. TRAINOR:  Do you think we should take a break?

19        THE COURT:  I would think so, yes.

20        MS. MAGNELLI:  That's fine.

21        MR. TRAINOR:  That makes sense.

22        THE COURT:  Okay.  "Possession of firearm."  Okay.  We

23   need that.  They're redrafting that?

24        MS. MAGNELLI:  Right this second.  That's why I said he

25   stepped out.

1          THE COURT:  All right.  Okay.

2          MR. TRAINOR:  Thank you.

3          (In open court:)

4          THE COURT:  Okay, ladies and gentlemen, I'm going to

5    redraft some language.  I'm on instruction 55.  I'm going to

6    rephrase some language here to include something a little more

7    accurate.  So, give me about five minutes to do that.

8          Let's give them a break right now.

9          (Jury excused for a recess.)

10         THE COURT:  All right.  We'll take a five-minute break,

11   yes.

12         (Recess from 11:15 to 11:25 a.m.)

13         THE COURT:  Let Mr. Trainor see that.

14         MR. TRAINOR:  I have a comment on the verdict sheet.

15   On those three questions that we put the extra subpart in, they

16   added a third subpart that says "both," which is really

17   redundant.  I don't suppose it -- it's not necessary.  It's

18   either -- their answers to the first two would either be

19   neither --

20         THE COURT:  Well, it doesn't harm it.  It's quite

21   obvious, but it doesn't harm.  It'll make it clear.

22         MS. MAGNELLI:  Your Honor, that was our understanding

23   of what the court wanted.  If it's not harmful, then I would

24   just say leave it in.

25         THE COURT:  Yes.  It doesn't harm anything.

1    MR. TRAINOR:  It's one more question that they can make

2  a mistake on.

3    MS. MAGNELLI:  Or really affirm their belief.

4    THE COURT:  That's all it does.  It's not a big deal.

5    All right.  We're looking at now a new instruction 55?

6  Is that what we're doing?

7    MR. TRAINOR:  I am reading it now.

8    THE COURT:  Okay.  All right.  Great.

9    MR. TRAINOR:  This was not in the instruction that was

10  presented.

11    THE COURT:  That's true.

12    MR. TRAINOR:  But these are definitions and they appear

13  to be accurate, and for that reason we will not object to

14  clarification.

15    THE COURT:  All right.  We can make copies.

16    What I propose would be after I finish, we probably

17  won't need a break because we'll move right forward in the

18  government's first part of their closing and then we'll take a

19  lunch break.

20    MS. MAGNELLI:  Okay.

21    THE COURT:  Yes.  We'll take a lunch break, because if

22  Mr. Felte goes an hour, it will be close to one.  So, we'll just

23  take a break, and then come back and Mr. Trainor then will go,

24  and then we'll have Ms. Magnelli finish up.

25    MS. MAGNELLI:  Yes, Your Honor.

1    THE COURT:  They'll probably get it close to the end of

2    the day.  So, I don't know whether they want to do any

3    deliberating today for a portion of the day and then come back

4    tomorrow and continue.

5    Are we ready for the jury?

6    MS. MAGNELLI:  Yes, Your Honor.

7    MR. TRAINOR:  Yes.

8    THE COURT:  All right.  We'll bring them back in.

9    MS. MAGNELLI:  Your Honor, the last page shouldn't be

10   there.  It's just the certificate of service.

11   (Jury present.)

12   THE COURT:  All right.  We can be seated.  Thank you,

13   ladies and gentlemen.

14   Again, I'm in the middle of instructions for Count

15   Five.  Again, Count Five of the superseding indictment charges

16   the defendant with possessing a firearm during and in relation

17   to the crime of violence, specifically, the conspiracy to commit

18   the sex trafficking in Count One and the two sex trafficking

19   allegations set forth in Counts Two and Three.

20   So, I'll read Count Five of the indictment for you.  I

21   gave you a limited instruction, which was instruction 52.

22   Essentially I said if upon all the evidence you find that the

23   government has failed to prove Counts One, Two and Three beyond

24   a reasonable doubt, then you don't have to go to Count Five

25   because Count Five is only relevant if you find that the

1    defendant -- beyond a reasonable doubt the defendant perpetrated

2    those crimes of violence set forth in One, Two or Three.

3          And then I gave you the two elements for this Count

4    Five.  In order to satisfy its burden of proof as to this count,

5    the government must establish each of the following elements

6    beyond a reasonable doubt:

7          One, that the defendant committed a crime of violence

8    as charged in the indictment; and, second, that the defendant

9    knowingly possessed a firearm in furtherance of that crime of

10   violence.

11         And the first element I went over, that was instruction

12   54, and I gave you the definition of "crimes of violence" and I

13   told you that if you find that the defendant committed either

14   Counts One, Two and Three, they were committed by the use,

15   attempted use or threatened use of physical force, then the

16   offense would be a crime of violence.

17         And so, we are now at instruction 55 and we noticed

18   some language missing and I have now found it and I'm about

19   ready to continue on.

20         All right.  So, the second element, possession of a

21   firearm in furtherance of a crime of violence, the second

22   element the government must prove beyond a reasonable doubt is

23   that the defendant knowingly possessed a firearm in furtherance

24   of the crimes of violence, which were charged in Count One, or

25   used or carried a firearm during and in relation to a crime of

1   violence charged in Count One.

2        Okay.  A firearm -- I gave you the definition of a

3   firearm -- is any weapon that will or is designed or may be

4   readily converted to expel a projectile by the action of an

5   explosive.  And I believe that there was a stipulation to that

6   effect by the parties.  So that really is not in dispute.

7        To use a firearm means active employment of the firearm

8   by the defendant during and in relation to the crime of

9   violence.  This does not mean that the defendant must actually

10  fire or attempt to fire the weapon, although those would

11  obviously constitute use of a weapon.  Brandishing, displaying,

12  or even referring to the weapon so that other persons knew or

13  know that the defendant had the weapon available if needed all

14  constitute examples of the use of the firearm.

15       However, mere possession of a firearm is insufficient

16  to establish use the firearm.

17       To carry a weapon in furtherance of a crime of violence

18  means that the defendant had the weapon within his control in

19  such a way that it furthered the commission of the crime or was

20  an integral part of the crime.

21       "To possess" means to have something within a person's

22  control.  This does not necessarily mean that the defendant must

23  hold it physically, that is, have actual possession of it.  As

24  long as the firearm is within the defendant's control, he

25  possesses it, that is, if the defendant either had actual

1    possession of the firearm or he had the power and intention to

2    exercise control over it, even though it was not in his physical

3    possession.

4           The law recognizes that possession may be sole or

5    joint.  If one person alone possesses it, that is sole

6    possession.  However, it is possible that more than one person

7    may have the power and intention to exercise control over the

8    firearm.  Whether the defendant had such power and intention,

9    even if he possessed it jointly with another, there is joint

10   possession.  Proof of ownership of the firearm is not required.

11          To possess a firearm in furtherance of the crime of

12   violence simply means that the presence of a firearm played

13   some part in forwarding, promoting, facilitating, or advancing

14   the commission of the crime of violence, that is, the presence

15   of the firearm was not merely coincidental to the crime of

16   violence -- not coincidental to the crime of violence.

17   Possessing a gun in furtherance of a crime of violence includes,

18   but is not limited to, having a firearm available to assist or

19   embolden or aid or protect the defendant in committing the crime

20   of violence.

21          For this element you must also find that the defendant

22   used, carried or possessed the firearm knowingly.  This means

23   that he used, carried or possessed it purposely and voluntarily

24   and not by accident or mistake.  It also means that he knew the

25   weapon was a firearm as we commonly use the word.  However, the

1   government is not required to prove that the defendant knew he

2   was breaking the law.

3           Okay.  So that ends Count Five and the instructions

4   there end at 55.

5           All right.  Let's go to Count Six of the indictment.

6   Count Six of the indictment, second superseding indictment,

7   charges the defendant with conspiracy to distribute controlled

8   substances.  Here is the language in the superseding indictment

9   which you'll have a copy of:

10          At some time between September 2006 and May of 2007, in

11  the District of Maryland and elsewhere, the defendant, Lloyd

12  Mack Royal, III, and the aka's listed, did knowingly and

13  intentionally combine, conspire, confederate, and agree with

14  others known and unknown to the grand jury to distribute and

15  possess with the intent to distribute the quantity of a mixture

16  or substance containing a detectable amount of marijuana, a

17  quantity of a mixture or substance containing a detectable

18  amount of cocaine, and a quantity of a mixture or substance

19  containing a detectable amount of PCP, phencyclidine.

20          Count Six of the second superseding indictment is

21  brought under 846, Section 846 of Title 21, which provides that

22  any person who conspires to commit an offense in this subchapter

23  has violated the criminal laws of the United States.  A

24  violation under Section 841 of Title 21 is an offense defined in

25  that section and provides as follows:

1    It shall be unlawful for any person, knowingly or

2  intentionally, to distribute, dispense or possess with the

3  intent to distribute a controlled substance.

4    You are further instructed as a matter of law that

5  marijuana is a controlled substance, cocaine is a controlled

6  substance, and PCP is a controlled substance as those terms are

7  used in the instructions and the indictment and the statute I

8  just read to you.  You must, of course, determine whether or not

9  the materials in question were, in fact, marijuana, cocaine or

10  PCP, phencyclidine.  In so doing you may consider all the

11  evidence in the case which may aid you in determining that

12  issue, including the testimony of any witnesses who may testify

13  either to support or to dispute the allegations that the

14  materials in question were marijuana, cocaine or PCP, or any

15  stipulations between the parties regarding the nature of the

16  substance.

17    Now, I've already instructed you on the elements of

18  conspiracy as it applied in Count One.  Remember, we talked

19  about conspiracy to commit sex trafficking.  So, I'm not going

20  to tell you or repeat all of those instructions, but you are

21  advised that unlike the conspiracy to commit sex trafficking

22  charged in Count One, the charge of conspiracy to distribute

23  controlled substances in Count Six does not require proof of

24  overt acts.  Consequently, for the government to prove beyond a

25  reasonable doubt that the defendant is guilty of Count Six, that

1    is, conspiracy to distribute controlled substances, the

2    government need prove beyond a reasonable doubt only the

3    following two elements, and here they are:

4           First element, beginning in September 2006 and ending

5    May 2007, that two or more persons entered the unlawful

6    agreement charged in Count Six of the superseding indictment;

7    and, second, that the defendant in question knowingly became a

8    member of the conspiracy.

9           In determining whether the government has proven these

10   two elements beyond a reasonable doubt, you may go back to my

11   previous instructions I gave you on conspiracy to commit sex

12   trafficking.

13          Now, as stated above, Count Six charges a conspiracy

14   involving the distribution of marijuana, cocaine and

15   phencyclidine.  As a result, let me give you the definition of

16   "distribute."  The word "distribute" means to deliver a

17   narcotic.  "Deliver" is defined as the actual, constructive or

18   attempted transfer of a narcotic.  Simply stated, the words

19   "distribute" and "deliver" mean to pass on, or to hand over to

20   another, or to cause to be passed on or handed over to another,

21   or to try to pass on or hand over to another narcotics.

22          Distribution does not require a sale.  Activities in

23   furtherance of the ultimate sale, such as vouching for the

24   quality of the drugs, negotiating for or receiving the price,

25   and supplying or delivering the drugs may constitute

1    distribution.

2              In short, distribution requires a concrete involvement

3    in the transfer of the drugs.

4              All right.  So that ends Count Six.  And Counts Seven

5    and Eight are basically similar charges.  So we'll talk about

6    them together.  Instruction 59 will be Counts Seven and Eight.

7    Counts Seven and Eight of the superseding indictment charge the

8    defendant with distribution of controlled substances to persons

9    under age 21.

10             The superseding indictment reads as to count seven:

11             In or about April 2007, in the District of Maryland and

12   elsewhere, Lloyd Mack Royal, a person of at least 18 years of

13   age, did knowingly and intentionally distribute a quantity of a

14   mixture or substance containing a detectable amount of cocaine,

15   controlled substance, to S.T., a person under 21 years of age.

16             Count Eight has a different date.  It says:

17             In or about May 2008, in the District of Maryland and

18   elsewhere, Lloyd Mack Royal, a person of at least 18 years of

19   age, did knowingly and intentionally distribute a quantity of a

20   mixture or substance containing a detectable amount of

21   phencyclidine, PCP, a controlled substance, also to M.P., a

22   person under 21 years of age.

23             The relevant statute, again, is Title 21, Section 841,

24   and that makes it a crime for any person to knowingly or

25   intentionally to distribute a controlled substance to any person

1    under 21 years of age, and that would be Sections 841 and 859.

2    Now, what are the elements of these Counts Seven and

3    Eight, the elements of distribution of controlled substance to

4    persons under age 21.  In order to prove these charges against

5    the defendant in Counts Seven and Eight, the government must

6    prove beyond a reasonable doubt each of the following three

7    elements:

8    One, that the defendant distributed the narcotic drug,

9    namely, cocaine in Count Seven and PCP in Count Eight, allegedly

10   to the named persons there; and, second, that the defendant

11   distributed the narcotics knowingly; and, third, that the

12   defendant knew that the person to whom he was distributing the

13   narcotics was under 21 years of age.

14   With reference to the first element, the distribution

15   of narcotics, I've already given you instructions on the

16   definition of "distribution" in Count Six.  So you can go back

17   to that and consider that instruction.

18   Second count, the defendant knowingly distributed.

19   Again, I've already given you the definition of "knowingly" in

20   Count One, the conspiracy count.  So you can go back and look at

21   those instructions and use them in connection with your

22   deliberations as to Counts Seven and Eight, the term

23   "knowingly."

24   The third element is age.  I've previously instructed

25   you on knowledge of age in Counts Two through Four, you recall,

1  which you can go back and look at and consider in your

2  deliberations on Counts Seven and Eight.

3          I'm going to again -- I'm beginning to wrap up here.

4  I'm on instruction 64, ladies and gentlemen.  I already gave you

5  these instructions during the course of the trial.  I'm going to

6  give it to you again.  This is the similar acts, intent,

7  knowledge and absence of mistake.  Yes.  So let me give it to

8  you again.  I believe it's in connection with that incident in

9  Gaithersburg involving the officers there and I'll give it to

10  you again.

11          The government has offered evidence tending to show

12  that on defendant occasions the defendant engaged in conduct

13  similar to the charges in the indictment.  In that connection

14  I'll remind you once again the defendant is not on trial for

15  committing that act -- those acts not alleged in the indictment.

16  Accordingly, you may not consider this evidence of the similar

17  act as a substitute for proof that the defendant committed the

18  crime charged here, nor may you consider this evidence as proof

19  that the defendant had a criminal personality or bad character.

20  The evidence of the other similar act was admitted for a more

21  limited purpose and you may consider it only for that limited

22  purpose.

23          If you determine that the defendant committed the acts

24  charged in the indictment and the similar acts as well, then you

25  may, but you don't have to, draw an inference that in doing the

1   acts charged in the indictment, the defendant acted knowingly

2   and intentionally and not because of some mistake, accident or

3   other innocent reasons.

4          Evidence of similar acts may not be considered by you

5   for any other purpose.  Specifically, you may not use this

6   evidence to conclude that because the defendant committed the

7   other act, he must also have committed the acts charged in the

8   indictment.

9          And then, ladies and gentlemen, the final instruction

10  that I would give you here is 65 and this ends the second

11  section of instructions, and that's on punishment.  The question

12  of possible punishment of any defendant is of no concern to the

13  jury and should not in any sense enter into your deliberations

14  or it shouldn't influence your deliberations in any way.  The

15  duty of imposing sentence rests exclusively with the court.

16  Your function is to weigh the evidence in the case and to

17  determine whether or not the defendant here is guilty beyond a

18  reasonable doubt based on the evidence that you heard and saw.

19         Under your oath as jurors, you cannot allow a

20  consideration of the punishment which may be imposed on a

21  defendant, any defendant, this defendant, if he is convicted to

22  influence your verdict in any way or in any sense it must not

23  enter into your deliberations.

24         So, ladies and gentlemen, you'll have copies of all of

25  those instructions to review and look at.  Okay.

1          Want to go straight ahead now?

2          MR. TRAINOR:  May I approach?

3          THE COURT:  You want to approach?  Yes.

4          (At the bench:)

5          MR. TRAINOR:  Your Honor, at this time I'd like to take

6    an exception to the instructions.  I'd take exception to jury

7    instruction No. 45, the second element of sex trafficking, and

8    to the extent that it instructs the jury on willful blindness in

9    this case, it's our position that that's not applicable to the

10   facts of this case.

11         And we've taken exception to the court's instruction

12   No. 49, which is essentially called Pinkerton liability of

13   co-conspirators.  It's our position that that instruction is not

14   applicable to the facts of this case.

15         And we would also take exception to the court's failure

16   to give defendant's proposed jury instruction No. 3 on

17   reasonable doubt.  Although we're aware of the Fourth Circuit

18   position defining it, we tried to carefully avoid defining it.

19   We feel that it was not adequately covered in the other

20   instructions.

21         THE COURT:  All right.  The record reflects your

22   exceptions.  No problem.  All right.

23         MR. TRAINOR:  Thank you, Judge.

24         THE COURT:  Thank you.

25         (In open court:)

1          THE COURT:  Okay.  All right.  We're now going straight

2    into the final arguments and we'll invite Mr. Felte if he

3    wishes.

4          MR. FELTE:  Thank you, Your Honor.

5          THE COURT:  All right.  You want to get the podium?

6    Yes.  And as soon as you conclude yours, Mr. Felte, we'll

7    probably take a lunch break.  I know you won't interfere with

8    the jury's lunch break.

9          MR. FELTE:  I wouldn't want to do that.

10         THE COURT:  All right.

11         MR. FELTE:  Counsel, court --

12         THE COURT:  Yes, sir.

13         MR. FELTE:  -- ladies and gentlemen, it was the

14   defendant's world.  It was his world to coerce, to control, to

15   manipulate.  This wasn't some make-believe fancy world of image

16   as the defendant suggests.  The strikes and punches to the face

17   were real.  The threats to kill and harm were real.  The drugs

18   were real.  The sex acts were real.  The money was real.  And

19   this gun is real.  It was the defendant's world.  It was a world

20   of violence, intimidation, deceit, guns, drugs, all tools to

21   manipulate and control.

22         This full grown man preyed upon the vulnerability of

23   the kids, the victims in this case.  He listened to them.  He

24   figured them out.  He learned their situations, their family

25   situations.  Even at the hotel party, the Motel 6, in the words

1    of Melissa, she said the defendant sat there and watched her

2    with his hands on his chin.  He sized them up.  He tested them

3    and their sexual aptitude.  On April 21st, May 8th and May 9th

4    of 2007, he sold their bodies.  As Ms. Magnelli told you at the

5    very beginning of this trial, these are crimes that were

6    committed out of sight, committed in an unsavory world by some

7    unsavory people.  But this is the world where the defendant

8    chose to commit his crimes.

9         Now, how do you know these crimes were committed?

10   Because after a week of trial -- after more than a week of trial

11   you know the evidence in this case.  You've heard from the

12   victims, Melissa, M.P., Stephanie, S.T., Ilana, I.L.  They all

13   told you how they got caught up with the defendant.  They all

14   told you how they committed and engaged in commercial acts of

15   prostitution.  They told you what they did, much of which was

16   very embarrassing to them, but they told you that because that

17   is what happened.

18        You also heard from other witnesses, witnesses such as

19   their friends, like David Garrett, who only knew the defendant

20   or only met the defendant for a very short period of time when

21   the defendant was trying to retrieve Stephanie because he

22   wouldn't allow her to see any other guys and had chased her.  He

23   chased her through Cinnamon Woods in a car, got her back in that

24   car and took her down to the lake.

25        But you also heard from friends and even family members

1    of the defendant.  You even heard from his cousin, Kureese

2    Royal, who actually grew up with the defendant.  And what did

3    Kureese tell you?  He told you that he engaged in sex acts with

4    some of these girls.  He even told you how the defendant told

5    him that he was pimping Melissa and Stephanie.  The defendant

6    even told him some of the people who was helping him do it.  He

7    mentioned Shantia, and then he described another girl.  By the

8    photograph, you know that's Sammy, Sammy Bentolila.

9         That's not all.  You heard from sex customers in this

10   case.  You heard from Mark Witherspoon.  Remember the man who

11   lived in D.C. that Honey set up the commercial sex transaction.

12   She set it up at his direction, and they went to travel to D.C.

13   and saw Mark Witherspoon.  He told you how he got those phone

14   calls.  He actually even had his phone.  He knew the date of

15   them.  And he told you what he did.

16        But you've also seen the physical evidence in this

17   case, the clothing, the gun, the ring, the pinky ring that the

18   defendant would have these girls kiss, the hotel and the phone

19   records, all corroborating that these crimes happened.

20        And you've heard from other people.  You've heard from

21   some of the people who helped the defendant commit these crimes,

22   because the defendant didn't do everything himself.  He went out

23   and he got help.  He got the help of his co-conspirators.  And

24   this really takes us to the charges in this case and the

25   evidence.  So, let's talk about that.  Let's talk about the

1    first charge, this conspiracy to commit sex trafficking.

2         Now, for the government to prove sex trafficking, the

3    conspiracy to commit sex trafficking, it has to prove four

4    elements beyond a reasonable doubt.  The first is there was an

5    unlawful agreement between two or more people.  In this case

6    that agreement was to cause these girls to engage in commercial

7    sex acts knowing that they were under the age of 18, knowing

8    that force, fraud or coercion would be used.  As the judge

9    instructed you, this doesn't require some formal, legal, written

10   out agreement.  This isn't some contract.  But you know the

11   agreement exists.  What do you look at?  Look at the conduct of

12   the parties, look at their deeds, look at their actions, because

13   their actions speak louder than word, and you'll know that there

14   was an agreement, that they were acting together, because it was

15   the defendant who was at the center of this conspiracy,

16   directing and controlling others.

17        Well, who are some of the members of this conspiracy?

18   Well, first, it was Shantia Tibbs, Honey.  It was Samantha

19   Bentolila, Sammy.  It was Michael Anderson, the one known as Shy

20   Mike.  There was P.J. or Guido, and obviously there was the

21   defendant who was at the center, giving everybody else

22   direction, telling everybody else what to do.

23        Let's talk about Shantia for a minute.  Shantia, who

24   was barely 18 herself at the time of these offenses, had been a

25   prostitute at the age of 13 and the defendant had known her for

1   years and he went to her and got her help.  What was one of the

2   first things he did?  Well, he had Melissa, the homeless

3   Melissa, 17, who was spending her days and nights in storage

4   closets, hanging out in restaurants begging for food or

5   sometimes even stealing food.  He took her in the very beginning

6   and he put her with Shantia for Shantia to watch, manage,

7   control her.

8           That's not all Shantia did, because, remember, Shantia

9   actually set up a commercial sex act with Mark Witherspoon when

10  the defendant told her to find some customers and she called

11  Mark up.  They even talked price at that time.  And she lied and

12  told Mark Witherspoon that the girls were of age.

13          Again, that's not all she did.  She helped get the

14  girls ready, Melissa and Stephanie ready, doing their hair,

15  helping them with their clothes.  She rode with them from

16  Maryland, from Sammy's house in Maryland, to D.C.  She went in

17  with the girls and was actually sitting in the room watching as

18  these commercial sex acts unfolded.  She collected the money and

19  then she gave that money to the defendant.  That was just on

20  April 21st.

21          You remember on May 8th, that's when the defendant and

22  Guido took Ilana and Melissa to that apartment where they were

23  cooking up crack cocaine.  They plied them with cocaine, PCP and

24  marijuana, and before going to meet Adam Grieder at the Holiday

25  Inn on May 8th, they stopped by Honey's house.  And what did

1  Honey do?  Well, she gave clothing to Ilana.  Remember the

2  halter top?  And she also gave Melissa condoms and the dental

3  damn, that plastic sheath that was used for oral sex.

4        And then on the very next day, Shantia went with

5  Melissa to see Adam Grieder again, this time at the Marriott

6  where she actually engaged in sex acts with Adam and with

7  Melissa there as well.

8        So Shantia was very much involved.  She was a

9  co-conspirator.

10        There was also Sammy.  And how did the defendant know

11  Sammy?  Well, Sammy knew him because that's where she bought her

12  cocaine.  And she wanted to keep that cocaine coming.  She

13  wanted the cocaine that the defendant was selling and, as she

14  told you, it was good quality cocaine.  And so, when the

15  defendant came to her and said can you have Melissa stay at your

16  house, she agreed.  She agreed as the defendant directed to

17  watch over her, to report on her, even punish her.  Remember

18  what she told you about the e-mails, the MySpace e-mails?  When

19  she found Melissa's MySpace e-mails, communicating with this

20  other guy, another potential boyfriend, somebody she was

21  interested in, she forwarded those e-mails to her own account

22  and she showed them to the defendant and Melissa was then

23  punished.

24        That wasn't all she did either.  She told you she

25  wasn't very nice to Melissa.  She smacked Melissa as well.  She

1    yelled at her.  She treated her very poorly.  And she didn't do

2    anything to protect Melissa.  What did she tell you?  When she

3    heard the muffled cries of Melissa because Melissa was upstairs

4    being angrily raped by the defendant, what did she do?  She did

5    nothing.  She was part of this conspiracy with the defendant.

6         There was Michael Anderson.  Who was Michael Anderson?

7    He's been characterized, described, testified to as the

8    defendant's best friend at the time.  And you didn't hear his

9    best friend testify, but you know a lot of what he did.  He

10   actually drove the Suburban down to D.C. from Sammy's house.

11   Remember how Sammy had loaned this conspiracy, the group, the

12   Suburban, the clothes, the cell phone, but it was Shy Mike,

13   Michael Anderson, who drove that down, drove them around.

14        And remember what happened at Cinnamon Woods, the

15   chase, going down to the lake.  It was Shy Mike who was with the

16   defendant.  It was Shy Mike who gave him his gun, this .380

17   Bersa, which the defendant then took with him, carried with him

18   down to the lake as he took Stephanie down, slapped her, told

19   her, "I am God.  I decide who lives and who dies," and

20   brandished that gun right in her face.  And Stephanie thought

21   she was going to die that night.  It was Shy Mike's gun.

22        There was another person as well.  There was P.J., also

23   known a Breedo.  Remember, this is the one that the defendant

24   kept referring to as his cousin, but don't confuse him with

25   Kureese.  Kureese and P.J. are two different people and you know

1  that because you saw Shantia and Melissa identify the

2  photographs of P.J. and Kureese as well.  But what did P.J. do?

3  P.J. was the one who went with the defendant when he took

4  Melissa and Ilana to that apartment where they were cooking up

5  the crack cocaine and gave them PCP, cocaine and the marijuana.

6  It was P.J. who then went with them to Honey's house and then

7  P.J. went with the defendant into that room with Ilana, with

8  Melissa, where they met Adam Grieder.  Remember him?  He was the

9  one smoking the crack cocaine, watching the pornographic movie

10 on the TV.  And it was P.J. who went with the defendant the next

11 day along with Honey and Melissa.  He was one of the

12 co-conspirators as well.

13       So, what's clear is that we definitely have an unlawful

14 agreement between two or more people.  You have at least five

15 people in this conspiracy.

16       Now, the second element is that the defendant knowingly

17 and willfully became a member of this conspiracy.  Of course he

18 became knowingly and willfully a member of this conspiracy.  He

19 was at the center of it.  He was the one who started it all.  He

20 was the one who recruited everyone else.  He told Shantia what

21 to do.  He had Shy Mike give him his gun.  He went with P.J.,

22 with Adam Grieder and cooked up the crack cocaine.  He had

23 Samantha reporting on Melissa's activities to him.  He had

24 Samantha punishing Melissa.  This is more than knowing and

25 willful involvement.  He was at the very center of it.

1          Now, the third and fourth elements that the government

2    must prove for the crime of conspiracy to commit sex trafficking

3    deal with overt acts.  The government must show that at least

4    one overt act was committed by a member of the conspiracy and

5    that it was committed in furtherance of the conspiracy.

6          Now, when you have a chance to look through the

7    indictment, you'll see a whole lot of overt acts.  They're

8    listed from "A" to "T" and I'm not going to go through all of

9    them, but I want to just go through a couple of them with you.

10          For example, there's overt act "E" where it talks about

11    the defendant and others struck M.P. on multiple occasions.

12    This is when Melissa was struck by the defendant on multiple

13    occasions.  You heard that.  You heard Stephanie tell you how he

14    slapped her, punched her in the parking lot outside Sammy's

15    house.  You heard Shantia tell you how when Melissa angered him

16    one time, in Shantia's words, he "smacked the mess out of her."

17    You heard Sammy tell you how she hit and struck Melissa.  So

18    that's just one overt act there.

19          And why was it done?  Why was it in furtherance of the

20    conspiracy?  This is another method of control by the defendant.

21    He's going to keep her submissive.  He's going to keep her bound

22    to his will so he can have her engage in these commercial sex

23    acts.

24          There was the overt act where the defendant held

25    Stephanie at gunpoint down at the lake when he was saying, "I'm

1   God.  I decide who lives and who dies."

2        There was the time when the defendant -- overt act "I"

3   when the defendant chased Stephanie in his vehicle.  Remember

4   the defendant was driving his Camry.  Stephanie was riding with

5   her friend David Garrett in the Toyota and they were chased

6   through Cinnamon Woods.  Why was this done?  Again, the

7   defendant wasn't going to let his girl get away to some other

8   guy.  He went to go get her.  He went to retrieve her.  And he

9   confronted Dave, yelled at him.  They got face-to-face, and he

10   told Stephanie to get in that car and she did.  Again, he was

11   controlling her.

12        There was overt act "M" where the defendant rented the

13   Motel 6 room.  Remember this was the hotel party on April 15th,

14   and you know that's the case because you can actually sit there

15   and look at the hotel receipt from Motel 6 with the defendant's

16   name, his address, his phone number on there.  This is the phone

17   number, the 877 number.  Remember the one that Crystal Brown got

18   for him that she put on her plan.  It was that number.

19        And why did he have this hotel party?  Remember, this

20   was right in the beginning.  This was when he had Melissa and

21   then he'd just found Stephanie, brought her in, sized her up.

22   In the words of Honey and the defendant, he wanted to see what

23   she was working with.  He wanted to know the sexual aptitude of

24   these snow bunnies, his words.

25        There was overt act "O."  A co-conspirator provided her

residence, clothing and vehicle. That's when Sammy allowed
Melissa to stay at her house, provided her clothing. You saw
the clothing they wore to go to D.C. that night, and the vehicle
for them to drive down to D.C. that night.

There was overt act "T" where Melissa and Ilana drove
to the Holiday Inn -- the defendant drove Melissa and Ilana to
the Holiday Inn to have a commercial sex with Adam.

And there was the time, overt act "U," when the
defendant and P.J. provided drugs, the PCP, cocaine and
marijuana to these girls. Again, have them intoxicated, more
easy to control, more easy to engage in these commercial sex
acts.

And those are just a few of the overt acts. I'm not
going to go through all of them. But you can see that many more
than just one overt act were committed and you know why they
were done as part of the conspiracy.

So, the government has proven beyond a reasonable doubt
these four elements of conspiracy to commit sex trafficking.

So, let's turn actually to the elements of sex
trafficking. These are Counts Two through Four. There's one
for Melissa, there's one for Stephanie, and there's one for
Ilana. These are what the judge referred to in his instructions
as the substantive crimes, and to prove these crimes the
government must prove three elements.

As you can see on the monitor there, the first two

1   elements have an either/or component.  Let me explain that a

2   little bit more.  The first element requires that the defendant

3   knowingly recruited, enticed, harbored, transported, provided,

4   or obtained another person or he knowingly benefited from

5   participating in a venture that did these things that recruited,

6   enticed, harbored, transported, provided, or obtained.

7           Well, what does this mean?  Think about what happened.

8   This is actually not very complicated at all.  Think about how

9   Melissa got into this.  Think about how he got Melissa and the

10  girls from that.  When he met Melissa she was 17, homeless,

11  again, living in sometimes storage shelters or wherever she

12  could find, stealing food, begging for food, and that's when she

13  met the defendant, and the defendant was nice to her, provided

14  for her, and she was thinking, hey, this is somebody who can

15  take care of me, he can be my boyfriend.  And from there on he

16  went and he had her get Stephanie, and that's when he took her

17  to that hotel party at the Motel 6.  Again, he was nice.  He

18  drove them to the hotel.  He was nice to them, but then tested

19  their sexual aptitude.  Then, finally, after Stephanie left,

20  that's when he got Ilana.  And Ilana was in this really for the

21  shortest period of time.  But, again, he went through Melissa

22  and invited Ilana to that barbecue over at Sammy's and Pic's

23  house, her boyfriend, and then drove them -- drove her home and

24  then also obtained her, transported her for the sex acts at the

25  Holiday Inn and the Marriott with Adam Grieder.

1    So it's clear that the defendant knowingly recruited,

2    enticed, harbored, transported, provided, or even obtained the

3    person.  He did that all for Melissa, Stephanie and Ilana.

4        And even if you didn't find that, you know he benefited

5    from the participation in this venture even if he wasn't the one

6    that actually went out and did it each time.  He was the one who

7    got all the money from these transactions.

8        Who did Honey give the money to after they went down to

9    see Mark Witherspoon in D.C. for the commercial sex act?  It was

10   the defendant.

11       Who got the money from the sex with Adam Grieder on

12   those two occasions?  It was the defendant.

13       Even though sometimes the defendant gave other people

14   money -- he gave Ilana $30 -- it was the defendant that was

15   receiving the money.  It was the defendant who was benefiting

16   from this.

17       Now, the second element for sex trafficking also has an

18   either/or component.  The government needs to show that force,

19   fraud, or coercion would be used to cause the person to engage

20   in a commercial sex act or that the defendant knew that the

21   person engaging in these commercial sex acts was under 18.  The

22   government has proven both of these elements.

23       Let's start with the second one, "b," first, that the

24   person was under 18.  You heard from Sammy.  You heard from

25   Shantia.  You heard from Melissa.  You heard from Ilana.  You

1   heard from Stephanie that the defendant all -- that the

2   defendant knew that all of these girls, Stephanie, Ilana, and

3   Melissa, were all under 18.  What were some of the things they

4   told him?  Well, Melissa and Stephanie told you it was the

5   defendant who told them to lie about their age.  What did he

6   say?  Remember that?  "Use your month and day of birth but just

7   change the year.  What did he tell Melissa and Ilana?  Remember

8   when they were talking about that they wanted to go to the club,

9   the girls wanted to go to the club but they couldn't get in.

10  The defendant said, "Hey, don't worry about it.  I can get you

11  fake I.D.'s.  I've got connections.  I can get you in that

12  club."  He knew how old they were.

13       Take Melissa, for instance.  Not only did he tell her

14  to lie about her age, but he tested her.  He took her to buy

15  cigarettes to see if she could pass for being 18.  Remember,

16  actually, Travis Melendez was actually at the gas station when

17  they ran into the defendant.  And what was Melissa doing for the

18  defendant?  She was buying cigarettes at that time.

19       And, finally, think about the incident where the

20  defendant provided all that cocaine and Stephanie took more of

21  it than she ever had in her life and overdosed, had that

22  seizure.  What did the defendant say?  He said, "Well, we can't

23  take her to the hospital.  She's a minor.  She's got drugs in

24  her system."  The defendant knew how old these girls were.

25       Now, for the force, fraud and coercion, let's talk

1 about Melissa first.  I think by all accounts Melissa was

2 subject to the most force, fraud and coercion.  By all accounts

3 she was treated badly more than the others.  The defendant took

4 her over to Sammy's house where she stayed.  And even Sammy, a

5 co-conspirator, would smack her, would yell at her, would treat

6 her badly.

7    But you've also heard how the defendant would punch

8 her, strike her, even in the words of Shantia, "smack the mess

9 out of her."  And what happened to Melissa just didn't happen in

10 a vacuum.  It created a climate of fear because Stephanie knew

11 about that as well.  Stephanie witnessed some of these assaults.

12 She told you how she saw the defendant hit Melissa outside the

13 parking lot at Sammy's house.  And this certainly had an effect

14 on her.  What would happen to her if she defied him?  Well,

15 think about it.  What happened the one time when she defied the

16 defendant?  The defendant came looking for her, chased her down

17 in a car, essentially told her to get back in the car while

18 confronting David Garrett, and he took her to that lake, walked

19 her down to the dark portion of that lake, told her, "Don't you

20 ever do that again."  Remember what Stephanie said, "Write the

21 words ever."  That's when he slapped her, hit her across the

22 face.  Then he pulls that gun out and talks about being God,

23 about deciding who lives and who dies.  She thought she was

24 going to die that night.

25    Ladies and gentlemen, that is force and coercion.  And

1    also remember, that doesn't happen in a vacuum either.  Melissa

2    was aware of what happened, and Melissa had to engage in

3    prostitution and she was still with the defendant after that.

4            Now, Ilana.  Ilana was actually subject to the

5    defendant probably the least -- actually, the least of anyone

6    else.  How did the defendant really kind of snare her?  It was

7    really a combination of sweet talk, deceit, telling her, hey, if

8    you prostitute for me, I'm going to take care of you, I'm going

9    to buy you jewelry, I'm going to buy you clothes.  Did you see

10   anybody other than the defendant with his pinky ring have any

11   jewelry or have any of these clothes?

12           What did the defendant do with these girls?  He plied

13   them full of drugs, got them intoxicated, cocaine, PCP and

14   marijuana, all making it easier to subject them to his will and

15   do what he wanted them to do.

16           The government has proven force, fraud and coercion of

17   these crimes.

18           The third element, in or affecting interstate commerce,

19   really, I don't believe is in much dispute.  It deals with

20   things that are economic in nature, and there's no doubt that

21   these crimes were economic in nature.  The defendant received

22   money for each of these crimes.  They used cell phones.  They

23   used hotels, public highways, and even on the incident where

24   they went to D.C., they had to cross the state lines to get to

25   Washington, D.C.  This case really isn't about interstate

commerce.

So the government has proven that the defendant committed Counts Two through Four, the sex trafficking. In the event you don't find the defendant guilty by these elements of sex trafficking, the government can still prove him guilty of sex trafficking in two other ways, by proving he aided and abetted others to physically commit these crimes or that he was liable for the actions of his co-conspirators.

As the judge instructed you concerning aiding and abetting, he told you what it was. He told you aiding and abetting means the defendant willfully and knowingly sought to help make the crime succeed. And you can ask yourself a series of questions to help you understand whether the defendant aided and abetted. The first one was did the defendant participate in the crime charged as something he wished to bring about? Of course he wanted these crimes to come about. He's the one who recruited the girls. He's the one who told others what to do. He's the one who set the wheels in motion for all of these crimes to succeed.

Question two: Did he associate himself with the criminal venture knowingly and willfully? Well, yes. Again, he was at the center of it. He told other people what to do. It was the defendant who had the girls kiss his pinky ring. It was the defendant who got the money from this.

And did he seek by his actions to make the criminal

venture succeed?  Well, what did he do?  He told the girls to
lie about their age.  He directed Shantia to find a customer.
He directed Sammy to harbor and monitor and watch over Melissa.
All of these things were done so that he could have these girls
engage in commercial sex acts and he would profit from it.

So he's an aider and abettor and he's guilty of these
crimes.

Even if you don't find that, he's liable for these
crimes as a co-conspirator.  For the government to prove that,
there are five elements, and they're not complicated.  The first
is you have to show that a crime was committed, that a crime or
crimes were committed.  Well, you've already heard extensive
testimony of that.  You know how Melissa, Stephanie and Ilana
were forced to engage in these commercial sex acts.  He knew how
old they were at the time and he knew -- the defendant -- had
all that information.  So these crimes were committed.

But who were the ones who committed these crimes?
Well, you know that, too.  It was the defendant, Shantia, Sammy,
Shy Mike, and P.J.  These crimes were committed by the defendant
or with the help of these co-conspirators.

Third, the crime or crimes were committed as part of a
common plan and understanding.  Well, it was the understanding
that they would cause these girls to engage in commercial sex
acts, knowing that they weren't 18, knowing that force, fraud or
coercion would be involved.  And how do you know it was their

1  understanding?  See how they worked together.  What part did

2  Shantia play?  Recruiting customers, helping to manage the

3  girls, helping to get them dressed.

4      Sammy, same thing.  She even did more.  She provided

5  her vehicle.  She provided the clothing.  She provided a cell

6  phone.  It was a common plan and understanding.

7      Finally -- excuse me.  Well, fourth, the defendant was

8  a member of the conspiracy when these crimes were committed.

9  The defendant was always a member of this conspiracy.  He was

10  always at the center.  He's the one who organized it.  He's the

11  one who recruited the others.  But for the defendant, these

12  crimes don't happen.

13      And the commission of these crimes by co-conspirators

14  were reasonably foreseeable by the defendant.  Of course he knew

15  these were going to happen.  He's the one who told everybody

16  what to do.

17      So, the government has proven these crimes in many

18  different ways.  It's proven the elements of sex trafficking.

19  It's proven that the defendant was an aider and abettor.  It's

20  proven he's liable even for the action of his co-conspirators.

21      Now, the fifth crime which the defendant is charged

22  with is possession of a firearm in furtherance of a crime of

23  violence, and you should only consider this count if you find

24  that either Counts One, Two or Three, conspiracy to commit sex

25  trafficking, the sex trafficking of M.P., Melissa, or the sex

trafficking of S.T., Stephanie, were committed by the use,
attempted use or threatened use of physical force.  And there
are two elements to this crime.  The first is that the defendant
committed a crime of violence.  And how do you know that's true?
Well, think about what he did.  Think about how he hit Melissa
on multiple occasions.  Think about him hitting Stephanie.
Think about him intimidating her, telling her he's God, he
decides who lives and who dies.  All of those are violent.

        And the second element is the defendant knowingly
possessed a firearm in furtherance of that crime of violence.
Well, there's no dispute that this is a firearm.  It's been
stipulated to.  That's not an issue.  But why did he have it?
What did he do with it?  Well, think about what he did to
Stephanie when he took her down there.  Talk about intimidation.
Talk about force.

        And what did Shantia and Sammy also tell you?  He told
her that he had her then fire that gun.  He had Stephanie fire
that gun.  Remember when she did it out the window, the loud
bang, the recoil, the muzzle flash.  He said if she ever left
him and tried to go to the police, he would be able to say she
was part of the crime, that she had gun powder on her hand.
That's used to further this, prevent somebody from ratting on
him as you might say.

        And Melissa was also aware of this incident.  And
Melissa saw this firearm on other occasions, too.  Remember she

1  told you that she saw this firearm even when Shy Mike was not

2  around.  This may be Shy Mike's gun, it may be registered to

3  him, but the law does not require ownership.  The defendant

4  didn't want anything in his own name.  He borrowed items,

5  whether it's cell phones, cars, guns.  Remember what Detective

6  Sakala told you sometimes how drug dealers function, that they

7  don't want to have things in their names to attract attention to

8  them.  Well, he borrowed this gun from Shy Mike.  Melissa told

9  you how she saw it in the glove compartment.  She saw it on

10 instances when Shy Mike wasn't around.

11      The defendant was the one who used this gun.  He

12 carried this gun.  He brandished this gun as he took Melissa

13 down to the lake and waved it in front of her, pointing it at

14 her.  That's brandishing.

15      And so, the government has established the elements of

16 Count Five beyond a reasonable doubt.

17      Now, Count Six concerning just the conspiracy to

18 distribute controlled substances, as the judge instructed you,

19 this conspiracy is a little bit different than the conspiracy to

20 commit sex trafficking.  It doesn't require any proof of overt

21 acts.  It just requires an unlawful agreement to distribute

22 controlled substances.  We've talked about what an agreement is,

23 how you find that and what you look to, the actions and deeds of

24 the co-conspirators.  Well, how does it apply to this

25 conspiracy, this conspiracy to distribute controlled substances?

1    Well, first, you remember Crystal Brown?  She was the

2 defendant's ex-girlfriend who testified on the stand, how she

3 told you how she loaned the defendant approximately $2,500 of

4 her own money.  She drove the defendant to New York to actually

5 meet with one of her family members.  She called him a distant

6 cousin.  She drove the defendant back after purchasing that

7 cocaine.  She allowed the defendant to use her house to cut up

8 and weigh out the cocaine.  She was involved in that.

9    But with all these, remember, the defendant is at the

10 center.  He's the one who asked her to do it.

11    Think about the testimony of Chris King.  Remember

12 Chris King?  He always tried to buy cocaine from the defendant,

13 again, because he had good quality, and he would call the

14 defendant up and talk about the code word, the Xbox games.  They

15 actually didn't talk about cocaine on the phone.  Remember him

16 describing certain instances when he would go and pick the

17 defendant up and the defendant didn't have any cocaine like that

18 and they would drove to other locations.  He said one was off

19 Mateny Road and the second was off, I think it was, Crystal Rock

20 and Father Hurley, and how he would give the defendant money and

21 the defendant would go out of sight and then come back with

22 cocaine.  The defendant was working with other people.  He had

23 other people which he got cocaine from.  They were part of this

24 conspiracy even though they're not named.

25    And you've heard significant testimony on the

1    defendant's distribution of marijuana, whether it's pounds of

2    marijuana in bags that he's weighing out on the scales or it's

3    distribution of PCP.  Remember all those vials that were

4    recovered from where the defendant was living, vials that were

5    not consistent with personal use but consistent with

6    distribution.

7            The defendant was part and parcel.  He was heavily

8    involved in this conspiracy to distribute controlled substances,

9    cocaine, marijuana and PCP.

10           And the second element is that he knowingly became a

11   member of this conspiracy.  Well, you know that's the case.  The

12   defendant wasn't involved in all these drugs by accident.  He

13   has a significant history for drugs, whether it's the incident

14   with the police officers in Gaithersburg or the extensive

15   testimony of how he dealt drugs to numerous other people.  It

16   just wasn't some accident or mistake.  He was knowingly a member

17   of this conspiracy.

18           Now, the last two counts, Counts Seven and Eight, the

19   distribution of controlled substances to persons under 21.

20   Count Seven is the distribution of cocaine to S.T.  That's

21   Stephanie.  Count Eight is the distribution of PCP to M.P.

22   That's Melissa.

23           Let's talk about Count Seven.  That's when he gave her

24   the cocaine that night at Sammy's house where she did more than

25   she ever had in her life and had that seizure.

1    The first element is that the defendant distributed a

2  narcotic drug.  Well, we all know his involvement with cocaine,

3  how all the testimony is that he brought the cocaine that night.

4  He's the one who provided it to Stephanie.  Again, he did so

5  knowingly.  This wasn't some mistake.  This wasn't like he

6  didn't know what that substance was.  His knowledge of cocaine

7  is extensive.

8    Then the third element is that he knew the person,

9  Stephanie, was under the age of 21.  But you know he knew she

10  was under the age of 18.  And what did he say after she had that

11  seizure?  "We can't take her to a hospital.  She's a minor."

12    With Melissa, she's right there at the apartment where

13  he was with P.J. cooking up the crack cocaine.  Remember how

14  Melissa especially -- actually, Ilana described that he had that

15  Pyrex, the ice cubes, the water, the baking soda cooking up the

16  crack cocaine.  And what is he doing at that time?  He's plying

17  them with PCP and other drugs.  He knew what PCP was.  You heard

18  testimony that he used it himself.  You saw all the vials that

19  were recovered from his house.  This wasn't some mistake.  And

20  he knew that Melissa was under the age of 21.  He told her how

21  to lie about her age.  He had tested her by making her buy

22  cigarettes.

23    So the government has established and proven beyond a

24  reasonable doubt these elements of both Count Seven and Count

25  Eight.

1          Ladies and gentlemen, I ask you to think about the

2    evidence in this case, think about what the defendant did.  This

3    wasn't some make believe fantasy world.  These events just

4    didn't take place.  This wasn't some boasting by the defendant

5    for his own image, his own rap image.  The case isn't about rap

6    music.  This case is about what the defendant did.  The

7    defendant sold children's bodies for his own benefit.  The

8    government has proven these crimes beyond a reasonable doubt.

9    Don't let him get away with it.  Thank you.

10         THE COURT:  All right.  Well, do you want to take a

11   break?  It's 20 of one.  Do you want to take a break?

12         MR. TRAINOR:  I think the court said that we were going

13   to break for lunch.

14         THE COURT:  Yes, we'll do that.  Okay.  It's less than

15   that.  Okay.  We'll go ahead and do that.

16         Let's come back, ladies and gentlemen -- let's do an

17   hour.  We'll be back at quarter of two.  It's a little earlier

18   than our normal lunch, but let's be back at quarter of two,

19   1:45.  All right.

20         All right.  We'll be back at quarter of two.

21         (Luncheon recess at 12:40 p.m.)

22

23

24

25

1                     AFTERNOON SESSION          (1:50 p.m.)

2        THE COURT: All right. Let's call the jury in.

3 Mr. Trainor will go next.

4        (Jury present.)

5        THE COURT: All right. Thank you. Let's be seated.

6        All right. Mr. Trainor will be next for the defense.

7        MR. TRAINOR: May it please the court. Members of the

8 prosecution team, ladies and gentlemen of the jury.

9        When I stood before you on March 16th, last week, I

10 asked that you keep an open mind and not jump to any conclusions

11 or make a judgment in this case until you had the benefit of the

12 court's instructions and you've had a chance to retire to the

13 jury room, consider each other's views, review the evidence

14 together. We're almost at that point. The case has moved a lot

15 faster than we thought it would. There have been things we

16 could stipulate to that we were not in disagreement on. And so,

17 that helped move it along.

18        I know that the subject matter of this case has been

19 distasteful. It's been difficult to listen to for you, I'm

20 sure, for me, for all of us in this courtroom. There's been a

21 lot of emotion involved in it, and I ask you as you look at this

22 case to try to put that emotion aside. Remember your

23 instructions. And we'll go over some of the testimony in this

24 case and try to see how that fits in.

25        Let me get right to the point with you. When this case

1  started, Lloyd Royal was presumed to be innocent.  At this

2  moment he is still presumed to be innocent.  That's what the

3  instructions tell you.  The presumption of innocence is

4  something you take into the jury room with you during your

5  deliberations.  I like to think of them as sort of an analytical

6  tool that you use to examine the testimony and the evidence in

7  the case.  You screen it through the presumption of innocence.

8        A trial like this, a criminal trial, is not always a

9  search for perfect truth.  In fact, what it is, in our view, at

10  least, is an exercise where you examine the evidence using the

11  presumption of innocence as a tool in a search for reasonable

12  doubt.  Instead of a search for truth, it's a search for doubt,

13  because you know from your instructions that the government has

14  a heavy burden of proof in this case.  That burden is called

15  beyond a reasonable doubt.  Meaning, if any doubt remains, any

16  reasonable doubt remains, not a capricious doubt, but if any

17  reasonable doubt remains, then you look at what you're

18  considering.  If it remains on any element of any offense, then

19  the presumption of innocence steps up, and your oath and your

20  instructions require a not guilty verdict on that count.  So, I

21  ask you to keep that in mind.

22        You've heard a lot of talk about elements of offenses.

23  The elements are defined in your instructions.  They're simply

24  the parts of each count, the subparts of each count.  If every

25  subpart is not proven to that very high level, beyond a

1    reasonable doubt, then the whole count falls.

2            One of the most important functions of a jury is to

3    examine carefully the credibility of the witnesses who testify

4    in the case.  A lot of your instructions go right to that point.

5    You're looking to instructions 22 through 30, I believe.  They

6    focus on this issue of credibility.

7            So, in this case, as I said in opening, credibility is

8    what this case is about, because we have some special

9    credibility issues in this case.  Look through your

10   instructions.  You'll see that -- at least from my perspective I

11   see this.  I see separate categories of witnesses in the

12   credibility analysis and I ask you to consider that, and I think

13   you'll find that in your instructions.

14           There are witnesses who lied under oath.  You've got a

15   special instruction on that.  I believe it's instruction 24 on

16   witnesses who have previously committed perjury.  The government

17   has called several witnesses who before the grand jury lied

18   under oath.  Examples would be Crystal Brown, I believe, and

19   Kureese Royal.

20           However the government chooses to justify lying under

21   oath, the fact is that when these witnesses were called to

22   testify, they had a choice.  They could have refused to testify

23   and withstood the consequences, but they chose to go forward.

24   They chose to lie about their testimony.  And what does that

25   show us?  I mean, that shows us when it is convenient for them,

1  they will lie.  And your instruction tells you when you're

2  confronted with a witness like that that you have to give them

3  special scrutiny.  You have to weigh their evidence with extreme

4  care, weigh their testimony with extreme care, because the

5  witness has committed perjury, lied under oath in the past.

6       There are other witnesses who never got to the point of

7  taking an oath until they walked into this courtroom but have

8  told lies.  They were untruthful about their involvement in this

9  case in the past.  In fact, I noticed one of the first lines of

10  questioning that the prosecution used on many of the fact

11  witnesses was something like this:  "Now, you have lied to the

12  FBI or the police in the past when you were asked about this

13  case.  Are you going to tell the truth now?"

14       The fact is they lied in the past.  Once you lie,

15  you've made a choice, and it's going to be difficult to believe

16  you in the future, for whatever reason they lied.  And it

17  started with the very first witness, Anthony Caban, the guy who

18  was known as The Pharmacist -- I'll talk a little bit more about

19  him later -- Samantha Bentolila, even Melissa and several others

20  admitted that they had not always told the truth.

21       This case has been going on.  I mean, you know the

22  offense conduct in this case ended some time in May of 2007 and

23  here we are almost three years later.

24       There are other types of witnesses that you've been

25  warned about in your instructions and I would call your

1  attention to instruction No. 28 warning you about witnesses who
2  were on drugs at the time that they observed what they actually
3  testified about in the courtroom.  Why is that dangerous?  It's
4  dangerous because cocaine, marijuana, PCP, ecstasy or
5  combinations of those things cloud the mind, distort perception
6  and make memory basically unreliable.  And, sadly, many of the
7  witnesses fall into this category, including the younger ones
8  who at many critical times were under the influence of various
9  drugs and alcohol, and I include Melissa, Stephanie and Ilana in
10 that group.  Of course, what they were on was supplied by adults
11 but, nevertheless, it distorted their perception, clouded their
12 memories, and makes it legitimate to question whether you can
13 believe everything they said.

14      Samantha Bentolila was a heavy cocaine user.  The only
15 time she said she wasn't using cocaine was when her child was
16 awake.  You give that the weight you think it deserves.

17      Shantia Tibbs was forever rolling blunts, and we heard
18 from the expert, Detective Sakala, what a blunt is.  For those
19 of you who don't know, he said it was two to three grams of
20 marijuana rolled up in a big cigar.  That clouds the mind.  That
21 distorts perception.

22      Crystal Brown, she's been smoking for a long time.  Her
23 demeanor on the witness stand suggests that maybe she was
24 smoking a little too long.  Her memory was all over the place.
25 We know that she also, even in the light most favorable to her,

1  had a load of cocaine in her house at one point.

2       Christopher King also used a fair amount of cocaine.

3  And, of course, there are others in that class of special

4  credibility witnesses and you know who they are.

5       There are instructions about witnesses who have entered

6  into agreements drafted by the government that give them some

7  extra incentive or advantage if the government, frankly, is

8  pleased with their testimony.  I would call your attention to

9  Samantha Bentolila on this point.  Her plea agreement is in

10  evidence.  You can pick it up.  You can read it.  And I ask you

11  to try to cut through the legalese when you read it and you will

12  see that it provides her something labeled -- if she provides

13  the government "substantial assistance," something with that

14  label, then she gets some special credit at sentencing.  So,

15  that's an incentive.  And who decides what is substantial

16  assistance is?  The government.

17       So, look carefully at your instructions on that and

18  you'll see that she's been offered an incentive in this case.

19  That incentive is to please the government with her testimony

20  and it provides a motive to falsify.  I ask you to keep that in

21  your mind as you examine and recall her testimony.

22       We also have a number of witnesses with proffer

23  agreements.  You'll see them.  You can read them.  Why do people

24  need proffer agreements?  They need proffer agreements because

25  they don't want to get prosecuted for what they say.  They feel

1  they need that protection.

2      Now, the government asked their witnesses who had

3  proffer agreements about the agreement and said things like,

4  "You were never promised that we would not prosecute you, were

5  you?"  Of course, they all answered yes.  But in this case there

6  is not one single witness who had a proffer agreement protection

7  who has been prosecuted by the federal government, other than

8  Samantha Bentolila, who had her plea agreement protection.  You

9  look at her plea agreement and you can see that she got some

10  fairly favorable treatment.  She pled to one count.  You can see

11  what the maximum penalty for that is.  It's written down in the

12  agreement.  She testified on the stand that she doesn't expect

13  to do more than a couple of years, if she has to do that.

14  Although she has a rather intensive drug history, a number of

15  drug transactions, not a single count that she pled to, nothing

16  she pled to had any drug charges in it whatsoever.  But she had

17  a proffer agreement on February 12th of '09 after telling

18  different stories in 2007 and even -- that was to Montgomery

19  County police, and on February 3rd, '09 when she was arrested,

20  she told a different story to the FBI.  February 12th she's

21  given proffer agreement protection.

22      Crystal Brown got a proffer agreement to protect her on

23  June 3rd, '09.

24      Now, if you look at Crystal Brown in the light most

25  favorable to her, this is a woman who set up a cocaine deal in

1  New York through her family.  She drove there and back in her

2  car.  She said she brought $2,500 in cash with her and she

3  claims to have loaned it to the defendant in New York.  She

4  allowed $2,500 worth of cocaine to be brought back in her car

5  and to be weighed and cut up in her bedroom.  And King,

6  Christopher King and Samantha Bentolila testified that they came

7  to her house a number of times to buy it.  Now, she has an

8  incentive to lay the blame for that drug transaction completely

9  on Mr. Royal and she got the proffer agreement protection to

10 protect her from that.

11         Anthony Caban, he got a proffer agreement in March,

12 March 13th I think it was, of '09.  It's also in the evidence.

13 This is the man who repeatedly stole from his employer and lied

14 about it.  He told the FBI about his thievery during interviews

15 with the FBI.  Anthony testified he never heard a word from his

16 employer about these thefts and he was never prosecuted.  So,

17 did he have an incentive to please the government with this

18 stuff hanging over his head?  Of course he did.

19         Thomas Christopher King, I think he testified

20 yesterday, the father of Samantha Bentolila's child.  They lived

21 together.  His brother was a very successful drug dealer,

22 according to Samantha.  It's Jason King.  He was involved in a

23 number -- Christopher King was involved in a number of cocaine

24 buys that he testified about.  And Melissa was actually living

25 in his house for a couple of weeks in April of 2009.  He

testified regarding the trip to D.C.  You'll either believe him
or you won't.  It started at his house.  It involved his
automobile which he loaned to them.  But he got his proffer
agreement protection on March 6th of '09, and you didn't hear
about any trouble that he's had because of that or subsequent to
that.

Of course, Kureese Royal had that protection June 17th,
'09.  He admitted having sex with at least two underage girls.
No problems for him.  He got his protection as well.

I ask you to look at these agreements, look at what
letterhead they're written on.  It tells you who drafted those
agreements.  The language is often self-serving in there.  So,
cut through the legalese.  And you're going to see that each one
of these witnesses either had a direct or implied promise.  And
regardless of the exact language of those agreements, what is a
fact is this, that people who make these deals with the
government have good things happen for them.  That's a fact.
So, it's fair and reasonable for you to give their credibility
strict scrutiny and I ask you to do that, and that scrutiny is
supported by your instructions.  Please do that.

There are other things about credibility that I could
say.  They're in your instructions.  There are instructions on
witnesses who show hostility or bias.  There are other
instructions as well.  So, I ask you to consider the credibility
instructions carefully.

1    Having said that, I'd like to quickly run through some

2  of the witnesses who testified for the government and talk about

3  how we see their testimony when we apply the presumption of

4  innocence to the evidence.

5    The leadoff witness who set the stage for the

6  government's case was Anthony Caban.  He was The Pharmacist as

7  they called him.  He said he knew Mr. Royal as a coworker at

8  Criswell Honda.  And he also had worked for Eckerd Pharmacy for

9  about six years, I believe.  That was prior to May 2007.  He

10  told us he was financially destitute.  He was broke, selling

11  cars but making no money.  He told us that his own car was

12  repossessed, that he was facing eviction, behind on his rent.

13  He said he was living on peanut butter for days at a time,

14  desperately looking for ways to make money.  He stole from his

15  employer in the hope of making money.  He blames all of that on

16  Mr. Royal.  He made a decision, but he blames it on Mr. Royal.

17  That's why he stole from his employer.  But he tells us he stole

18  only non-controlled substances.  I think his testimony was that

19  he had no access to CDS, controlled dangerous substances, had no

20  access to C1 or C2 drugs, and he knew it because he worked in

21  pharmacies for six years.  He was not at that level.

22    He says that there were lists given to him over at

23  Samantha's house.  No lists were ever produced, if they existed.

24  I think the evidence supports the fact that the brains behind

25  those lists were Thomas Christopher King and Samantha Bentolila.

1    Anthony knew that he couldn't get ahold of Fentanyl,
2    morphine, Percocet and oxycodone.  He knew that.  So, why would
3    he need a list of drugs that he couldn't get ahold of and then
4    come back and get another list with the same drugs?
5         So, maybe there were lists.  Maybe there weren't.  But
6    it's sort of a red herring because there's no count in the
7    indictment relating to stealing ibuprofen from a pharmacy, and
8    this is not a part of Count Six, the drug conspiracy, which is
9    limited to PCP, cocaine and marijuana.
10        Mr. Caban is a thief and I hope you don't give his
11   testimony great weight.
12        One thing that he testified about is when he was
13   working with Mr. Royal at Criswell Honda, they were outside on a
14   break and Mr. Royal had his cell phone.  He said that Mr. Royal
15   showed him some pictures of some girls.  We asked him about
16   those girls.  They were not pornographic pictures and he said
17   none of the girls were Caucasian.  Mr. Royal apparently said,
18   "It'll cost you if you want to hang out with them."
19        So, what do we know from that?  We know that the
20   pictures, whatever they were, if they were, did not involve
21   Melissa, did not involve Stephanie, and did not involve Ilana.
22        He also told us about being at a barbecue at Bentolila
23   and King's house and that he went up to the bathroom on the
24   second floor and Melissa knocked on the door and they engaged in
25   a sex act.  He told us that there was no discussion of money,

1   that, in fact, no money was paid.  And then he testified that

2   when he came downstairs and went back to the barbecue, Mr. Royal

3   jokingly said, "You owe me."  I asked him have you testified

4   about this very incident before in the grand jury and could you

5   show me where it says "You owe me."  He fumbled with it and

6   couldn't find it because it wasn't there.  "You owe me" came for

7   the first time on this witness stand three years after the fact.

8         After Anthony we heard from Ilana.  Now, Ilana is a

9   young lady who had an extensive drug history despite her youth.

10   She had been on a number of drugs, by her own admission, in the

11   past.  And she told us about a day in her life essentially which

12   was, I believe the evidence will show, May 8, 2007.  She was

13   with her friend Melissa.  Under whatever circumstances, both of

14   the young ladies were using various drugs, something that they

15   were not unaccustomed to doing.  And she said Melissa and she

16   had talked among themselves and she knew what was going on.  She

17   knew what they were going to do.  The two girls she says went

18   with Mr. Royal and his cousin, but we know from the evidence

19   that that's probably not and almost definitely not his cousin,

20   but there was a guy who you didn't hear from, Breedo, P.J., Paul

21   Green.  He is the guy that Shantia Tibbs linked to Anthony

22   Grieder.  She said P.J. or Breedo was the crack supplier for

23   Mr. Grieder.  And Mr. Grieder was the guy in the hotel whom the

24   young ladies saw on May 8, 2007.  Ilana told us about what went

25   on in the hotel and we even stipulated that Adam Grieder had

1   rented that room at that hotel on May 8, 2007.  You'll see the

2   hotel receipt.

3          I asked her an important question in that series of

4   testimony.  I asked her whether she engaged in those acts as a

5   result of force or as a result of coercion, threats or fraud,

6   and she said no, that she didn't.  That becomes important when

7   you get to deciding some of these counts and the questions that

8   you'll see on the verdict sheet, because if you convict the

9   defendant of the count involving Ilana, you've got to answer the

10  question as to whether there was threats, fraud -- it's not

11  threats -- it's force, fraud or coercion.  But based on her

12  testimony, based on the events of May 8th, there wasn't that

13  factor in the case.

14         Now, when it was over, she went home with Mr. Royal,

15  and you heard about what she said happened on the way home in

16  the car, that he drove past her house, tried to have some sex

17  act with her, which she partially complied and so forth.  Here

18  is the point on that.  Whatever happened after the hotel could

19  not have influenced what occurred in the hotel room before that.

20  So, when you consider whether this is a commercial sex act,

21  you'll have to decide that issue.  You'll also have to decide,

22  if it is, whether it was compelled by force, coercion, fraud.

23  The answer I would say is no based on the evidence.

24         One witness was quite a witness, Samantha Bentolila.

25  She's the one with the plea agreement.  She also has a proffer

1  agreement.  She told us she lied to the police in 2007 and she

2  repeated the same story on February 3, 2009.  And,

3  interestingly, I thought, and it's up to you how you view this,

4  the story she told previously which she says is a lie, was that

5  she was dressing the girls up so they could go to a club in

6  D.C., that they wanted to look a certain way to go to this club.

7  That's exactly the story that Thomas Christopher King told on

8  the witness stand and testified that he had testified to before

9  the grand jury previously.

10      What we know about Samantha is she's a big time drug

11  user, or was.  She says she's cleaned up her act now.  She

12  denied about having a background in prostitution.  She said she

13  was just a dancer in New York, contradicted by Shantia Tibbs,

14  who says, "She knew more about prostitution than I did," and

15  Shantia was involved in it at age 13.  She said, according to

16  Shantia, both Ms. Bentolila and Thomas Christopher King were

17  involved in prostitution.

18      But Samantha is a woman who loves being in control.

19  Remember her testimony.  Her words were "run things my way or no

20  way."  She likes control.  She wanted to be in control.

21      Thomas Christopher King, who lived with her almost as

22  her husband, is the father of her child, told us in his

23  testimony, yes, she would bark orders and you'd better follow

24  them.  Now Samantha is saying, yes, I'm the control person but

25  this time I was being controlled.  I don't know how credible you

1    find that.  I ask you to consider that when you weigh her

2    credibility.

3           Samantha was a woman who really didn't like Melissa.

4    She disliked her so much that she would hit her.  She's a person

5    with a motive to lie, a history of lying.  She told us about the

6    events leading up to the trip to D.C., that she provided, with

7    Chris, the automobile, the vehicle, and the telephone that went

8    in the vehicle.

9           One thing Samantha told us is that, to her knowledge,

10   Melissa never used cocaine at her house.  And she also told us

11   she didn't have any knowledge that this guy Anthony Caban ever

12   had any sexual act with Melissa.

13          Stephanie also testified.  Stephanie admitted that she

14   had lied about her age but said that Mr. Royal told her to lie

15   about her age.  So, age is an issue that I ask you to look at.

16   She's almost 21 now when she testified and she was a few days

17   away from being 18 when all this happened in April of 2007.  I

18   think she testified her birthday was May 1st when she would turn

19   18.

20          Any allegations of commercial sex relating to Stephanie

21   have to do with the April 21st trip to D.C. where she visited

22   with Mark Witherspoon.  She was driven there by Michael

23   Anderson, prepared and outfitted by Samantha.  She was provided

24   encouragement and makeup by Honey or Shantia Tibbs.  And she was

25   taken home afterwards by Mr. Royal when it was over.

1    Now, when you consider Stephanie's testimony, April 21,

2    2007, going into the next morning, April 22nd, you've got

3    another one of those questions about if that was a commercial

4    sex act, was it procured by force, fraud or coercion.

5    Now, Mr. Felte argued -- he put a lot of emphasis on

6    what happened at the lake, what happened with David Garrett, but

7    put Samantha's testimony together with the phone records, which

8    tell you that whatever happened with Mark Witherspoon happened

9    the night of the 21st into the 22nd of April.  David Garrett was

10   certain that whatever happened with him, his confrontation with

11   Mr. Royal, was April 22nd, the next night, April 22, 2007.  And

12   the lake happened after that confrontation.  So, if you find

13   that there was a commercial sex transaction for which the

14   defendant is liable based on April 21, 2007, you can't use the

15   David Garrett incident and the lake incident as a force or

16   inducement to enter into the sex transaction, if it happened.

17   Melissa testified.  Now, Melissa certainly had a very

18   tough life.  I mean, I can't imagine a tougher childhood.  She

19   was young and she's living in a storage room because her mother

20   was in a shelter or something like that.  She had dropped out of

21   school earlier and it's natural to be sympathetic toward her and

22   I understand that if you feel way.  But you have to put that

23   aside in evaluating this case.  Her first statement to the

24   police was in May of '07.  I think she said she made two

25   statements about that time, one at her house, one at the police

station, and told lies.  She admitted that.  She admitted that over this process of interviewing her, which took a long time -- it lasted over a couple of years -- that she would not always tell the truth, but she's telling the truth now.  That's what they says.  You've got to consider that and weigh that credibility.

I asked her about her MySpace public image and whether she had, in fact, shown her age there as being older, which kids do.  She couldn't remember.  She was kind of confused about that and said, "Oh, my friend set my MySpace up."  I don't know.  But I think it was either Ilana or Stephanie, and I think it was Stephanie who I asked about that as well, because these girls communicate on MySpace.  They use the e-mail function to communicate.  I said isn't it a fact that Melissa posts a birthday that's older than she really is on her MySpace page, and she did say that that is a fact.  And I offer that to you only on that element of whether the defendant had knowledge of age when Melissa engaged in whatever she engaged in.

Melissa told us about how she met the defendant.  I think some friend named Wendell introduced her to the defendant, that they were just kind of walking around Gaithersburg or Germantown outside the 7-eleven, I think.

She's a mixed up girl.  She talked about vengeance on her old boyfriend.  We never really developed that so much.  She wanted to get him jumped or something.  I don't know what that

1  was about and I don't think she quite developed her testimony on

2  that.

3  But the fact is she met Mr. Royal one day and then she

4  went back to the storage room with Wendell and slept there, and

5  you saw a picture of it.  The next day Wendell more or less

6  dumps her at a Roy Rogers.  She's sitting there alone, which was

7  her way, to sit there and pass the day, try to get some food.

8  She had a cell phone.  She had Mr. Royal's number.  She called

9  him, and whatever happened happened after that, but it was she

10  who pursued him at that point.

11  You've heard about the Motel 6.  Motel 6 I believe

12  happened on April 15th.  That is not the subject of a

13  substantive count in this indictment.  There's no allegation of

14  a commercial sex act at the Motel 6.  You've got different

15  stories if you really compare carefully on details.  You've got

16  Kureese Royal's version.  You've got Shantia Tibbs's version and

17  Stephanie and Melissa's version on the sequence of events.  And

18  the details of that are -- there are conflicts in the details

19  that you'll find if you review your memory and your notes about

20  who left the room, when.  Stephanie tells of sitting in the

21  bathroom with Mr. Royal and that Melissa came back and knocked

22  on the door, and Melissa says she went with Mr. Royal to pick up

23  Kureese.  And so, she would have left twice.  And when she came

24  back she found Stephanie in the bed with no clothes on.  So, you

25  have those conflicts, but it's not as important because there's

1  no substantive count relating to Motel 6.

2          Any sex transactions that Melissa was involved in would

3  have to be three, three incidents you have to evaluate, April

4  21st, D.C., and the two times with Adam, May 8th and May 9th.

5  When you evaluate that, remember on May 8th Ilana was there with

6  her and said that there were no threats, force or coercion.  And

7  that's the same incident in which Melissa said she did it

8  because she was terrified and her family was threatened.  You're

9  going to have to sort that out.

10          Mark Witherspoon, I won't spend much time on him.  The

11  only thing about Mark is you've got to balance his testimony

12  with Shantia's testimony.  He told us that he had set all this

13  up with Shantia Tibbs in a series of phone calls over time.  He

14  had canceled and rescheduled, wanted to wait till his place was

15  ready.  That was his version.  Shantia Tibbs testified that this

16  whole thing was developed at Christopher King and Samantha's

17  house that night, April 21st, that she made a call to this guy

18  and it was set up and it went down that same day.  They can't

19  both be right.  So, you've got to weigh that and decide who's

20  right and whether that is significant in your analysis.

21          Shantia Tibbs told us she had lied previously about

22  this.  She has a history of prostitution and working in the

23  adult entertainment industry, I would say, as a dancer at five

24  or more clubs.  When it got to questions about age of the girls,

25  she gave testimony regarding some revelation that the girls were

underage that took place at her aunt's house in the kitchen.
Now, the aunt was never called as a witness.  So we don't know
about that.  We have to take Shantia's word for it if it's
believed and you have to examine her credibility carefully.

Remember on this trip to D.C., it is Shantia Tibbs who
knew where to find a customer.  It is she who worked with Sammy
to get these girls all dolled up and ready to go.  It is she who
placed the call to Mr. Witherspoon or the series of calls,
depending on who you believe.  So, I ask you to try to sort that
out.

Crystal Brown testified after that.  I've talked about
her a little bit.  She lied to the police first in 2009 and then
she committed perjury before the grand jury after that.  But she
blames that on Mr. Royal, said she was scared.  Well, she made a
choice.

On the witness stand she had great difficulty
remembering details.  She told us about this excursion to New
York.  She put the blame elsewhere.  What's significant about
that relationship, though, is when you look at the drug count --
there is a conspiracy count in the indictment.  I think it's
Count Six, general conspiracy to distribute controlled
substances -- the time frame of that is really designed around
the relationship that the defendant had with Crystal.  I think
she testified that they lived together from September of 2006
until May of 2007.  That's the period covered by Count Six.

1    Every other count has a much shorter, more collapsed time frame.

2           There was testimony from an FBI analyst about phone

3    records and I'm not going to go through all of these detailed

4    boards that have been prepared.  I can tell you what's in

5    dispute and what's not.  There's really nothing in dispute about

6    the phone records that were taken from the records.  What they

7    tell you is where a certain phone was in relation to the tower

8    at a particular time.  So you can establish dates and relative

9    times with those.  You can look at those records and see the

10   number of seconds that each call was held.  The government has

11   put names next to each phone.  That's not from the records.

12   Remember that.  That's something that the government added to

13   it.  You don't know what was said on those phone calls.  But

14   these are good records for determining dates and times where

15   phones were located and the duration of calls.  Other than that,

16   they're not worth much and they don't add much, but they'll tell

17   you about April 21st and 22nd, May 8th and 9th, and you can

18   establish locations.

19          You heard from Kureese Royal, who is some relation, a

20   distant cousin, I think, of the defendant, who was raised by

21   Mrs. Cox from the time he was 12.  Kureese was questioned in a

22   way that was slightly misleading, I think.  He was asked about,

23   well, when you were living with the Royals, Mr. Royal and

24   Cierra, in 2007, tell us what you observed and heard and that

25   sort of thing.  It was never really established when he was

living with Mr. Royal, and I think we tried to straighten that out with Mrs. Cox when she testified.  When you think about it, you know from the evidence this, that Mr. Royal was arrested on May 18, 2007.  Officer Liquorie told us that.  He's a vice officer.  He took him into custody with Shantia Tibbs.  You have all the stuff in evidence that was seized from him at the time of his arrest.

Mrs. Cox says that Cierra didn't move into that house until June 1st of 2007.  The government approached her with a Housing Opportunities Commission lease, Section 8 housing, showing that actually perhaps Cierra had signed a lease earlier.  Mrs. Cox said she didn't recognize that signature.  You have an instruction on that, incidentally, where questions are not evidence, answers are evidence.  So, try to use that instruction.  But the fact is, logic tells you this, that Cierra moved in on June 1st.  Maybe she moved in on May 19th.  I don't know.  Maybe she had some access to the house on May 19th.  The fact is Mr. Royal was under arrest on May 18th.  Mom says that he didn't join her for several months after that, which is logical, and it's a logical inference you can draw from the fact that he was arrested on May 18th.  She also tells us that Kureese didn't move in until months after Mr. Royal moved in.  So, what you have is testimony outside of any of the dates in the indictment.

Now, there's an instruction on that.  I think it's

1   instruction 13 or 14 on variance in dates.  It tells us that the

2   government doesn't have to prove dates precisely, but they have

3   to show substantially similar dates.

4           Kureese Royal's testimony is about a time period after

5   all this happened.  That is not substantially similar.

6           As an example of what is not substantially similar, we

7   see what happened on May 2nd of '06.  That was Officers Eastman

8   and Best from the Gaithersburg Police Department who testified

9   about a drug deal or something, a small drug deal up there.  You

10  were instructed immediately that you can't consider that as

11  substantive evidence of his guilt of a drug conspiracy.  It's

12  outside of the indictment.  The same thing goes with Kureese

13  Royal and the same thing goes with Eugene Travis Melendez, who

14  was one of the last witnesses who testified.  He told us about

15  all these observations he made at Cierra's house while Mr. Royal

16  lived there with baby Madison and Cierra.  He said he would see

17  piles of marijuana and scales and things like that and they had

18  talks about prostitution and stuff like that.  That didn't

19  happen during the indictment period.  That happened well after

20  that.  You know that.  That's what was confirmed by Mrs. Cox.

21  And it makes sense.  There is no proof that Cierra moved into

22  that house at any time prior to June 1st or May 19th at the

23  earlier, and Mr. Royal was gone at that time.

24          Thomas Christopher King was one of the last witnesses.

25  He's older than many of these folks.  He's 35 years old.  He had

a proffer agreement to protect him, admitted that he made some

large cocaine buys.  He bought it at Crystal Brown's house until

perhaps that supply ran out, if that was the New York stuff.

And then he would, according to his testimony, really, use Lloyd

Royal to try to get cocaine for him.  He couldn't reach Lloyd

Royal on his TracFone that he had to buy minutes on.  So

Mr. King got him a phone so he could reach him better.  That

didn't work out well for him.  But he told us about how he

would -- when he wanted cocaine for the weekend, he would get

Mr. Royal to go with him.  They would drive up to some

neighborhood in Montgomery County and he would send Mr. Royal in

with his money to buy cocaine for him.  What was he doing?  He

was using Mr. Royal to take the risk for him of going into the

tougher neighborhood.

And, again, Mr. King told us about Samantha and her

control attitude.  He also told us something about Mr. Royal,

his personality, that he was always full of himself, always

puffing up his image.  He had this dream of being a rapper,

maybe a fantasy, that he claimed that that ring that's been

passed around was platinum and diamonds.  You've seen it.  You

can tell it looks like it came out of a gum machine.  And that

he only rapped about what he knew.  And I expect the government

to suggest, okay, on February of 2009, two years after this all

happened, we searched Cierra's house where Mr. Royal was living

at the time and in a container in the basement we found rap

lyrics.  They moved all of these into evidence.  And if you've ever heard or read rap lyrics, they're about some fairly nasty or unpleasant things.

They want you to think that those are the truth, that that's his confession to you.  I say look at the other evidence.  There's enough evidence here where you can make a decision without having to stretch it that far.

The final thing that I want to say about Mr. King is this.  He told us about the trip to D.C.  He said, "I don't know what's going on."  It's a small townhouse.  Samantha is there.  The girls are there.  He is there.  They're hurrying around.  He says that the girls, in his words -- this is his words -- were dressed in slutty attire.  You've seen it and probably that is a fair description for it.  This is stuff that he and his wife had bought in 2006 and it was in Samantha's inventory.  But he told us that he had testified under oath in the grand jury and before you that when he loaned the Suburban to Mr. Royal, to Shy Mike, to Shantia, Melissa and Stephanie on April 21st, it was to go to a club in D.C.

Now, there's two possibilities.  Either he's lied under oath twice -- that would be at the grand jury and here -- or he's telling the truth.  Now, if you decide he was telling the truth about that, then there's a reasonable inference that can be drawn that there was actually some ambiguity about what was going on that night and where people were going.  You're going

1   to have to resolve that.  But I think it's only fair that you

2   consider it in weighing what happened on April 21st.

3          We talked about Mr. Melendez.  Again, he told you about

4   his observations.  My recollection, and it's yours that

5   controls, but my recollection is that he told us about these

6   observations he made of Melissa at a gas station some time early

7   in April of 2007 and he said all of these observations about

8   drugs and scales and weight, marijuana, that is, occurred six

9   months before that, which would put it in 2006.  That makes no

10  sense since Cierra didn't even have her house until, at the

11  earliest, May 19th of 2007 but more likely June 1st of 2007.

12         One thing he did tell us is Eugene Travis Melendez is

13  Shy Mike's little brother.  Shy Mike is the guy who didn't

14  testify in this case, who was the driver.  He said that during

15  the nine years that he knew Mr. Royal, he never once saw him

16  with a firearm but he saw his brother with a handgun, and it's

17  probably the handgun that Mr. Felte was showing you earlier.

18         Ladies and gentlemen, there are many exhibits that are

19  going to come in that are already in evidence that you will go

20  through.  You're going to see glass vials, for example.  A lot

21  has been made out of them.  They were found at 522 Carousel

22  Court, but they were found February of 2009.  That's two years

23  after this -- almost two years after this drug count was

24  supposedly completed.

25         In the physical evidence you'll see a handgun belonging

1  to Michael Anderson.  You didn't hear from Michael Anderson.

2  This is the gun that Melissa says that Lloyd Royal always had.

3  But the testimony on that gun is that it was seized from Michael

4  Anderson at his home on Girard Street on July 5th of '07.  It

5  was registered to him and he purchased it.

6          You'll see the rap lyrics that I referred to that were

7  seized in 2009.  I submit that this should have no consequence

8  in your decision.  In fact, read it if you like, but I hope

9  you'll agree with me on that.  Please look at other evidence on

10 that.

11         You'll see the ring, the gaudy watch, the phone

12 records, all of that.  You'll see Samantha's exotic dancing

13 clothes or whatever kind of clothes you want to call them.  All

14 that is in the exhibits.

15         You'll see the stipulations, which are matters that are

16 not in dispute.

17         Give these physical exhibits and stipulations the

18 weight you think they deserve and the consideration you think

19 they deserve.  But to fairly decide this case, you've got to go

20 back to the witness testimony from the witness stand.  You've

21 got to carefully analyze that testimony.  It all goes back to

22 credibility, the question of who can you believe.  Can you

23 believe all of what they say?  Can you believe some of it, part

24 of it, none of it?  You've got to make that evaluation.  You

25 know lies have been told in the past.  You know lies have been

1   told under oath by these witnesses.  These witnesses, many of

2   them are from the drug culture and were high or under the

3   influence of drugs when they testified -- strike that -- not

4   when they testified necessarily but when they observed what they

5   testified about.  They have been offered deals and incentives,

6   advantages for their testimony, and their stories changed over

7   time, over a period of three years up till today.  All of this

8   needs to be weighed carefully.

9         And you've heard the instructions.  They've been read

10   to you.  When you go into the jury room, you'll have, I think,

11   three copies of this.  I ask that you make sure you understand

12   the instructions before you start talking about counts and

13   charges and the evidence.  Understand the instructions.  Review

14   the evidence.  Deliberate with one another.  Please keep the

15   presumption of innocence in mind.  Please keep that high

16   standard of proof, beyond a reasonable doubt, in mind and I ask

17   you to search for reasonable doubt.

18         I'm sure I haven't covered everything that I should

19   have covered in talking to you.  Please search for reasonable

20   doubt.  If you do that and you find it on any element, then your

21   verdict on that count for that element should be not guilty.

22         Now the government gets their final argument.  I thank

23   you for your attention.

24         THE COURT:  All right.  Thank you.

25         Does the jury need a break or you want to continue on?

1          Continue on.  All right, government.

2          MS. MAGNELLI:  Good afternoon.

3          Ladies and gentlemen, welcome to the defendant's world.

4    It is a world filled with people who do drugs.  It is a world

5    filled with people who own handguns.  It is a world filled with

6    people who are willing to beat on other people.  This is the

7    defendant's world.  These are the people he chose to associate

8    with.  These are the people with whom he entered into this

9    agreement to do these acts.

10         The government is put to its paces to prove a

11   conspiracy.  Remember what that's defined as?  Two or more

12   people are in agreement.  Of course you're going to hear from

13   the conspirators.  We have to show you that evidence.  We

14   embrace the fact that we have to do that.  We embrace our beyond

15   a reasonable doubt standard.  Of course we do.  That's not an

16   issue, because the evidence is there.

17         Now, the defense has spent a lot of time parsing

18   through every single witness.  I'm not going to do that.  We had

19   12 civilian witnesses.  We had seven law enforcement witnesses.

20   Ladies and gentlemen, we had 19 witnesses, 19.  Not everybody is

21   going to be consistent.  Can you imagine if 19 people all said

22   the same thing, if the 12 civilians all said the exact same

23   thing?  That would be odd.  That would be scripted.  That would

24   be rehearsed.  Who cares if they don't remember stuff in order.

25   That's the way memory works.  There are instructions that talk

1  about lapses in memory and that type of thing.  These are

2  natural occurrences.  You might remember who was at the

3  Christmas party three years ago because they spilled the punch

4  bowl, but can you tell me when they came into the party or when

5  they left?  Can you tell me everybody who was there at the

6  party?  Did you see everybody in the living room and in the

7  kitchen and the den and out on the deck?  Or do you just

8  remember that some guy knocked over a bunch bowl?  Maybe you had

9  two or three beers that night.  But you remember that

10  specifically because it was significant, because it mattered,

11  because it was important, and because when put to your paces and

12  you really think about it, that's what you remember.

13       Ladies and gentlemen, when you talk about Melissa, when

14  you talk about Stephanie, when you talk about Ilana, these are

15  individuals who were just kids at the time.  They were 16 and 17

16  and they entered his world.  You can scrutinize his world.  We

17  invite you to.  Scrutinize his associates, his friends, his

18  family.  Scrutinize the people he associated with.  But make no

19  mistake, this is the world these three girls found themselves

20  in, as teenagers they found themselves.  Enter his world.

21       Look at the exhibits.  See what they show you.  Your

22  recollection of the testimony is what controls.  And one-by-one

23  they took that stand.  This isn't grand jury.  They weren't

24  subjected to public scrutiny in grand jury.  That was a secret

25  process.  That's investigation.  This is different.  They have a

1    public audience out there.  They have you guys.  They had

2    attorneys.

3           And not everybody had these proffer agreements the

4    defense has made so much of.  Five of the 12 individuals had

5    that kind of agreement, just five.  And he went through them one

6    by one by one by one, telling you the things that they didn't

7    say or the things that they did say.  I told you all this in the

8    beginning.  I told you every bit of this in the beginning.

9           We talk about Anthony Caban, The Pharmacist.  We told

10   you he stole drugs.  We told you why.  Sammy told you why.

11   Melissa was even there with the list.  There was no question

12   about that.

13          Ilana.  Ilana was 16 years old at the time.  She spent

14   the least amount of time with the defendant and, if you recall,

15   she was friends with Melissa.  Melissa told her about the

16   defendant.  Ilana knew about the defendant before she got into

17   this.  And the defendant knew Ilana's age.  Remember he saw

18   Ilana's picture on Melissa's MySpace and Melissa told him, "I

19   think she's 14, 15."  That didn't matter.

20          The witnesses, ladies and gentlemen, one-by-one have

21   told you everything that you need, everything you need to know

22   in this case.  Who cares if you didn't hear from Mike Anderson,

23   or Paul Green, or Adam Grieder for that matter, who is deceased.

24   You don't have to hear from everybody.  Mike Anderson, who is

25   the defendant's best friend, Paul Green, who was his buddy, so

1  what if you didn't hear from them.  Don't speculate as to why

2  they didn't take the stand.  The fact is you have 12 people,

3  civilians, whom you did hear from.  The victims took the stand

4  one-by-one and told you what they remembered as best they could.

5      Yes, they did drugs.  That's part of this case.  They

6  got all those drugs from him.  Let's not forget that.  The

7  defense glosses over that and says they got it from adults.

8  They got it from him.  This is what the case is about, the

9  defendant, not every single person in this conspiracy.

10     Ladies and gentlemen, we did not build this case, I

11 would submit, on smoke and mirrors.  There is real testimony.

12 There is tangible evidence.  And when you combine them, we do

13 believe that it proves this case beyond a reasonable doubt.

14     I want to talk about April really quick.  April 2007,

15 we have two -- well, we'll talk about two events.  Now, let me

16 remind you there has not been a single shred of evidence, not

17 just the slightest bit to suggest that these events didn't

18 happen, not a single piece, nothing.  It's all been --

19     MR. TRAINOR:  Objection.

20     THE COURT:  Overruled.

21     MS. MAGNELLI:  It's all been pointing at other people.

22 Oh, this person did that, that person did that, oh, this person

23 did that.  But not the date it happened, April 15, 2007, Motel

24 6.  What evidence do you have of that?  You have the phone

25 number that the defendant gave to Motel 6, 8777.  That's the

1  number Crystal Brown testified she got for the defendant.  And

2  that record is in evidence.  That was a stipulation.

3          Don't forget Sergeant Sakala testified that individuals

4  who sell drugs generally don't have items in their own names,

5  like a phone.  So you have the phone that the defendant gave to

6  Motel 6.  It's right there on the receipt.  It's right there on

7  the guest list.  It's clear he used it.  He provided that as his

8  contact number.

9          You have testimony from Shantia, from Kureese, from

10 Melissa, from Stephanie.  Are all those completely consistent?

11 Of course not.  Those are four different human beings.  You have

12 four different vantage points of the same situation.  Of course

13 they're going to be slightly different.  That doesn't mean that

14 you shouldn't believe them.  They all told you what they

15 remembered, the way they remembered it.

16         April 21st through 22nd, those are approximate dates.

17 However, there is evidence in the record to support them.  Now,

18 remember, the government doesn't have to prove the specific

19 date.  We just have to prove substantially similar, reasonably

20 close in time.  But on those dates we have D.C. and Cinnamon

21 Woods.  We have evidence that the defendant borrowed a phone

22 from Sammy.  4690 are the last four digits.  She testified about

23 that.  And you have Mark Witherspoon's phone.  Look through it.

24 You'll have to scroll past 2008 to 2007 and you will see dates

25 April 21st, 22nd.  You'll see a phone call from Tea, T-E-A,

1    which is how he spelled Shantia's nickname, and you'll see the

2    number 4690 calling him.

3          You have evidence that Melissa saw a phone being passed

4    back and forth in the Suburban on the way to D.C.  You have

5    Shantia's testimony that she got the phone from the defendant to

6    call Mark.  Mark was on the phone when she passed it over back

7    to him for directions.  There is evidence that he was in that

8    car on the way to D.C.  There is no evidence that Sammy was in

9    that car or that Chris was in that car.  There's just none.

10          You also heard from Mark Witherspoon.  He got on the

11    stand and he told you, yes, she gave me a phone call, she gave

12    me a picture, two for one, I paid.

13          You heard from Melissa.  You heard from Stephanie.  You

14    heard the details of what happened at Mark's apartment.

15          Before that, you heard that Stephanie had stolen some

16    drugs from the defendant and he smacked her for it.  You heard

17    that she knew that the defendant had smacked Melissa.  You heard

18    that she had overdosed one night from drugs the defendant had

19    given her.

20          These are not inconsequential things.  With each act of

21    the defendant, each incident of force, of coercion, it created

22    or helped create this climate of fear that existed when

23    Stephanie went to D.C.

24          And you did hear from David Garrett and when

25    Mr. Trainor got to that on his list, he just sort of skipped

1   over that.  He just kept going.  He had nothing really to say

2   about Mr. Garrett.  That evidence is unrefuted.

3         Let's look at May.  May 8, 2007, Holiday Inn,

4   Gaithersburg.  What evidence do you have that this happened?

5   What evidence do you have that it didn't?  The evidence that you

6   have that it did is the defendant's use of those phones again,

7   8777.  You'll see the cell site activity.  You also have the

8   7283 number.  These phones place him, the defendant, in that

9   area.  They're not inconsequential.  They place him there along

10  with all the testimony.  7283, ladies and gentlemen, belongs to

11  the phone that the defendant was arrested with, this phone.

12  This is the phone he was arrested with on May 18, 2007.  When

13  those contacts from this phone were downloaded, and they're in

14  evidence, you will see that they reflect the names of his

15  family, his girlfriends, Crystal, Sky, Cierra, the victims, the

16  co-conspirators, his friends Mike and P.J.  That was his phone.

17  He used it.  The evidence is there for you to find that, and it

18  places him at the Holiday Inn.  It also places him at the

19  Courtyard Marriott.

20        What else places him there?  For the Holiday Inn, you

21  heard from Melissa and Ilana, and, of course, as you know, Adam

22  Grieder is deceased.

23        You also will see the hotel receipt that shows it was

24  Adam Grieder who rented that room just as the testimony has

25  developed.

1    May 9, 2007, you heard from Melissa and you heard from

2    Shantia.  Of course, you didn't hear from P.J.  He's the

3    defendant's buddy.  But you have more than sufficient evidence

4    to find that not only did this happen but the defendant is part

5    and parcel of it.  He's the only one on trial here.  Don't get

6    distracted with all this other argument about who did what.  We

7    embrace who did what, and who did what includes what he did.

8    There's no mistake about that.

9        Now, there was some talk about Kureese Royal and Travis

10   Melendez and dates, when he moved into Cierra's house, that kind

11   of thing.  And, with all due respect, when questioned on cross,

12   Mrs. Cox indicated that she knew that Cierra had access to the

13   house before the date she moved in.  And, quite frankly, mothers

14   don't know what their adult children do.  He is an adult male.

15   He is clearly putting his head down different places all the

16   time.  The Motel 6 receipt shows you that.  All the testimony

17   shows you that.  And Sergeant Sakala talked about how drug

18   dealers can be nomadic, never staying in one place too long.

19   And let's not forget this Travis Melendez.  You remember he's

20   Mike Anderson's younger brother.  He saw Melissa with the

21   defendant at the gas station when Melissa went to buy

22   cigarettes.  This is not some event that happened way outside

23   the time frame of the conspiracy or the indictment.  He clearly

24   was present during relevant times and dates.

25        Ladies and gentlemen, we are going to send the exhibits

1  back to you and you're going to get a chance to look at them.  I

2  do urge you to look at them just like the defense does.  Look at

3  Shantia's black address book, see the names that are in there,

4  see how her number is reflected.  Compare it to the cell site

5  map.  See how the number for Breedo or P.J., Paul Green, is

6  reflected, the numbers for Blyss and B in her floral address

7  book, also the number for B, for Blyss.  She testified that at

8  the time she wrote these down, and these were her handwriting,

9  that the defendant had given them to her.  They were fresh in

10 her mind, and that was in 2007.

11        So, again, the evidence, the tangible evidence that you

12 can see, it does nothing but support the testimony that you've

13 heard.  It is objective evidence.  The phone records are not

14 going to lie to you.  Whatever you think of the witnesses, these

15 are not going to lie.

16        The accessories bag, the one that Sammy packed and took

17 to D.C. or gave to the girls to take to D.C., you remember where

18 this was recovered?  The defendant's car.  Not Sammy's house,

19 not the Suburban.  The defendant's car.

20        Let's not forget some of the most crucial pieces of

21 evidence that you've heard about force, about fraud, about

22 coercion.  From their own mouths essentially you have heard he

23 put a knife to my throat.  He pulled out a gun.  He told me he

24 wouldn't take me home unless I kissed it.  He got mad because I

25 didn't know what medicine to take, so he smacked me.  He smacked

1  the mess out of her.  He told me if I paid for it, I could have

2  sex with these girls.

3          Ladies and gentlemen, those words, statements, actions

4  objectives, they don't have anything to do with Shantia, Sammy,

5  Paul, Mike.  They're all about the defendant, every last one of

6  them.  And there are more.  And the evidence shows you time and

7  time and time again, shows you the force, the fraud, the

8  coercion, the fact that he knew how old they were at the time.

9  He knew they weren't 18.

10         The evidence shows you the conspiracy, the agreement

11  between all these people to make these things happen.  We don't

12  excuse that.  We ask you to look at it.  The evidence shows you

13  the conspiracy to distribute drugs.  We embrace that as well.

14  We have to.  It's an agreement, two or more people, to commit

15  this criminal act.

16         But, again, this trial is about that man, and we would

17  ask you to look at the evidence and enter his world the way

18  Melissa did, the way Stephanie did, the way Ilana did back in

19  2007, and we believe that when you do, you will find down that

20  rabbit hole all the evidence you need to convict him as charged.

21  Thank you.

22         THE COURT:  All right.  Thank you.

23         Now, ladies and gentlemen, the last of the instructions

24  I'll give you right now.

25         The government, to prevail, must prove the essential

elements by the required degree of proof as I have explained in these instructions.  If the government succeeds, your verdict should be guilty.  If it fails, it should be not guilty.  To report a verdict, it must be unanimous.

Your function here is to weigh the evidence in the case and determine whether or not the defendant is guilty solely upon the basis of such evidence.

Each juror is entitled to his or her opinion.  Each should, however, exchange views with his or her fellow jurors. This is the very purpose of jury deliberations, to discuss and consider the evidence, to listen to the arguments of fellow jurors, to present your individual views, to consult with one another, and to reach an agreement based solely and wholly on the evidence, if you can do so, without violence to your own individual judgment.

Each of you must decide the case for yourself after consideration with your fellow jurors of the evidence in the case, but you should not hesitate to change an opinion which, after discussion with your fellow jurors, appears erroneous.

However, if after carefully considering all the evidence and the arguments of your fellow jurors you entertain a conscientious view that differs from the others, you are not to yield your conviction simply because you are outnumbered.

Your final vote must reflect your conscientious conviction as to how the issues should be decided.  Your

1   verdict, whether it's guilty or not guilty, must be unanimous.

2   Now, ladies and gentlemen, again, I instruct you not to

3   consider anything that's not in the record beyond your own

4   inferences and common sense.  No research.  There will be no

5   dictionaries sent back, and I ask that you not do any

6   computerized research or go on the Internet to get any facts.  I

7   have given you the terms.  I think they're sufficient for your

8   understanding.

9   If you want smoke breaks during your deliberation, you

10  certainly can do that.  And I'll send a note at the conclusion

11  of every day you're in deliberation asking whether you wish to

12  stop at a certain time or you wish to move forward.

13  Now, in my courtroom, ladies and gentlemen -- some

14  judges do it differently, but in my courtroom the first juror

15  who is called is designated as the foreperson by me.  So, Juror

16  No. 1, you are the foreperson.

17  Now, the foreperson, again, has no extra votes or

18  anything, but she will preside over the deliberations and she is

19  the spokesperson here in the court whenever the verdict is

20  announced, if one is reached.  If you need to communicate with

21  me, the foreperson will sign a note to me.

22  As I mentioned, a detailed verdict sheet has been

23  prepared.  And, ladies and gentlemen, each of you will have it.

24  It's four pages long and essentially there are 14 questions to

25  assist you in your decision-making.

1    Count One, how do you find the defendant, Lloyd Mack

2    Royal, as to Count One, the conspiracy to commit sex

3    trafficking, you have two choices, guilty or not guilty.

4    As to Count Two, how do you find the defendant, Lloyd

5    Mack Royal, as to Count Two, the sex trafficking, again, you'll

6    have two choices.

7    And remember in my instructions as to Count Two, Count

8    Three and Count Four, my instructions told you that the jury

9    must make a unanimous determination as to how the second element

10   took place.  Again, it's beyond a reasonable doubt if you find

11   the government has sustained its burden as to Counts Two, Three

12   and Four, you must also unanimously determine how the second

13   element was presented.  So, in that connection, if you find

14   Lloyd Mack Royal guilty as to Count Two on the sex trafficking,

15   you'll have to answer three additional questions there.  If you

16   find him not guilty, you would move on to question 3 and skip --

17   you'll skip question 3 and move to question 4.  But, again, if

18   you find the defendant guilty of Count Two and that question,

19   you'll move to the next three questions, and here it is.  If you

20   find the defendant guilty of Count Two, do you find that this

21   offense was effected, one, by force, fraud or coercion?  And you

22   have two choices, yes or no.  Or do you find the defendant knew

23   that M.P. in this count was under the age of 18, two choices,

24   yes or no.  And then a third question would be as to both, yes

25   or no.

1    And, actually, that C wasn't necessary because I think

2    you can pretty much determine whether it's both or either based

3    on questions A and B.  But, anyway, we just wanted to make it

4    clear so we have given you a third choice.

5    All right.  So, then, question 4, how do you find the

6    defendant, Lloyd Royal, as to Count Three, and then the same

7    choices, guilty or not guilty.  And if you decide that it's not

8    guilty, you'll skip the next question 5 and go to 6.  But if you

9    find the defendant guilty, you would ask the same three

10   questions, force, fraud or coercion, yes or no; the defendant

11   knew that S.T. here was under the age of 18, yes or no.  And

12   then both yes or no.

13   And then you then move to question 6.  Again, that's

14   for Count Four, same approach, two choices, yes or no.  That's

15   for the third person, and, again, you repeat the same three

16   questions in 7.

17   All right.  Then, you would move to Count Five, how do

18   you find the defendant, Lloyd Mack Royal, III, as to Count Five,

19   possession of firearm in furtherance of a crime of violence, two

20   choices, guilty or not guilty.  If you find the defendant guilty

21   of Five, then you would answer questions in 9 and 10 -- excuse

22   me -- question 9.  If you find the defendant not guilty, then

23   you would move forward to -- you skip questions 9 and 10 and

24   proceed to question 11.  It's pretty self-explanatory here.

25   So, what is 9?  If you find the defendant guilty of

1  Count Five, do you find that the defendant possessed the firearm

2  in furtherance of a crime of violence, yes or no.  If you found

3  the defendant in Count Five, do you find the defendant used or

4  carried a firearm during and in relation to a crime of

5  violence -- and all those questions are issues I described in my

6  instructions -- or both, yes or no.  So you have two different

7  questions under 9 and then you can say yes or no as to both.

8          And then question 10, if you find that a firearm was

9  used in that count, Count Five, do you find that it was

10 brandished, and you would answer that question yes or no.

11         Then Count Six, how do you find the defendant, Lloyd

12 Mack Royal, as to Count Six, conspiracy to distribute controlled

13 substances, two choices, guilty or not guilty.  If you find not

14 guilty -- defendant not guilty of Count Six, then skip question

15 12 and proceed to 13.  But if you find the defendant guilty of

16 Count Six, then you're asked certain questions related to that

17 and that's the type of controlled substance.

18         And question 12 says if you find the defendant guilty

19 as to Count Six, how do you find as to the type of controlled

20 substance involved, and you have marijuana, yes, or no; cocaine,

21 yes or no; phencyclidine, PCP, yes or no.

22         And then question 13, how do you find the defendant,

23 Lloyd Mack Royal, III, as to Count Seven, distribution of

24 controlled substance, cocaine, to a person under 21, S.D.

25 person, two choices, guilty or not guilty.  And then the same

1    question, Count Eight, this time the person is M.P. and the

2    cocaine -- it's not cocaine.  It was PCP here.

3         So, that's -- those are the questions, ladies and

4    gentlemen.  And, again, I would remind you, you can just put a

5    note with reference to question 8, how do you find the

6    defendant, Lloyd Mack Royal, as to Count Five, possession of a

7    firearm in furtherance of a crime of violence, I direct you back

8    to question -- to instruction 52.  Put a note there, 52, because

9    that's a limiting instruction again.  You have to find -- before

10   you can talk about a crime of violence, you have to find first

11   that the defendant is guilty of the crimes of violence in, I

12   think, Counts One, Two and Three.

13        Okay.  So, ladies and gentlemen, we talked about the

14   foreperson.  If it becomes necessary during deliberations to

15   communicate with me, again, you may send a note by the marshal

16   signed by your foreperson or by one or more members of the jury.

17   No member of the jury should communicate with the court by any

18   means other than a signed writing and the court will not

19   communicate with any member of the jury on any subject touching

20   the merits of this case other than in writing or orally here in

21   open court.  You will note from the oath about to be taken by

22   the marshal that he, too, as well as all other persons are

23   forbidden to communicate in any way or manner with any member of

24   the jury on any subject touching the merits of this case.

25        Bear in mind you may not reveal to any person -- not

1   even to the court -- how the jury understands numerically or

2   otherwise on the question of guilt or innocence of the accused

3   until after you have reached a unanimous verdict, if you can.

4          All right.  Now, ladies and gentlemen, are there any

5   members of the 12 who are unable at this point to deliberate?

6          All right.

7          JUROR NO. 3:  One question.  Is Friday still going to

8   be an off day?

9          THE COURT:  No.  That was just testimony.  You will be

10  expected to come in on Friday and continue to deliberate if all

11  of you agree to that.  But you'll set pretty much your own

12  schedule on deliberations.  Is there a problem Friday for you?

13         JUROR NO. 3:  I had made some other plans for Friday

14  understanding that that would be an off day.

15         THE COURT:  Yes.  Again, the trial was quickened, as

16  you see.

17         MR. TRAINOR:  Your Honor, may we approach on that

18  issue?

19         THE COURT:  Sure.

20         (At the bench:)

21         MR. TRAINOR:  That was the day that I was -- I was

22  supposed to leave Thursday night for a death penalty --

23         THE COURT:  That's right.  You won't be here.  You

24  won't be here Friday.  Yes, you will not be here on Friday.

25         MR. TRAINOR:  That's correct.  That's the problem I

1  have.  I'm hoping we would get a verdict by today or tomorrow.

2  THE COURT:  Well, we never know.  We'll cross that

3  bridge then.  We know you aren't coming.  Do you have someone

4  who could take a verdict if they decide they want to sit?

5  MR. TRAINOR:  I don't know.  I will try to --

6  THE COURT:  I could seal it and make them come back

7  Monday.  Where will you be?

8  MR. TRAINOR:  Denver.

9  THE COURT:  That's tough because notes may come in.

10 Why don't we -- what's today?  Wednesday.  Why don't we make

11 that decision tomorrow at the end of the day and we may just

12 tell them that they can skip --

13 MR. TRAINOR:  If you could give me a heads up, I might

14 be able to cancel the flight and get my money back.

15 THE COURT:  That's not necessary.  You don't want to do

16 that.

17 MR. FELTE:  The government has no objection.

18 THE COURT:  All right.  Okay.  Great.

19 (In open court:)

20 THE COURT:  All right, ladies and gentlemen, again, we

21 can make a decision on whether you will sit on Friday if you

22 like.  We don't want to disrupt people.  And you can deliberate

23 starting now, as soon as I swear the marshal in, and then you

24 can continue deliberating, and if you decide that you don't want

25 to sit on Friday, that's fine.  I don't think -- I don't want

1  any jurors or the jury to believe you're pressured to make any

2  decision.  I want deliberations and the parties want

3  deliberations here.  They want you to review the evidence and

4  make a decision that's fair and impartial after due

5  consideration.

6           So, why don't you start your deliberations and then if

7  it continues on through the end of tomorrow, then we'll make a

8  decision whether you want to come back or you want to skip and

9  come back Monday.  Is that fair?

10          All right.  Is that fair to the parties?

11          MS. MAGNELLI:  Yes, Your Honor.

12          MR. TRAINOR:  That's fine.

13          THE COURT:  All right.  So, at this point we're going

14 to discharge the alternates.  And let me thank you for your time

15 and consideration here.  And often in these long cases,

16 sometimes we lose jurors.  But thank you for your patience and

17 you are discharged.

18          All right.  Let's go ahead and swear in the marshal

19 here.

20          THE DEPUTY CLERK:  Please raise your right happen.

21          (Court security officer duly sworn by the deputy

22 clerk.)

23          THE DEPUTY CLERK:  Please state your name for the

24 record.

25          COURT SECURITY OFFICER:  C.S.O. Robert Germine, United

1    States Marshal Service.

2              THE DEPUTY CLERK:  Thank you, sir.

3              THE COURT:  All right.  You can take charge and escort

4    them back.  We will get the evidence and bring it right back and

5    those documents.  Gather the evidence and send it back.

6              (Jury retired from the courtroom to commence

7    deliberations at 3:25 p.m.)

8              THE COURT:  All right.  We'll recess until the jury

9    returns.

10             (Recessed from 3:25 to 4:50 p.m.)

11             THE COURT:  All right.  Thank you.  Be seated.

12             I wanted to put something on the record and make sure

13   that Mr. Royal is advised of everything that happens.

14             Mr. Royal, we received a letter from the jury asking a

15   certain question.

16             Do you have a copy of the letter, madam clerk?

17             MR. TRAINOR:  We have one in front of us, Your Honor.

18             THE COURT:  All right.  Can you read that for the

19   record.

20             MR. TRAINOR:  I will read it.  A note came at 4:20 from

21   the jury to Judge Williams and it said, "Please explain

22   relevance of 'interstate commerce' re Count Four.  Does it infer

23   crossing state lines?"

24             THE COURT:  All right.  And we had a brief conference

25   with the attorneys a few minutes ago and both sides agreed that

1   we would send them a note, not call them in and tell them

2   anything but basically refer them to a couple of instructions.

3         So, Mr. Trainor, will you read that for the record, the

4   response that the court gave.

5         MR. TRAINOR:  I will.  The agreed upon response after

6   consulting with Judge Williams and all counsel was that we would

7   send this message back.  "Please refer to instructions No. 43

8   and 46 in particular.  If you still have requests, please

9   advise."  It's signed by Judge Williams at 4:40 p.m. on today's

10   date.

11         THE COURT:  All right.  And that just went back to

12   them.  And, as I said, we are not in the discussions.  We don't

13   know what they're thinking, which count they are discussing or

14   which question they're discussing, and ultimately we may have to

15   answer their question whether or not in every situation that

16   interstate commerce requires the crossing of state lines.  As I

17   look at 46, I suspect if you read the first portion of it, it

18   does seem to suggest that there's a requirement for crossing

19   state lines, but the last paragraph in there makes it very clear

20   that there's an either/or.  Either you can cross or the second

21   half of it, you can affect interstate commerce with the movement

22   of activities that affect commercial -- stream of commercial

23   traffic.

24         So, we'll see what they do after they read it again,

25   but we referred them to instructions 43 and 46.

1    All right.  So, madam clerk, have you sent in the note

2  yet?

3    THE DEPUTY CLERK:  I have not, Your Honor.

4    THE COURT:  All right.  Madam clerk is going to send a

5  note in now.  I'm going to sign it.  The note is a note I

6  usually send in.  "I write to inquire as to how long you wish to

7  deliberate this evening?  You may stay as long as you wish or

8  you may return tomorrow.  In the event you wish to continue

9  deliberating this evening, do you wish that I order the jurors

10  dinner?  If not, please advise how long this evening you

11  anticipate deliberating.  If you do not anticipate completing

12  your deliberations this evening, what time tomorrow do you wish

13  to convene?"

14    That's my standard letter and I'm going to go ahead and

15  sign that and we can send that in and wait for a response.  And

16  that will dictate whether we can ourselves retire for the

17  evening or whether we need to wait around.

18    MR. TRAINOR:  Your Honor, we have no objection to that

19  note going in.

20    THE COURT:  All right.  Okay.  4:55 p.m., 3-24-10.  All

21  right, madam clerk, you can send that in.  If they want copies,

22  give them copies.

23    All right.  So we'll just wait.  As soon as I hear back

24  from the jury, I'll share it with you.  You may want to hang

25  around because they may respond to that quickly and let us know

1   what time they want to retire today.

2           All right.  So, I would just relax.

3           (Pause.)

4           THE COURT:  All right.  Here is the note here.  Okay.

5   It says, "Wish to continue this evening.  Projected time frame

6   5:30 to 6:00."  This is what Juror No. 1 has written.

7           So, give them copies of that response and we'll just

8   wait.  Apparently they want to continue deliberating and get

9   back to us.  All right.

10          (Recess from 5:05 to 5:50 p.m.)

11          THE COURT:  All right.  We have a note.  It says, "Jury

12  deliberations done."  File that.

13          THE DEPUTY CLERK:  Yes, sir.

14          THE COURT:  Bring the jury in.

15          (Jury present.)

16          THE COURT:  All right.  Let's be seated.

17          Thank you, ladies and gentlemen.  I received a note

18  from the forelady indicating that the deliberations were

19  completed, and I assume you've reached a verdict.  Is that

20  right, madam foreperson?

21          THE FOREPERSON:  We have, Your Honor.

22          THE COURT:  All right.  What we're going to do first,

23  we're going to call roll for all 12 persons and then the clerk

24  will take the verdict.

25          All right, madam clerk, let's call the roll first.

1          THE DEPUTY CLERK:  We are here to receive the verdict

2    in criminal number AW-09-048, United States of America v. Lloyd

3    Mack Royal, III.

4          Members of the jury, will you please answer present

5    when I call your juror number.

6          (Roll called; all 12 jurors present.)

7          THE DEPUTY CLERK:  Members of the jury, have you agreed

8    on your verdict?

9          THE JURY:  We have.

10         THE DEPUTY CLERK:  Who shall speak for you?

11         THE FOREPERSON:  I shall.

12         THE DEPUTY CLERK:  Madam foreperson, please rise.

13         Has the verdict form, including the special

14   interrogatories which were submitted to the jury, been answered?

15         THE FOREPERSON:  Yes.

16         THE DEPUTY CLERK:  Is the form signed and dated by you?

17         THE FOREPERSON:  It is.

18         THE DEPUTY CLERK:  As I read the questions, please

19   provide the answers.

20         Count One, No. 1, how do you find the defendant, Lloyd

21   Mack Royal, III, as to Count One, conspiracy to commit sex

22   trafficking?

23         THE FOREPERSON:  Guilty.

24         THE DEPUTY CLERK:  No. 2, how do you find the

25   defendant, Lloyd Mack Royal, III, as to Count Two, sex

1  trafficking?

2  THE FOREPERSON:  Guilty.

3  THE DEPUTY CLERK:  If you find the defendant guilty of

4  Count Two, please answer the following questions.

5  No. 3a, if you find the defendant guilty of Count Two,

6  do you find that this offense was effected by force, fraud or

7  coercion or do you find the defendant knew that M.P. was under

8  the age of 18 --

9  THE COURT:  Hold on.  Let's go back to 3a and get an

10  answer for 3a.

11  THE FOREPERSON:  No.  Well, we checked the third

12  option.

13  THE COURT:  Which one?

14  THE FOREPERSON:  We checked the third option.

15  THE DEPUTY CLERK:  We needed to read all three, Your

16  Honor.

17  THE COURT:  What's that?

18  THE DEPUTY CLERK:  We should have read all three.

19  THE COURT:  All right.  Go ahead.

20  THE DEPUTY CLERK:  I'm on No. 2, okay.  Do you find the

21  defendant knew that M.P. was under the age of 18 years, or,

22  both, c?

23  THE FOREPERSON:  Both, yes.

24  THE COURT:  All right.

25  THE DEPUTY CLERK:  No. 4, how do you find the

1  defendant, Lloyd Mack Royal, III, as to Count Three, sex

2  trafficking?

3            THE FOREPERSON:  Guilty.

4            THE DEPUTY CLERK:  If you find the defendant guilty of

5  Count Three, please answer the following question.

6            5a, if you found the defendant guilty of Count Three,

7  do you find that this offense was effected by force, fraud or

8  coercion, or do you find the defendant knew that S.T. was under

9  the age of 18 years, or both?

10           THE FOREPERSON:  Both, yes.

11           THE DEPUTY CLERK:  No. 6, how do you find the

12 defendant, Lloyd Mack Royal, III, as the Count Four, sex

13 trafficking?

14           THE FOREPERSON:  Guilty.

15           THE DEPUTY CLERK:  If you find the defendant guilty of

16 Count Four, please answer the following question.

17           No. 7a, if you found the defendant guilty of Count

18 Four, do you find that this offense was effected by force, fraud

19 or coercion, or, b, do you find the defendant knew that I.L. was

20 under the age of 18 years, or c, both?

21           THE FOREPERSON:  Both, yes.

22           THE DEPUTY CLERK:  No. 8, how do you find the

23 defendant, Lloyd Mack Royal, III, as to Count Five, possession

24 of a firearm in furtherance of a crime of violence?

25           THE FOREPERSON:  Guilty.

1      THE DEPUTY CLERK:  If you find the defendant guilty of
2 Count Five, please answer the following question.
3      No. 9a, if you found the defendant guilty of Count
4 Five, do you find that the defendant possessed the firearm in
5 furtherance of a crime of violence, or b, if you have found the
6 defendant guilty of Count Five, do you find that the defendant
7 used or carried a firearm during and in relation to a crime of
8 violence, or c, both?
9      THE FOREPERSON:  Both, yes.
10      THE DEPUTY CLERK:  No. 10, if you find a firearm was
11 used or carried in this count, do you also find that it was
12 brandished?
13      THE FOREPERSON:  Yes.
14      THE DEPUTY CLERK:  No. 11, how do you find the
15 defendant, Lloyd Mack Royal, III, as to Count Six, conspiracy to
16 distribute controlled substances?
17      THE FOREPERSON:  Guilty.
18      THE DEPUTY CLERK:  If you find the defendant guilty of
19 Count Six, please answer the follows question.
20      No. 12, if you find the defendant guilty as to Count
21 Six, how do you find as to the type of controlled substance
22 involved, marijuana, cocaine --
23      THE FOREPERSON:  Yes.
24      THE DEPUTY CLERK:  Cocaine?
25      THE FOREPERSON:  Yes.

1        THE DEPUTY CLERK:  Phencyclidine?

2        THE FOREPERSON:  No.

3        THE DEPUTY CLERK:  13, how do you find the defendant,

4   Lloyd Mack Royal, III, as to Count Seven, distribution of

5   controlled substance, cocaine, to a person under the age of 21,

6   S.T.?

7        THE FOREPERSON:  Guilty.

8        THE DEPUTY CLERK:  No. 14, how do you find the

9   defendant, Lloyd Mack Royal, III, as to Count Eight,

10  distribution of controlled substance, PCP, to a person under the

11  age of 21, M.P.?

12       THE FOREPERSON:  Guilty.

13       THE COURT:  All right.  Now, ladies and gentlemen,

14  we're going to poll the jury to make sure that each of the 12

15  agree with this.  So we'll ask you individually.

16       All right.  Poll them.

17       THE DEPUTY CLERK:  Juror No. 1, please rise.  Having

18  delivered the verdict of the jury, is that your verdict also?

19       THE FOREPERSON:  Yes.

20       THE DEPUTY CLERK:  Thank you.  You may be seated.

21       Juror No. 2, please rise.  Having heard the verdict of

22  your foreperson, is that your verdict also?

23       JUROR NO. 2:  Yes.

24       THE DEPUTY CLERK:  Thank you.

25       Juror No. 3, please rise.  Having heard the verdict of

1  your foreperson, is that your verdict also?

2           JUROR NO. 3:  Yes.

3           THE DEPUTY CLERK:  Thank you.

4           Juror No. 4, please rise.  Having heard the verdict of

5  your foreperson, is that your verdict also?

6           JUROR NO. 4:  Yes.

7           THE DEPUTY CLERK:  Thank you.

8           Juror No. 5, please rise.  Having heard the verdict of

9  your foreperson, is that your verdict also?

10          JUROR NO. 5:  Yes.

11          THE DEPUTY CLERK:  Thank you.

12          Juror No. 6, please rise.  Having heard the verdict of

13 your foreperson, is that your verdict also?

14          JUROR NO. 6:  Yes.

15          THE DEPUTY CLERK:  Thank you.

16          Juror No. 7, please rise.  Having heard the verdict of

17 your foreperson, is that your verdict also?

18          JUROR NO. 7:  Yes.

19          THE DEPUTY CLERK:  Thank you.

20          Juror No. 8, please rise.  Having heard the verdict of

21 your foreperson, is that your verdict also?

22          JUROR NO. 8:  Yes.

23          THE DEPUTY CLERK:  Thank you.

24          Juror No. 9, please rise.  Having heard the verdict of

25 your foreperson, is that your verdict also?

1          JUROR NO. 9:  Yes.

2          THE DEPUTY CLERK:  Thank you.

3          Juror No. 10, please rise.  Having heard the verdict of

4     your foreperson, is that your verdict also?

5          JUROR NO. 10:  Yes.

6          THE DEPUTY CLERK:  Thank you.

7          Juror No. 11, please rise.  Having heard the verdict of

8     your foreperson, is that your verdict also?

9          JUROR NO. 11:  Yes.

10         THE DEPUTY CLERK:  Thank you.

11         Juror No. 12, please rise.  Having heard the verdict of

12    your foreperson, is that your verdict also?

13         JUROR NO. 12:  Yes.

14         THE DEPUTY CLERK:  Members of the jury, you have heard

15    the verdict and answers thereto as delivered by your foreperson,

16    and they have been recorded, and do you each agree?

17         THE JURY:  Yes.

18         THE DEPUTY CLERK:  Verdict recorded.

19         THE COURT:  All right, ladies and gentlemen.  You've

20    done your job as jurors, and that's all that the parties have

21    asked.  You were sworn to look at the case, evaluate it and make

22    judgments.  These are difficult cases over here often and we

23    really can't really achieve justice unless we have people of

24    various walks of life collectively use your wisdom to reach a

25    decision.  You've done that.  I appreciate it.  The lawyers

1   appreciate it.  I will have other cases with these lawyers.

2   These are veteran lawyers.  So they appreciate what you've done.

3       We do have a rule in the federal system that they are

4   not able to speak with you.  And so, we'll honor that rule here.

5       I will come back in just a minute and thank you again

6   and if you have any concerns you'd like me to bring to their

7   attention, you can do that at that time.

8       So, you are discharged and I thank you again.  And,

9   mister marshal, I'll be back in in a couple of minutes just to

10  thank them personally.

11      (Jury discharged.)

12      THE COURT:  Why don't we be seated just for a second.

13      We'll order a presentence report and we'll set the

14  sentencing here for June 7.  How is that?

15      MS. MAGNELLI:  Your Honor, I've spoken with defense

16  counsel and, given some other things coming up, if we could have

17  the sentencing date at the end of April, if that would be at all

18  possible.  I know Mr. Trainor is in agreement with that.

19      THE COURT:  You want an expedited?

20      MS. MAGNELLI:  Yes, please, Your Honor.

21      THE COURT:  Well, we'll see what we can do.  The end of

22  April?

23      MS. MAGNELLI:  Yes, please, Your Honor.

24      MR. TRAINOR:  I was asked to accommodate the

25  prosecution on that.  I can tell the court on June 7th I'll be

1  in trial here with you.

2         THE COURT:  All right.  What we'll try to do, we'll try

3  to get an expedited sentencing, if we can.  If we can't, we'll

4  let you know.  I know you have some other matters you've go to

5  tend to.

6         So, madam clerk, let's try to do an expedited

7  sentencing for the end of April because -- what do you have,

8  look at the very end.  Can you do it all the way to the end?

9         MS. MAGNELLI:  The only dates I'm unavailable are the

10  28th and 30th.  Other than that, I'm wide open.

11         MR. TRAINOR:  I have that entire week open right now.

12         THE COURT:  29th?

13         MS. MAGNELLI:  That's fine for the government.

14         MR. TRAINOR:  That works.

15         THE DEPUTY CLERK:  9:30.

16         MS. MAGNELLI:  I'm sorry?

17         THE DEPUTY CLERK:  9:30.

18         THE COURT:  All right.  We'll try to do that and if we

19  can't, we'll let you know.

20         Mr. Royal, we'll see you back here on April 29th at

21  9:30 before me.

22         MR. TRAINOR:  Could I have just a moment?

23         THE COURT:  Yes.

24         MR. TRAINOR:  Thank you, Your Honor.

25         THE COURT:  All right.  We'll see you back here on the

1  29th of April.

2           (Proceedings adjourned at 6 o'clock p.m.)

3                    CERTIFICATE OF REPORTER

4           I hereby certify that the foregoing is a true and

5  accurate transcript of proceedings in the above-entitled matter,

6  to the best of my knowledge and ability.

7

8

9  _____/s/_____

                  Gloria I. Williams
10                Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25